```
             UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF NORTH CAROLINA
                   ASHEVILLE DIVISION


UNITED STATES OF AMERICA,

            Plaintiff,

vs.
                                No. 1:19-CR-5-MR-WCM
JOSEPH JUMPER,

            Defendant.
_____/




             TRANSCRIPT OF MOTION TO SUPPRESS
           Held before JUDGE W. CARLETON METCALF
                   August 6th, 2019



    APPEARANCES:

    For the Government:
    JUSTIN EASON, ESQUIRE
    Assistant United States Attorney
    100 Otis Street, Suite 233
    Asheville, North Carolina 28801

    For the Defendant:
    FREDILYN SISON, ESQUIRE
    JARED MARTIN, ESQUIRE
    Assistant Federal Public Defenders
    1 Page Avenue, Suite 210
    Asheville, North Carolina 28801

    ALSO PRESENT:
    Joseph Jumper


    Court Reporter:  Beverly Bourlier James, RPR
    Stenograph with Computer Aided Transcription
```

# E X A M I N A T I O N

|  | Page |
|---|---|
| JASON CABLE | |
| DIRECT EXAMINATION................................ BY MR. EASON | 8 |
| CROSS EXAMINATION................................ BY MS. SISON | 25 |
| REDIRECT EXAMINATION............................ BY MR. EASON | 64 |
| MARY LAMBERT | |
| DIRECT EXAMINATION................................ BY MR. EASON | 66 |
| CROSS EXAMINATION................................ BY MS. SISON | 77 |
| REDIRECT EXAMINATION............................ BY MR. EASON | 91 |
| DANIEL IADONISI | |
| DIRECT EXAMINATION................................ BY MR. EASON | 92 |
| CROSS EXAMINATION................................ BY MS. SISON | 110 |
| REDIRECT EXAMINATION  ........................ BY MR. EASON | 126 |
| RICHARD LEO, PhD, JD | |
| DIRECT EXAMINATION ........................... BY MS. SISON | 130 |
| CROSS EXAMINATION  ........................... BY MR. EASON | 187 |
| REDIRECT EXAMINATION  ........................ BY MS. SISON | 208 |

# E X H I B I T S

| Government's Exhibit 1...... | in Evidence......... | 6 |
|---|---|---|
| Government's Exhibit 2...... | in Evidence......... | 6 |
| Government's Exhibit 3...... | in Evidence......... | 16 |

1          THE COURT:  Good morning, counsel.

2          MS. SISON:  Good morning, your Honor.

3          MR. EASON:  Good morning, your Honor.

4          THE COURT:  The Court will call the case of the

5    United States versus Joseph Jumper.  This is 1:19-CR-5.

6    This matter is before the Court this morning for an

7    evidentiary hearing on the Defendant's motion to suppress.

8          There are some preliminary issues that need to

9    be addressed before we begin the evidence and I'm going to

10   go through those now.  The first preliminary issue that I

11   see pertains to the parties' filings.  Mr. Eason, I see

12   that the Government has filed a document there in the case

13   which appears to be the rights form, that's document

14   number 19-1, filed on May the 31st.  That document appears

15   to have the Defendant's Social Security number on that.

16         MR. EASON:  Yes, your Honor, I apologize.

17   That's a redaction that should have been made on my part.

18         THE COURT:  So if you will file a redacted copy

19   of that document.

20         And then with respect to the Defendant's

21   filings, Ms. Sison, I see that the Defendant has filed

22   document number 23-4 on July the 8th, 2019, which document

23   would appear to me to be a transcription of the interview

24   of the Defendant.  And that document includes references

25   to minors as well as third parties.  That document, it

1       appears to me, is not filed under seal.  I was a little

2       surprised to see that going in the record.  It would

3       appear to me that that document should be sealed.

4               Mr. Eason, does the Government have a position

5       in that regard?

6               MR. EASON:  That maybe sealing would be the most

7       appropriate way.

8               THE COURT:  Any objection to that?

9               MS. SISON:  No, that would be fine, your Honor.

10              THE COURT:  All right.  So ordered.

11              The next preliminary issue pertains to the

12      victim in this case.  Mr. Eason, has the alleged victim or

13      her parent or guardian been notified of this hearing and

14      accord the rights set forth in the Crime Victims' Rights

15      Act?

16              MR. EASON:  They have and they are present.

17              THE COURT:  How much time does the Government

18      expect to need for its evidentiary presentation,

19      Mr. Eason?

20              MR. EASON:  For its evidence, your Honor,

21      pending some stipulations that we hope the Court will

22      accept, we anticipate three agents.  I would hope we can

23      finish up before 11:00 with all of their evidence.

24              THE COURT:  Ms. Sison, how long do you expect

25      the Defense evidence to be?

1          MS. SISON:  Probably an hour to hour and a half.

2          THE COURT:  For planning purposes on my part,

3     I'll let you put on all the evidence you need to put on.

4          Will there be any further preliminary issues

5     that need to be addressed before we begin the evidence,

6     anything from the Government, Mr. Eason?

7          MR. EASON:  Your Honor, there have been items

8     introduced previously through filings, specifically, the

9     transcript which your Honor referenced earlier and a video

10    of the interview in question.  At this time, I would ask

11    the Court to just adopt those by stipulation and admit

12    them into the record so that they can be considered by

13    your Honor for the purposes of this hearing.

14         THE COURT:  Do you agree with that, Ms. Sison?

15         MS. SISON:  Yes, your Honor.

16         THE COURT:  I have not seen the video.  I have

17    not seen a copy of that document.

18         MS. SISON:  I think that was presented to the

19    Court a while back at the same time that we filed -- and I

20    believe that there was a notice that I had received

21    notifying Mr. Eason that I have provided you a hard copy

22    of it.

23         THE COURT:  We will check on that to make sure.

24         MS. SISON:  Yes.  So that's what it was, your

25    Honor, I think that was with the -- I'm trying to remember

1    if it was with the motion or with the reply.

2              THE COURT:  Which party will be submitting the

3    transcript and the video?

4              MR. EASON:  Your Honor, I've asked them to be

5    Government's exhibits.

6              MS. SISON:  We do have a correction with the

7    transcript.  So if we can just let the Court know where

8    those corrections are, it's just the party's name, it's

9    not the substance of the -- what was said.

10             But on page 3 of the transcript, on line 24,

11   that should be Officer Cable, not Mr. Jumper.

12             And then on page 35, on line 23, instead of

13   Detective Cable, it should be Detective Iadonisi.

14             THE COURT:  Let me make sure I got that.  So

15   page 3, line 24 should be Officer Cable and not the

16   Defendant.  And did you say page 35, line 23?

17             MS. SISON:  That's correct, your Honor.

18             MR. EASON:  Should be Detective Iadonisi, not

19   Detective Cable.

20             THE COURT:  I'll make a note of that.

21             MR. EASON:  Going back, it appears that the

22   video was received in chambers May 6th and there was an

23   email sent to confirm that.

24             THE COURT:  All right.  Thank you.

25             We will confirm that the subject to confirmation

1      exhibit -- the Government's Exhibit 1 and 2, that would be

2      the video would be Exhibit 1 and the transcript will be

3      Exhibit 2 as now corrected on the record, will be accepted

4      and admitted.

5             (Government's Exhibit 1 was admitted in

6  Evidence.)

7             (Government's Exhibit 2 was admitted in

8  Evidence.)

9             THE COURT:  Will there be anything further to

10     address preliminarily here before we begin the evidence?

11           MS. SISON:  Mr. Eason and I spoke about our

12     expert Dr. Richard Leo who is present.  I do have his CV,

13     but it was also attached to the reply.  The Government is

14     not objecting to our use of him as an expert, although I

15     would let the Court know I will discuss his qualifications

16     for the appellate record.

17           THE COURT:  All right.  Is there any question

18     before the Court at this time or you just letting me know

19     that that's coming, Ms. Sison?

20           MS. SISON:  Yes, your Honor.

21           THE COURT:  I'll take that issue as necessary

22     when we get into the evidence.

23           Anything further preliminarily before we begin

24     the evidentiary presentation from either side?

25           MS. SISON:  Your Honor, I would just ask that

```
1        the witnesses be sequestered with the exception of our
2        expert witness because he is here to discuss the testimony
3        and also the video and the transcript.
4                   THE COURT:  Mr. Eason, what says the Government?
5                   MR. EASON:  We don't object to sequestration,
6        your Honor.
7                   THE COURT:  Will you have a case agent or a
8        representative of the Government?
9                   MR. EASON:  No, your Honor.
10                  THE COURT:  All right.  That request will be
11       allowed and the Government's witnesses will be
12       sequestered.  And, Mr. Eason, I take your statement there
13       to mean also you do not object to the Defendant's expert
14       being present in the courtroom?
15                  MR. EASON:  No, your Honor.
16                  THE COURT:  Thank you.
17                  Anything further that needs to be addressed
18       before we begin the evidence?
19                  MS. SISON:  Your Honor, I wasn't sure if you
20       knew co-counsel here Jared Martin, but I just wanted to
21       introduce he's sitting at counsel table.
22                  THE COURT:  Mr. Martin, welcome.
23                  MR. MARTIN:  Thank you, your Honor.
24                  THE COURT:  All right, Mr. Eason, the Government
25       can begin its evidence.
```

1          MR. EASON:  Thank you, your Honor.

2          The first witness for the Government will be

3     Jason Cable.

4          THE COURT:  Please come around to be sworn.

5     THEREUPON:

6                    JASON CABLE

7     called as a witness on behalf of the Government herein, duly

8     sworn and responding "I do," was examined and testified as

9     follows:

10         THE COURT:  Mr. Eason, before you begin

11     questioning Mr. Cable, have all your witnesses now left

12     the courtroom?

13         MR. EASON:  Yes, your Honor.  I don't anticipate

14     calling anyone that remains in the courtroom.

15         THE COURT:  Thank you, sir.  You may proceed.

16                 DIRECT EXAMINATION

17     BY MR. EASON:

18     **Q.**     Good morning.  If you would please state your

19     name and spell it for the court reporter.

20     **A.**     Jason David Cable, J-A-S-O-N D-A-V-I-D

21     C-A-B-L-E.

22     **Q.**     How are you employed, sir?

23     **A.**     I'm employed with the Cherokee Indian Police

24     Department.

25     **Q.**     How long have you been with the Cherokee Indian

1      Police Department?

2          **A.**      Since March of 2008.

3          **Q.**      And do you have any other previous law

4      enforcement experience prior to that?

5          **A.**      Yes.  I was employed with the Graham County

6      Sheriff's Office for four years and almost a year for Swain

7      County Sheriff's Office.

8          **Q.**      What position do you currently hold with the

9      Cherokee Indian Police Department?

10          **A.**      I'm a criminal investigator with the

11      investigations division.

12          **Q.**      How did you become aware of this case, this

13      Defendant, Joseph Jumper?

14          **A.**      At the time, Sergeant Mary Lambert, she was the

15      acting interim for the lieutenant over the investigations

16      division, she requested that I assist in attempting to

17      locate the individual in question and bring him to the

18      police department.

19          **Q.**      And were you able to locate Mr. Jumper?

20          **A.**      Yes, sir.

21          **Q.**      Could you tell the Court a little bit about how

22      that happened?

23          **A.**      On the day in question, myself and Detective

24      Daniel Iadonisi, last name is I-A-D-O-N-I-S-I, myself and

25      Detective Daniel Iadonisi, we met Lieutenant Eric Oswalt in

1    the Snowbird Community, which is in Graham County, and

2    Lieutenant Oswalt escorted us to a known location in which

3    Mr. Jumper was supposed to reside.

4    **Q.**    Now, when you say "the day in question," is that

5    the same date as the interview, August 29, 2018?

6    **A.**    That's correct.

7    **Q.**    Do you recall about what time of the day it was

8    when you guys went to seek out Mr. Jumper?

9    **A.**    It was in the afternoon hours.  I think it was

10    around maybe 4:00 p.m., somewhere along there.

11    **Q.**    And for those who might not be familiar with

12    Snowbird Community, where is that located?

13    **A.**    It's in Graham County.  The town is

14    Robbinsville, North Carolina.

15    **Q.**    And is that located on the Eastern Band of

16    Cherokee Indians, within the confines of the reservation?

17    **A.**    Yes.  There is reservation land in Graham County

18    as well.

19    **Q.**    So were you guys able to locate Mr. Jumper

20    there?

21    **A.**    We wasn't -- we went to a residence which was

22    stated to be his residence in which no one -- we knocked on

23    the residence and no one would come to the door.  Some

24    additional patrol units that works with the Cherokee Indian

25    Police Department, they was assisting as well, and Officers

1       Dewitt Chicawily (phonetic) and Hannah Mathieson, I think

2       that's her last name, they located Mr. Jumper at a nearby

3       residence.

4           **Q.**     Did you make contact with Mr. Jumper there?

5           **A.**     Yes.

6           **Q.**     What did you say you wanted to do with

7       Mr. Jumper at that time?

8           **A.**     We asked Mr. Jumper if he would come to the

9       Cherokee Indian Police Department in reference to an

10      investigation that was ongoing and that we needed to speak

11      with him to ask him some questions about.

12          **Q.**     Was he placed under arrest at that time?

13          **A.**     No, he was not.

14          **Q.**     Was he placed in handcuffs at that time?

15          **A.**     No, he was not.

16          **Q.**     Did Mr. Jumper agree to go with you, accompany

17      you to the Cherokee Indian Police Department?

18          **A.**     Yes, he did.

19          **Q.**     Approximately how far away is the Cherokee

20      Indian Police Department from the Snowbird Community?

21          **A.**     It's at least an hour drive from where we was at

22      to the police department.

23          **Q.**     Once you arrived at the Cherokee Indian Police

24      Department, what did you do with Mr. Jumper?

25          **A.**     Mr. Jumper was placed in one of our two recorded

1  interview rooms.  He was brought in and set down.  He was

2  not handcuffed at that time and he was allowed his cell

3  phone.  And we seated him inside the room and started the

4  recording and then we started -- proceeded to interview

5  Mr. Jumper.

6      Q.      Tell me a little bit about that environment.

7  How long is the room?

8      A.      I'm just estimating, maybe 15-foot by 8 feet,

9  somewhere along there.

10     Q.      Are there video cameras recording what's going

11  on in the interview?

12     A.      Yes, sir, it is.

13     Q.      What's the purpose of those video cameras?

14     A.      To document everything that is said and view.

15     Q.      Does the interview room door lock?

16     A.      No, it does not.

17     Q.      So it's not a locked door?

18     A.      No, it is not locked.

19     Q.      To get into the Cherokee Indian Police

20  Department, do you have to proceed through a secure door?

21     A.      Except for the main entrance, during normal

22  business hours, those doors are opened, but we brought

23  Mr. Jumper through the back of the police department, which

24  requires a security card.

25     Q.      Does it require a security card to exit?

A.      No, it does not.

Q.      So Mr. Jumper was permitted to retain his cell
phone during the course of the interview?

A.      That's correct.

Q.      And is there free wi-fi within the police
department and the courthouse?

A.      Yes, there is.

Q.      Were you present for the entirety of the
interview of the Defendant?

A.      I wasn't in the room for the entirety of the
interview, but I was present there at the police department.

Q.      So you weren't in the room interviewing him the
entire time, but you were at the police department?

A.      Yes.

Q.      Were you able to observe the entirety of the
interview?

A.      Yes.

Q.      Who was with you when you began the interview
with the Defendant?

A.      Initially, the interview was -- began with
myself and Detective Daniel Iadonisi.

Q.      Prior to asking the Defendant any questions, did
you make him aware of his rights under Miranda?

A.      Yes.  Detective Daniel Iadonisi read him his
Miranda rights and he was also given a copy.

1           MR. EASON:  If I may approach, your Honor.

2           THE COURT:  You may.

3    BY MR. EASON:

4       Q.      Showing you what I've marked for this hearing as

5    Government's Exhibit Number 3.  Can you identify that

6    document for the Court, please?

7       A.      That is the Cherokee Indian Police Department

8    Criminal Investigations Division, it was the rights form.

9       Q.      And what is the purpose of this document?

10      A.      This is to advise the people being questioning,

11   as far as who are being interviewed, their Fifth Amendment

12   rights.

13      Q.      And also their Sixth Amendment rights about an

14   attorney, is that correct?

15      A.      That's correct.

16      Q.      Now, how do you make sure that a Defendant

17   understands these rights?

18      A.      We read each sentence off, and if they

19   understand that right, they will initial by each sentence.

20   And also there is a waiver of rights at the bottom, which if

21   they have any -- if they wish to speak with us, they sign

22   that and it is witnessed.

23      Q.      If it's not -- if a person doesn't sign each of

24   those boxes indicating that they understand their rights, do

25   you proceed to interview them?

     A.      As long as they don't request an attorney.  I
mean, they can refuse to initial these, but until they
verbally request an attorney, then we can still continue the
interview.

     Q.      What if they verbally request to terminate the
interview?

     A.      The interview is terminated.

     Q.      This particular rights form, who filled out this
information at the top?

     A.      The top portion of it is the place, the date and
the time, I filled out that information.  I also
witnessed -- I was a witness as far as the Miranda rights
being read to Mr. Jumper and I also filled out the address
in which he resided at.

     Q.      On this form, did Mr. Jumper indicate that he
understood each of the rights afforded to him?

     A.      Yes, he did.

     Q.      Did he sign that he wished to speak with you
without an attorney present?

     A.      Yes, he did.

     Q.      Did you -- did he sign it in your presence?

     A.      Yes.

     Q.      Is that his signature there?

     A.      Yes.

     Q.      Is that your signature below?

1        **A.**      That is mine, yes.

2        MR. EASON:  Your Honor, at this time, I'd move

3  to admit Government's Exhibit 3.

4        THE COURT:  Any objection, Ms. Sison?

5        MS. SISON:  No, your Honor.

6        THE COURT:  So admitted.

7        (Government's Exhibit 3 was admitted in

8  Evidence.)

9  BY MR. EASON:

10       **Q.**      After you advised the Defendant of his rights --

11  well, pardon me.  While you were going over those rights, do

12  you remember if the Defendant had any questions or asked for

13  any specific clarifications as to any of those points?

14       **A.**      No.

15       **Q.**      As you were speaking to him, did the Defendant

16  give you any impression that he wasn't understanding what

17  you were saying?

18       **A.**      No.  Whenever he was questioned, he answered

19  with clear and direct answers.

20       **Q.**      When you brought him in, how was he dressed?

21       **A.**      He had a T-shirt on, some shorts and I think

22  some tennis shoes.

23       **Q.**      Was that appropriate for the weather on

24  August 29, 2018?

25       **A.**      Sure, yes.

1     **Q.**     When you began asking the Defendant questions,

2     again, was there anything about his responses that gave you

3     pause or make you concerned that he understand what --

4     didn't understand what was going on?

5     **A.**     No.

6     **Q.**     Did the Defendant tell you of any disease or

7     defect, mental or otherwise, that might hinder his ability

8     to understand the proceedings?

9     **A.**     No.  I mean, he was very coherent and alert, and

10     he answered his questions very clear and direct.

11     **Q.**     During the course of the interview that you were

12     in there with him, how was he behaving?

13     **A.**     He was -- his behavior was normal.  There was

14     nothing that stood out in my opinion that something was

15     wrong or anything like that.

16     **Q.**     Was he yelling, screaming or crying or anything

17     like that?

18     **A.**     No.

19     **Q.**     Was he sweating abnormally or pacing?

20     **A.**     No.

21     **Q.**     During the time period where you were with the

22     Defendant and where you were observing the interview of the

23     Defendant, did Mr. Jumper ever indicate that he wanted to

24     stop the interview?

25     **A.**     No, he did not.

1          **Q.**      Did he ever indicate during the course of the

2     interview or -- that you were present or that you were

3     watching that he wanted an attorney --

4          **A.**      No.

5          **Q.**      -- or wanted to wait for one?

6          **A.**      He did not request one, no.

7          **Q.**      Did the Defendant ever tell the officers

8     present, you or anybody else, that he felt uncomfortable or

9     threatened by your presence?

10         **A.**      No.

11         **Q.**      Or your behavior?

12         **A.**      No.

13         **Q.**      Did the Defendant ever ask you to clarify or

14    tell you he was confused by what you were asking?

15         **A.**      No, he did not.

16         **Q.**      Approximately how long did this interview last?

17         **A.**      There was a number of breaks in the interview in

18    which Mr. Jumper was left by himself inside the interview

19    room, however, the interview was recorded and documented in

20    its entirety through video and audio.

21         **Q.**      About how long was that entire recording?

22         **A.**      The entire recording is about three hours long.

23         **Q.**      During that entire 3-hour period did the

24    Defendant have access to his telephone?

25         **A.**      Yes, the whole time.

1      **Q.**      Did the Defendant ever ask any of the officers

2   present to speak to anyone outside of the interview room or

3   make a telephone call?

4      **A.**      Not while I was there, no.

5      **Q.**      Did he do that while you were observing him on

6   the --

7      **A.**      Not that I seen, no.

8      **Q.**      Did the Defendant ever ask to use the restroom

9   or otherwise take breaks during this interview?

10     **A.**      I know Mr. Jumper was offered a number of times

11  by the officers, the other detectives that were speaking

12  with him, if he needed to use the restroom and also if he

13  wanted anything to drink, and there was a time in which he

14  was provided with water to drink and he was given a bathroom

15  break.

16     **Q.**      Were you armed during this interview, were you

17  wearing your sidearm?

18     **A.**      I think so.  I'm pretty -- I usually do.

19     **Q.**      At any time, did you draw any type of attention

20  to your firearm?

21     **A.**      No.

22     **Q.**      Did you ever take your firearm out and reference

23  it in any way?

24     **A.**      No.

25     **Q.**      Did you or anyone that you saw ever point a

1    firearm at the Defendant?

2         **A.**     No, sir.

3         **Q.**     Did the Defendant initially admit or deny --

4    well, what did you tell the Defendant about why he was

5    there?

6         **A.**     When we initially picked him up, we stated that

7    we needed to speak with him and he referenced his

8    girlfriend, that he thought that was what we wanted to speak

9    with him about.

10            Once we got to the police department, I know

11   myself, I asked him a question regarding, you know, when we

12   first approached him that -- and told him we needed to speak

13   with him, Mr. Jumper referenced his girlfriend and then he

14   also willingly stated that he was -- he had heard he was

15   being accused of molesting his girlfriend's daughter.

16        **Q.**     So that's what he indicated was the reason he

17   thought y'all wanted to talk to him?

18        **A.**     Yes.

19        **Q.**     And what did you tell him with regards to that?

20        **A.**     I confirmed that there had been allegations made

21   of inappropriate contact with the girlfriend's daughter.

22        **Q.**     To your knowledge at that point, did there exist

23   warrants for the Defendant's arrest?

24        **A.**     There had been warrants issued prior to

25   Mr. Jumper being picked up, yes.

1     **Q.**     Was he served with those warrants when he was

2     picked up?

3     **A.**     No, he was not.

4     **Q.**     Was he served with those warrants when he was

5     brought to the police department before the interview began?

6     **A.**     No, it wasn't until after the interview was

7     completed.

8     **Q.**     Approximately how long did you spend with the

9     Defendant in the interview room that night?

10     **A.**     Without looking minute for minute on the video,

11     I'm going to estimate that I was probably in there with him

12     maybe an hour total.

13     **Q.**     Who else was present during the interview

14     process, to your knowledge?

15     **A.**     Myself, Detective Daniel Iadonisi and Detective

16     Mary Lambert.

17     **Q.**     When you weren't present in the interview room,

18     you were observed on the video monitors?

19     **A.**     That's correct.

20     **Q.**     Did you ever make any promises, explicit or

21     otherwise, to the Defendant regarding what would happen if

22     he spoke to you in that case?

23     **A.**     No, I did not.

24     **Q.**     At any time, did you observe anybody threaten

25     the Defendant?

1      **A.**      No, I did not.

2      **Q.**      Did you observe anybody threaten the Defendant's

3   family or even his girlfriend or her family?

4      **A.**      No, I did not.

5      **Q.**      Initially, the Defendant denied allegations, is

6   that correct?

7      **A.**      That is correct.

8      **Q.**      Approximately when -- approximately how long

9   into the interview did he begin to confess to inappropriate

10  sexual contact with the minor child in question?

11     **A.**      I know I had already -- I had stepped out of the

12  room and Detective Daniel Iadonisi and Detective Mary

13  Lambert had initiated questioning with Mr. Jumper, and after

14  Detective Mary Lambert had stepped out was whenever

15  Mr. Jumper had made a confession that -- of the incident.

16     **Q.**      And when Mr. Lambert -- or when Detective

17  Lambert stepped out, Mr. Jumper began to make those types of

18  statements, how did -- did his -- pardon me.

19                 When he was making those statements, did

20  Mr. Jumper express guilt or contrition for his behavior at

21  all?

22                 MS. SISON:  Objection, leading.

23                 THE COURT:  Overruled.

24                 THE WITNESS:  Could you ask that one more time?

25    I'm sorry.

1    BY MR. EASON:

2        Q.    Did the Defendant, as he was making these

3    statements, express any guilt or feelings of remorse for his

4    behavior?

5        A.    He was -- he was the same as far as his

6    demeanor, the same the whole time through the whole

7    interview, in my opinion.

8        Q.    At the moment when he moved from denial to

9    admission, did you see any substantial change in his

10   appearance or demeanor?

11       A.    Not in my opinion, no.

12       Q.    He wasn't crying?

13       A.    No, he was not.

14       Q.    Was he giving any visible outward signs of

15   intense duress?

16       A.    No.

17       Q.    So, if the entirety of the interview lasted --

18   or if the entire video runs for approximately three hours --

19   the video runs for approximately three hours, is that

20   correct?

21       A.    That's including the breaks.  That's the

22   entirety of it from the time he's -- we get there to the PD

23   to the time he's taken out of the interview room.

24       Q.    In the time between moving him from denials to

25   admission, how long would you say that took as far as

1    questioning?

2         A.      It would have been in the -- within the first

3    two hours.

4              MR. EASON:  If I may have just a moment, your

5      Honor.

6              THE COURT:  You may.

7    BY MR. EASON:

8         Q.      Approximately how long had the Defendant been in

9    the interview room with you and the other officers prior to

10   executing the waiver of his Miranda rights?

11        A.      As soon as we brought him into the interview

12   room, within the first five minutes.  When we come into the

13   room and started speaking with him.

14        Q.      It was one of the first things you did, in fact,

15   sitting down, isn't it?

16        A.      Correct.

17        Q.      Did the Defendant ever tell you if he'd been

18   drinking heavily that day or taken any controlled

19   substances?

20        A.      No, he did not.

21        Q.      Did you observe the odor of alcohol about his

22   person or any signs consistent with impairment on any type

23   of substance?

24        A.      No, I did not.

25        Q.      Are you at all familiar with the Defendant, do

1      you know him or anything like that?

2           A.      No.  I think this was my first time actually

3      meeting Mr. Jumper.

4           Q.      During the course of the interview, did you or

5      anyone else actually raise their voice at the Defendant?

6           A.      Not that I'm aware of, no.

7                   MR. EASON:  Those would be my questions for this

8        witness, your Honor.

9                   THE COURT:  Ms. Sison, would you have cross

10       examination?

11                  MS. SISON:  Thank you, sir.

12                         CROSS EXAMINATION

13     BY MS. SISON:

14          Q.      Prior to going to Mr. Jumper's house, there was

15     already an arrest warrant, is that right?

16          A.      Yes, ma'am.

17          Q.      Did you see that prior to going there?

18          A.      I don't recall seeing it, there was another

19     detective who had initially started the investigation who

20     had drawn that warrant.

21          Q.      That was Officer Jenkins?

22          A.      Yes.

23          Q.      But it was Officer Lambert who told you to go to

24     the house, is that right?

25          A.      That's correct.

1      **Q.**      But she herself did not go?

2      **A.**      Right.

3      **Q.**      If I told you that the warrant was issued at

4      2:43 p.m., would you have a quarrel with that?

5      **A.**      No, ma'am.

6      **Q.**      And I think there was also a criminal complaint

7      that was drafted at the same time?

8      **A.**      I --

9      **Q.**      Or was it prior to the warrant?

10     **A.**      Yes, ma'am.

11     **Q.**      And that was issued at 2:37, is that right?

12     **A.**      I -- I don't think there would be a reason why

13     it wouldn't be then.

14     **Q.**      Okay.  And, so, you and Lieutenant Iadonisi,

15     were you wearing clothing that would indicate you were

16     police officers?

17     **A.**      It's Sergeant Iadonisi.

18     **Q.**      I'm sorry.

19     **A.**      Yes, ma'am.  We usually -- we wear polo-type

20     shirts that's got our badge on it and name and -- unless

21     we're in plain clothes, we also are plain clothes, but we

22     usually have our neck badge like this (indicating).

23     **Q.**      And then I take it that day you were wearing it?

24     **A.**      Yes, ma'am.

25     **Q.**      And was Sergeant Iadonisi also wearing it?

1          **A.**      I'm not sure if he was.  However, where

2     Mr. Jumper was located, we were -- there was additional

3     units in marked patrol units from the Cherokee Indian Police

4     Department.

5          **Q.**      Was the car you were in marked?

6          **A.**      No, it was not.

7          **Q.**      You were driving, sir?

8          **A.**      No, I think Detective Daniel Iadonisi was

9     driving the vehicle.

10         **Q.**      And the officers that were at I believe it was

11    his cousin's home, did you plan to have them meet you there

12    or did they just come by themselves?

13         **A.**      They was coming out to assist us in attempt to

14    locate Mr. Jumper.  They -- they are familiar with the area,

15    so they had knowledge of Mr. Jumper, where he might be at.

16    So they had went to this location upon theirselves and

17    located Mr. Jumper.

18         **Q.**      You testified it took about an hour it get from

19    where you were in Robbinsville to the police station, so I

20    take it it took an hour to get from the police station to

21    Robbinsville, is that right?

22         **A.**      Yes, somewhere about there, yes, ma'am.

23         **Q.**      How long did you stay at his house when you

24    first got there?

25         **A.**      At Mr. Jumper's house?

1        **Q.**     His house.

2        **A.**     The first residence we went to, we went to the

3 residence and knocked on the door; no one come to the door.

4 There's a neighbor that resides real close to Mr. Jumper and

5 she had come out and spoke with myself and Lieutenant Oswalt

6 and Detective Daniel Iadonisi, and she was asked if she had

7 seen Mr. Jumper, you know, within the last little bit, and

8 she said she hadn't seen him in, I think, maybe a day or two

9 or something like that.

10       **Q.**     And how did you know to go to the cousin's

11 house?

12       **A.**     They -- through radio, the officers that

13 initially located Mr. Jumper had contacted us through radio.

14       **Q.**     So, when you said they located him, did they

15 actually go to the house and see him there or how did they

16 find out he was at that house?

17       **A.**     I'm assuming that, once we got there, they had

18 already initiated contact with Mr. Jumper, and I don't know

19 how they found out or if the cousin told them that he was

20 there or anything like that, but he was there.

21       **Q.**     And how would they have known to look for

22 Mr. Jumper?

23       **A.**     Just working their area.  They patrol that area

24 and I guess they know Mr. Jumper as far as where he resides

25 at.

1    **Q.**    Let me clarify that information.  How would they

2    know to be looking for Mr. Jumper that day?

3    **A.**    Due to Lieutenant Eric Oswalt was the one to

4    assist us and he is the lieutenant over the patrol officers

5    in that area, so he contacted them as well to help us.

6    **Q.**    All right.  And, so, you met that Officer Oswalt

7    at Mr. Jumper's house initially, right?

8    **A.**    We initially met him at a substation because,

9    like I said, myself and Detective Daniel Iadonisi didn't

10   really know the area which Mr. Jumper resides and he

11   escorted us out to that residence in attempts to located

12   Mr. Jumper.

13   **Q.**    At that point, there were two cars at

14   Mr. Jumper's house?

15   **A.**    Yes, ma'am.

16   **Q.**    When you got to Mr. Jumper's cousin's house,

17   there was at least one or two more patrol vehicles?

18   **A.**    Yes, ma'am.

19   **Q.**    And at least two other officers?

20   **A.**    Yes.

21   **Q.**    And you weren't present for the conversation

22   with Mr. Jumper, were you?

23   **A.**    Not initially, no, ma'am, I was not.

24   **Q.**    Do you know how long they had been there before

25   you got there?

1      **A.**     Once they contacted us, we went -- I mean, I

2  think the drive from where Mr. Jumper's residence is to the

3  location is maybe five minutes.

4      **Q.**     But you don't know how long they had been there

5  prior to your getting there?

6      **A.**     No, other than them contacting us and letting us

7  know that they located him.

8      **Q.**     And they were, I take it, in police uniforms?

9      **A.**     Yes, ma'am.

10      **Q.**     And by that time, Mr. Jumper was already with

11  them?

12      **A.**     He was at that residence where they was at, yes,

13  ma'am.

14      **Q.**     And when you came in contact with him, was he

15  inside or outside the house?

16      **A.**     I want to -- he walked on the outside of the

17  house and we spoke with him there, I think it was on the

18  front porch where we initially made contact with Mr. Jumper.

19      **Q.**     When you say "we," are you talking about

20  Sergeant Iadonisi or Officer Oswalt?

21      **A.**     We was all there.  We all went to that location,

22  so there was about five officers there.

23      **Q.**     Was anybody else present besides you, the

24  officers and Mr. Jumper?

25      **A.**     His cousin was there at the residence.  I'm

1    assuming that was a family member.

2         Q.      Okay.  And then you testified that you told him

3    that I believe you were investigating something?

4         A.      Yes, ma'am.

5         Q.      Were you more specific?

6         A.      We just informed him that we was investigating a

7    case which he's allegedly involved in and that we would like

8    to speak with him and ask him some questions about it.

9         Q.      But you didn't say to him that he was a suspect

10   at that time?

11        A.      Just other than, you know, that his name had

12   been mentioned being involved in it, so --

13        Q.      But that could mean he could be a witness?

14        A.      That's correct.

15        Q.      Okay.  And I take it you didn't tell him about

16   the complaint or the arrest warrant?

17        A.      No, I did not.

18        Q.      All right.  And, so, when he left with you, how

19   long had you spoken to him before he came into the car?

20        A.      Before he came into the car?

21        Q.      Your car.

22        A.      Once he -- he voluntarily agreed to come with

23   myself and Detective Daniel Iadonisi to the Cherokee PD,

24   once we spoke, it was maybe five minutes from the time that

25   we got in the vehicle and left.

**Q.**     Did you ask him about an iPad?

**A.**     Yes.

**Q.**     And that conversation took place while you were still at his cousin's house?

**A.**     Right.  And his cousin had brought out the iPad and gave it to the officers.

**Q.**     So the iPad was at the cousin's house and it was the cousin who gave it to the officer?

**A.**     Yes.

**Q.**     And which officer was that?

**A.**     That was myself.

**Q.**     Okay.  So, when you drove with Mr. Jumper, was it in your car with Sergeant Iadonisi?

**A.**     Yes, ma'am.

**Q.**     And he was placed in the back seat?

**A.**     I want to -- the patrol vehicle itself, it does not have any kind of cage inside the vehicle, it's open, the front seats and the back seats are open, so there's no kind of confinement.  I don't recall -- actually recall if he was placed in the front passenger seat or if he was put in the back seat.

**Q.**     Okay.  So did you ask him any questions while he was in the car?

**A.**     Nothing case related, no, ma'am.

**Q.**     Did you ask him any questions, case related or

1    not?

2         A.        I mean, I think there was a little bit of small

3    talk, you know, about the weather, that type of thing, but

4    nothing as far as regarding the case in specific, no, any

5    kind of questions like that.

6         Q.        What about Sergeant Iadonisi, did he ask him any

7    questions?

8         A.        No, ma'am, he did not.

9         Q.        And can you describe the room a little bit, you

10   said it was 15 by 8 feet?

11        A.        Something like that.

12        Q.        And it was one of the two rooms that was at the

13   police headquarters, is that right?

14        A.        Yes, ma'am.

15        Q.        And that police headquarters, is that one that's

16   connected to the tribal court?

17        A.        Yes, ma'am, it is.  Address is 137 Seven Clans

18   Lane, Cherokee, North Carolina, 28719.

19        Q.        You said you came towards the back, so you're

20   not talking about the main entrance where the public would

21   come in, is that right?

22        A.        That's correct.

23        Q.        And in order to get in, you said that you needed

24   the security card, but you did not need one to get out?

25        A.        That's correct.

1     **Q.**     And how many -- how big is the police

2     headquarters, I know it's attached to the tribal court, but

3     what part of it belongs to law enforcement versus what part

4     of it is tribal court?

5     **A.**     It's sort of like divided.  The best way I can

6     explain it, it's divided sort of right down the middle.  I

7     mean, you just got almost an equal amount of space on the

8     court side as you do the police department side.

9     **Q.**     And are there two or three stories?

10     **A.**     There's two stories.

11     **Q.**     Two?

12     **A.**     Two.  The detention center is located on the top

13     of the police department and courthouse.

14     **Q.**     And where is the -- where is the room that you

15     interrogated him in in reference to where the police

16     department is?

17     **A.**     It's located near the back of the police

18     department from the main entrance.  If you come through the

19     main entrance, it will be located more towards the back of

20     the building.

21     **Q.**     And we're talking about the first floor?

22     **A.**     Yes, ma'am.

23     **Q.**     One way out, as you describe it, would have been

24     the back way?

25     **A.**     There is -- yes, you can go out the back way as

1    well as the front.

2         Q.      Okay, but before you get to that door, you

3    actually have to leave the interview room as well, is that

4    right?

5         A.      Yes.  I mean, to get out, you have to leave the

6    interview room, yes.

7         Q.      And that interview room sounded -- from the way

8    you describe it, had a two-way mirror because you said that

9    you observed the entire interview?

10        A.      No.  What I'm saying as far as observed, the

11   room has got audio and video recording.  There was computers

12   that are set up inside the investigators' office, which you

13   can live monitor the interview as it is being conducted.

14        Q.      Got it.

15                And, so, how far away was that room from the

16   interview room?

17        A.      It's adjacent to the interview room itself.  I

18   mean, you've got a wall that divides the interview rooms

19   from the investigation room where the computers are located.

20        Q.      So I take it there are no windows in that room?

21        A.      There is a window that's in the interview room,

22   however, it is covered by blinds.

23        Q.      Okay.  So a person can see outside?

24        A.      They could see into the investigative office.

25        Q.      But it was covered by blinds that day?

| | |
|---|---|
| 1 | **A.**      Yes, ma'am. |
| 2 | **Q.**      And were there any desks? |
| 3 | **A.**      Inside the interview room? |
| 4 | **Q.**      Yes. |
| 5 | **A.**      There is one table and there's usually three |
| 6 | chairs inside the interview room. |
| 7 | **Q.**      And where was Mr. Jumper placed in the interview |
| 8 | room? |
| 9 | **A.**      As soon as you come into the door -- or into |
| 10 | interview room, he was placed in the chair immediately to |
| 11 | the left, which was the closest to the door. |
| 12 | **Q.**      And where were the other two chairs? |
| 13 | **A.**      They're -- where Mr. Jumper was seated, the |
| 14 | chair is placed next to the door, there's a table that comes |
| 15 | up against where he was seated.  I was on the middle of the |
| 16 | table and Detective Daniel Iadonisi, he was on the other |
| 17 | opposite end of the table. |
| 18 | **Q.**      Okay.  And you also indicated that -- is it |
| 19 | Detective Lambert? |
| 20 | **A.**      Yes, ma'am. |
| 21 | **Q.**      She came in.  Were three of you in the room at |
| 22 | the same time at any point during the interview? |
| 23 | **A.**      No, ma'am, there was not. |
| 24 | **Q.**      Okay.  And, so, when you first got there, I take |
| 25 | it it was you and Sergeant Iadonisi that went into the room? |

1     **A.**     That's correct.

2     **Q.**     Did you put him in that room by himself at some

3     point and you two left?

4     **A.**     Yes.

5     **Q.**     And that was at the beginning?

6     **A.**     At -- before we started the initial

7     interviewing, he was just placed in there until we got our

8     materials together to come in and start interviewing him.

9     **Q.**     When he was placed there at that initial time,

10    did the videotape start at that particular time or was there

11    a pause?

12    **A.**     Yes.  I mean, the video starts whenever he's in

13    there prior to us coming in.

14    **Q.**     Okay.  Now, before you got in there, did you,

15    Sergeant Iadonisi or Detective Lambert have a plan as to how

16    to interrogate Mr. Jumper?

17    **A.**     Did we have a plan?

18    **Q.**     Yes.

19    **A.**     Just it was going to be case specific type

20    questions that Detective Jenkins had acquired through the

21    initial investigation to try to question him about.

22    **Q.**     So, when you say "case specific," did he come up

23    with the questions?

24    **A.**     Mr. Jumper or --

25    **Q.**     Jenkins.

1      **A.**      No, he did not.

2      **Q.**      So I take it prior to your questioning

3  Mr. Jumper that you looked over Officer Jenkins' reports?

4      **A.**      I didn't personally look over the reports

5  because, like I said, it come in, it was right at the end of

6  the day whenever I was requested to do this, so it wasn't I

7  was able to sit down and study this case, you know, in its

8  entirety, so I was just kind of going off of information

9  provided as far as statements made during the forensic

10  interview with the minor child to question Mr. Jumper in

11  that area.

12     **Q.**      I just want to make sure I understand that.

13  There was a forensic interview of the minor child?

14     **A.**      Uh-huh.

15     **Q.**      When did that take place?

16     **A.**      I'm not sure, ma'am.

17     **Q.**      When did you get that information?

18     **A.**      The day of, that Mr. Jumper was interviewed.

19     **Q.**      And when you say "the day of," are you talking

20  in the morning?

21     **A.**      That afternoon, August the 29th, I think, 2018.

22     **Q.**      But before you went out to Robbinsville?

23     **A.**      I had initially heard what the case was about.

24  Like I said, I did not get the whole case file in its

25  entirety on -- I didn't look over that whole case file.

1    This was kind of a spur -- I guess, I don't know if that's

2    the right word to say, spur of the moment that Lieutenant --

3    or she's not lieutenant, she's the acting lieutenant, she

4    requested me to assist in the investigation and it had come

5    in sort of at the end of the day.

6         **Q.**    You're saying Investigator Lambert or --

7         **A.**    Yes, ma'am, yes.

8         **Q.**    Okay.  And, so, I take it from what you said, I

9    just want to make sure I understand it, you had not read any

10   files, but the information you had gotten was orally given

11   to you?

12        **A.**    Right, that's correct.

13        **Q.**    And that was by acting Officer Lambert?

14        **A.**    I mean, like I said, Detective Larry Jenkins had

15   initially started the investigation and he had provided

16   information as far as the information provided during the

17   forensic interview.

18        **Q.**    And, again, did you get it from him or did you

19   get it from Lambert?

20        **A.**    He was there, you know, at the -- like I said,

21   it's kind of like a group discussion what was going on, so

22   he provided what was said in the interview.

23        **Q.**    So I take it you yourself had not looked at any

24   reports or even the medical information that you referred

25   to?

1    **A.**      Not at the time, no, because we didn't know if

2    we was actually going to locate Mr. Jumper.  It was just an

3    attempt to try to find him, bring him to the police

4    department and try to conduct an interview with him.

5    **Q.**      And, so, besides Lambert, Jenkins and yourself,

6    was Sergeant Iadonisi there as well?

7    **A.**      He was.

8    **Q.**      And, so, it was the four of you having this

9    discussion?

10   **A.**      I don't -- I can't really answer for Detective

11   Daniel Iadonisi as far as if he was present during that, but

12   he was -- I mean, he was obviously there because he's in the

13   interview with me on the video.

14   **Q.**      I'm talking about when you were talking to

15   Lambert and Jenkins, was Sergeant Iadonisi present?

16   **A.**      I can't answer that.  I don't know.

17   **Q.**      Okay.  And this happened before you went to

18   Robbinsville?

19   **A.**      Yes.

20   **Q.**      Okay.  Now, sir, have you gotten any training in

21   how to interrogate people?

22   **A.**      Yes, ma'am, I have.

23   **Q.**      Can you describe that training for me?

24   **A.**      I took a number of interview interrogation

25   classes.  Now those classes are not, I guess, sexual child

1    abuse as far as oriented, you know, it's just the basic type

2    how to try to interview subjects, you know, techniques

3    that's used and worked in the past, you know, trying to

4    build a kind of rapport with the people you're speaking with

5    and just establishing a baseline.

6        Q.    Okay.  So you've taken a number of classes?

7        A.    Uh-huh.

8        Q.    And do you talk specifically about child abuse

9    cases, is that right?

10       A.    I don't myself.  I don't work a lot of child

11   abuse crimes, so it's kind of -- and I'll be honest with

12   you, it's a gray area in which I work.  I work mostly mainly

13   adult-type crimes.  So we have our own CVU department which

14   usually handles those type of cases and that's something

15   that I don't have a lot of experience in as far as

16   child-related crimes.

17       Q.    Okay, but you do have experience questioning

18   adults, I take it?

19       A.    Yes, ma'am.

20       Q.    And, so, these classes that you took, were they

21   part of your training as a police officer?

22       A.    It's classes I took myself, you know, through

23   the department or the departments that I've been able to

24   attend, yes, ma'am.

25       Q.    And, so, when you say you took yourself, you

1    weren't forced to take them?

2        **A.**    No, I was not.

3        **Q.**    But they were all by -- sponsored by the police,

4    we're not talking about like an outside company that's not

5    police affiliated?

6        **A.**    No.  I took classes through the North Carolina

7    Justice Academy.  Stan Walters, he's kind of an outside guy,

8    but he's done a number of interviews, documenting interviews

9    as well.  And Reid technique is another one.

10       **Q.**    What was the technique?

11       **A.**    Reid technique.

12       **Q.**    R-E-I-D?

13       **A.**    Yes, ma'am.  And they do an interview and

14   interrogation class as well.

15       **Q.**    And how long ago did you take those classes?

16       **A.**    I've been in law enforcement now for 17 years,

17   over 17 years, so it's been spread out over the number of

18   years.  I mean, I have recently just actually took an

19   interview and interrogation class at the justice academy.

20       **Q.**    I'm sorry, when did you take that?

21       **A.**    Within the last month, I recently took one.

22       **Q.**    And was there a particular method that was

23   taught?

24       **A.**    No, ma'am, it's just -- it was just to, you

25   know, show videos of actual interviewing and interrogation

1    that -- case-documented interviews and things like that,

2    just -- there's no exact science to the -- you know, it's

3    just you got to work off the case and what you're given and,

4    I mean, most of your interviews are based off physical

5    evidence, you know, that you try to establish information

6    from that suspect.

7       Q.    Okay.  So, in this case, you talked about

8    getting information from Officer Jenkins and Investigator

9    Lambert?

10      A.    Yes, ma'am.

11      Q.    Okay, but you didn't actually see any reports,

12   just it was oral information provided to you?

13      A.    That's correct.

14      Q.    And it was provided to you sometime the morning

15   before you picked up Mr. Jumper?

16      A.    It was in the afternoon.

17      Q.    In the afternoon?

18      A.    Yeah, it wasn't in the morning.

19      Q.    Okay.  So I take it it happened just before you

20   were asked to pick him up, would that be correct?

21      A.    About an hour and a half or so prior to, yes,

22   ma'am.

23      Q.    And, so, one of the things that you mentioned is

24   that you get the information about the investigation, but

25   then you also try to develop a rapport with the person

1     you're interviewing?

2          A.     Yes, ma'am.

3          Q.     What do you mean by that?

4          A.     Just get a little bit of information about

5     themselves, you know, to try to make them feel at ease, be

6     comfortable because, I mean, it is -- nobody likes having to

7     be interviewed by the police, you know, and it's not a

8     comfortable environment at times, but it's just to kind of

9     like get them to try to relax and to be truthful about the

10    situation and just to make it less intrusive as it can be.

11         Q.     What other methods have you used in addition to

12    putting somebody at ease like that?

13         A.     Just getting to know them, ask them about their

14    personal life, you know, interest, things that they are

15    interested in, what they want to do, that kind of thing.

16         Q.     Okay.  And when Mr. Jumper went into the room at

17    5:27, he did not sign the waiver until 5:47, is that right?

18         A.     I don't know without looking at the documented

19    time, but, I mean, that sounds right.

20         Q.     Okay.

21         A.     I mean, it's a short time because, like I said,

22    he was in there in the interview room initially a little bit

23    by himself prior to the officers coming in.  And once we

24    come inside the room, then some brief statements were made

25    in which we told him we were reading his Miranda rights

1    prior to him being questioned.

2        **Q.**     And I take it prior to your giving him Miranda,

3    you didn't show him a copy of the arrest warrant or the

4    criminal complaint, is that right?

5        **A.**     No, we did not.

6        **Q.**     Okay.  And at some point, I understand it was

7    you and Sergeant Iadonisi, but then -- and, I'm sorry, I

8    can't remember her title, but Investigator Lambert came in?

9        **A.**     Yes, ma'am.

10       **Q.**     And, so, when you first brought Mr. Jumper in,

11   did you converse with Investigator Lambert?

12       **A.**     No, not at that time, no, ma'am, I did not.  Now

13   she was inside the investigators' office and she was

14   observing, you know, the video while -- or the interview

15   while it was being conducted.

16       **Q.**     So she would have known what time you came in

17   with Mr. Jumper?

18       **A.**     I mean, once we brought him in, she would know,

19   you know, inside the interview room.

20       **Q.**     Was there anybody else in the office, not the

21   interrogation room, but the investigators' room with her?

22       **A.**     I want to -- I know -- I know at the end of the

23   interview, Detective Larry Jenkins, who initially started

24   the investigation, he does serve Mr. Jumper with the arrest

25   warrants.

1      **Q.**      Uh-huh.

2      **A.**      And I don't know at the time if he was actually

3      in there, but he was in the area or in the building.

4      **Q.**      So did you, Iadonisi, Lambert or Jenkins come up

5      with a plan on how to interrogate Mr. Jumper once you got to

6      the police headquarters?

7      **A.**      No, we didn't come up with a plan, it was just

8      to ask him case-related questions to see what his side of

9      the story was.

10     **Q.**      Okay.  And at some point, sir, I notice in the

11     video that officers, including you, went in and out of the

12     room.  What was the purpose of that?

13     **A.**      As far as me leaving?

14     **Q.**      Yes.

15     **A.**      It was -- it was an attempt to maybe set up some

16     additional interviewing for Mr. Jumper.

17     **Q.**      What do you mean by that?

18     **A.**      Scheduling forensic-type interviewing.

19     **Q.**      Are you talking about a polygraph?

20     **A.**      Yes, ma'am.

21     **Q.**      And you had asked him if he was willing to take

22     a polygraph at some point during the questioning, is that

23     right?

24     **A.**      Yes, ma'am, I did.

25     **Q.**      And he willingly said he would?

1     **A.**     Yes, he did.

2     **Q.**     And, so, that's about the time that you left the

3     room?

4     **A.**     Yes, ma'am.

5     **Q.**     And did you make plans to get a polygrapher in?

6     **A.**     Yes.  I mean, I was the one to schedule that,

7     yes.

8     **Q.**     Who did you contact in regards to that?

9     **A.**     I attempted to contact one of our local

10    polygraphers that conducts those, but he didn't answer his

11    phone at that time.

12    **Q.**     Did you just try that one time?

13    **A.**     Yes, ma'am.

14    **Q.**     And even though you came back and Mr. Jumper had

15    asked about the polygrapher, you didn't try again to contact

16    that polygrapher?

17    **A.**     No.  Once -- I mean, like I said, once I stepped

18    out, we continued the interview, you know, without trying to

19    contact the polygrapher.

20    **Q.**     And I take it that was the only time during that

21    entire interview that you contacted or tried to contact

22    somebody to do a polygraph?

23    **A.**     Yes, ma'am.

24    **Q.**     How long were you gone, sir, when you tried to

25    make the arrangements?

1      **A.**      Maybe I want to estimate like about five

2    minutes, five, six minutes, somewhere in there.

3      **Q.**      Do you remember telling him pretty early in the

4    interview that you weren't there to throw the book at him,

5    you just wanted to know what happened?

6      **A.**      That's correct.

7      **Q.**      And that was your intent?

8      **A.**      Yes, I mean, I wanted to get the truth.

9      **Q.**      And you had said that the cousin had given, I

10   guess, either you or Iadonisi an iPad.

11     **A.**      Yes, ma'am.

12     **Q.**      Did you take a look at that iPad while either

13   one of you were interview Mr. Jumper?

14     **A.**      No, ma'am.

15     **Q.**      So there was no forensic information that you

16   had gotten from that iPad?

17     **A.**      No, ma'am.  There would be either consent to

18   look at that iPad or a search warrant before we looked at

19   that iPad.

20     **Q.**      Did you get consent to seize the iPad?

21     **A.**      Once -- once the interview was completed,

22   Mr. Jumper was informed that his cell phone and the iPad was

23   going to be seized.

24     **Q.**      Okay, but I'm talking about when you asked the

25   cousin for the iPad.

1      **A.**      Uh-huh.

2      **Q.**      You didn't have a warrant at that time?

3      **A.**      No, the cousin freely give it to -- give

4      Mr. Jumper's iPad.

5      **Q.**      You didn't take a look at it?

6      **A.**      No, ma'am.

7      **Q.**      Even though it was freely given to you?

8      **A.**      No, ma'am.

9      **Q.**      And you indicated that this was your first

10     contact with Mr. Jumper?

11     **A.**      Yes, ma'am.

12     **Q.**      You had not seen him at the police station

13     before?

14     **A.**      No, I don't recall, no.

15     **Q.**      And I take it that he was not familiar with the

16     setup of the police station?

17     **A.**      I'm not sure if he had been in there with

18     someone else.

19     **Q.**      Okay.  And the review of the Miranda rights, how

20     long did that take from the time it was presented to him to

21     the time it was signed?

22     **A.**      I'm going to estimate maybe two, three minutes.

23     **Q.**      And you had said that Mr. Jumper was allowed a

24     number of breaks.  What do you mean by "breaks"?

25     **A.**      He was -- he was offered a number of times if he

1    needed to use the restroom.  Now those number of times,

2    Mr. Jumper said he was okay.  I know at one point Detective

3    Daniel Iadonisi brings him water, you know, so he has some

4    water to drink.  And then towards the later part of the

5    interview, he did request to use the restroom and was taken

6    to the restroom.

7         Q.    And that was the only time he was asked to go to

8    the restroom?

9         A.    No, he was asked --

10        Q.    No, no, he asked to go to the restroom.

11        A.    Yes, yes.

12        Q.    And I think you said -- other than water, was

13   any food provided to him?

14        A.    No, I don't think so, no.

15        Q.    And was he ever offered to leave?

16        A.    He wasn't -- no, he wasn't offered to leave, but

17   I know -- I personally know that the door to the interview

18   room was not locked, you know, that he could go out if he

19   wanted to.

20        Q.    Did you ever tell him that he could go at any

21   time?

22        A.    No, ma'am.

23        Q.    Did anybody ever tell him he could go at any

24   time?

25        A.    I don't -- I'm not sure.  I mean, I know

1 personally I did not tell him that.

2   Q.  And, so, the videotape would show if somebody

3 had?

4   A.  Yes.

5   Q.  And he never left, did he?

6   A.  No, ma'am, he did not.

7   Q.  And you indicated that you were wearing a

8 sidearm.  Did Sergeant Iadonisi wear a sidearm as well?

9   A.  He should be.  I mean, I don't -- I can't recall

10 if he was at that time or not, but most everybody does wear

11 sidearms.

12   Q.  So, when you say "most everybody," that would

13 also include Investigator Lambert?

14   A.  Yes, ma'am.

15   Q.  And you had said that, when you spoke to him

16 initially, and I take it that was when you met him at his

17 house, you referred -- you referenced his girlfriend, is

18 that right?

19   A.  He referenced his girlfriend.

20   Q.  He referenced his girlfriend?

21   A.  Yeah.  I told him I needed to speak with him

22 about some issues, you know, as far as the -- and he

23 referred to his girlfriend, you know.

24   Q.  And neither you nor Sergeant Iadonisi said, no,

25 we want to talk about a minor child, is that right?

1      **A.**     I don't think we mentioned that at that time,
2    no, ma'am.
3      **Q.**     And then you said that, when he got to the
4    police station, he was the one that said it was because of
5    the minor child, is that right?
6      **A.**     That's correct.
7      **Q.**     So that would be in the video?
8      **A.**     Yes, ma'am.
9      **Q.**     And besides you leaving to go get the
10   polygrapher, did Investigator Lambert come in when you left?
11     **A.**     I think I had come back in.  I tried to make
12   contact and then I left again, and then Detective Lambert
13   come in.
14     **Q.**     So, during the 3-hour period, you left twice?
15     **A.**     Uh-huh.
16     **Q.**     But you came back?
17     **A.**     Right.
18     **Q.**     And Investigator Lambert came in once and stayed
19   for a while and then she left?
20     **A.**     Let's see, I come back three times.
21     **Q.**     Three times?
22     **A.**     Three times.  Once was the -- to try to set up
23   the polygrapher, I come back in and asked Mr. Jumper some
24   additional questions and which I left and Detective Mary
25   Lambert had come back in and was in the interview with

1   Detective Iadonisi for a time.  And then she left and

2   Detective Iadonisi began questioning or speaking with

3   Mr. Jumper, and then I come back in after that.

4       Q.      Okay.  And then you indicated that it was

5   around -- you were out when -- you were out of the room but

6   were watching it in the next room.  That's when he,

7   Mr. Jumper, went from denying to, in your words, confessing?

8       A.      I'm pretty sure that I -- from whenever

9   Detective Mary Lambert comes into the interview room and she

10  starts questioning Mr. Jumper, she tells Mr. Jumper, you

11  know, that she will leave the room if he feels more

12  comfortable speaking with a male subject than a female, and

13  once Detective Mary Lambert left the interview room is

14  whenever Mr. Jumper starts confessing about the alleged

15  incident.

16      Q.      What was the purpose of Investigator Lambert

17  coming in?

18      A.      Just as far as, like I said, myself, this was

19  kind of like new.  I don't do a lot of child abuse-type

20  crimes.  She has a little bit more experience, she's been

21  there years, and she come in to try to, you know, get -- to

22  speak with Mr. Jumper.

23      Q.      So, if she's the one with the experience, why

24  did she leave when you started talking about the alleged

25  child abuse?

1          MR. EASON:  Objection, calls for speculation.

2      That may be best asked of Detective Lambert.

3          THE COURT:  Overruled.

4          THE WITNESS:  I don't know.  You'd have to ask

5      her about that because I really don't -- I don't know.

6      BY MS. SISON:

7      Q.     Well, I guess my question is this:  Would

8      people -- with the officers coming in and out, was that part

9      of the interrogation plan?

10     A.     No, ma'am, it wasn't.

11     Q.     Now did Sergeant Iadonisi leave the room at any

12     time?

13     A.     I want to say that we had stepped out a couple

14     of times from the interview.  Like I said, there are -- in

15     the interview, Mr. Jumper, there's times through that

16     interview where he's in the room by himself, you know, for a

17     little bit of time and the detectives would come back in and

18     start speaking with Mr. Jumper again.

19     Q.     And what was the purpose of leaving him in the

20     room by himself?

21     A.     Just to -- just to see where else we could go

22     with the interview as far as questions that were missing,

23     you know, to speak about, to try to ask to get the whole

24     truth about the incident.  Just get as much information as

25     we can about this incident.

1      **Q.**      So, every time he was left alone, you,

2      Investigator Lambert, Sergeant Iadonisi and Officer Jenkins

3      would get together and discuss where to go from there?

4      **A.**      I don't know who all was there at that time, but

5      I know that, yes, it was just to speak about what else can

6      we ask at that time.

7      **Q.**      Okay.  And this also happened during the time

8      that he kept denying all the allegations, is that right?

9      **A.**      I know I had stepped out while he was denying

10     these allegations.  And like I said, I went out to try to

11     set up a polygraph for Mr. Jumper.  And -- but up until the

12     point where Detective Mary Lambert had walked out of the

13     interview room, he had denied the allegations up to that

14     point, yes, ma'am.

15     **Q.**      Okay.  And, sir, you had testified that during

16     direct that you had made no promises as to what would

17     happen.  Am I characterizing that correctly?

18     **A.**      No, I didn't make any promises, no, ma'am.

19     **Q.**      So you never made any promise?

20     **A.**      No, ma'am.

21     **Q.**      And, so, let's just be clear.  What do you mean

22     by a promise?

23     **A.**      I mean, just anything as far as telling

24     Mr. Jumper you're going to walk out of here today, I promise

25     you're not going to be charged with anything, anything like

1    that.

2         Q.    Okay.  So that's what a promise is to you, that

3    no promises that he would walk out and that no charges would

4    be levied against him?

5         A.    Right.

6         Q.    Okay.  And then also you said that you or

7    anybody else threatened him, is that right?

8         A.    Not that I'm aware of.

9         Q.    Okay.

10        A.    He wasn't threatened while I was in the

11   interview room with him, no.

12        Q.    So we're clear, what do you mean by a threat?

13        A.    Threatened him or like with if you don't -- if

14   you don't confess to this, that, you know, we're going to do

15   bodily harm or, you know, force him into a confession.

16        Q.    So a threat means something done to him

17   physically?

18        A.    Yeah.

19        Q.    And that's what a threat means to you?

20        A.    Well, physically, just make verbal threats, you

21   know, that kind of thing.

22        Q.    Okay.  All right.  So -- and, so, during the

23   questioning, sir, it looked to me that it was kind of even

24   between you, mainly, and Sergeant Iadonisi.  Would that be a

25   fair characterization, it was back and forth between the two

1      of you?

2           A.      Yes.

3           Q.      And do you remember talking to Mr. Jumper about

4      maybe accidentally touching the minor child?

5           A.      I think so.

6           Q.      So you don't dispute that you might have asked

7      him if he had accidentally touched the child?

8           A.      Yes.

9           Q.      And do you ever make references to perhaps it

10     was an innocent touch?

11          A.      Yes.

12          Q.      Do you remember saying that you didn't think

13     that he was taking advantage of a kid?

14          A.      I don't remember saying that.

15          Q.      Okay.  And do you remember talking about that

16     somebody can misconstrue a touch?

17          A.      Yes.

18          Q.      And do you remember at some point that you

19     mentioned that the mother in this case might have had a part

20     in this?

21          A.      I do.

22          Q.      Now Mr. Eason had asked you if there were any

23     indications of duress.  Do you remember that question?

24          A.      What's that again, I'm sorry?

25          Q.      If there was any indication of duress during the

1    interview --

2         **A.**    Yes.

3         **Q.**    -- the interrogation.

4              Now you understand -- well, how do you

5    understand what duress means?

6         **A.**    Like he's very uncomfortable, that's the way I'd

7    take it as, you know, as he didn't want to be there.

8         **Q.**    And, so, how would that be shown, is it voice,

9    action?

10        **A.**    There are actions as well as their voice, you

11   know.  They could just simply say I don't want to be here,

12   you know, I want to leave, that kind of thing.

13        **Q.**    That's how you would interpret somebody under

14   duress?

15        **A.**    Right.

16        **Q.**    And I just want to make sure, the video was not

17   stopped at any point?

18        **A.**    No, ma'am.

19        **Q.**    So what we see is what happened?

20        **A.**    Right.

21        **Q.**    And who had turned it off?

22        **A.**    I'm not sure on who turned off the video.

23        **Q.**    And what happened after it was turned off?

24        **A.**    Once -- at the end of the interview, you can see

25   Detective Larry Jenkins come in and serve Mr. Jumper with

1    the arrest warrants.  He takes Mr. Jumper out into the

2    hallway in which he's trying to get the detention officer, I

3    think, at that time.  And the detention officers come down

4    and take Mr. Jumper up to the detention center or before the

5    magistrate.

6         **Q.**    Now, sir, I've had some experience with Cherokee

7    Police Department in other cases and I've seen statements

8    written by people, witnesses and also suspects.

9         **A.**    Yes, ma'am.

10        **Q.**    Was one written in this case?

11        **A.**    He was given the opportunity to write a

12   statement by, I think, Detective Daniel Iadonisi and he

13   didn't do that.

14        **Q.**    Actually, wasn't he asked to write a letter of

15   apology?

16        **A.**    I think so, yes, ma'am.

17        **Q.**    So he wasn't asked to write a statement.

18        **A.**    Well, I mean, it's a statement, an apology or a

19   letter, it would be a statement.

20        **Q.**    And he didn't write it?

21        **A.**    No, ma'am.

22        **Q.**    I take it that he was given a pen and a piece of

23   paper to do that?

24        **A.**    Yes, I'm sure he was.  I know he was given

25   paper, yes, ma'am.

1      **Q.**     And he was left alone to do that?

2      **A.**     Yes.

3      **Q.**     For approximately how many minutes?

4      **A.**     I'm not sure, it was reflected on the video.

5      **Q.**     Okay.  And, sir, as I reviewed the video, what

6 were the specifics of the crime that was committed?  I'm

7 talking his version of how the crime was committed.  Can you

8 tell us what it was?

9      **A.**     His version?

10     **Q.**     Yes.

11     **A.**     Like Mr. Jumper's?

12     **Q.**     What did he say -- what did he say happened?

13     **A.**     At what time?

14     **Q.**     Give us one incident that he described it and

15 I'm talking about he described it, not that he was told what

16 happened.

17     **A.**     He described what he had done to the minor

18 child.

19     **Q.**     Okay.  And that was not through words that you

20 or Sergeant Iadonisi or Investigator Lambert gave him?

21     **A.**     No, I didn't give him anything.  I mean, he

22 freely and voluntarily made these statements he said.

23     **Q.**     And it's your opinion that the statements that

24 he made were specific as to the crime that was committed, is

25 that right?

1          **A.**      Yes, ma'am.

2          **Q.**      So, for example, we would know what hand was

3    used during this alleged crime?

4          **A.**      Yes, ma'am.

5          **Q.**      And which finger or fingers were used during

6    this crime?

7          **A.**      I don't know fingers specific, but finger, yeah.

8          **Q.**      You don't know what finger specific, is that

9    because you don't remember or because that was not part of

10   the statement?

11         **A.**      That wasn't whenever I was in the interview

12   room.

13         **Q.**      So is it your understanding that somebody else

14   got that information?

15         **A.**      Yes, ma'am.

16         **Q.**      But you yourself didn't get that information, is

17   that right?

18         **A.**      That's correct.

19         **Q.**      Now, sir, again, my experience with Cherokee

20   Police Department is that you write police reports regarding

21   arrest or interview of a suspect or witness, is that right?

22         **A.**      Yes, ma'am.

23         **Q.**      That's typically what happens?

24         **A.**      Yes, ma'am.

25         **Q.**      And I take it that's because you need to recall

1          what happened in case we have to go to trial or you're

2          questioned like today, is that right?

3          **A.**     That's correct.

4          **Q.**     And in this case, you didn't write a police

5     report regarding the arrest and the interrogation of

6     Mr. Jumper, did you?

7          **A.**     I didn't write an arrest report because I didn't

8     arrest him.  And as far as my involvement in this case was

9     picking Mr. Jumper up and then what's on the video as far as

10    the interview.  That's all -- and it's documented through

11    transcription of the video and audio.

12         **Q.**     And, so, even though you didn't arrest him and

13    you had the video, you didn't feel that you needed to write

14    a police report?

15         **A.**     My actions were documented as far as what I said

16    on audio and video and, like I said, we have the interviews

17    transcribed.

18         **Q.**     You had the video transcribed, sir?

19         **A.**     The video, yes, ma'am, it was transcribed.

20         **Q.**     Do you know by whom?

21         **A.**     Asheville Reporting.

22         **Q.**     Did you do that or did our office do that?

23         **A.**     We do that, our department does that.  I --

24         **Q.**     And you provided that information to the

25    Government?

1      **A.**     As far as the transcription?

2      **Q.**     Yes.

3      **A.**     Yes, the transcription is there.

4      **Q.**     Do you know when you provided that to the

5 Government?

6      **A.**     I don't.  I mean, I'm not the case agent on this

7 case.

8      **Q.**     And, so, you didn't write a report regarding the

9 arrest and the interrogation.  Do you know if anybody else

10 did, either Sergeant Iadonisi or Officer Jenkins or

11 Investigator Lambert?

12      **A.**     I do not know.

13      **Q.**     And, so, when you prepared for testimony today,

14 I take it that you didn't have any reports to refer to

15 regarding that?

16      **A.**     I referred to the video and the transcription of

17 the interview.

18      **Q.**     Okay.  And did you discuss this case at all, the

19 suppression hearing, with any of the other people that were

20 present in the courtroom today?

21      **A.**     Right now?

22      **Q.**     No, with the other --

23      **A.**     Yes, I spoke with Justin Eason and Detective

24 Mary Lambert and Detective Daniel Iadonisi.

25      **Q.**     And that was to prepare for this?

1       **A.**     Yes, ma'am.

2       **Q.**     How long did that take, sir?

3       **A.**     Ourselves, probably about an hour and a half.

4       **Q.**     And --

5       **A.**     I do my own, I do my own preparation.  I mean, I

6 don't necessarily do it with all the investigators because I

7 like to be prepared whenever I come to court.

8       **Q.**     And by that, you mean that you reviewed the

9 video again?

10      **A.**     Yes, ma'am.

11      **Q.**     And looked at the transcript?

12      **A.**     Yes, ma'am.

13      MS. SISON:  Thank you, sir.

14 I have no more questions, your Honor.

15 THE COURT:  Any redirect by Government?

16 MR. EASON:  Very briefly, your Honor.

17 REDIRECT EXAMINATION

18 BY MR. EASON:

19      **Q.**     In the past, the Cherokee Indian Police

20 Department has submitted interviews to be transcribed, is

21 that right?

22      **A.**     That's correct.

23      **Q.**     Do you know if that's done in every case or in

24 just certain cases?

25      **A.**     Just certain cases.

         Q.     Do you know personally if that was the case in
this case or not?

         A.     I don't know as far as personally if that's the
case.

         Q.     But you do know that the transcript was
prepared?

         A.     That's correct.

         Q.     And you reviewed that transcript?

         A.     Yes, sir.

                MR. EASON:  Those would be my questions.

                THE COURT:  All right, Officer.  Thank you.  You
   may step down.

                Mr. Eason, you can call your next witness.

                MR. EASON:  I apologize, I was wildly optimistic
   by that 11:00.

                The Government would call Mary Lambert.

THEREUPON:

                         MARY LAMBERT

called as a witness on behalf of the Government herein, duly

sworn and responding "I do," was examined and testified as

follows:

                THE COURT:  You may proceed.

                MR. EASON:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. EASON:

    **Q.**    If you would please state your name for the record.

    **A.**    Mary Lambert.

    **Q.**    And how is that spelled just for our court reporter?

    **A.**    M-A-R-Y L-A-M-B-E-R-T.

    **Q.**    And, Ms. Lambert, how are you employed?

    **A.**    With the Cherokee Indian Police Department Investigations Division.

    **Q.**    What's your title currently?

    **A.**    Interim lieutenant over investigations.

    **Q.**    Were you acting in that capacity on August 29, 2018, the date in question of this hearing?

    **A.**    Yes, sir.

    **Q.**    Could you give us a little bit of the background that you have in law enforcement?

    **A.**    I have -- this month, will be 25 years in law enforcement.

    **Q.**    How did you become aware of this case?

    **A.**    Through Larry Jenkins, the detective who used to be with the child victims unit.

    **Q.**    And when he brought this case to your attention, what did you do?

A.      I asked about the case and spoke with Detective

Cable and Detective Iadonisi, and had them go and go ask to

speak with Mr. Jumper and bring him in to do an interview.

Q.      Were you present for when they made contact with

him?

A.      No, I was not if you're referring to Mr. Jumper.

Q.      Yes, sorry.  You were not present when they made

contact with Mr. Jumper?

A.      No, I was not.

Q.      Were you present at the police department when

Mr. Jumper was brought in for his interview?

A.      I was in the investigation room when Mr. Jumper

was brought into the interview room.

Q.      Talk a little bit about the interview room.  If

you could just sort of give the layout of the interview

room, basically.

A.      You come into the police department, you'll go

down this long hall and you'll pass by four doors, then an

opening that goes into investigations and the restrooms,

very next door is the interview room and it's on to the

right.  As you go into the interview room, I don't know the

footage of the interview room.

Q.      Can you give a rough guess?

A.      Approximately 6 by 10, maybe, I don't know, I've

never measured it.  Once you go in, there is three chairs,

1    the first chair is the -- against the wall, and to the left,

2    there's a small table in between the three chairs, there's a

3    chair in the center of the table and then two chairs at each

4    end and the table is against the wall.

5         **Q.**    So three chairs, one table?

6         **A.**    Yes.

7         **Q.**    Where was Mr. Jumper seated in the interview

8    room for that interview?

9         **A.**    Just as you come in the door, the first chair.

10        **Q.**    So it's the closest chair to the door?

11        **A.**    Yes, sir.

12        **Q.**    Is that door locked?

13        **A.**    Not to my knowledge, no, sir.

14        **Q.**    Was the Defendant in handcuffs when you observed

15   him in the interview room?

16        **A.**    No, sir.

17        **Q.**    Did he have -- how was he dressed, if you

18   remember?

19        **A.**    A T-shirt that didn't have any sleeves on it and

20   a pair of shorts.  I don't recall shoes.

21        **Q.**    Was that attire appropriate for the weather back

22   in August of 2018, August 29, 2018?

23        **A.**    It was August.  I don't recall what the weather

24   was that day.  It's been almost a year.

25        **Q.**    Sure.  To your knowledge, he had been placed

1    under arrest at that point?

2         **A.**    Not to my knowledge.

3         **Q.**    Were there any warrants for his arrest active at

4    that time?

5         **A.**    I don't recall.

6         **Q.**    Had Detective Jenkins drawn warrants prior to

7    him being brought into the interview, do you know?

8         **A.**    He was -- he spoke to me about starting the

9    warrants.  I don't know when he completed the warrants.

10        **Q.**    Okay.  Do you know whether or not the Defendant

11   was issued Miranda warnings when he was brought in for the

12   interview?

13        **A.**    When he was brought into the interview room, he

14   was placed in the interview room and Detective Cable and

15   Detective Iadonisi came in, we were discussing who was going

16   to actually interview Mr. Jumper.  And Detective Iadonisi

17   and Detective Cable went into the interview room and I was

18   looking at the monitor when they read him his rights from

19   the Miranda form that we have.

20        **Q.**    Did you observe anything from the Defendant that

21   made it look like he was unclear or didn't understand those

22   rights as they were being gone over?

23        **A.**    From what I observed from the monitor?

24        **Q.**    Yes.

25        **A.**    No.

        **Q.**      Did you have an opportunity to observe sort of
the interactions between the detectives and the suspect over
the monitor?

        **A.**      The interview, yes.

        **Q.**      Was he appropriately responding to their
questions, did he appear to understand the questions and
understand them?

        **A.**      Yes.

        **Q.**      Can you talk about how he was behaving during
the interview that you were observing?

        **A.**      Talking, like we are talking now.

        **Q.**      Did he appear to be upset or emotional or
anything like that?

        **A.**      Just the way he's sitting now.

        **Q.**      There was some period of time when Detective
Cable left and you came in.  Can you explain why that was?

        **A.**      Detective Cable and Detective Iadonisi both came
out of the interview room, I believe, and myself and
Detective Cable didn't know what else to -- the kind of
questions.  I had to -- got the folder, the report.

        **Q.**      Uh-huh.

        **A.**      And that had the CME and the report in it and
things like that, and Detective Iadonisi actually took over
the interview at that time and I went with him back into the
interview room.

1    **Q.**    So, prior to that, you guys hadn't had an

2    opportunity to review any of the reports at that point?

3    **A.**    I didn't review the reports, no.

4    **Q.**    Detective Iadonisi did?

5    **A.**    I don't know.  I don't know.

6    **Q.**    Okay.  Where did you get those reports?

7    **A.**    From Larry Jenkins.

8    **Q.**    About what time, if you can say, was it -- did

9    you get those reports from Detective Jenkins prior to

10   sending Detectives Cable and Iadonisi to go get Mr. Jumper?

11   **A.**    Not that I recall.

12   **Q.**    Did you get them after Mr. Jumper was returned

13   to the police department?

14   **A.**    Yes.

15   **Q.**    So -- okay.  And you never had a real -- would

16   you say that you had a good opportunity to review those

17   reports and get the facts all straight?

18   **A.**    Not the reports, no, I was reading the reports

19   while I was in the interview room.

20   **Q.**    So most of your perception from the case came

21   where, then, where did it come from?

22   **A.**    Larry Jenkins briefed us shortly on it and I

23   basically told Detective Cable that he would be doing the

24   interview.

25   **Q.**    Did you guys -- did the four of you prepare any

1      specific plan or strategy for this interview, did you have

2      any set operational tactics, I guess?

3          **A.**      No, sir.

4          **Q.**      After a certain point, you went back in to

5      assist Detective Iadonisi, is that correct?

6          **A.**      Yes.

7          **Q.**      And you were speaking with Mr. Jumper, is that

8      right?

9          **A.**      Yes.

10         **Q.**      Do you recall how Mr. Jumper was behaving while

11     you were speaking with him?

12         **A.**      Normal just conversation.

13         **Q.**      To you, did he appear to be in extreme

14     discomfort or duress?

15         **A.**      He was just talking to me and I was talking to

16     him, just like we're talking now.

17         **Q.**      At a certain point, you decided to leave the

18     interrogation room, is that correct?

19         **A.**      Yes, I did.

20         **Q.**      And why did you leave the interview room at that

21     point?

22         **A.**      To go to the restroom.

23         **Q.**      You didn't return, did you?

24         **A.**      No, I did not.

25         **Q.**      Was there any particular reason that you decided

1    to leave and not come back to the interview?

2        **A.**        They were already talking again, I didn't want

3    to interrupt.

4        **Q.**        Prior to leaving the interview room, you told

5    the Defendant, "I hope you do the right thing," is that

6    correct?

7        **A.**        Yes, I did.

8        **Q.**        What did you mean by "I hope you do the right

9    thing"?

10        **A.**        It's always better to get everything out in the

11    open about what happened, your way, tell it your way,

12    explain it to us, what, you know, your side of the story is

13    so that we can get your perception of what happened, compare

14    it to what's already been said and evaluate the two.

15        **Q.**        So that was your intention in telling him to do

16    the right thing?

17        **A.**        Yes.

18        **Q.**        You wanted him to get his side the story out?

19        **A.**        Yes, sir.

20        **Q.**        While you were in the interview room with the

21    Defendant, did the Defendant ever request an attorney?

22        **A.**        No, sir.

23        **Q.**        While you were in the interview room with the

24    Defendant, did the Defendant ever ask to stop the interview

25    or to leave the interview process?

1          **A.**      No, sir.

2          **Q.**      Did the Defendant ever mention to you that he

3      felt threatened at any time?

4          **A.**      No, sir.

5          **Q.**      When you were speaking with the Defendant, do

6      you know if you were wearing your sidearm?

7          **A.**      Yes, sir.

8          **Q.**      Did you ever draw your sidearm?

9          **A.**      No, sir.

10         **Q.**      Did you ever point your sidearm at anyone?

11         **A.**      No, sir.

12         **Q.**      Did you ever draw attention to your sidearm?

13         **A.**      No, sir.

14         **Q.**      Did the Defendant ever comment on your sidearm?

15         **A.**      No, sir.

16         **Q.**      To your knowledge, did the Defendant have any

17     personal items with him when he was in the interview room?

18         **A.**      He had his cell phone.

19         **Q.**      Did the Defendant ever tell you or anyone else

20     that you're aware of about any medical or psychological

21     illnesses or infirmities that would make it hard for him to

22     understand what was going on?

23         **A.**      No, sir.

24         **Q.**      Did the Defendant ever appear to you to be

25     confused as to what the subject of the investigation was or

1    as to the nature of what was being investigated?

2         **A.**    No, sir.

3         **Q.**    Did you watch the entirety of the interview when

4    you weren't present on the monitors or were you doing other

5    things as well?

6         **A.**    I was doing other things as well.

7         **Q.**    Were you able to keep up with the interview as

8    it progressed on the monitor?

9         **A.**    Can you explain?

10        **Q.**    Were you trying to keep up with what was being

11   said or done in the interview room during the time period of

12   the interview?

13        **A.**    I was coming in and out.  I had actually went to

14   the restroom a couple times, I went to get a coffee a couple

15   times.

16        **Q.**    During what you were present for and what you

17   observed, did you ever hear anyone threaten the Defendant

18   with anything?

19        **A.**    No, sir.

20        **Q.**    Did you hear anyone threaten the Defendant's

21   family or his girlfriend or his girlfriend's family?

22        **A.**    No, sir.

23        **Q.**    Did you ever hear anyone raise their voice to

24   the Defendant?

25        **A.**    No, sir.

1      **Q.**      Did you or anyone -- did you ever physically

2  touch the Defendant during the course of this interview?

3      **A.**      I don't recall.

4      **Q.**      If you did, would it be on the video?

5      **A.**      Yes.

6      **Q.**      Did you observe anybody else make physical

7  touch, contact with the Defendant of any kind for any

8  reason?

9      **A.**      I don't recall.

10      **Q.**      If there was, would it be on video?

11      **A.**      Yes, sir.

12      **Q.**      Did you make any promises to the Defendant

13  regarding anything about the case?

14      **A.**      No, sir.

15      **Q.**      Did you observe anyone else make any explicit

16  promises to the Defendant about the case?

17      **A.**      No, sir.

18      **Q.**      Do you know if the Defendant was placed under

19  arrest after the interview was concluded?

20      **A.**      Yes, sir.

21      **Q.**      Was the Defendant ever left alone in the

22  interview room while y'all officers conversed about the case

23  or reviewed files, made notes, anything like that?

24      **A.**      Yes.

25      **Q.**      During that time period, was -- he still had

1    access to his phone?

2         **A.**    Yes, sir.

3              MR. EASON:  If I may have just a moment, your

4    Honor.

5              THE COURT:  You may.

6              MR. EASON:  Those would be my questions for this

7    witness.

8              THE COURT:  Cross examination by the Defense.

9              MS. SISON:  Thank you.

10                      CROSS EXAMINATION

11   BY MS. SISON:

12        **Q.**    Ma'am, should I call you investigator or

13   lieutenant?  I'm sorry, I want to get the right name.

14        **A.**    You can call me Mary, I don't care.

15        **Q.**    Well, I prefer to call you by your last name.

16   Investigator Lambert, would that be fine?

17        **A.**    Detective Lambert is probably -- easier for me

18   to remember.

19        **Q.**    Detective Lambert, you said that you had been

20   working for 25 years as a law enforcement official, is that

21   right?

22        **A.**    Yes, ma'am.

23        **Q.**    And was that all with the Cherokee Indian Police

24   Department or have you worked for other places?

25        **A.**    I worked for Buncombe County Sheriff's

1    Department from August 17th of '94 until January 17th of

2    '96.

3        **Q.**     And after '96?

4        **A.**     January of '96 was my first day at Cherokee

5    Indian Police Department, actually, night shift, worked day

6    shift and night shift, and then took -- I've been with

7    Cherokee Indian Police Department.

8        **Q.**     And, so, at the time that this investigation was

9    taking place, you were also then still the interim

10   lieutenant, is that right?

11       **A.**     I become the interim lieutenant in August 13th

12   of 2018.

13       **Q.**     And that's the position you hold now?

14       **A.**     Yes.

15       **Q.**     Now you said that you became involved because of

16   an investigation by the Department of Health.  Is that like

17   DSS for the tribe?

18       **A.**     No, I became involved because Detective Larry

19   Jenkins explained to me that there was a case with

20   Mr. Jenkins (sic) and the allegations.  And I don't recall

21   whether the CME was that day or a day or two before or he

22   had went to the CME and came back and explained to me about

23   the case.

24       **Q.**     And, so, that might have been a couple days

25   before the interrogation of Mr. Jumper?

1      **A.**      I know it was that day.

2      **Q.**      So sometime in the morning, I take it?

3      **A.**      Probably about lunchtime.

4      **Q.**      Okay.  And it was Detective -- or, I'm sorry,

5      Investigator Jenkins that told you about it?

6      **A.**      Yes.

7      **Q.**      And how did he find out about it, if you know?

8      **A.**      I do not know.

9      **Q.**      And, so, at that point, you didn't have any kind

10     of police reports when you were first told about it, is that

11     right?

12     **A.**      No, we were going through a transition where the

13     child victims unit was coming under the investigations unit

14     because it had just lost its lieutenant.

15     **Q.**      Okay.

16     **A.**      Or before, prior to.

17     **Q.**      And that's the person you referred to as

18     somebody who had worked there before?

19     **A.**      Yes.

20     **Q.**      All right.  And, so, at that point, do you know

21     if Investigator Jenkins had any materials like DHS reports

22     or medical reports, anything like that?

23     **A.**      I do not know.

24     **Q.**      And, so, when did you actually get your hands on

25     the reports?

1      **A.**     Before I went into the interview.

2      **Q.**     Okay.  So, when you say before you went to the

3  interview, are you talking when Mr. Jumper was already in

4  the room?

5      **A.**     Yes.

6      **Q.**     And I take it that you were the one who sent

7  Iadonisi and Cable to the location where Mr. Jumper was, is

8  that right?

9      **A.**     Yes.

10     **Q.**     And did you give them any information about the

11  case?

12     **A.**     The four of us were speaking about the case,

13  Cable, Iadonisi, myself and Mr. Jenkins.

14     **Q.**     This is prior to them going to Robbinsville, is

15  that right?

16     **A.**     Yes.

17     **Q.**     So -- and who is doing the briefing, was it you

18  to the two who went out there or was it Lieutenant Jenkins

19  -- I'm sorry, Investigator Jenkins?

20     **A.**     Investigator Jenkins.

21     **Q.**     Okay.  And, so, at that point, you were actually

22  getting more information as you were listening to him?

23     **A.**     Yes.

24     **Q.**     And, so, that was the second time that he

25  provided this information, the first time without the other

1    two, and then the second time, you and the other two

2    investigators, is that right?

3        A.    I don't recall if it was just the one specific

4    time or whether there was two encounters.

5        Q.    And, so, at that point when the four of you were

6    talking about it, did you come up with any plan as to what

7    was going to happen that day regarding the investigation?

8        A.    I told Detective Cable that he would be doing

9    the interview and Detective Iadonisi was going to assist

10   him.

11       Q.    And was that after Mr. Jumper was already in

12   custody or before?

13       A.    That was before he was in custody.  He wasn't in

14   custody until after he was interviewed.

15       Q.    After he was put in the interview room, that was

16   still the plan, is that right, with Cable doing the

17   interviewing and Investigator Iadonisi being the backup, is

18   that correct?

19       A.    I don't understand your question.

20       Q.    I guess I understood you to mean that Mr. Cable

21   was going to do most of the talking and that Iadonisi was

22   going to back him up?

23       A.    Yes.

24       Q.    Is that correct or did I get that wrong?

25       A.    No.

1      **Q.**      And, so, at some point, though, you became

2  involved.  Is there a reason why you became involved?

3      **A.**      Because Mr. Cable didn't want -- Mr. Cable was

4  having an issue or could not -- he didn't know what else to

5  ask for questions during the interview.

6      **Q.**      And that was because Mr. Jumper kept denying

7  that he'd done anything wrong, is that right?

8      **A.**      I don't know if that was the issue or Mr. Cable

9  just didn't know what else to ask.

10      **Q.**      Is that what Mr. Cable imparted to you when he

11  went back into the investigator room?

12      **A.**      That he didn't know what else to ask.

13      **Q.**      And you had been watching the interview during

14  that time, is that right?

15      **A.**      Most -- part of it, yes.

16      **Q.**      Okay.  Do you recall Mr. Cable saying that he

17  was going to ask to get a polygrapher, do you remember that

18  part?

19      **A.**      Yes.

20      **Q.**      And then that's when he went into the room, the

21  investigators' room?

22      **A.**      Yes.

23      **Q.**      And that's when he told you that he didn't know

24  what else to ask?

25      **A.**      Well, and we started making phone calls to -- in

1   reference to getting an interview at that time.

2      Q.     And you couldn't find someone to do the

3   polygraph?

4      A.     I don't know if he actually reached out to

5   anybody or got ahold of anybody that night.

6      Q.     Okay.  And, so, when he -- and then Mr. Cable

7   did come back and then you went into the interrogation room,

8   is that right?

9      A.     Me and Detective Iadonisi went into the room,

10  yes.

11     Q.     Did Detective Iadonisi ever come out after

12  Mr. Cable went into the interview room or was he in the

13  interrogation the entire time?

14     A.     No, Mr. Jumper was placed in the interview room.

15  Detective Iadonisi and Detective Cable went into the

16  interview room.  Detective Cable came out of the interview

17  room and it was Detective Iadonisi and Mr. Jumper in there

18  by theirselves.  At some point in time, both detectives came

19  out of the room and Mr. Jumper was in the room by himself.

20  When me and Detective Iadonisi went into the room, it was

21  just me and Detective Iadonisi, there was no one else in the

22  room with Mr. Jumper, and that's when Officer Iadonisi or

23  Detective Iadonisi gave Mr. Jumper a bottle of water, he sit

24  down in the chair in the middle and I sat down on the chair

25  on the other side of the room.

1      **Q.**      And that was the only time you went into the

2  room, is that right?

3      **A.**      Yes.

4      **Q.**      How long would you say you were in the room?

5      **A.**      20, 25 minutes.

6      **Q.**      And what was your role at that time?

7      **A.**      I was just -- I was reading the report and

8  asking questions.

9      **Q.**      Okay.  And did Investigator Iadonisi or

10  Mr. Cable have access to those reports that you were reading

11  at that time?

12      **A.**      Detective Iadonisi, I believe, looked at the

13  reports the same time I did.

14      **Q.**      So I take it the two of you were close to each

15  other so that you could pass the report back and forth?

16      **A.**      The table is maybe smaller than this counter up

17  here as far as width wise, and then wide, it may be 3, 4,

18  so --

19      **Q.**      I think one of the questions you were asked on

20  direct is that you had said prior to your leaving, "I hope

21  you do the right thing," is that right?

22      **A.**      Yes.

23      **Q.**      Do you remember also saying right before then,

24  saying that you would be right back, that you would be

25  leaving to go to the bathroom, but you'd be right back?

```
 1        A.      Yes.

 2        Q.      But you never came back?

 3        A.      No.

 4        Q.      Was that intentional or is that part of the

 5   plan?

 6        A.      No.

 7        Q.      No, it wasn't part of the plan or it wasn't

 8   intentional?

 9        A.      When I walk in the room --

10              MR. EASON:  Objection, your Honor.  That's a

11     compound question.

12              MS. SISON:  I can ask simply, your Honor.

13              THE COURT:  I'll sustain that objection.

14   BY MS. SISON:

15        Q.      When you said, "I'll be right back" and you

16   didn't come back, did you mean to not come back?

17        A.      Did I mean not to come back?

18        Q.      Yes.

19        A.      No.  I don't know whether I was going to be

20   coming back or not.  I mean --

21        Q.      So, at that point, you thought you were coming

22   back?

23        A.      It's possible, yes.

24        Q.      And, Detective Lambert, do you remember talking

25   specifics to Mr. Jumper regarding a finger versus a penis?
```

1    **A.**     Yes.

2    **Q.**     And then you had said to him at some point

3    during the 20, 25 minutes you were there is that "It's just

4    a finger, okay, compared to an actual penis."  Do you

5    remember saying that?

6    **A.**     Yes, because, prior to that, Detective Iadonisi

7    stated it was a digital penetration.  I wanted him to

8    understand the difference between a finger or a penis would

9    be digital penetration is a finger and not the --

10   **Q.**     Okay.  And then -- but you also said, "I

11   understand.  I guess maybe that wasn't something that

12   happened."  And you meant that there wasn't any penile

13   penetration, is that right?

14   **A.**     According to the CME report.

15   **Q.**     And that was something that you had been aware

16   of prior to reading the report?

17   **A.**     No, I read the report.

18   **Q.**     Okay.  And then you came in with that report, is

19   that right?

20   **A.**     Yes, into the interview room.

21   **Q.**     And, so, as you were reading that report, you

22   were telling Mr. Jumper that something did happen?

23   **A.**     According to the allegations.

24   **Q.**     And that's in response to him denying anything

25   ever happened, is that right?

1          **A.**      He did deny at that point.

2          **Q.**      He kept denying up to that point?

3          **A.**      Yes.

4          **Q.**      And then you said, "It happened, all right.  I'm

5     not going to beat around the bush."  Do you remember saying

6     that?

7          **A.**      Uh-huh.

8          **Q.**      Is that a yes?

9          **A.**      Yes, ma'am, sorry.

10         **Q.**      And that you said, "It wasn't your penis, but it

11    was your finger and it did happen, okay."  Do you remember

12    saying that?

13         **A.**      Yes, ma'am.

14         **Q.**      And then at some point toward the end, right

15    before you left, you did say, "Would you prefer me to step

16    out of the room and you just go ahead and tell Danny what

17    happened?"  Is that right, do you remember saying that?

18         **A.**      I don't remember the exact words.

19         **Q.**      But you did offer to step out?

20         **A.**      Yes, I did.

21         **Q.**      And what was -- what was the reason for that?

22         **A.**      Sometimes males feel more comfortable without

23    females being in the room present when they speak about

24    sexual acts.

25         **Q.**      Now you indicated that the door was not locked

1    when Mr. Jumper was brought into the room, is that right?

2        **A.**    Correct.

3        **Q.**    And is that the kind of door you can lock from

4    the outside instead of the inside?

5        **A.**    I don't know that that door has a lock on it.

6        **Q.**    So he could have just gotten up and left?

7        **A.**    Yes, ma'am.

8        **Q.**    And what would happen if he had just gotten up

9    and left?

10       **A.**    He --

11               MR. EASON:  Objection, calls for speculation.

12               THE COURT:  Overruled.

13               THE WITNESS:  He would go out into the hallway.

14   BY MS. SISON:

15       **Q.**    Would you have allowed him to leave?

16       **A.**    At that point in time, there was a warrant for

17   his arrest, I'm assuming, because Detective Larry Jenkins

18   had completed the warrant by then.

19       **Q.**    So there was warrant for his arrest and you

20   would not have let him leave?

21       **A.**    No, ma'am.

22       **Q.**    And it sounds as if Detective -- or Investigator

23   Jenkins did most of the paperwork and collected all the

24   evidence.  Is there a reason why he didn't participate in

25   the questioning?

1      **A.**       At that point in time, we were transitioning

2    from him going into general investigations and Detective

3    Cable was taking over major crimes.

4      **Q.**       And I take it prior to Mr. Jumper being taken to

5    the police headquarters, he had been searched for weapons,

6    right?

7      **A.**       I wasn't there, I do not know.

8      **Q.**       But he didn't have any weapons with him when he

9    was in the interrogation room?

10     **A.**       No, ma'am.

11     **Q.**       And I take it that you would not have allowed

12   him to have any kind of weapons?

13     **A.**       No, ma'am.

14     **Q.**       Now, ma'am, you being the interim lieutenant,

15   does that mean that you are the supervisor of the

16   investigative department?

17     **A.**       Yes, ma'am.

18     **Q.**       Okay.  And, so, part of your duties as the head

19   person would be to have a hand in all the investigations or

20   at least know what's going on as far as what your people

21   were doing?

22     **A.**       Yes, ma'am.

23     **Q.**       And part of the way you would do that is that

24   you would talk to your police officers?

25     **A.**       I had just come into that role.

1      **Q.**     That would be one of your duties, right?

2      **A.**     Yes.

3      **Q.**     And I take it that another would be that you

4 would read police reports?

5      **A.**     Yes, ma'am.

6      **Q.**     Now, in this case, I take it that getting a

7 version of the events from Mr. Jumper's point of view is

8 important, would that be fair to say?

9      **A.**     Yes, sir -- I mean, yes, ma'am, I'm sorry.

10      **Q.**     That's all right.

11      And I take it in this case no statement -- he

12 was not asked to write a statement, was he?

13      **A.**     I don't recall.  Not by me.

14      **Q.**     By anybody in the police department?

15      **A.**     I don't recall.

16      **Q.**     Okay.  And, in fact, there is no police report

17 regarding the interrogation or the arrest, is that right?

18      **A.**     A police report?

19      **Q.**     Any kind of written report.

20      **A.**     I did not write one.

21      **Q.**     Do you know if the other people that worked

22 under you wrote a report?

23      **A.**     I don't know.

24      **Q.**     Did you ask them to?

25      **A.**     I don't recall.

1      **Q.**      Would you have wanted them to write a report

2   regarding the interrogation or the arrest?

3      **A.**      Yes, ma'am.

4               MS. SISON:  Thank you.

5               No more questions, your Honor.

6               THE COURT:  Any redirect by the Government?

7               MR. EASON:  Very briefly.

8                      REDIRECT EXAMINATION

9   BY MR. EASON:

10     **Q.**      Detective Lambert, do you sometimes change who

11  is in an interview and who is conducting an interview based

12  on who best establishes a rapport with an interview subject?

13     **A.**      Yes, sir.

14     **Q.**      Was that factoring into your thinking when a lot

15  of people were sort of coming and going in this interview?

16     **A.**      Yes, sir.

17              MR. EASON:  Those would be my questions.

18              THE COURT:  Thank you, Detective.  You may step

19     down.

20              Mr. Eason, before you call your next witness,

21     we've been proceeding for a little over two hours here.

22     Why don't we take about a 10-minute recess.

23              MR. EASON:  Thank you, your Honor.

24              (Brief recess was taken.)

25              THE COURT:  Mr. Eason, you may call your next

1    witness.

2              MR. EASON:  Your Honor, the Government would

3    call Daniel Iadonisi to the stand.

4              THE COURT:  Sir, please come around and be

5    sworn.

6    THEREUPON:

7                        DANIEL IADONISI

8    called as a witness on behalf of the Government herein, duly

9    sworn and responding "I do," was examined and testified as

10   follows:

11             THE CLERK:  Thank you, sir.  Be seated.

12             THE COURT:  You may proceed, Mr. Eason.

13             MR. EASON:  Thank you, your Honor.

14                      DIRECT EXAMINATION

15   BY MR. EASON:

16        **Q.**    Could you please state your name for the record

17   and spell it for the benefit of the court reporter?

18        **A.**    Daniel Iadonisi, I-A-D-O-N-I-S-I.

19        **Q.**    And, Mr. Iadonisi, how are you employed?

20        **A.**    I'm currently retired.

21        **Q.**    And what did you retire from?

22        **A.**    I was detective sergeant, criminal investigator

23   for the Cherokee Indian Police Department.

24        **Q.**    How long have you been in law enforcement

25   altogether?

1          **A.**        Approximately 20 years.

2          **Q.**        Are you familiar with the subject of this case,

3     the interview of Mr. Jumper occurring on or about August 29,

4     2018?

5          **A.**        Yes.

6          **Q.**        How did you become aware of this case?

7          **A.**        By one of the other criminal investigators

8     there.

9          **Q.**        Who was that?

10         **A.**        Detective Larry Jenkins.

11         **Q.**        And did he tell you about the case?

12         **A.**        Briefly.  He explained what was going on and he

13    would like to interview the Defendant.

14         **Q.**        And what was going to be your role as far as

15    that goes?

16         **A.**        I was to accompany Detective Jason Cable to

17    Robbinsville to try to locate the Defendant and bring him

18    back for questioning.

19         **Q.**        At that point, do you know if there had been a

20    warrant issued for Mr. -- the Defendant in this case?

21         **A.**        I heard Detective Larry Jenkins say that he was

22    issuing a warrant for Mr. Jumper's arrest.

23         **Q.**        Do you know whether or not that had been done by

24    the time you went out to Robbinsville to locate the

25    Defendant?

1    **A.**      I don't know if the warrant was issued or not

2    when we left.

3    **Q.**      When you went with Detective Cable to

4    Robbinsville, where did you go?

5    **A.**      We had met Lieutenant Oswalt at their substation

6    there near Robbinsville.

7    **Q.**      The substation there in Robbinsville, is that

8    usually used for suspect interviews or anything like that?

9    **A.**      Not that I'm aware of.

10   **Q.**      Why not?

11   **A.**      I don't know.

12   **Q.**      Does it have the same audio/video recording

13   capabilities as the CIPD?

14   **A.**      I don't know, I don't think it does.

15   **Q.**      Do you have much experience with the

16   Robbinsville or the Snowbird substation?

17   **A.**      No, I don't.

18   **Q.**      Okay.  Did you speak to anybody aside from

19   Detective Jenkins about the allegations in this case?

20   **A.**      I had spoke with Detective Cable, Jason Cable,

21   and Detective Mary Lambert.

22   **Q.**      And when you went out to Robbinsville, where did

23   you say you met Lieutenant Oswalt?

24   **A.**      At their substation.

25   **Q.**      Where did you proceed to after that?

1          **A.**      We had followed Lieutenant Oswalt to a location

2     where we thought Mr. Jumper might be.  I don't know the

3     exact address, the first address that we went to.

4          **Q.**      And where eventually did you locate Mr. Jumper?

5          **A.**      I believe it was 143 Wachacha Road, 143 Wachacha

6     Road.

7          **Q.**      That's in the Snowbird Community?

8          **A.**      Yes.

9          **Q.**      And do you remember making contact with the

10    Defendant Mr. Jumper in that -- at that residence?

11         **A.**      At that residence.

12         **Q.**      What did you all tell him about why you were

13    there and what you were doing?

14         **A.**      I believe Detective Cable told Mr. Jumper that

15    there's been some allegations and we would have to bring him

16    to Cherokee to do the interview.

17         **Q.**      And Mr. Jumper agreed to go with you?

18         **A.**      Yes.

19         **Q.**      Was he placed -- did he get in y'all's patrol

20    car or squad car?

21         **A.**      Yeah, he sat in the front.

22         **Q.**      He sat in the front?

23         **A.**      Yes.

24         **Q.**      Where did you sit?

25         **A.**      I sat in the back behind him.

1    **Q.**     In this particular car, was there any type of

2    like divider or anything like that?

3    **A.**     No.

4    **Q.**     No cage or anything?

5    **A.**     No cage.

6    **Q.**     Was he handcuffed at that point?

7    **A.**     No, sir.

8    **Q.**     Do you remember what he was wearing?

9    **A.**     He was wearing shorts and a sleeveless T-shirt.

10   **Q.**     Uh-huh.  Do you remember if that was appropriate

11   for the weather at that time of year for where y'all were?

12   **A.**     Yes, it was summertime, it was August.

13   **Q.**     Prior to bringing him back to Cherokee for an

14   interview, had you had an opportunity to review any of the

15   paperwork in this case, any of the reports or forensic

16   interview or anything like that?

17   **A.**     Not prior to bringing him back, no.

18   **Q.**     About what time did you make contact with him in

19   the afternoon that day initially?

20   **A.**     I'm guessing maybe about 4:30 p.m.

21   **Q.**     And you brought him back to Cherokee?

22   **A.**     Cherokee, yes, sir.

23   **Q.**     And where did y'all go once you got to Cherokee?

24   **A.**     We went directly to the -- one of the interview

25   rooms.

1      **Q.**     Could you talk to the Court a little bit about

2  the layout of this interview room as far as size, what's in

3  it, all that type thing?

4      **A.**     The room is approximately -- it might be 8-foot

5  by 8-foot.  It has a window in it with silver film and it

6  has blinds on the other side so as not to be able to see

7  through.  It has one table in it which sits up against the

8  wall directly underneath a window.  It has -- it has three

9  seats in it, one chair specifically designed for the

10  interviewee and then it has two rolling like desk chairs.

11      **Q.**     When you say one chair for the interviewee,

12  where is that chair located in relation to the others?

13      **A.**     Well, soon as you walk into the door, that chair

14  is immediately to the left up against the wall.

15      **Q.**     Uh-huh.

16      **A.**     And then the other two locations are where the

17  other rolling chairs are.

18      **Q.**     And, in fact, there are cameras specifically

19  focused on that area to catch -- to sort of catch everything

20  that the interviewee says or does?

21      **A.**     Yes, sir.

22      **Q.**     Anything that -- okay.

23      The door to the interview room, do you know if

24  that locks?

25      **A.**     I don't think it locks, no.

1       **Q.**    The doors to the Cherokee Indian Police

2  Department, those are secure, correct?

3       **A.**    Those are, yes.

4       **Q.**    You need a card to get in?

5       **A.**    You need a swipe card, yes, sir.

6       **Q.**    Do you need a swipe card to get out?

7       **A.**    No.

8       **Q.**    Were you present for the entirety of the

9  interview with the Defendant?

10       **A.**    Yes.

11       **Q.**    Approximately how long did the interview last?

12       **A.**    I started taking notes at 5:48, which is when

13  the actual interview began and I had Mr. Jumper sign a

14  release form for one of his electronic devices at the very

15  end of the interview at 7:41, approximately two hours.

16       **Q.**    Now there was some other time period where he

17  was left sort of alone, generally?

18       **A.**    Yeah.

19       **Q.**    Nobody was asking him questions during that time

20  period, were they?

21       **A.**    No, he was in the room by himself.

22       **Q.**    During that time period, did he have access to

23  his cell phone?

24       **A.**    Yes.

25       **Q.**    Did you take the cell phone from him at any --

1    at any point?

2          **A.**        I didn't, no, sir.

3          **Q.**        Prior to beginning the interview, did you or

4    someone in your presence advise the Defendant of his Miranda

5    rights?

6          **A.**        Yes.

7          **Q.**        How did you do that?

8          **A.**        I provided the Defendant with a copy of his

9    Miranda and I have a copy of it myself, and I read the

10   Miranda rights one sentence at a time, and if you understand

11   what I'm reading, I'll have the Defendant put his initials

12   next to the end of that particular sentence.  And after

13   reading all of his Miranda rights, we'll have him sign it

14   and, together, we will fill out the bottom portion, which

15   is, you know, address, phone number, Social Security number,

16   things like that.

17         **Q.**        And did you do that in this case --

18         **A.**        I did.

19         **Q.**        -- with Mr. Jumper?

20         **A.**        Yes.

21         **Q.**        Did Mr. Jumper -- while you were going over the

22   rights, did he ever ask for any clarification or ask you any

23   questions about the instructions?

24         **A.**        No.

25         **Q.**        Did he ever seem like he didn't understand what

1     was going on or give you pause or concern about his ability

2     to understand the process and what was happening?

3         **A.**     No.

4         **Q.**     Did he mention to you any infirmity, either

5     physical or psychological, that you thought might bear on

6     his ability to appreciate what was going on?

7         **A.**     No.

8         **Q.**     Prior to transporting the Defendant to Cherokee,

9     did you -- did you tell him specifically what the topic of

10    the interview was?

11        **A.**     I did not.

12        **Q.**     Did anybody, do you know?

13        **A.**     I don't recall.

14        **Q.**     When you got to the interview room, did you

15    explain to him the nature of the investigation?

16        **A.**     Detective Cable did in my presence.

17        **Q.**     And did Mr. Jumper seem to be taken aback or

18    surprised by these allegations?

19        **A.**     No.

20        **Q.**     No?

21        **A.**     No.

22        **Q.**     Could you talk about that a little bit?

23        **A.**     Detective Cable told him there were some

24    allegations made against him and we were there to discuss

25    his side of the story and that it involved his girlfriend,

1    and Mr. Jumper was the one who stated that it involves her

2    daughter, too.

3         **Q.**    Okay.  So he didn't seem surprised by these

4    allegations?

5         **A.**    No, sir.

6         **Q.**    Okay.  During the course of your interview, did

7    you get a feel for how he was behaving, the Defendant, how

8    he was --

9         **A.**    He was pretty calm.

10        **Q.**    Did you ever observe the Defendant crying or

11   expressing pain or discomfort?

12        **A.**    No.

13        **Q.**    Did he stand up and pace or become agitated?

14        **A.**    No.

15        **Q.**    Did he ever tell you that he wanted to stop the

16   interview process?

17        **A.**    No.

18        **Q.**    At any time during the interview, did he give

19   you the impression through his answers or his behavior that

20   he was confused or unable to follow your questions?

21        **A.**    No.

22        **Q.**    Were you armed during the time you were in the

23   interview room with him?

24        **A.**    Yes, sir.

25        **Q.**    Do you remember if he ever mentioned your

1     firearm?

2          **A.**      No.

3          **Q.**      Did you ever remove your firearm from its

4     holster?

5          **A.**      No.

6          **Q.**      Did you ever point your firearm at anyone?

7          **A.**      No.

8          **Q.**      Did you ever draw attention to your firearm in

9     any way?

10         **A.**      No.

11         **Q.**      Did the Defendant ever ask to take a break for

12    the restroom or to get some water or anything like that?

13         **A.**      He never asked for water.

14         **Q.**      Did you ever offer opportunities for the

15    Defendant to go to the bathroom or get something to drink or

16    eat?

17         **A.**      Yes.

18         **Q.**      Did he ever take you up on that?

19         **A.**      We went to the bathroom and I had brought him

20    back a bottle of water.

21         **Q.**      Did he ever ask for like a cigarette break or

22    anything like that?

23         **A.**      No.

24         **Q.**      The initial portion of the interview, the

25    Defendant denied mostly any type of inappropriate sexual

1    contact with the minor in question, is that correct?

2          **A.**      That's correct.

3          **Q.**      Approximately 90 minutes into it, after

4    Detective Lambert left, he began to confess, is that

5    correct?

6          **A.**      That's correct.

7          **Q.**      What was he saying about what had happened when

8    he started confessing?

9          **A.**      He admitted that -- we were discussing alleged

10   digital penetration of the child's vagina and he had

11   admitted that it happened once and then he admitted that it

12   happened maybe one or two times.

13         **Q.**      What number did he settle on eventually?

14         **A.**      It happened five times.

15         **Q.**      Where did he say these events took place?

16         **A.**      In the car on the way back from Mission Hospital

17   around Canton area and twice at the house where they live.

18         **Q.**      Prior to changing from denial to admission, did

19   you observe any change in the demeanor or behavior of the

20   Defendant?

21         **A.**      No.

22         **Q.**      Did he start crying or retreating into himself

23   or anything like that?

24         **A.**      No.

25         **Q.**      In fact, he sort of leans forward during this

1    portion of the interview, doesn't he?

2         A.        Yes, sir.

3         Q.        What did you take that to be when he started

4    leaning forward like that?

5         A.        That he was interested in what he was saying,

6    like he was really into what he was saying.

7         Q.        Did he appear to be under duress at that point?

8         A.        No.

9         Q.        Had you -- you were in the interview with him --

10   interview room with him -- sorry.  Let me rephrase.

11            Was there ever a time when there was someone in

12   the interview room with him that you weren't also there,

13   like were you there the entire time someone else was there

14   with him?

15        A.        Yes.

16        Q.        So you saw the entirety of all of the

17   interactions that took place in that room between the

18   Defendant and any law enforcement, is that correct?

19        A.        Yes.

20        Q.        During those time periods, did anybody threaten

21   the Defendant?

22        A.        No.

23        Q.        Did anybody threaten the Defendant's family?

24        A.        No.

25        Q.        Did anybody threaten the Defendant's girlfriend

1    or the Defendant's girlfriend's family?

2        **A.**     No.

3        **Q.**     At any time during that period, did anyone make

4    any promises to the Defendant?

5        **A.**     No.

6        **Q.**     Did you talk about whether or not you would be

7    able to help the Defendant or have him help himself?

8        **A.**     Have him help himself.

9        **Q.**     Could you describe a little bit about that to

10   the Court?

11       **A.**     Convincing the Defendant to tell the truth, to

12   tell all of the truth, not just bits and pieces of it, would

13   go a long way as far as, you know, court proceedings,

14   telling the truth goes a long way.  And in my interview, I

15   attempt to convince a Defendant to do that.

16       **Q.**     To tell the truth?

17       **A.**     To tell the whole truth, correct.

18       **Q.**     So approximately how long would you say that the

19   interview had been going on between his denials to his

20   confession?

21       **A.**     From his denials, maybe an hour or so.

22       **Q.**     And the remainder of the time of the interview

23   was what, specifically, if that only took about an hour, why

24   did the whole interview take two hours?

25       **A.**     Well, I had spoke to the Defendant by myself, it

1    was just me and him for a while.  And then Detective Cable

2    had reentered the room and we did some follow-up questions,

3    try to recap what was happening, things of that nature.  We

4    had him sign some forms to retrieve his cell phone and iPad.

5         **Q.**    Uh-huh.  Did you offer the Defendant an

6    opportunity to make a written statement in this case?

7         **A.**    I did.

8         **Q.**    Did you provide him with the necessary things to

9    do that, paper, pencil, that type thing?

10        **A.**    I did.

11        **Q.**    Do you know if he ever produced a written

12   statement at all?

13        **A.**    No, he didn't.

14        **Q.**    What did the Defendant tell you about what he

15   did, how did he describe what he was doing?

16        **A.**    He described the -- initially as, yes, it did

17   happen once or maybe twice, he had touched the child in the

18   vaginal area and his finger had went up inside her.

19        **Q.**    Did he say about how deep?

20        **A.**    Well, I had asked him that and I had showed him

21   on my finger, you know, was it this much or that much, and

22   he had indicated that it was up to the first knuckle joint.

23        **Q.**    During this, did he say whether he was aroused?

24        **A.**    I don't recall him saying he was aroused.

25        **Q.**    During this, did he indicate to you that he

1    believed that the minor child was aroused?

2        **A.**    Yes.

3             THE COURT:  Mr. Eason, I have reviewed the

4    transcript.

5             MR. EASON:  Yes, your Honor.

6    BY MR. EASON:

7        **Q.**    Is that something that you suggested to him?

8        **A.**    Can you rephrase the question?

9        **Q.**    Did you suggest the notion that the minor child

10   might have been a willing participant?

11       **A.**    No.

12       **Q.**    At any time during the interview process, did

13   the Defendant ask to speak to an attorney?

14       **A.**    No.

15       **Q.**    At any time during the interview process, did

16   the Defendant indicate that he was even uncomfortable or

17   asked for something to be done to improve his comfort?

18       **A.**    No.

19       **Q.**    Was there any sort of plan or organization or

20   stratagem as far as who was interviewing him and what was to

21   be said conceived in advance of this interview?

22       **A.**    No.

23       **Q.**    Did you treat this particular Defendant any

24   differently than you would any other interviewee?

25       **A.**    No.

1       **Q.**    In fact, during the entire time you were with

2   this Defendant, did anybody so much as raise their voice to

3   him?

4       **A.**    No.

5       **Q.**    To your knowledge, did anyone physically touch

6   him prior to when he was placed under arrest at the

7   conclusion of everything by Detective Jenkins?

8       **A.**    No.

9       **Q.**    There -- were there ever more than two officers

10   present in the interview room at any given time?

11       **A.**    No.

12       **Q.**    What's the purpose of limiting that?

13       **A.**    Well, there's only three seats in there, first

14   of all.  One for the Defendant and one for, you know, each

15   officer.  The room is small, an overabundance of people in

16   there, I mean, you just don't do that.

17       **Q.**    What's the purpose of recording all of these

18   interviews, why is that policy, do you know?

19       **A.**    Well, we like to document audio and video for,

20   you know, court purposes and to recall, to refresh memories,

21   things like that.

22       **Q.**    Can it also be used to make sure nothing

23   inappropriate is happening to the Defendant?

24       **A.**    It's also used for the officer safety and the

25   Defendant, uh-huh.

1    **Q.**    Did you produce a written report regarding your

2    involvement in this interview?

3    **A.**    I don't recall ever typing up a report about

4    this.

5    **Q.**    Were you just relying on the interview itself as

6    sort of to speak for itself?

7    **A.**    Yes, sir.

8    **Q.**    Detective Iadonisi, at any point in the

9    interview process, did the Defendant express any contrition

10   or guilt or feeling bad about what happened?

11   **A.**    No.

12   **Q.**    Do you know -- the Defendant was arrested after

13   the interview, is that correct?

14   **A.**    I understand that he was.  I didn't actually see

15   the arrest.

16   **Q.**    And you didn't participate in the arrest?

17   **A.**    No, sir.

18   **Q.**    Prior to that arrest, the entire time the

19   Defendant was in the interview room, though, he had his

20   phone with him, correct?

21   **A.**    Yes.

22   **Q.**    And he was allowed to keep his phone and keep it

23   even when you all were in the room?

24   **A.**    Yes.

25   **Q.**    Did you see him make any calls or anything?

1          **A.**      I didn't personally, no, sir.

2          **Q.**      And there's free wi-fi in the Cherokee Indian

3     Police Department, isn't there, tribal-wide?

4          **A.**      Yes, sir.

5          **Q.**      Anybody can link up to it?

6          **A.**      Yes, sir.

7          **Q.**      Did the Defendant ever ask to speak to anyone

8     outside of the interview room at any time during the

9     interview?

10         **A.**      No.

11         **Q.**      Was there anything physically obstructing him

12    from leaving the interview room at any time?

13         **A.**      No.

14         **Q.**      Other than when officers were coming and going?

15         **A.**      No.

16              MR. EASON:  Those would be my questions for this

17       witness, your Honor.

18              THE COURT:  Cross examination, Ms. Sison.

19              MS. SISON:  Thank you.

20                        CROSS EXAMINATION

21    BY MS. SISON:

22         **Q.**      Detective Iadonisi, was he ever given the option

23    to speak to anybody, I mean, somebody saying to him you want

24    to speak to anyone?

25         **A.**      He had that option.

1          **Q.**      I understand, but did any of you tell him you

2     have the option to speak to someone?

3          **A.**      I did not say that.

4          **Q.**      And you didn't hear anybody else say that?

5          **A.**      I don't recall hearing anyone else say that.

6          **Q.**      And you didn't tell him he could leave at any

7     time, I take it?

8          **A.**      I didn't say that.

9          **Q.**      And I take it that, when you were there, you

10    didn't hear anybody else tell him he could leave?

11         **A.**      I don't recall hearing anybody else telling him

12    he could leave.

13         **Q.**      Okay.  And as I understand it, when he was

14    brought to police headquarters, he was taken to the back

15    door?

16         **A.**      Correct.

17         **Q.**      Not the front door, which is open to the public,

18    is that right?

19         **A.**      That's right.

20         **Q.**      And in order for somebody to get into the back

21    door, you need a card to swipe, is that right?

22         **A.**      That's correct.

23         **Q.**      And, so, either you or Investigator Cable took

24    out your card to go in, is that correct?

25         **A.**      Correct.

1          **Q.**     And you indicated that you don't need a card to

2     get out?

3          **A.**     No.

4          **Q.**     But that's not known to Mr. Jumper, is it?

5          **A.**     I don't know.

6               MR. EASON:  Objection, speculation.

7               THE COURT:  Sustained.

8     BY MS. SISON:

9          **Q.**     He saw you or Investigator Cable take a card and

10    swipe, right?

11         **A.**     I don't know if he saw that or not.  I don't

12    remember.

13         **Q.**     He might have?

14         **A.**     He might have.

15         **Q.**     But it was clear you couldn't just pull the door

16    and it would open?

17         **A.**     Yes.

18         **Q.**     And you indicated also that he had a phone with

19    him during the entire interview?

20         **A.**     He had it on his person.

21         **Q.**     So one of the reasons that was suggested is so

22    that he could call anybody at any time?

23         **A.**     We just didn't have a reason to take his phone

24    at that time.

25         **Q.**     Another reason is that he may call someone at

1      any time, is that right?

2          **A.**      He may.

3          **Q.**      And, so, if he calls somebody and confesses on

4      the phone, that would be yet another evidence that would be

5      good for the police, is that right?

6          **A.**      I suppose so.

7          **Q.**      Now you indicated that you are relying on the

8      tape instead of a written report, is that right?

9          **A.**      I have a transcript of the interview.

10         **Q.**      And you have a transcript in lieu of a police

11     report that you wrote?

12         **A.**      I don't have a police report.

13         **Q.**      And I take it nobody else that day that

14     interviewed Mr. Jumper wrote a police report?

15         **A.**      Detective Cable wrote the police report.

16         **Q.**      He wrote a police report?

17         **A.**      I believe he wrote because this was his case.

18         **Q.**      Would you be surprised if he said he didn't

19     write a police report?

20         **A.**      No, I wouldn't be surprised at all.

21         **Q.**      Okay.  So I think from what you said in direct

22     that part of the reason you didn't need a police report in

23     this case is you have the transcript to rely on?

24         **A.**      Yes.

25         **Q.**      But you don't have the transcript of the actual

1    picking up Mr. Jumper, do you?

2         A.    I was with him.

3         Q.    Correct?

4         A.    There was no transcript of that.

5         Q.    And -- but you didn't write a report regarding

6    your picking him up?

7         A.    Correct.

8         Q.    And you didn't write a report regarding from the

9    time you picked him up and taken him to the police

10   department, is that right?

11        A.    That's right.

12        Q.    And there was no video of that entire encounter

13   with him?

14        A.    No.

15        Q.    And, sir, you said there was never more than two

16   officers in the interrogation room, is that right?

17        A.    To my knowledge, that's right.

18        Q.    And I take it both officers can't speak at the

19   same time, and I'm talking simultaneously, to question a

20   suspect, is that right?

21        A.    Well, sometimes we will speak at the same time,

22   sometimes one of us will start to speak and then the other

23   one will interject, that happens.

24        Q.    Sure, I understand that, but I'm talking about

25   you don't talk intentionally at the same time, I'm not

1    talking about interruptions, but you don't talk at the same

2    time?

3         **A.**    Correct.

4         **Q.**    And, so, you don't need two officers, you could

5    do an interview with one officer?

6         **A.**    You can.

7         **Q.**    And in this case, there were times where

8    Mr. Jumper was alone?

9         **A.**    Correct.

10        **Q.**    There was a time when I think he was alone with

11   you as the only officer there, is that right?

12        **A.**    Correct.

13        **Q.**    But most of the time it was two officers, either

14   you or Investigator Cable, or you or Investigator Lambert,

15   is that right?

16        **A.**    Correct.

17        **Q.**    And, so, I take it that the plan was to get a

18   confession from him, would that be fair to say?

19        **A.**    That was the purpose of the interview.

20        **Q.**    Okay.  You indicated during this interview

21   process he -- and I'm talking about the entire interview

22   process, not a particular time, that he purportedly said

23   that there was five times when he allegedly touched the

24   minor victim in this case, is that right?

25        **A.**    That's right.

1      **Q.**      Now you studied the report -- the forensic

2   interview of that minor victim?

3      **A.**      I didn't study it.  I had -- I was privy to it

4   during the -- a portion of the interview with myself and

5   Detective Lambert.

6      **Q.**      And you're aware that the minor victim said that

7   there were only allegedly three instances?

8      **A.**      I don't recall.

9      **Q.**      You never followed up why there was such a big

10  inconsistency between his purported statement and her

11  purported statement, is that right?

12     **A.**      I don't recall that.

13     **Q.**      You don't recall that?

14     **A.**      I don't recall her saying that it happened three

15  times.

16     **Q.**      Okay.  So you did not study the report from the

17  forensic -- the forensic report regarding the minor victim?

18     **A.**      Right.

19     **Q.**      You didn't?

20     **A.**      Correct.

21     **Q.**      Okay.  So, if Investigator Lambert said she was

22  sharing that information with you, she would be wrong?

23     **A.**      No, I had the CME report as written by the

24  interviewer.  We were passing that back and forth, and that

25  was the first time I was looking at that.  So, while

1  Detective Lambert was talking, I was looking at it.  While I

2  was talking, Detective Lambert was looking at it.  I don't

3  recall seeing where the minor said that happened three

4  times.

5       Q.    Would you like to take a look at it if it would

6  refresh your recollection?

7       A.    Yes.

8            MS. SISON:  Your Honor, may I approach?

9            THE COURT:  Any objection?

10            MR. EASON:  No, your Honor.

11            THE COURT:  Yes, ma'am, you may.

12            THE WITNESS:  Okay.

13  BY MS. SISON:

14       Q.    Does that refresh your recollection?

15       A.    Not really, but, I mean, I recall looking at

16  that and reading bits and pieces as we were interviewing

17  Mr. Jumper.

18       Q.    But that was the case, a total of three times

19  that the victim indicated it happened?

20       A.    What I just read, it indicates three times.

21       Q.    Now, sir, Mr. Jumper kept denying anything

22  happened for a good while, would that be fair to say?

23       A.    He denied it for about an hour more or less, I'm

24  not exactly sure.

25       Q.    And he just kept saying nothing happened,

1      nothing happened, you're wrong, you're wrong, that would be

2      fair to say that's what he said?

3          **A.**        Correct.

4          **Q.**        And then at some point, Investigator Cable left

5      to go get a polygraph expert?

6          **A.**        He had offered that forensic examination to

7      Mr. Jumper who complied and he left the room to go make the

8      necessary phone calls to set that up.

9          **Q.**        And Mr. Jumper readily wanted to take the

10     polygraph, is that right?

11         **A.**        Correct.

12         **Q.**        There was no hesitation on his part?

13         **A.**        No.

14         **Q.**        And this was happening the whole time he was

15     denying anything happened between him and the minor child,

16     is that correct?

17         **A.**        Correct.

18         **Q.**        I take it that -- you said you recently retired

19     there from the police department?

20         **A.**        Yes.

21         **Q.**        And you had said that you had 20 years'

22     experience as law enforcement?

23         **A.**        Correct.

24         **Q.**        Is that all with Cherokee or did you work

25     someplace else?

1      **A.**      No, I worked somewhere else.

2      **Q.**      And how long had you been at Cherokee?

3      **A.**      I was at Cherokee for 13 and a half years.

4      **Q.**      Were you a detective during the entire time?

5      **A.**      No, ma'am.

6      **Q.**      What did you start off as?

7      **A.**      I started off as a corrections officer there.

8      **Q.**      And how long before you went from corrections

9      officer to becoming a detective?

10     **A.**      In April of 2007, I became a detective.

11     **Q.**      Prior to being a corrections officer, were you

12     law enforcement someplace else?

13     **A.**      I was, I was a patrol officer six years in

14     Bryson City.

15     **Q.**      And what about prior to that?

16     **A.**      I was a reserve officer in Fort Pierce, Florida

17     for approximately a year.

18     **Q.**      Okay.  Now, as part of your training, were

19     you -- have you taken any classes in interrogation

20     techniques?

21     **A.**      Yes.

22     **Q.**      And how many classes have you taken?

23     **A.**      I've taken quite a few classes.  I don't have

24     all my training certificates with me, but we have been to

25     several interview and interrogation techniques.

1      **Q.**     And when you say "we," are you talking about the

2  other police officers?

3      **A.**     The other investigators.

4      **Q.**     And how often would you go?

5      **A.**     Whenever they become available.

6      **Q.**     And, so, when you say quite a bit, I'm assuming

7  more than 10 during your career?

8      **A.**     We probably have been to about three or four

9  interviewing interrogation techniques, seminars, symposiums.

10  We've been to crime scene investigation techniques, evidence

11  collection, bullet trajectory, blood splatter analysis.  We

12  have gone to a lot of investigator training.

13      **Q.**     And, so, part of those techniques is to ask the

14  questions so that the person will provide you information

15  about what you believe happened, would that be fair to say?

16      **A.**     We ask him a question that pertains to what

17  we're talking about.

18      **Q.**     And according to your direct testimony, you

19  never suggested an answer?

20      **A.**     I don't recall.

21      **Q.**     Pardon me?

22      **A.**     I don't recall that.

23      **Q.**     So everything that Mr. Jumper said was not a

24  result of a suggestion from the police, that's something

25  that he came up with himself?

1      **A.**      Not all of them, no.

2      **Q.**      So there were some suggestions that you or one

3  of the other officers made?

4      **A.**      Yes.

5      **Q.**      And I believe one of the things you had asked

6  him, that was there was accidental touching at some point.

7      **A.**      I don't recall exactly asking it in those words,

8  but I probably did.

9      **Q.**      Okay.  And that also I got the feeling from

10  reading the transcript that you were trying to show him that

11  you were trying to help him out.  Would that be a fair

12  characterization?

13      **A.**      By telling the truth, I would tell the

14  prosecutor that he cooperated.

15      **Q.**      Do you remember telling him that you can fix

16  this?

17      **A.**      We can fix this.

18      **Q.**      Meaning you and he together?

19      **A.**      Meaning if he tells the truth, yeah, we can fix

20  this.

21      **Q.**      And you used the word "truth"?

22      **A.**      The truth.

23      **Q.**      And do you remember saying that, after today,

24  meaning after the day of the interview, that you couldn't

25  help him anymore?

A.     After his interview was over, I knew that he was going to be charged and arraigned and assigned a lawyer, an attorney, and I wouldn't be able to talk to him one-on-one anymore after that day.

Q.     Is that what you told him, that, after this, he's going to be charged, arraigned, given an attorney and that you can't speak one-on-one with him anymore?

A.     No, I just told him after today, I can't talk, I can't help you anymore.

Q.     And then do you recall telling him that you didn't want the girl to go through court?

A.     I recall that, yes.

Q.     And that, at some point, do you recall telling him that her mother had a part in this, too?

A.     I never said that to him, no.

Q.     You don't recall saying that the latter part?

A.     I don't recall that, no.

Q.     Do you remember telling Mr. Jumper that the minor child was torn and I'm assuming you meant the private parts?

A.     Yes.

Q.     And do you recall saying that she was scarred?

A.     I do.

Q.     And do you mean that physically or psychologically?

1     **A.**      I told him that she was scarred meaning

2     physically and I also told him that she was -- could have

3     been traumatized.

4     **Q.**      Okay.  And, so, when you went to pick him up

5     initially in the Robbinsville home, I take it you went to

6     his cousin's house.  Do you remember that?

7     **A.**      Yeah, I mean, yes, he was a -- his last name was

8     Jumper as well; I don't recall his first name offhand.

9     **Q.**      Would it be Jason?

10    **A.**      I don't recall.

11    **Q.**      Now you gave the address of 143 Wachacha Road?

12    **A.**      Yes.

13    **Q.**      Was that -- that's Mr. Jumper's home.  I just

14    want to make sure I wasn't -- that is not the cousin's home,

15    right?

16    **A.**      That's where they were staying.  I don't recall

17    the address of his cousin's home.

18    **Q.**      Are you sure it wasn't at his cousin home at 41

19    Little Snowbird Road?

20    **A.**      It could have been.  I don't recall that.

21    **Q.**      Okay, but it was within, I guess, five minutes

22    of each other?

23    **A.**      Yes.

24    **Q.**      And at that point, did you ever tell -- and I'm

25    talking about when you first initially encountered

1    Mr. Jumper, did you ever tell him that he was a suspect?

2        **A.**    I don't recall ever telling him that.

3        **Q.**    So you never told him that?

4        **A.**    No.

5        **Q.**    Do you remember hearing if Investigator Cable

6    told him that?

7        **A.**    I don't recall him -- I don't recall that.

8        **Q.**    And you never told him that there was a warrant

9    for his arrest?

10       **A.**    I never told him that.

11       **Q.**    And you never told him that there was a criminal

12   complaint with his name on it?

13       **A.**    I never told him that.

14       **Q.**    And, so, during the time that you took him from

15   his house, or whoever's house it was, to the police station,

16   did you ask him any questions?

17       **A.**    No.

18       **Q.**    Did you make any small talk with him?

19       **A.**    No.

20       **Q.**    Did you hear if Investigator Cable made any

21   small talk with him?

22       **A.**    I don't recall hearing anything.

23       **Q.**    Did you hear Investigator Cable ask him any

24   questions?

25       **A.**    I don't recall Investigator Cable asking him

1    anything.

2         Q.      So, during the entire -- and I take it it was

3    about an hour from Robbinsville to the police department,

4    was there any conversation that went on?

5         A.      No.

6         Q.      No conversation at all?

7         A.      Not that I recall.

8         Q.      And because you hadn't told him anything, he

9    didn't know why you were taking him other than you had

10   questions, would that be fair to say?

11        A.      Correct.

12        Q.      And you -- now you indicated that, at some

13   point, you did leave the interview room at some point?

14        A.      At some point, we left the interview room,

15   correct.

16        Q.      Do you remember how many times you did that?

17        A.      No, I don't.

18        Q.      And when you did leave, was it for any period of

19   time when somebody else was talking with him?

20        A.      I don't recall that.

21        Q.      Do you recall watching him from the

22   investigators' room through, I guess, the video monitor of

23   some sort?

24        A.      I recall seeing him, watching him for a little

25   bit, yes.

1      **Q.**     Do you know what he was doing at that time?

2      **A.**     He was sitting there very still.

3      **Q.**     Okay.  And during the time that this interview

4 was happening, did you have a chance to talk to Officer

5 Jenkins?

6      **A.**     No.

7      **Q.**     Was he in the interview -- in the investigators'

8 room?

9      **A.**     I don't know where he was.

10      **Q.**     Did he ever enter the interrogation room?

11      **A.**     Not to my knowledge.

12      **Q.**     And who served the criminal complaint and the

13 arrest warrant on Mr. Jumper, if you know?

14      **A.**     Detective Jenkins.

15      **Q.**     I'm sorry?

16      **A.**     Detective Jenkins.

17      **Q.**     So is that the only time that he went into the

18 room?

19      **A.**     As far as I -- as far as I know, yes.

20      MS. SISON:  Okay.  Thank you, sir.

21      Nothing more, your Honor.

22      THE COURT:  Any redirect, Mr. Eason?

23             REDIRECT EXAMINATION

24 BY MR. EASON:

25      **Q.**     Detective Iadonisi, the -- what would you say is

1    the purpose of an interview in any situation?

2         **A.**    To determine -- to get the truth.

3         **Q.**    And was --

4         **A.**    To hear their story and get the truth out.

5         **Q.**    And was that the purpose of the interview in

6    this case as well?

7         **A.**    Yes.

8              MR. EASON:  Those would be my questions on

9    redirect, your Honor.

10             THE COURT:  Thank you, Detective.  You may step

11   down.

12             THE WITNESS:  Yes, sir.

13             THE COURT:  Any further evidence by the

14   Government?

15             MR. EASON:  Not at this time, your Honor.  I

16   believe that's the evidence from the Government.

17             THE COURT:  Ms. Sison, you had indicated

18   previously you expected to present evidence that lasts an

19   hour to an hour and a half?

20             MS. SISON:  That's correct, sir.

21             THE COURT:  We will go ahead and proceed with

22   yours at this time, if you want to call your first

23   witness.

24             MS. SISON:  Your Honor, that would be

25   Dr. Richard Leo.

1              THE COURT:  Dr. Leo, please come around this

2       way.

3    THEREUPON:

4                   RICHARD LEO, PhD, JD

5    called as a witness on behalf of the Defendant herein, duly

6    sworn and responding "I do," was examined and testified as

7    follows:

8              THE CLERK:  Thank you, sir.

9              MS. SISON:  Your Honor, before I start, Mr.

10       Eason and I talked about Dr. Leo's CV.  I believe it was

11       part of the attachments to the reply and Government does

12       not have any objection.

13              MR. EASON:  Your Honor, we're just asking

14       specifically as to the area he's going to be tendered as

15       an expert.

16              MS. SISON:  That's correct, your Honor.  I'm not

17       going far afield anyplace else.  The CV does have

18       information about his accomplishments and stuff, but I

19       understand where Mr. Eason is coming from, so I'm not

20       asking anything legal.

21              THE COURT:  I'm not sure I understand where

22       you're coming from.  Is the question whether his CV is --

23              MR. EASON:  No, no, your Honor.

24              THE COURT:  -- not being offered or what he's

25       being offered to testify about.

1          MR. EASON:  Your Honor, the CV is satisfactory

2     and Dr. Leo has testified as an expert in cases, actually,

3     that I've worked on before and I'm well aware of his

4     credentials.  I just want to know -- I guess I'm

5     interested in the specific area of expertise he's going to

6     testify about today.

7          THE COURT:  That was the question I'd had as

8     well.

9          Ms. Sison, what field or area is he going to be

10    testifying about today?

11         MS. SISON:  Your Honor, Dr. Leo has a specialty

12    in discussing interrogation techniques and, so, what I'm

13    going to ask him about is the interrogation techniques

14    that were used in this particular case.  So we're talking

15    about confession that I believe was involuntarily made, so

16    that's -- it's limited to that.

17         THE COURT:  So he's being proffered as an expert

18    in the field of interrogation techniques?

19         MS. SISON:  That's correct.

20         THE COURT:  And what's Government's position

21    about that?

22         MR. EASON:  In that regard, your Honor, we would

23    have no objection.

24         THE COURT:  I have reviewed his CV.  Ms. Sison,

25    if you wouldn't mind for the record just laying a little

1      more foundation in that regard.

2              MS. SISON:  Yes.  And we will ask questions,

3      your Honor, so in light -- I'm sorry for going to ask a

4      lot of questions, but I'm going to do it directly.

5              THE COURT:  Yes, ma'am.

6                       DIRECT EXAMINATION

7      BY MS. SISON:

8          Q.      Dr. Leo, what's your current occupation?

9          A.      I'm currently professor of law and psychology at

10     the University of San Francisco.

11         Q.      And what are your responsibilities at the

12     university?

13         A.      I teach courses, I do research and publication,

14     and I do service to the university and the community.

15         Q.      And what courses do you currently teach?

16         A.      I currently teach criminal law, constitutional

17     criminal procedure and seminar on erroneous convictions in

18     the criminal justice system.

19         Q.      And were you previously professor of psychology

20     and criminology at UC Irvine?

21         A.      I was.

22         Q.      And what kind of courses did you teach there?

23         A.      There, I taught undergraduate courses on

24     criminal justice system, on police interrogation and

25     confessions, on erroneous convictions, and I taught graduate

1    level seminars on police organizational behavior and other

2    topics in the fields of criminology and social psychology.

3        **Q.**    And can you tell us about your academic training

4    and the degrees you currently hold?

5        **A.**    Sure.  I have a bachelor's degree in sociology

6    from UC Berkeley, a master's degree in sociology from UC

7    Berkeley.  I have a JD and PhD from the UC Berkeley.

8            The PhD is in interdisciplinary law and social

9    science program which allowed me to specialize in graduate

10   school in fields of criminology, social psychology and

11   sociology in addition to law.

12       **Q.**    And, so, as part of your PhD, did you do a

13   dissertation?

14       **A.**    I did.

15       **Q.**    And can you tell us what the subject of that

16   dissertation was?

17       **A.**    It was the how interrogation, police

18   interrogation, had changed over the course of the 20th

19   century and the implications for psychology for law and for

20   public policy.

21       **Q.**    And when did you present that dissertation?

22       **A.**    The research was done in 1991 to 1993.  It was

23   written in 1993 to 1994 and filed in 1994.

24       **Q.**    And have you published any articles or books

25   based on that particular research?

1          **A.**      I have, yes.

2          **Q.**      What other topics have you conducted research

3     on?

4          **A.**      So the primary topics I've conducted research on

5     in my career would be the psychology of interrogation,

6     psychological coercion, true and false confessions, and the

7     problem of error in the criminal justice system, why it

8     happens and what can be done to minimize it from happening.

9          **Q.**      You had mentioned that you had a JD.  Are you a

10    practicing lawyer?

11         **A.**      I am not, no.

12         **Q.**      Why did you get a JD?

13         **A.**      Well, certainly it's a busman's holiday, so it

14    turned out to be free, I didn't have to pay for it.  I was

15    able to use any graduate fellowship money to pay for the

16    tuition of the law school.  And since I wanted to be a

17    scholar, a social scientist of the legal system,

18    essentially, I thought it would be helpful to have a JD to

19    better understand the legal system.  So that was primarily

20    the reason.  It was for academic reasons and interest, not

21    to become a lawyer.

22         **Q.**      Okay.  You had mentioned that you had published

23    articles and books in regards to your research.  How many --

24    I mean, just give us a ballpark figure as far as the books

25    and the articles.

1    **A.**      So half a dozen books at this point.  And the

2    articles I tend to lump them together with chapters and

3    edited volumes.  So, at times connected with research,

4    somebody will put together a series of papers that become

5    chapters in a book that's an edited book about a certain

6    topic.  So lumping the academic journal articles with the

7    chapters in edited volumes, at this point, I think I'm over

8    a hundred or around a hundred.

9    **Q.**      So can you tell us what a peer-reviewed

10   publication is?

11   **A.**      Sure.  So, in academia, particularly in science

12   and social science, the convention is, when you submit an

13   article or a book manuscript, to have it anonymously

14   reviewed by your peers which would be experts in your field

15   for the originality and the quality of the analysis and the

16   data and the conclusions, and then the editor will decide

17   whether to accept or reject the article or ask for it to be

18   revised and resubmitted based on the peer reviews.

19           And, so, the theory is that if the peer reviews

20   are negative, the article would not be accepted.  If the

21   reviews are positive, the article would be accepted.  If

22   it's in the middle, the work would be revised responsive to

23   the critical comments within the review.  And, so, the

24   theory is that it weeds out research and publications,

25   doesn't mean the standards of the scientific research or

1    discipline and, therefore, you get a higher quality research

2    and publication.  So, really, it's a quality control

3    mechanism, a way in which scientists and social scientists

4    police the quality and the competence of the research that

5    ultimately gets accepted for publication.

6        **Q.**    So the publications that you mentioned, are most

7    of them peer reviewed?

8        **A.**    In my case, yes.  When I shifted to teaching at

9    the law school, some of the research that I published has

10   been in law reviews and law reviews either have no peer

11   review or they have some brief peer review, sometimes full

12   peer review or modified peer review, but the overwhelming

13   majority of my publications have gone through the

14   traditional peer review process and I serve at times as peer

15   reviewer at times myself.

16       **Q.**    Can you tell us some honors or awards that

17   you've received in your field?

18       **A.**    So I've been very fortunate to receive a number

19   of honors and awards.  The awards really break into two

20   categories.  There's career achievement or lifetime

21   achievement awards based on the body of my research and

22   publications and then there are awards for particular books

23   that I've written.

24            The organizations that have given these awards

25   have been academic, professional, scientific organizations

1    like the American Society of Criminology or the American

2    Psychological Association or the American Sociological

3    Association.  So there's a number of awards over the years

4    of those nature -- that nature.

5        **Q.**     And, so, the research that you've done, is this

6    a generally accepted area of study within the social

7    scientific community?

8        **A.**     So the specific areas that I mentioned earlier

9    are all generally accepted in the sense that there is a body

10   of social scientific research and critical peer-reviewed

11   social science research that goes back many decades, that

12   there are hundreds, if not thousands, of publications,

13   primarily journal articles but also books, that this is the

14   subject matter where there are dozens of graduate students

15   and professors and internet researchers and document

16   research publishing -- writing dissertations, publishing

17   articles and books, every year.  That when the large

18   disciplines of social psychology, criminology have

19   encyclopedias, there's usually a section on psychology

20   interrogation of false confessions, for example.

21            So it's generally accepted in that there is this

22   body of peer-reviewed research and, more specifically, it's

23   generally accepted in terms of the core body of findings,

24   the methods that are used to acquire the information and the

25   research.  There are theories or principles that animate or

1    drive some of the research that is also part of what is

2    generally accepted.

3          So there's general acceptance that it's a

4    legitimate area of study going back many years with

5    recognized methods with the core body of findings,

6    obviously, science and social science change over time and,

7    so, people push the envelope, new additions, new ideas as in

8    any field, but there's no dispute that it's a generally

9    accepted area of social science in the ways that I've

10   described.

11   **Q.**    And, so, have you been invited to do

12   presentations or seminars to particular groups of people?

13   **A.**    So I've given hundreds of seminars -- or

14   lectures, I should say, not seminars.  It divides into two

15   or three types of situations.  One is where I make

16   presentations at scientific and professional societies upon

17   research or I give keynote lectures at these societies

18   synthesizing a body of research.

19          And then there is invitations to present at

20   universities, which is typically the same thing, ongoing

21   research or synthesis, or perhaps at a conference around a

22   particular subject matter or theme.

23          And then the third context would be to criminal

24   justice professionals.  So what is this body of knowledge

25   have to do or how can it help or apply to the activities of

1    particular professional groups.

2              So, primarily, I've given lectures to -- invited

3    to give lectures to criminal defense attorneys, in

4    particular, public defenders and also presented many times

5    to judges at their conferences, to police officers, though

6    not very recently, either teaching courses to a couple

7    departments that I did in Florida many years ago or giving

8    lectures to police organizations or at conferences of law

9    enforcement, to paralegals, to investigators, to forensic

10   psychologists and psychiatrists.  That would be the third

11   type of lectures that I've been invited to present over the

12   years.

13   **Q.**    Have you ever been an advisory member to a

14   police department?

15   **A.**    I was on one occasion in the City of Long Beach,

16   they had an academic advisory committee.  So the police

17   chief that met every couple of months had a number of local

18   area academics who studied either policing or subjects

19   related to policing.  I think it was about 2001 or 2003 for

20   the Long Beach Police Department as a member of that

21   committee.

22   **Q.**    And have you ever been asked to give legislative

23   testimony based on your research?

24   **A.**    I have on a number of occasions; I'd say about

25   half a dozen at this point, California, Wisconsin, Illinois,

New York.  Again, the testimony has been responsive to what
the congressional committee or subcommittees were looking
for.  So research on use of intimidation or the use of
deception during interrogation or how to recognize and
prevent false confessions leading to erroneous convictions.

Q.      So have you ever testified as an expert witness
on the subject of police interrogation, involuntary
confessions and psychological coercion?

A.      I have on many occasions, yes.

Q.      And have you actually served in that capacity
before this Court?

A.      I believe I have on at least one occasion or
maybe only one occasion, yes.

Q.      And that was a couple years ago before a
different magistrate judge, is that correct?

A.      Correct.

Q.      And how many times have you been qualified to
testify as an expert witness and in what states?

A.      Well, at this point, it's over 350 times.  I
believe it's around 35 to 40 states, somewhere in that
range, going back to 1997.  Most of the time, state court,
but I think about 30 times in federal and military courts.
And about two-thirds of the time at trials and about
one-third of the time at pretrial motions in limine or
suppression motions or what, in California, are called 402

1    hearings.

2         **Q.**      Have you ever testified for the prosecution?

3         **A.**      I have, yes, on three occasions.

4         **Q.**      Why -- can I ask why so few?

5         **A.**      Well, it's very rare for my kind of expertise to

6    be called by the prosecution.  I'm sure there are other

7    types of investigations where it would be rare to be called

8    by the Defense.  And, so, I almost never get any calls

9    asking me to consult on cases by the prosecutors.

10        **Q.**      Well, given the research that you've done, are

11   you opposed to police interrogation?

12        **A.**      No.

13        **Q.**      Can you say more about that?

14        **A.**      Yes, sure.  So a couple things.  One is that I

15   think everyone, whether it's law enforcement or academic

16   researchers, is really interested in the same thing, which

17   is improving the quality of interrogation so that you can

18   get more accurate and reliable confessions and fewer false

19   or inaccurate confessions.  I found the research

20   tremendously fascinating starting with police interrogation

21   and then the unintended consequences of which could be

22   coerced or involuntary or false confessions.

23             There is some police interrogation manuals that

24   many years ago referred to opponents of police interrogation

25   and sometimes would directly or indirectly refer to me and

1    the research that I'd done.  I don't think of myself as an

2    opponent.  When I have been invited to give talks to police

3    or put on police training, I've done it, I've always done it

4    pro bono.

5           So what I want is interrogation procedures that

6    are fair and result in accurate information and I think, to

7    solve crimes in a democratic society, that's enormously

8    important.  I don't see myself as an opponent of police

9    interrogation.  It maybe because, when I testify, I often

10   testify for criminal defense attorneys.  Maybe that's why

11   there's a misperception, but I don't think I've been

12   referred to police interrogation manuals as an opponent of

13   police interrogation.

14           MS. SISON:  Your Honor, I would like to tender

15    Dr. Leo as an expert witness in police interrogation,

16    psychological coercion and involuntary confessions.

17             THE COURT:  Any objection by the Government?

18             MR. EASON:  No, your Honor.

19             THE COURT:  Do you have any questions before I

20    rule on that tender?

21             MR. EASON:  No, your Honor.

22             THE COURT:  Without objection by the Government,

23    the Court will accept Professor Leo's testimony in the

24    areas of interrogating techniques, psychological coercion

25    and involuntary confession.

1          You made proceed, Ms. Sison.

2          MS. SISON:  Thank you.

3   BY MS. SISON:

4      **Q.**      Can you give us a brief history of the police

5   interrogation methods in the United States?

6      **A.**      Very briefly, the old method of third degree,

7   physical coercion, was very common in the early part of the

8   20th century through the 1930s and it was effectively

9   released out and replaced by, with some exceptions,

10  psychological interrogation methods in the 1940s and since

11  the 1940s has been primarily psychological.

12          So police are now trained in psychological

13  approaches to interviewing and interrogation.  In the 1940s,

14  police investigators started writing manuals and later put

15  on training courses across the country and that has

16  continued to develop to this day.

17     **Q.**      When you said "third degree," I imagine you mean

18  some sort of physical coercion?

19     **A.**      Correct.  Primarily physical coercion, sometimes

20  brutal physical coercion, often combined with psychological

21  coercion and duress as well.

22     **Q.**      And, so, as the method developed, it became less

23  that and more psychological?

24     **A.**      Correct.

25     **Q.**      And from what you said, it sounds like it's

1    primarily psychological?

2         A.        I think with rare exception, correct, that it's

3    understood that interrogation is psychological and there's

4    not supposed to be any physical aspects to the police

5    interrogation anymore.  And, so, when we read about cases of

6    physically coercing interrogation, it's usually exceptional,

7    outside of Chicago, it's usually just, you know, one off

8    kind of thing.

9         Q.        And you're talking about what they call bad

10   cops?

11        A.        Correct, yeah.

12        Q.        And, so, when you say it's the exception, that's

13   not how interrogation techniques are being taught?

14        A.        Correct.

15        Q.        Now what's the difference between an interview

16   and an interrogation?

17        A.        So police make this distinction going back to

18   the 1940s.  Interviewing -- they are both forms of getting

19   information in the end but they are very different.

20   Sometimes they are used dishonestly, but they are not the

21   same thing.  The idea behind interviewing is it occurs in

22   the earlier stage of investigation.  The interviewer

23   is typically interviewing victims, witnesses, potential

24   suspects.  The idea is to ask open-ended questions, not to

25   be accusatory, not to be suggestive, not to be leading, to

1    let the person be interviewed do most of the talking and,

2    ultimately, the goal is to advance the investigation, get

3    the truth, develop a base theory of why did that particular

4    crime occur.

5           An interrogation is different because normally

6    you interrogate suspects.  The idea, at least in police

7    training, is you should prefer investigation before you have

8    interrogation.  So interrogation would not occur early in

9    the process, it shouldn't be a fishing expedition, it should

10   be solidly based on evidence prior to the interrogation.

11   And police are trained primarily in America only interrogate

12   somebody once you concluded that they have committed a

13   crime, normally, in the investigator's mind.

14          The interrogation involves specialized

15   techniques.  These techniques are based on pressure and

16   persuasion, psychological techniques.  It's different from

17   interviewing in that the interrogator is trained to dominate

18   the conversation until you get the interviewee or, I should

19   say, the suspect to start making incriminating statements.

20   The goal is ultimately to remove the suspect from expected

21   or anticipated denial to admission, ideally a narrative

22   confession, that can then be used to help prosecution

23   convict the presumed guilty subject.

24          So interrogation -- interview and interrogation

25   are very different in terms of the assumptions, the point in

1    the process where they occur, the person that is interviewed

2    and then the techniques of interviewing persons versus

3    techniques of interrogation as well as the goal of

4    interrogation versus interview.

5        **Q.**    Now, do police not -- talking about tribal

6    police or even the police officers, special agents, do they

7    receive any kind of training in interviewing versus

8    interrogation?

9        **A.**    Typically, it's interview above interrogation.

10   I think interviewing is more straightforward and typically

11   more mistakes, so police, in their courses, I've taken many

12   of them, I've read all the manuals and written about this,

13   in the courses, typically interviewing is a small portion

14   and it's primarily about interrogation, how to effectively

15   interrogate, what techniques you use sometimes

16   differentiating by types of crime, things to learn about the

17   law and avoid.

18            So they are trained to do both, but typically

19   not separately, typically together in like a 3-day or 1-day

20   or 4-day seminar.

21       **Q.**    So, you said you took some of these courses.  I

22   mean, when somebody is teaching police, are they making a

23   distinction by saying this is an interview technique, this

24   is an interrogation technique?

25       **A.**    Yes, but, typically, they might start with

1   interview, talking a little bit about interviewing, and then

2   interrogation when it's clear -- move to interrogation, it's

3   clear that's what they are discussing.  So, typically, it

4   wouldn't be the case that we were talking about approaches

5   or methods, they would say this is interview and that's

6   interrogation; it would be more of a move from here's the

7   interviewing segment to now we're going to the interrogation

8   segment and different techniques would be discussed in both.

9       **Q.**     Is there a leading manual, training manual for

10  interrogation?

11      **A.**     So the leading manual is called the Reid Manual,

12  R-E-I-D, and it goes back to the 1940s.  There's a firm in

13  Chicago, Reid & Associates, that first produced that manual

14  and have continued to write updates and put on training all

15  across the country and sort of dominates the field of police

16  interviewing and interrogation, so much so that what they

17  call the method of interrogation, the Reid technique or the

18  Reid method, is pretty much synonymous with how American

19  police conduct these interrogations.

20               So their book is called the bible of

21  interrogation, but even training forces or training firms

22  that don't explicitly use that book or don't exclusively

23  call it the Reid method pretty much derive what they do from

24  the Reid method of interrogation.  So it's synonymous for

25  the most part with American-style police interrogation.

1      **Q.**      And, so, you've heard Investigator Iadonisi and

2      Investigator Cable make a reference to Reid.  Is that what

3      you're referring to as well?

4      **A.**      Correct.  And they put on introductory

5      interviewing interrogation training courses as well,

6      interviewing courses.

7      **Q.**      And are there situations where someone takes the

8      Reid course and try to teach it to another person without

9      calling it Reid, does that ever happen?

10      **A.**      Yes, it's permeated the culture of police

11      investigation.  And also the Reid courses are quite

12      expensive and, so, sometimes departments, to save money,

13      will send someone to one of those courses, maybe the

14      in-house -- somebody who is an in-house experienced

15      detective, and then that person will come back, or maybe two

16      people, and teach a version of the course to the detectives

17      of that department.

18      **Q.**      Do police typically receive training in

19      psychological interrogation methods and techniques?

20      **A.**      Yes.  So getting statements and confessions is

21      very important in solving crimes and the assumption is

22      that it's not -- and it's a correct assumption, it's never

23      in somebody's self-interest to confess, therefore, it may be

24      difficult to get confessions and statements, and good

25      interrogators are not born, they are trained and learn it.

1    So the point of interrogation, interview and interrogation

2    training, is to make police better, learning the collective

3    wisdom and psychology over the last 75 years, to get better

4    at eliciting the kind of evidence that may be difficult to

5    elicit to solve crimes and prosecute people.

6        **Q.**      And are they trained to investigate before they

7    interrogate?

8        **A.**      So, you know, I was referring to that indirectly

9    earlier.  It's one of the -- it's kind of a mantra of the

10   Reid method in particular.  So the idea is that when you

11   subject somebody to an interrogation, you want to have a

12   basis for that because it involves pressure.  You wouldn't

13   start an investigation with an interrogation.  As I

14   mentioned earlier, police trained in the Reid method only to

15   interrogate once they've concluded that the person committed

16   a crime or, in their mind, it's reasonably likely that the

17   person committed the crime.

18       **Q.**      And, so, why do they receive -- why do police

19   receive training in these interrogation methods?

20       **A.**      Well, an interview will be more effective in

21   eliciting this kind of evidence which can be difficult to

22   elicit.  I think also there is always or almost always a

23   legal segment to it, typically, at the end.  So not only to

24   learn the methods that would make you more effective at

25   eliciting this type of evidence but also to learn where the

1    legal lines are so that those lines aren't crossed.

2           And police also know, for example, about Miranda

3    and what Miranda requires as well as other areas of law that

4    might be relevant to interrogation as well as best

5    practices, when to do and what not to do.

6      **Q.**     Are these interrogation methods, the

7    psychological ones, are they beyond common knowledge and

8    experience?

9      **A.**     They are for a few reasons.  Most people would

10   not have had the experience of being interrogated, and even

11   if they had the experience of being interrogated, they

12   typically wouldn't be able to identify the techniques by

13   name.  Most people haven't read the social science research

14   on these type of techniques, are not familiar with the

15   psychology of these techniques.

16          So they are not something that are typically

17   part of the daily experience or common experience, I should

18   say, of suspects who are being interrogated and even

19   criminal justice professionals who might be interrogators or

20   evaluate the work of police in courtrooms typically haven't

21   read the research and couldn't really talk about what the

22   techniques are, how they are designed to work or what the

23   research shows about their effect.

24     **Q.**     So is there a scientific discipline that

25   carefully studies police interrogation methods and

1    confessions?

2        A.        So it's primarily the field of psychology which

3    is divided into a number of subfields.  The primary subfield

4    of the discipline of psychology is social psychology, at

5    least the one that studies this.  Social psychology is the

6    study, essentially, of the human behavior in social

7    contexts, particularly with respect to persuasion and

8    attitudes and beliefs and perceptions and decision-making.

9            So most scholars who study the interrogation

10   process, methods, confessions are social psychologists.

11   There are also clinical psychologists who study personality

12   traits that make people more vulnerable or likely to

13   confess.  And there are also other social scientists,

14   primarily but not exclusively criminologists, people in the

15   criminal justice system, typically police and police

16   investigation, who also have studied police interrogation

17   and confessions.

18       Q.        How far back does the empirical study go?

19       A.        Well, it goes back to 1908 and, of course,

20   empirical means coming up with the data, not just talking

21   about off the top of your head or philosophizing, but even

22   though it goes back to 1908, I would say the modern study

23   with the modern social scientific sophisticated research

24   methods begins in the early 1980s.

25       Q.        And is that generally accepted within that

1    relevant scientific community?

2         **A.**    Yes.

3         **Q.**    And what are indicia that are generally accepted

4    within this scientific community?

5         **A.**    Well, I guess first would be peer-reviewed

6    publications.  There's hundreds of thousands of those.

7    Second would be that there are generally accepted methods

8    for gathering data and public publishing in the discipline.

9    Usually researchers in the social sciences are trained, not

10   only substantively in the area but also methodologically,

11   different ways of gathering data and executing basically

12   empirical research.  That's also checked by the peer review

13   process which is another indicia of generally accepted

14   field.  And I mentioned earlier encyclopedias, that when you

15   break down the subject matter discipline typically include

16   interrogation, confession, in psychology.

17            At some point, when a field becomes of a

18   particular size, measured by a number of publications and

19   number of researchers contributing to it, textbooks usually

20   emerge to summarize that for people who are generalists who

21   are not experts in that subfield and that's also happening

22   in this area of research.

23            So, whether it's peer reviewed, number of

24   qualifications, how far they go back, the development of the

25   field, encyclopedias, specialized textbooks, there's no

1    dispute that this is a generally accepted area within social

2    science, but particularly within the discipline of

3    psychology and social and clinical psychology in particular.

4         Q.        So what's the goal of police interrogation then?

5         A.        Well, the primary goal of police interrogation

6    is to get an incriminating statement, ideally, a narrative

7    confession from somebody who has been presumed guilty of

8    committing a crime and, ideally, truthful and verifiable and

9    accurate incriminating statement for full confession.

10        Q.        And, so, what are the main techniques of

11   interrogation and how does it work as a psychological

12   process?

13        A.        So I think there's two questions there.  The

14   core interrogation is half a dozen or so categories.  So

15   there are hundreds of pages of interrogation training

16   manuals and dozens of techniques, but at its core, what

17   interrogation -- the main techniques of interrogation would

18   be isolating somebody, which is why typically they are put

19   in the interrogation rooms.  Developing rapport typically

20   prior to the giving of Miranda warnings but sometimes

21   through an interview as it becomes an interrogation.

22   Accusing a suspect of committing the crime.  Accusing the

23   suspect of lying when they denied committing the crime.

24             As the suspect continues to deny, challenges

25   those denials, attacking the denials as illogical,

implausible, inconsistent with the detective's superior

knowledge or experience.  Confronting the suspect with

alleged or real evidence linking them to the allegations.

So that they might have true and accurate evidence, they

might have circumstantial or ambiguous evidence, and they

are allowed to make up or pretend they have evidence, tell a

suspect they have evidence that doesn't exist and sometimes

exaggerate existing evidence.  So that's a technique.

Another technique is putting pressure on a

suspect.  There's a variety of ways in which police can do

that.  Sometimes they raise their voices, sometimes they

don't.  Sometimes they move closer.  Sometimes they tell a

suspect it's now or never, this is your only opportunity for

me to help you or we're going to be here as long as it

takes.  There's a variety of ways in which they can put

pressure on a suspect.  The Reid people talk about

increasing the anxiety of suspects and that can happen

through a variety of ways of just putting personal pressure

on the suspect.

And then I would say some form of what we call

inducements or incentives where police try to persuade a

subject it's in their self-interest if they stop denying and

start admitting.  They might make moral appeals.  They might

make psychological appeals.  They might be appeals to how a

suspect's case is going to unfold in the legal system and

1    why they would be better off if they stopped lying and

2    started admitting.

3              Sometimes what happens in these inducements or

4    incentives is the police will come up with two scenarios,

5    sort of a good scenario and a bad scenario, but they don't

6    really call it this in police training, they call it themes

7    and the alternative question.

8              And, so, for example, a homicide case, they

9    might talk about -- the police might try to convince the

10   suspect that it was self-defense or just an accident.  That

11   would be the good scenario because it conveys mitigation of

12   consequences or blameworthiness.  If it was just an accident

13   or a person was killed in self-defense and if the person won

14   confesses, the idea is they could confess to that, but if

15   they continue to deny, the people will impute or attribute

16   to them the bad scenario which would be pre-medicated

17   potentially, cold-blooded planned murder.

18             So sometimes these appeals to self-interest will

19   be explicit.  Sometimes they will be psychological, moral,

20   legal, sometimes they would be in the form of sort of these

21   good/bad scenarios that are designed to get the suspect to

22   admit to the underlying crime.

23        Q.   So you're talking about a number of different

24   types of techniques and they don't necessarily use all of

25   them, is that correct?

1      **A.**      Correct.  They don't necessarily use all of them

2      and a lot of times what they do is variations on a

3      particular technique and repetition of particular

4      techniques.

5            The psychology, which is the second part of the

6      question, is -- trying to be very brief here -- to convince

7      the person they are caught, they are trapped, all the

8      evidence establishes their guilt, there's no doubt in the

9      investigator's mind.  Nobody is going to believe their

10     denials, the jig is up and, given that fact, it's in their

11     best interest to stop denying and start admitting.

12           So that's the psychology of interrogation in a

13     nutshell.  It's really sort of carrots and sticks and

14     motivating somebody who is -- sticks and carrots, motivating

15     somebody to see it as in their best interest, given their --

16     given what the interrogator is representing as the facts and

17     the inevitability of what's going to happen in the case, it

18     makes sense for them to stop denying and start agreeing and

19     admitting.

20     **Q.**      So I take it in order to do that they have to

21     assess the person that they are interrogating, is that

22     right?

23     **A.**      Well, they are trained to assess people as part

24     of the training and then to assess what techniques they

25     should use after having done what the Reid manual versus

1    actual analysis, investigation and analysis.

2        **Q.**      So, when you say psychological coercion, you're

3    talking about the methods that are being used to get that

4    person to do something that they normally would not or is

5    that just too simple?

6        **A.**      Well, I would say yes with a qualification.  So

7    I would say to the Reid people and police interrogation

8    trainers they always look to the law.  So they are trained

9    in coercion, they are really trained in legal coercion based

10   on their understanding of the case law.  Here's what the

11   court has said is admissible and leads to involuntary

12   confessions, here's where we draw the line.

13            To social science researchers, we're not -- you

14   know, the law is interesting to us, but we're just

15   interested in our theories and in our settings and when we

16   mean by psychological coercion.  We do not regard

17   interrogation as inherently coercive nor do we regard all or

18   even most techniques as, by themselves, psychologically

19   coercive.

20            What we mean by psychological coercion is that

21   cumulatively the interrogation process has caused somebody

22   to give up and perceive they have no meaningful choice,

23   which is similar to the idea of just perceiving there's no

24   way out unless you give the interrogators what they want.

25   Sometimes we refer to particular techniques as

1   psychologically coercive like threats or promises or certain

2   deprivations just because they tend to be so potent when

3   used that they have effect of overbearing somebody's ability

4   to fully choose to participate in the interrogation.

5       **Q.**     Now, are there some individuals that are more

6   vulnerable to psychological coercion?

7       **A.**     There are, yes.

8       **Q.**     And can you describe that for us?

9       **A.**     Sure.  So very quickly, so this is the focus

10  largely of clinical psychologists, although this is a part

11  of a body of research that anybody in this area would be

12  familiar with.  So, generally, there are three, maybe four,

13  groups of individuals that we focus on.  One would be

14  juveniles, people who are younger, for a lot of reasons,

15  particularly having to do with the development of the brain

16  and what's called psychosocial maturity or immaturity, are

17  more vulnerable.  Tend to be more kid-like and impulsive and

18  easier to lead and manipulate.

19          Now we used to talk about people up to the age

20  of 17 or 15 or 14 or under.  There's been a lot of research

21  in the last decade about how the brain continues to develop

22  to the age of 25 and, so, some of that psychological --

23  social psychosocial maturity, impulsive decision-making kind

24  of, you know, is a continuum, continues beyond the age of

25  18, but that's one group.

1           And they are disproportionately represented in

2      the universe of false confessors as are other groups.

3      People with cognitive limitations, low IQ, low intellectual

4      functioning, this group of people used to be described as

5      mentally retarded.  That's not considered a term anybody, so

6      they're often described as intellectually disabled and the

7      definition of that is IQ of 70 or below, but IQ -- maybe 1

8      to 2 percent of the population would have that.  IQ is a

9      continuum, so, typically, this group of people who are in

10     the low level cognitive or intellectual function, some of

11     them might be over the 70 threshold, typically not much.  So

12     that's second.

13          Third group is people who are mentally ill,

14     particularly certain types of mental illness that are

15     sometimes referred to or described as reality monitoring

16     disorders where people are delusional, might be more easy to

17     influence to make or to agree to confessions.

18          And then finally I would say that, even those

19     are the three groups we tend to focus on as highly

20     susceptible to make or agree to a false confession, there

21     are mentally normal adults in the population who are highly

22     suggestible or highly confined and, thus, more vulnerable to

23     making or agreeing to a false confession.  Clinical

24     psychologists had to write tests to study that and sometimes

25     there are people with high IQs, high social status, a lot of

1    education, and sometimes not.

2              There are also cultural groups that sometimes

3    tend to be more vulnerable.  So, for example, people from

4    Central and South America, often from countries that torture

5    is common, police torture as well as sometimes Asian

6    societies tend to be more vulnerable and describe that

7    vulnerability as fear of police torture or police abuse

8    because of what happens in their home countries.

9              There's also some research and a lot of

10   discussion about Native Americans being more vulnerable to

11   interrogation and confession because of cultural personality

12   traits that sometimes go with that culture or passivity,

13   resignation.  So that sometimes is discussed also as an

14   ability to coerce your false confession in the research.

15       **Q.**     And you could still provide a false confession

16   even if you don't belong to one of these groups, is that

17   right?

18       **A.**     Correct.  Not only that but most of the

19   documented false confessions, more than 50 percent, would be

20   from mentally normal adults.  When you talk about those

21   groups being unusually susceptible, it's because they are

22   disproportionately represented in the known universe of

23   proven false confessions and because there's a lot of

24   research now why they are so easily led and manipulated and

25   susceptible to interpersonal pressure.

1      **Q.**     Now, Dr. Leo, you talked about inducements.

2 Would that include promises or is that something totally

3 different?

4      **A.**     No, that would include promises. To social

5 psychologists, the term "promises," there should be context

6 for understanding that. So, in social psychology, which

7 again is about the study of perception and attitudes and

8 decision-making and behavior, a person's perception is their

9 reality. So we're interested in what people perceive or

10 understand to constitute a promise and how that affects

11 their behavior or a threat, particularly in interrogations.

12 So a suggestion, an implication might be perceived as, thus

13 considered, a promise even if it's not a literal quid pro

14 quo, if you do X then Y will happen.

15      So we sometimes will talk about implied promises

16 in interrogation because the interrogator is in the

17 situation where they have to persuade somebody that it's in

18 their best interest to make a confession which many suspects

19 know or believe is not in their best interest. And, so,

20 they have to use inducements or incentives to suggest why a

21 suspect should confess and stop denying, and sometimes those

22 involve suggestions or implications or maybe explicit

23 statements about the benefits that they will receive or lead

24 them to believe what they will receive in return for

25 agreeing to confess.

1      **Q.**     It doesn't necessarily have to be express such

2  as "I'm going to not arrest you"?

3      **A.**     Correct.  That might be a more explicit

4  statement than suggesting or promising the benefit in

5  exchange for confessing than, typically, most promises and

6  threats in interrogation are implied by context and they are

7  not that explicit, but sometimes that happens, too.

8      **Q.**     So, in addition to promises, can there also be

9  threats?

10      **A.**     Yes.  And that's two sides of same coin.  So if

11  there is suggested benefit or promise if the suspect stops

12  denying and starts admitting, you'll go home, then the

13  implication, if it's not explicitly stated, is if you don't

14  stop denying and start admitting you won't go home.  So if

15  you have explicit conversation with an implied threat, if

16  you had an explicit threat with an implied promise, then

17  they are two sides of same coin.  Where there's one, there's

18  always the other, even if it's just implied by the absence

19  of agreeing to what's being suggested.

20      **Q.**     And, so, threats don't necessarily have to be

21  something physical?

22      **A.**     Correct.  And most of the time, they wouldn't be

23  physical, yes.

24      **Q.**     Okay.  Can you describe what the

25  "maximum/minimization technique" is?

**A.**      So, unfortunately, there's a lot of jargons and
I didn't create these terms, but it's a simple idea and, in
a way, I've kind of alluded to that without saying it
explicitly.  So the idea is when I was saying the good
choice/bad choice and there were two scenarios, that's
another way of describing what the research sometimes calls
minimization and maximization.

          And, again, the police training manual will talk
about this in different terms, but the idea is that you
conjure up a scenario that minimizes the suspect's
culpability and blameworthiness and consequences he or she
will face if they agree that they committed the underlying
act that they are being accused of committing.

          Homicide, for example, this was self-defense,
they were coming at you, it was an accident, you didn't mean
to do it or this was spur of the moment bad judgment or you
were provoked, and the idea is that if they go with that
explanation, it will minimize how third parties, the victim
or the jurors in a criminal case, perceive the
blameworthiness, the culpability and, by implication,
sometimes explicit, the consequences that will happen, which
is the prosecution's decision to charge, what to charge or
what punishment they will receive.

          So minimization, minimize culpability of
consequences, but get the suspect to admit to the underlying

1    act.  Yes, I did X, but give them that narrative if they

2    confess.

3           Then maximization is the bad scenario, where if

4    they continue to deny, the suggestion is things will go

5    worse for them, they will be perceived as more blameworthy,

6    more culpable, and the implication often is consequences,

7    again, how it's in the system, prosecutors, judges, jurors

8    will treat decisions that those actors will make will be

9    worse.  So, again, an example of homicide would be the idea,

10   if you continue to deny, people like the prosecutor or the

11   jury will think this was pre-meditated, intentional,

12   cold-blooded, and then that narrative gets wrapped around

13   the accusation that you did it.

14          And, so, minimization/maximization techniques is

15   a form of inducement, it's suggesting the benefits if you --

16   beneficial narrative if you stop denying and admit to the

17   act and a more adverse detrimental narrative to what will

18   occur if you continue to deny that you committed any of the

19   acts.

20      Q.     Is there an implication, then, of some sort of

21   leniency if they go along with what the interrogator is

22   looking for with that method?

23      A.     They are often -- it's not always, but there

24   often is, yes.

25      Q.     And if you hadn't spoken about this, the term

1    "pragmatic implication," is that related or is that

2    something different?

3         A.        So it is related.  Again, I apologize for the

4    jargon.  This one comes from the field of linguistics.  In

5    the field of linguistics, researchers are always trying to

6    understand how people infer meaning from context, and when

7    we communicate with one another, we imply certain things or

8    communicate in shorthand, literally say everything we mean.

9              And, so, the context of interrogation, pragmatic

10   implication means what are the messages that are implied and

11   understood through context of what's being stated.  And

12   we're interested in this because sometimes inducements or

13   promises or threats are implied by context without being

14   specifically stated and that can have the same effect on a

15   suspect if he or she understands that there's a very

16   negative consequence that will occur if they continue to

17   deny which might be determined as a threat, or a beneficial

18   consequence if they stopped denying and started to

19   admitting, and that is interpreted or understood as the

20   equivalent, essentially, of a promise or a suggestion of

21   benefit or leniency, immunity, making something go away if

22   they stopped denying and started admitting.

23        Q.   So have the social scientists been able to study

24   the effect of these psychological interrogation techniques?

25        A.        That's one of the areas we try to study.  We

1    studied it in multiple ways through actual live

2    interrogations or recorded interrogations, through

3    interviewing suspects and in our experiments.  Some

4    experiments recreate interrogation situations, true and

5    false confession, using some of these methods.  Artificially

6    in laboratory environments because, for ethical reasons, we

7    can't accuse people of rape or murder, for example, so lower

8    level transgressions.

9           And then sometimes what we do is we take actual

10   transcripts and observe techniques and then do randomized or

11   controlled studies where one group reads a transcript

12   involving these particular techniques, another reads a

13   transcript involving some or all of the same techniques and

14   we try to get at how -- what their understanding is of the

15   techniques, what messages they learn from the use of those

16   methods.

17      Q.      Is interrogation designed to be stress inducing

18   and stressful?

19      A.      Yeah.  Well, police interrogation is designed to

20   be stress inducing within the limits of the law.  So, as I

21   mentioned earlier, one of the things the Reid method talks

22   about when they talk about the psychology of interrogation

23   is you raise the suspect's anxiety.  And, so, it's an

24   unpleasant stressful process, but the Reid trainers and, you

25   know, most police would say yes but within the laws.  So the

1    law permits police to exercise a certain amount of stress,

2    to induce certain stress.

3                    MS. SISON:  I'm sorry, your Honor.

4                    MR. EASON:  Your Honor, I'm sorry.  My agents

5        are asking if they can be released.  I don't intend to

6        re-call them, but I just wanted to make sure that was all

7        right with the Court before I let them go.

8                    THE COURT:  Any objection, Ms. Sison?

9                    MS. SISON:  No, none at all, your Honor.

10                   THE COURT:  All right.  You may release them.

11                   MR. EASON:  Thank you, your Honor.

12   BY MS. SISON:

13       Q.      So does interrogation necessarily have to have

14   that use of psychological pressure and manipulation?

15       A.      Well, if a suspect makes an admission straight

16   off, spontaneous admission, then no.  If the suspect made an

17   admission, it would just be who, what, when, where, why type

18   questions.  And sometimes that happens, there's no need for

19   pressure or persuasion.  But to the extent that the suspect

20   resists, then, yes, some pressure and persuasion is

21   necessary and that's part of the reason why police are

22   trained in these accusatory techniques.

23                   Remember, at this point, the role is essentially

24   to get a confession, to move the suspect from the

25   anticipated denial to the desired admission.  The more

1    resistance the suspect puts up in the form of denials, the

2    more pressure and persuasion will be required by the

3    detective.  And that's why some interrogations last longer

4    and others are very short because some suspects put up more

5    resistance and, so, you need to exercise more techniques or

6    more repetition of techniques, more pressure and more

7    persuasion.

8        **Q.**     So then in an interrogation, is that necessarily

9    used to get to the truth?

10       **A.**     Well, the primary goal is not to get to the

11   truth, the primary goal is to get an incriminating statement

12   and, oftentimes, police will elicit statements that are not

13   fully truthful but incriminating and that can be used

14   against the suspect by the prosecution.

15           The police will say in the training confession

16   is the best thing, but the next best thing is a pack of

17   lies.  And what they mean by that is if they can catch a

18   suspect in a lie, that can be used to incriminate them and

19   develop a case.

20           Now I'm not saying that police intentionally get

21   false confessions or false information.  I said earlier

22   that, ideally, they want a truthful confession.  What I am

23   saying is that the primary goal of American police

24   interrogation is to get incriminating statements that can be

25   used as evidence in building a case against a suspect who

they have concluded is guilty of a crime and that

incriminating evidence can be given to the prosecution to

successfully prosecute a case.  That's the primary goal.

Ideally, police would like truthful confessions, I would

say, a secondary goal of interrogation.

**Q.**     Do you study psychological coercion?

**A.**     I do and, of course, people in my field do.

**Q.**     And, so, what is meant by psychological coercion

during interrogation?

**A.**     Well, again, certain techniques, making promises

regarding this, inherently are so coercive, so potent, they

are likely to overbear somebody's capacity or perception of

free choice, but more generally, the idea if the

interrogation process cumulatively makes someone perceive

they have no meaningful choice, that they are essentially

being forced to comply or the interrogation will never end

or they won't be able to put an end to it, that's what we

mean by psychological coercion in this context.

**Q.**     So what are the risks of using this kind of

interrogation technique?

**A.**     Well, again, most interrogations are not

psychological coercion.  All those techniques are used

cumulatively as they could be, but there are essentially two

risks.  One risk would be that you get false or unreliable

information or confessions, which nobody wants, of course,

1    and a second risk is that you get involuntary statements or

2    admissions or confessions.

3        **Q.**    The researchers in your field, do they study the

4    use of trickery and deception in interrogation?

5        **A.**    Yes.

6        **Q.**    And can you tell us more about that?

7        **A.**    Well, it's inherently fascinating and it's a

8    little counterintuitive in that most people do not know that

9    police can lie during interrogation and pretend or say they

10   have evidence that they don't.  Fingerprints, we have the

11   DNA, somebody saw you commit this crime, there are

12   witnesses, we have surveillance photos, whatever it is,

13   medical evidence that dispositively shows you did it.

14           So police are permitted in America to make false

15   representations or exaggerate what they do have falsely.  In

16   the context of police interrogation where we study police

17   deception, we often primarily what we call false evidence,

18   what police often call ruses and most people call it lies,

19   but deception and trickery is a little broader than that.

20   Part of the psychological police training is to develop a

21   rapport and convince the suspect that you're there to help

22   them and that sort of means de-adversarial in the process

23   and suggesting that you want what's best for the suspect,

24   you the interrogator, and that can be deceptive as well.

25           So the trickery and deception is not just about

1    particular lies about evidence that doesn't exist or

2    exaggerating it does exist, but also representing that the

3    interrogator is there to help the suspect or get the

4    suspect's best outcome so that would be more trickery, I

5    suppose.

6        **Q.**    So -- but that's allowed in our American system?

7        **A.**    Correct.

8        **Q.**    And even though it's allowed, does that stop it

9    from being psychologically coercive?

10        **A.**    We don't regard that technique in and of itself

11    as psychologically coercive unless the lies, for example,

12    or, you know, the idea of trying to help a suspect rose to

13    the level of a promise or a threat, but it can contribute

14    cumulatively to psychological coercion.  The use of it can

15    make other techniques like promises and threats more

16    coercive if the examination becomes coercive.  So that would

17    be the concern of researchers, that it contributes -- could

18    contribute to coercion or make interrogations otherwise

19    psychologically coercive more coercive.

20        **Q.**    Dr. Leo, when I did retain you as a consultant?

21        **A.**    I think in March or April.  I could be wrong.

22        **Q.**    So sometime a few months from this date?

23        **A.**    Correct.

24        **Q.**    What materials did I provide for you to review?

25        **A.**    You provided me with some discovery materials.

1    I believe you provided me the indictment or the Information.

2    You provided me the videotaped interrogation of Mr. Jumper.

3    You provided the transcript of that videotaped

4    interrogation.  You also provided me a transcript, I

5    believe, of the videotape, but I haven't looked at this in a

6    long time.  It may have been just a transcript of the

7    forensic interview of the alleged victim.

8        **Q.**    Okay.  And you've been able to watch the

9    testimony, listen to the testimony here and review those

10   items.  Can you describe what various interrogation

11   techniques did you see the detectives use in this particular

12   case?

13       **A.**    Sure.  Of course, there was bringing Mr. Jumper

14   to the police station.  I think there was rapport building,

15   especially early on.  At some point, there was accusations.

16   I think this was what we would call guilt presumptive

17   interrogation.  Police, when they start accusing Mr. Jumper

18   and telling him what they believed he did, were not trying

19   to get his side of the story so much as trying to get him to

20   admit essentially to the alleged victim's account of what

21   she said occurred.

22            And, so, they were trying to get him to

23   incriminate himself in a way that was consistent with her

24   accusations.  They were suggesting what he did and they were

25   accusing him of doing certain things that came from her

1    allegations.  When he denied doing that, they were

2    challenging his denials or attacking his denials, though no

3    one raised their voice.

4                 They were confronting him with alleged evidence,

5    ambiguous case evidence that did exist as well as

6    exaggerating the evidence, and I believe at least a couple

7    of examples of suggesting or implying false or nonexistent

8    evidence.

9                 They were also using sort of minimization and

10   maximization technique where there were two scenarios, they

11   weren't always fully spelled out, but they were referred to

12   multiple times.  You did this accidentally, she sat on your

13   lap or came on to you, it was digital penetration, it was

14   not penile penetration, you're not -- you're not a rapist.

15   The implication if you denied that that people might

16   perceive that, but if you admitted that, it could be

17   minimized, that he was drunk or she sat on his lap or that

18   he did this accidentally.

19                 There was also an issue of that

20   minimization/maximization, bad/good scenario.  He could help

21   himself or get help, fix the situation if he -- or be able

22   to fix the situation if he stopped denying and started

23   admitting.  And, so, like maximization and minimization or

24   good scenario/bad scenario, that would be sort of the

25   inducement category of interrogation techniques, suggesting

1    or implying real world benefits to stopping denying and

2    start admitting.

3         Q.    So you're basically saying that they employed a

4    number of the interrogation techniques that you discussed

5    previously?

6         A.    Correct.

7         Q.    And, so, one of them would be the presumption of

8    guilt and the investigative bias just based on their initial

9    contact with him and their research -- I call research prior

10   to picking him up?

11        A.    Yeah.  I do think this was the presumptive.  I

12   don't think -- I think they started that interrogation with

13   the goal of getting him to confess to what the alleged

14   victim was alleging, not with the goal of entertaining his

15   denials and the interrogation was designed to continue until

16   they got that admission of guilt.

17        Q.    So it didn't matter how many times he denied

18   anything had happened, that wasn't the ultimate outcome, it

19   was to get him to confess to something?

20        A.    Correct.  You know, I would say it didn't matter

21   how many times he denied because they weren't crediting his

22   denials.  The plan, whether implicit or explicit, was to get

23   him to confess to overcome his denials.  Obviously, there

24   would have been some time, I don't know, four hours, six

25   hours, eight hours where I'm sure they would have just cut

1    it off.  So, you know, there could have come a time when

2    they just gave up on overcoming his denials, but I don't

3    think his denials mattered in the sense that I don't think

4    they would have been able to evaluate them.  Their goal was

5    to overcome, break down those denials in order to get

6    incriminating testimony or evidence that could be used to

7    prosecute him.

8         **Q.**    So an example of that presumption of his guilt

9    would be statements such as Detective Iadonisi said "because

10   it happened," would that be an example?

11        **A.**    Yes.  There were a number of places where either

12   Detective Cable or Iadonisi were basically telling him what

13   he did, telling him that it happened and explicitly telling

14   him he did it or implying that he did it.  So they were

15   presuming his guilt with the role of getting a confession,

16   exactly how the Reid method and other American methods based

17   on the training that police do.

18        **Q.**    So also a statement, and you heard this from

19   Detective Lambert, I'm not going to go around -- "I'm not

20   going to beat around the bush, it happened"?

21        **A.**    Correct.  And, so, I don't think they wavered at

22   all from their belief that it happened and that Mr. Jumper

23   did it and he did it exactly the way it was alleged by the

24   alleged victim and that they needed him to stop denying and

25   start agreeing or admitting to their accusations and the

1    alleged victim's accusations.

2         Q.        And you also talk about the minimization and the

3    maximization.  Would that include them suggesting it was an

4    accidental touch?

5         A.        Correct.  And the idea is, which is more than

6    one occasion, I had some comments about this in various

7    places, about the idea is that we all perceive people who do

8    something accidentally as less culpable, less blameworthy

9    and, of course, that's redefined in the law as well, where

10   there was an intent element, a mitigating, unintentional or

11   accidental.

12            So that is a common minimization technique and

13   the problem with that technique is it can shade into a

14   suggestion of leniency or immunity or reduced culpability in

15   exchange for confession.  So that was used at least several

16   times in this interrogation.  Even though I think it's clear

17   from what the detectives said eventually in the

18   interrogation that they didn't believe it was intentional,

19   so this would be an example of using a technique that is not

20   really designed to get truthful information or information

21   they regard as truthful but is designed to get the suspect

22   to incriminate himself.

23        Q.        So a promise what -- part of the testimony was

24   we never promised to drop the charges or we never promised

25   not to arrest.  Would that be included in this particular

1    circumstance as an implied promise to -- I should say you

2    don't have to promise something explicitly in order to make

3    a promise?

4        **A.**    Correct.  So I've attended these training

5    classes, read the manuals, interviewed lots of police

6    trainers over the years.  They rarely read the social

7    psychological research.  They are only trained in promises

8    and threats.  Typically, you know, briefly and kind of

9    extreme or explicit examples of that in case law.  To a

10   social psychologist, as I mentioned earlier, the problem of

11   the minimization technique is it can imply leniency or

12   immunity if you stopped and started confessing.

13            In research, published research, the accident

14   scenario technique, just did this accidentally, people are

15   inferring the message that if I admit to or someone admits

16   to do this accidentally, they will receive less punishment,

17   less -- the consequences will be mitigated or less harsh.

18   That is the functional equivalent of a promise of leniency

19   or a promise of mitigating consequences if that's how the

20   person is perceiving it.

21            When interrogators say the only way we can help

22   you or fix this or we only want if you say X or Y or agree

23   this happened, they are conveying that benefit in exchange

24   for confessing.  And the way they say it can suggest, again,

25   leniency or escape from criminal prosecution.  When an

1    interrogator, for example, says we can fix this, the

2    suspects and subjects in the research infer sometimes that

3    fixing it means making it go away so that it doesn't come

4    back to haunt a suspect or there's no material consequence

5    to it.

6        **Q.**    What about the -- all officers testifying that

7    they never threatened him, and when asked what do you mean

8    by that, well, we never told him we were going to do

9    something to him physically, that was part of this

10   interrogation.  How does that play into it?

11       **A.**    Well, I guess, with all due respect to the

12   officers, I would say they are not experts on what

13   constitutes promises and threats.  Typically, they aren't

14   doing research on how people perceive things to be a promise

15   and threats implicitly.  Because, as I said earlier, every

16   promise, whether implied or not, implies a corresponding

17   threat.  Promise if you -- a suggestion if you do confess,

18   this outcome will occur, the implication is if you don't, a

19   worse outcome will occur.

20            So they may not have intended implied promises

21   or implied threats and they may not have thought that they

22   said anything that came close to that, but in my opinion,

23   the suggestion of how -- suggestion of fixing it, the

24   repeated references could have just been done accidentally,

25   the continual playing down of this isn't all about rape or

1    penile penetration, suggested that if you admitted to the

2    scenario that we're suggesting, minimizing the scenario,

3    they are suggesting, that he would be less culpable and face

4    less consequences and, therefore, is the functional

5    equivalent of implied promise or implied threat.

6       **Q.**      So what happens in a situation like this one

7    where Mr. Jumper kept denying and I think it went on for

8    over an hour.  Does that play into what happens with the

9    officers and what they are going to do next?

10      **A.**      Yes.  So, again, one way of thinking about this

11   is the investigator's goal is to get the -- they expect the

12   suspect will deny.  They have techniques and experience

13   of -- the techniques they have learned from experience, some

14   limited training, to be used to overcome the denials.  Some

15   suspects stop denying early on, others for many hours.

16          The denials can really be seen as sort of an

17   assertion of a suspect's will not to incriminate themselves,

18   and the more the suspect denies, the more pressure that the

19   interrogator brings to bear, amp up the interrogation

20   pressure and use or repeat interrogation techniques to

21   overcome the denials, which is language straight our of the

22   interrogation manuals, to overcome the denials in order to

23   get to the confession.

24          So more denials, the more amping up the pressure

25   and techniques to break down and overcome the denials and,

1    so, that is significant in the analysis.

2         Q.    So does that include people going in and out of

3    the room?

4         A.    Well, strategically, yes.  I mean, there are

5    multiple interrogators.  Sometimes interrogators are either

6    watching the interrogation or one will be relaying

7    information to another.  Sometimes somebody will come in to

8    actually get the confession, if nothing else is working and

9    a new person's approach might be more effective at a certain

10   point.

11         So, strategically, yes, I do think that American

12   police are sensitive to the idea of tag-teaming and, so, you

13   know, they usually don't put too many interrogators in a

14   room or interrogate with relays, but sometimes there are

15   multiple interrogators involved strategically.  And

16   sometimes it changes by gender, one gender is not working,

17   let's put in another gender.  One approach is not working,

18   let's bring in somebody who maybe has a different approach.

19         Q.    So what about when the officers say "after

20   tonight, we can't help you" or "you've got until today"?

21         A.    So one thing that brings to mind is this idea of

22   pressure.  I said earlier one technique of increasing

23   somebody's anxiety is exerting pressure in a number of

24   different ways to do that.  That we call time pressure, it's

25   now or never, you can -- we can only help you now if you

start denying and confess now.  This is your one

opportunity.

The other thing that it conveys the idea of

help, again, people often hear, when there is a suggestion

or implication that the officer can help them or the only

way they can get help is if they start denying and start

admitting, that they will get the benefit.  And that benefit

may be leniency, immune, maybe this thing goes away.  It may

be that the person is punished but punished in a minimal way

if they admit.

And, so, the promise, the suggestion of help

oftentimes implies a promise of help or a promise of

leniency or promise of some material benefit, mitigating the

suspect, what will happen to the suspect if he or she stops

denying and starts admitting.

**Q.**     Can it also work the other way where it seems as

if the options are becoming limited to the person if they

don't participate in letting the officer help them?

**A.**     Correct.  So that's part of what interrogation

is designed to do, is to narrow a suspect's perception of

his or her options and that, in that example, in the

interrogation we're talking about, already we have all this

medical evidence, this happened, the alleged victim was too

detailed, too specific, kids don't make this up, we know it

happened.  And, so, if you -- this is your one opportunity

1   for us to help you, and if you don't admit to what they are

2   calling the truth, then we're not going to be able to help

3   you, you're not going to get the benefit of that.

4           You could say, just as I've said, that the flip

5   side of promise is a threat.  The implication there is

6   narrow his options and, thus, he will be seen as more

7   culpable and the consequences will be worse and the threat

8   of a worse outcome to him if he doesn't take the opportunity

9   or what they call an opportunity for them to help him in

10  this interrogation.

11      **Q.**    What do you think of the fact that there were

12  inconsistencies in what the alleged statement of the child

13  was?

14      **A.**    So it's not my role to say whether something was

15  a true or false confession, but in our research, we're very

16  interested in reliability.  We have a pure false or

17  partially false, partially true confession.  So we use the

18  broad category of reliability to refer to a spectrum from

19  completely true and reliable to completely unreliable and

20  everything in between.

21          And I mentioned earlier that one of the risks of

22  coercive interrogations, psychologically coercive

23  interrogation, is getting unreliable information or

24  statements or confessions.  And there are indicia of that

25  that you see in true and false confession cases.  The

1    suspect doesn't know the details because they weren't at the

2    crime scene, for example, so they guess correctly to

3    something that can be guessed, heads up, heads down, easy to

4    guess, maybe repeat things that they might have been told,

5    they know somebody was present at the time or suggesting the

6    information.

7            So absence of personal knowledge, not likely

8    guessed by chance, would be indicia of false or unreliable

9    confession.  It's not dispositive, but the pattern we see.

10           So, too, with the inconsistencies in -- between

11   an alleged victim's account and a suspect's confession.

12   Again, not always, but the idea is that then true and false

13   confessions, the suspect doesn't know the details because

14   they didn't commit the crime, they weren't present at the

15   crime scene.  And, so, when they broke him to move to

16   confess and the police are now pressuring him to provide

17   those details, they are getting some wrong of the details

18   because they didn't know the details other than what they

19   could guess by chance or what they learned from the police

20   in the interrogation or from other people who were either

21   present at or knew about the crime.

22           So inconsistent details might be a red flag of

23   false confession and sometimes those inconsistent details

24   don't go to culpability.  So, you know, they might get

25   things wrong that don't make them any more or less culpable,

1    they just get them wrong because they don't know.

2         **Q.**    What about one of the techniques that you were

3    talking about, the false evidence ploy; did you see that

4    used in this case?

5         **A.**    Yes, I did see that used in this case.  There

6    was repeated references to alleged evidence against

7    Mr. Jumper.  The false evidence, there was some reference on

8    page 36 of the transcript that I have, about the size --

9    about the alleged victim known knowing the size of the

10   penis, and on page 59, about scarring, alleged scarring that

11   was represented -- both of these were represented as being

12   evidence that Mr. Jumper had sexually assaulted the alleged

13   victim.

14        And also there were was repeated references to

15   medical evidence establishing that he had committed a crime

16   that was certainly an exaggeration of the evidence, right.

17   The evidence that the alleged victim was sexually

18   penetrated, but the fact that there was evidence of that, if

19   it was does, does not establish that Mr. Jumper is the one

20   who did it.

21        And, so, you might recall that exaggerated

22   evidence in that they were falsely representing to him that

23   that evidence meant he did it, there's evidence that he did

24   it even if there was evidence that something occurred, it

25   wasn't necessarily evidence that he did it.

1          THE COURT:  Ms. Sison, it's 1:30 at this moment

2     here.  What's -- how much time do you need to complete

3     this evidence?

4          MS. SISON:  Not more than 10, your Honor, we

5     should be done.  I'm toward the last part of my

6     questioning.

7          THE COURT:  We will go ahead and finish him, and

8     then we will probably take a break.

9     BY MS. SISON:

10     **Q.**     Dr. Leo, what is police contamination and

11     scripting?

12     **A.**     So what we mean by police contamination is

13     leaking or disclosing the details of a crime to the suspect.

14     Police are trained not to do it, but it happens oftentimes

15     in interrogations, oftentimes without police intending to do

16     it or realizing you're doing it.  So providing the details

17     of a crime to the suspect.  Interrogation is presumptive and

18     police presume the person they're interrogating is guilty.

19     It's also in the false confession cases where the police are

20     confronting the suspect with details of the crime scene,

21     here's the photo, you did X or Y, and the suspect is now

22     learning about it and they don't know the details because

23     they are falsely assumed to be guilty when they are

24     innocent, but, so, they are feeding non-public details or

25     crime details to the suspect.  That's what we mean by

1    contamination.

2            By scripting, we mean pressuring the suspect to

3    accept a theory or narrative of how and why, or how or why,

4    the alleged crime occurred.

5        **Q.**    So you're talking about feeding that information

6    to the suspect and that's not something that they can do

7    themselves?

8        **A.**    Correct.  So the police manuals will say, you

9    know, don't provide non-public details to the suspect, hold

10   back details, and then when they say I did it, make them

11   tell you those details that are non-public, not in the case

12   by chance, which would corroborate the reliability of the

13   confession.

14           So the police and researchers are in agreement

15   with this, that the problem with contamination is that when

16   a suspect is brought in to confess, an innocent suspect, if

17   they are fed the details, they often will parrot those back.

18   And then third parties, like judges and jurors, will

19   attribute, because we all do in society, a detail that is

20   being more truthful and accurate.

21           So you have lots of examples of proven false

22   confessions, let's say, by DNA where somebody gives a very

23   detailed confession and jurors convicted and appellate

24   courts have held referencing the corroboration that was in

25   the details, when the only person who knew those details was

1    the true perpetrator and the police.  And when confessor is

2    shown not to have been the true perpetrator, it's clear that

3    they learned those details from the police and those details

4    were used to provide illusory or false corroboration of a

5    confession which contributed to why the jury convicted him.

6         **Q.**    In other words, it affected the voluntariness of

7    the confession or perception of that?

8         **A.**    Well, yes, it can effect the voluntariness.  And

9    one of the ways in which the scripting can affect the

10   voluntariness is police will often pressure a suspect to

11   provide a coherent narrative of why they committed the

12   crime, a motive, to express remorse, to write an apology

13   note, to agree that their statements are voluntary, to try

14   to script a narrative that is believable and voluntary in

15   order to get a third party to convict, like a jury to

16   convict and a judge to not rule the confession was coerced

17   or involuntary.

18        **Q.**    So that was present in this case, in Mr.

19   Jumper's case?

20        **A.**    The apology note is a technique, yes, and they

21   asked him to write an apology note.

22        **Q.**    So, in your opinion, was this interrogation

23   psychologically coercive?

24        **A.**    I would say in my opinion, yes, because of the

25   minimization/maximization techniques, in particular, the

1    suggestions of help, I should say repeated references to

2    doing this accidentally, that he would get help and this

3    would be fixed if he stopped denying and started admitting.

4           And I think that shaded into the suggestions or

5    implied promises of leniency, the benefit, and that we know

6    from research often has a psychological coercive effect on

7    the suspects and increases the risk that they would confess

8    involuntarily and/or falsely.

9    **Q.**    And, so, in your field of expertise, do

10   researchers presume that coercive interrogation methods are

11   meant to produce involuntary confessions?

12   **A.**    Yes, in my field.  In hearings like this, we

13   don't tend to testify that something is involuntary because

14   involuntary is, of course, a separate legal concept and it's

15   not within the province of the expert witness to be making

16   legal judgments in a pretrial hearing.

17          But what we study is psychological coercion, in

18   particular, psychologically coercive methods or how

19   interrogation becomes cumulative of psychological coercion,

20   and when that happens when they interview suspects, they

21   describe essentially their interrogations or their

22   statements as being voluntary.

23          MS. SISON:  Thank you.

24          Thank you, your Honor.  I have no more

25     questions.

1          THE COURT:  Thank you.

2          We're going to take a break until 2:15 when we

3    come back.

4          Professor Leo, you'll be back on the stand and,

5    Mr. Eason, you can begin your cross examination.

6          MR. EASON:  Thank you, your Honor.

7          THE COURT:  All right.

8          (Luncheon recess was taken from [!LUNCH BEGIN]

9    p.m. to 2:18 p.m.)

10

11         THE COURT:  Professor, if you would come back to

12    the stand.

13         As he's coming up, I'll let counsel know I have

14    a matter with the grand jury that will need to be

15    addressed here after a while.  If you're not completed

16    with this proceeding, I'll need to recess briefly, but we

17    will see how things are when that need arises.

18         All right.  I believe it's the Government's

19    cross examination.

20         MR. EASON:  Yes, your Honor.  Thank you.

21             CROSS EXAMINATION

22  BY MR. EASON:

23     **Q.**    Dr. Leo, are you on any type of a time crutch?

24     **A.**    I have a 5:30 flight out of the Asheville

25    airport.

1          **Q.**    Okay.  I will do my best to be direct then.

2                 Dr. Leo, you indicated in your testimony that

3     everyone is interested in improving the quality of

4     interrogations from all spectres, correct?

5          **A.**    Correct.

6          **Q.**    And you've, in fact, published papers on how to

7     best do that, isn't that right?

8          **A.**    Yes.

9          **Q.**    One of your papers is Police Induced

10    Confessions, Risks and Recommendations, is that correct?

11         **A.**    I think it was Risk Factors and Recommendations.

12         **Q.**    Risk Factors and Recommendations.

13                And when did you publish that paper?

14         **A.**    2010.

15         **Q.**    And in 2010, you listed several recommendations

16    that could reduce the risk factors associated with coerced

17    confessions, isn't that right?

18         **A.**    Correct.

19         **Q.**    One of those recommendations is that interviews

20    be videotaped, is that correct?

21         **A.**    Yes.

22         **Q.**    And that was done in this case, correct?

23         **A.**    Yes.

24         **Q.**    You also recommended that time in custody be

25    limited to six hours or below, is that correct?

1    **A.**       I believe so, yes.

2    **Q.**       And in this case, that factor was also observed?

3    **A.**       Correct.

4    **Q.**       In fact, almost all of the risk factors that

5    you -- or recommendations that you made in that paper to

6    avoid these types of risk factors, they were pretty closely

7    adhered to, weren't they?

8    **A.**       Yeah, except for the false evidence and

9    minimization and implied promises, yes.

10   **Q.**       And, so, other than those, pretty much all of

11   those recommendations were followed, correct?

12   **A.**       Correct.

13   **Q.**       You said that you had reviewed several documents

14   as far as this specific case, is that correct?

15   **A.**       Correct.

16   **Q.**       You said that you reviewed, I believe, a

17   transcript of -- you reviewed the video of the interview

18   questions, is that right?

19   **A.**       Yes.

20   **Q.**       The transcript of said interview?

21   **A.**       Correct.

22   **Q.**       Also a transcript of the forensic interview?

23   **A.**       Yes.

24   **Q.**       An indictment, is that correct?

25   **A.**       I think so.  I think there was an indictment in

1   there or Information.

2       Q.      Was there any other paperwork associated with

3   this case that you reviewed; did you review any of the

4   motions by either party or responses?

5       A.      I think I did, yeah.  Give me a moment here.

6               So there was the Defense motion to suppress

7   evidence and request for evidentiary hearing, the

8   Defendant's memorandum in support, and Government's response

9   to Defense motion to suppress statements.  And then there

10  were also, when I said discovery --

11      Q.      Uh-huh.

12      A.      -- I think this is primarily the Government's

13  requirements, 302, of course, that were Bates stamped six

14  zeros 1 from through six zeros 77.

15      Q.      So --

16      A.      Maybe I was wrong, maybe there's no indictment

17  or Information in this.

18      Q.      But you did review the Defense's motions prior

19  to formulating your testimony?

20      A.      Prior to the testimony, yes.

21      Q.      So isn't that sort of putting the cart before

22  the horse, to read what they say happened before you had an

23  opportunity to formulate your own opinion as to what

24  happened?

25      A.      Well, I guess if you assume that, then I -- my

1    opinion is based on what they are saying, yes, but my

2    opinion was independent of what they were saying.

3              I think I may also have been provided, I don't

4    remember specifically, but I think I may have been provided

5    not with the initial documents, in fact, I think there's a

6    cover letter -- I'd have to dig through, but I think I

7    wasn't provided with it initially, I think I was provided

8    with it later after I affirmed my appointment.

9         **Q.**    Okay.  You have never actually met the Defendant

10    in this case, have you?

11        **A.**    Correct.

12        **Q.**    And you never have spoken with him?

13        **A.**    Correct.

14        **Q.**    You never spoken with any family members?

15        **A.**    Correct.

16        **Q.**    To your knowledge, there haven't been any

17    psychological tests performed on the Defendant that would

18    indicate that he's -- that he falls into one of the

19    categories that you identified as being especially

20    vulnerable to coercive police interrogation tactics?

21        **A.**    I have no reports of psychological testing.

22    Other than being Native American, I have no information.

23        **Q.**    Okay.  I do want to ask specifically Native

24    Americans, you said that cultural traits of Native Americans

25    seems to be resigned to be more deferential to police, is

1     that correct?

2          **A.**        There's some writing on that, yes.

3          **Q.**        Some writing on that.

4                         Is that specific to the culture of the Eastern

5     Band of Cherokee Indians?

6          **A.**        No.

7          **Q.**        Do you know anything specifically about the

8     cultural approaches of the Eastern Band of Cherokee Indians

9     vis-à-vis police or persons in authority?

10         **A.**        No.

11         **Q.**        Are you aware that the Eastern Band of Cherokee

12    Indians are actually the descendents of people who refused

13    to be forcibly removed from their homelands by the US

14    Government?

15         **A.**        I don't know the history there.

16         **Q.**        Okay.  But you've got no indication that the

17    Defendant is a juvenile?

18         **A.**        Correct.

19         **Q.**        And no indication that the Defendant suffers

20    from any type of cognitive limitations or is intellectually

21    disabled?

22         **A.**        Correct.

23         **Q.**        You have no indication that he's mentally ill?

24         **A.**        No.

25         **Q.**        You've got no reports or psychological

1    evaluations that indicate that he's highly suggestible or

2    compliant?

3         **A.**     Correct.

4         **Q.**     And he's not South American or Asian so far as

5    you're aware?

6         **A.**     Correct.

7         **Q.**     You used the term "proven false confessions" at

8    several points in your testimony.  Can you elaborate on

9    that, proven false confessions?

10        **A.**     Sure.  So it's hard to prove that a confession

11   is false because you have to prove the negative.  And in

12   1998, I and another scholar coined in term "proven false

13   confession" where we said you can prove a confession false

14   to a near reasonable degree of certainty through one of four

15   criteria.  Either you showed no crime occurred and, thus, a

16   confession to it would be false, or that it was physically

17   impossible for the confessor to have committed the crime

18   and, thus, the confession is false, or that there was

19   dispositive scientific evidence that demonstrated the

20   confession was false, or that the true perpetrator was

21   identified and everybody agreed that that person was or

22   assumed that that person committed the crime.

23              And reason we coined this term is because when

24   we were evaluating cases based on indicia of unreliability

25   and offering our opinions, in some cases, that didn't fit

1    into these four categories were, in our opinion, almost

2    certainly to be likely confessions, police and prosecutors

3    involved in those cases complained and instead of focusing

4    on findings of studies of aggregates of false confessions,

5    they would -- one person in particular would challenge some

6    of the individual cases.

7               And, so, I and another scholar coined this

8    phrase of proven false confession, which is very

9    conservative criteria, to say, okay, here's a smaller set of

10   cases where we can prove it was false even though the

11   universe of false confessions is much larger than that.

12   **Q.**     So understanding that if we're talking about a

13   Venn diagram, a very small circle within a much larger

14   circle, according to your research and perspective, this

15   case definitely does not fall within that very small circle,

16   does it; none of those four factors apply?

17   **A.**     To my knowledge, yes.  I wasn't asked to

18   evaluate that, but yes.

19   **Q.**     In your review of the video, the Miranda rights

20   were read very, very early on in the interview, is that

21   correct?

22   **A.**     Correct.

23   **Q.**     And there was nothing coercive or inappropriate

24   about how those were handled, was there?

25   **A.**     I don't believe so.

1      **Q.**      There were no techniques of any kind used to

2      elicit a waiver of those Miranda rights, were there?

3      **A.**      Not to my recollection, no.

4      **Q.**      And none of the techniques -- you listed several

5      techniques.  You said there is about half dozen core

6      techniques and you listed a great many of them.  None of

7      those are unlawful techniques, are they?

8      **A.**      Well, you know, promises and threats just

9      depends on the Court reviewing, you know, what is a promise

10     and a threat.  And there's federal constitutional law.

11     There's also splits in terms of how judges analyze it.

12              But I think it's fair to say that oftentimes

13     promises and threats are regarded as unlawful by the courts

14     and, oftentimes, they are not.

15     **Q.**      Okay.  So you're saying that it's not an

16     outright lying sort of situation?

17     **A.**      Particularly in promises and threats, yeah.

18     **Q.**      Particularly in that one, but the vast majority

19     of what you looked at and outlined, not unlawful?

20     **A.**      Correct.

21     **Q.**      Even the false evidence ply which you identified

22     as being used in this case, it's not unlawful?

23     **A.**      Correct.

24     **Q.**      And you talked a great deal about -- in this

25     specific case, you said that they brought him to the police

1    department and you believed there was rapport building

2    there, is that correct?

3         **A.**      I thought so.  I thought that -- unless I'm

4    misremembering, that, you know, the interrogation doesn't

5    really get going until around page 15 or 20 and, so, there

6    was just some open-ended questioning --

7         **Q.**      Okay.

8         **A.**      -- in the beginning prior to the interrogation

9    getting accusatory.

10        **Q.**      It's not coercive to build rapport with someone,

11   is it?

12        **A.**      Correct.

13        **Q.**      And -- but this was a guilt presumptive

14   interview/interrogation?

15        **A.**      I thought so, yes.

16        **Q.**      But that in and of itself is not necessarily

17   coercive, is it?

18        **A.**      Correct.

19        **Q.**      And the challenged his denials and confronted

20   him with evidence?

21        **A.**      Correct.

22        **Q.**      That's how you observed this to proceed.

23              You talked about the narrowing of options in

24   this minimization/maximization, I guess, two scenarios,

25   alternative scenarios --

1    **A.**       Correct.

2    **Q.**       -- a great deal.

3              It could have been an accident or it could have

4    been a rape was basically the two extremes that it was sort

5    of laid out as?

6    **A.**       Correct.

7    **Q.**       But what the Defendant ended up confessing to,

8    he steadfastly denied accident, and even when offered an

9    opportunity, he elaborated further and didn't just set the

10   facts down?

11   **A.**       Well, in a sense, that's correct.  He was trying

12   to adopt their account as well.

13   **Q.**       So if minimization and maximization is coercive

14   as you say, why would he go beyond the bare minimum, the

15   good scenario?

16   **A.**       My recollection is that they didn't believe it

17   was an accident once they got him to admit to the initial

18   act.  Sometimes the people were so broken down in

19   interrogation that they will say anything to please their

20   interrogators just to get out.

21   **Q.**       That is sometimes the case, sure.  And in cases

22   like that, you often see very visible signs of duress, don't

23   you?

24   **A.**       In some cases, yes, not in all.

25   **Q.**       Aren't the visible signs of duress the most

1    effective means of evaluating whether a person is, in fact,

2    suffering from undue stress or duress?

3        **A.**      Not always, no.  Sometimes people will look very

4    composed even if they have been interrogated for several

5    hours.

6        **Q.**      In this case, you had an opportunity to review

7    the video.  Did you ever see the Defendant crying?

8        **A.**      I don't recall seeing that, no.

9        **Q.**      Did you ever see the Defendant stand up and

10   begin pacing or anything like that?

11       **A.**      I don't recall seeing that, no.

12       **Q.**      He's not sweating profusely, wiping his face,

13   you know, in that respect?

14       **A.**      I don't recall seeing that.

15       **Q.**      He doesn't get very demonstrably upset at much

16   of anything, does he?

17       **A.**      Not that I recall.

18       **Q.**      He does, however, get rather engaged about the

19   90-minute mark after Detective Iadonisi is the only person

20   in the room, doesn't he?

21       **A.**      I don't recall his level of engagement changing,

22   but, you know, I watched the videotape close to when I was

23   retained.  When I reviewed for testimony, excuse me, I

24   worked off the transcript.  So I don't recall particular

25   change in the 90-minute mark.  Since there's a record of it,

1    we could look to that.  It's possible I'm just not

2    remembering.

3         **Q.**    Okay.  Generally speaking, it wouldn't be a sign

4    of duress or coercion for a person to lean towards the

5    person who is coercing them; that's not, psychologically

6    speaking, the normal response you would expect from someone

7    who is experiencing a stressful situation?

8         **A.**    Well, we all respond differently to stress, but

9    I don't think that's a normal reaction, but I don't think

10   it's an abnormal reaction, either.

11        **Q.**    What about smiling or leering, would that be

12   indicative of coercion in your -- indicative of duress in

13   your opinion?

14        **A.**    I don't think it's a good indication.  Sometimes

15   people smile out of nervousness inappropriately, but I don't

16   think it's a good sign of whether somebody is or is not

17   feeling coerced.

18        **Q.**    When you talk about the length of an

19   interrogation, you said some people sit very quietly for

20   long interrogations.  The major factor that you're looking

21   at as far as how long interrogation runs is the time it

22   takes to overcome the denial, isn't that correct?

23        **A.**    Yeah, I mean, I guess that would be correct.  We

24   often measure the entire time, so, you know, the time the

25   interrogation begins to the time it ends, so we would call

1    this 3-hour interrogation, even it was an hour or three

2    hours when he agreed to the first admission.

3         Q.    So it would be a 3-hour interrogation of which

4    there were admittedly long portions where he was left alone

5    in the room, approximately 10 minutes to begin the

6    interrogation, another period of several minutes during the

7    middle, and then towards the end, he was also left to his

8    own devices, correct?

9         A.    That's my recollection, yes.

10        Q.    He wasn't being asked questions that entire

11   time?

12        A.    Correct.

13        Q.    And as far as that interrogation went, the

14   period that it took for him to shift from denying outright

15   to confessing was approximately 90 minutes, isn't that

16   correct?

17        A.    That sounds right.

18        Q.    And in your research, you found a very strong

19   statistical correlate between interrogations that last

20   longer than six hours and false confessions, isn't that

21   correct?

22        A.    Correct.

23        Q.    So this would not qualify for that particular

24   warning flag?

25        A.    Correct.

1          **Q.**      Are you heard the testimony of both Detective

2     Cable and Detective Lambert today in court, correct?

3          **A.**      Yes.

4          **Q.**      And they made specific reference to attempting

5     to -- let me see if I can find the exact quotes.

6               "Try to make him at ease, make him comfortable,

7     relax and be truthful," that's what Detective Cable said, is

8     that correct?

9          **A.**      I think so.

10         **Q.**      And Detective Lambert indicated that she left

11    the room specifically because sometimes people feel more

12    comfortable talking about sexual matters without a woman

13    present, isn't that correct?

14         **A.**      That's what she said.

15         **Q.**      Aren't both of those sort of contrary to the

16    theory that police interrogations must be a continued

17    ramping up of a stressful environment?  These people are

18    actively making decisions to increase his comfort level in

19    the hopes that he will be voluntarily truthful?

20         **A.**      I don't think it's necessarily, first of all, if

21    that's accurate, but I don't think it's necessarily --

22         **Q.**      Well, do you have any reason to disbelieve

23    that's what they said?

24         **A.**      Okay.  So can you repeat them one by one?

25         **Q.**      I apologize.

1              First off, Detective Cable indicated that he --

2     his belief was that you try to make them at ease, make them

3     comfortable, to relax and be truthful?

4        A.       That is inconsistent with the Reid method in the

5     sense that you have efforts about increasing anxiety, but

6     it's consistent with it if the detective thinks that

7     strategically that's going to maximize the confession.

8        Q.       So, as I understand it, coercive pressure is

9     inappropriate but also actively attempting to reduce the

10    course of pressure is itself a form of coercion?

11       A.       I didn't mean to suggest it's a form of

12    coercion.  It could be to mix things up the interrogator is

13    trying to use a different approach.

14       Q.       But not every new or different approach is

15    necessarily coercive?

16       A.       Most are.

17       Q.       Most are, okay.

18              You identified specifically the implied promises

19    as being problematic, is that correct?

20       A.       Yes, or were a functional equivalent of implied

21    promises, yes.

22       Q.       Functional equivalent of implied promises.

23    Because these were -- let me see if I can find what you

24    said.  These were psychologically coercive

25    maximizing/minimizing tactics that "shade into implied

1   promises," is that correct?

2        **A.**     Can do that, yes.

3        **Q.**     And that those come with increased risk?

4        **A.**     Correct.

5        **Q.**     Can you quantify the increased risk in this case

6   of a false confession?

7        **A.**     No, I couldn't quantify the increased risk.

8   There's experimental studies where, in that study, they will

9   show the increased risk when you use minimization or

10  maximization or other techniques, but I can't generalize

11  from that to this case.

12       **Q.**     So it does increase the risk, you just can't

13  tell to what degree?

14       **A.**     In this case, correct.

15       **Q.**     If any?

16       **A.**     Correct.

17       **Q.**     You talked about reliability of confessions and

18  that there was some issue with scripting and contamination,

19  is that correct?

20       **A.**     Yes.

21       **Q.**     And I believe that -- aren't those more

22  questions for a jury rather than a hearing like this where

23  you're talking about what is or isn't coercive?

24       **A.**     I believe they are more likely to contribute to

25  unreliability and the perception of reliable confessions

1    unreliable, then they are to contribute to coercion or

2    voluntariness.  Although if one feels coerced and there has

3    been contamination in scripting, one may feel compelled to

4    repeat back the account along with the details that the

5    interrogator is seeking.

6         Q.    So it's not actually a solid indicator of

7    coercion in this case, is that correct?

8         A.    Correct.  I'm primarily focused on the

9    minimization and maximization, the suggestions of help and

10   of fixing it for him.

11        Q.    Let's talk about fixing it.  To fix something is

12   to make a broke thing better or whole, correct?

13        A.    Yes.

14        Q.    That doesn't necessarily mean that -- I don't

15   fix my broken bicycle by throwing it in the trash and never

16   see it again?

17        A.    Correct.  I think in this context it means

18   something a little bit different, but it is ambiguous.

19        Q.    So, using the term "fixing it" was -- it meant

20   something but that something might be ambiguous?

21        A.    I do think it's inherently ambiguous.  I think

22   when you said it's making something whole, that is closer to

23   what I think it meant in this case.

24             MR. EASON:  May I have just a moment, your

25      Honor?

1          THE COURT:  You may.

2     BY MR. EASON:

3          Q.     What is your going rate for consulting on a case

4     like this on an hourly basis?

5          A.     I think it's 350 an hour.

6          Q.     And approximately how many hours do you

7     anticipate you will bill for this case including your

8     testimony here in court?

9          A.     I would guess 30 hours, 20 to 25 to 35,

10    something like that, at the end of the day.  That might be

11    more, it might be less.

12         Q.     I understand, I'm just trying to get a round

13    figure.

14                As far as your transportation, the flight out

15    from California, that is a long flight.  Did you pay for

16    that or was that ticket provided for you?

17         A.     It was provided.

18         Q.     There was some talk made about a polygraph in

19    this case.  Is there research on the, I guess, what would be

20    called an instrumental interrogation, do you have any

21    experience with that?

22         A.     Yes.

23         Q.     Can you talk to the Court a little bit about

24    that and why it might matter?

25         A.     Well, sometimes the polygraph is really designed

1    as an interrogation technique and, so, it's kind of a setup

2    and doesn't follow the proper polygraph protocols and then

3    the suspect fails or is told they fail and then that is used

4    as an evidence ploy to suggest science has now proven the

5    suspect to be lying to a 99 percent certainty and,

6    therefore, they stop denying, something to that effect,

7    right.

8            So the reason people who study polygraphs call

9    certain polygraphs instrumental interrogation is because the

10   polygraph is not being used so much as a truth verification

11   or a lie detection instrument as it is being used as a prop

12   to elicit a confession by forewarning the result when the

13   suspect fails it and then using it as a sophisticated

14   evidence ploy or ruse.

15   **Q.**    And in this case, we don't have to consider

16   whether or not it was intended in either direction for that,

17   correct?

18   **A.**    Correct, there was no polygraph.

19   **Q.**    So, ultimately, the test that we're looking for

20   as far as the legal evaluation is to determine whether or

21   not the Defendant's will was overborne, his capacity for

22   self-determination critically impaired; is that your

23   understanding of the legal test that we're dealing with?

24   **A.**    Yeah, more or less, yeah.

25   **Q.**    But that is not the test that you have applied

1  when determining whether or not there was psychologically

2  coercive interrogation employed here, is that correct?

3      **A.**     Correct.  I wasn't applying a legal test.

4      **Q.**     So you're not applying the legal test in

5  offering your opinion, you're applying a psychological test?

6      **A.**     Well, psychological standards.

7      **Q.**     Standards.

8      **A.**     You could say a test, but if we describe it that

9  way, it would be misleading because psychological tests are

10  IQ tests and other sorts of tests and it's not that.

11      **Q.**     So then we're talking about a psychological

12  standard as opposed to sort of a legal standard?

13      **A.**     Correct.

14      **Q.**     And that legal standard is going to be up to the

15  Judge in this case?

16      **A.**     Correct.

17      **Q.**     And you have not -- and you have not offered an

18  opinion as to whether or not it has been met or not met in

19  this case and you couldn't?

20      **A.**     Correct.  Not as a matter of law, correct.

21      **Q.**     So, again, your primary contention as far as the

22  nature of the psychologically coercive activity that took

23  place, and these are your words, is that the maximization

24  and minimization and specifically the use of the word "fix"

25  shaded into implied promises with an increased risk for a

1    coursed confession, is that correct?

2        **A.**    More or less.  I also mentioned the offers of

3    help and the minimization of particular repeated references

4    to just did it accidentally and contrasting that with

5    touching, with alleged digital touching with the penile

6    rape, but I think you captured the essence of it in how you

7    said it, I was just saying there was little bit more to it

8    than what you stated.

9        **Q.**    You said that the strongest, the most

10   troublesome were the maximization and the minimization and

11   the offer to -- the explanation of fixing it which you said

12   shade into implied promises?

13       **A.**    Yes, the maximization/minimization and offers,

14   too.

15       **Q.**    That's fine.

16           MR. EASON:  I think those would be my questions

17     for this witness.

18           THE COURT:  Redirect by the Defense.

19           MS. SISON:  Thank you.

20                    REDIRECT EXAMINATION

21   BY MS. SISON:

22       **Q.**    Dr. Leo, you were hired to discuss the

23   psychological standards, correct, not the legal opinion?

24       **A.**    Correct, correct, yes.

25       **Q.**    And the reason that you were hired is because

1    you have specialized knowledge that is not available to

2    common person, even people in the legal field as we are?

3        **A.**      That's my understanding, yes.

4        **Q.**      All right.  And, so, what you were hired for is

5    to determine whether or not, based on your expertise,

6    coercive techniques were used in this case?

7        **A.**      Correct.

8        **Q.**      And just to identify what those techniques are

9    to provide that information to the Court?

10       **A.**      Correct.

11       **Q.**      Now, Mr. Eason asked you about the polygraph and

12   instrumental interrogation.  Now, in this case, Mr. Jumper

13   readily agreed to have a -- being polygraphed?

14       **A.**      Correct.

15       **Q.**      Does that indicate anything to you?

16       **A.**      Well, you see that oftentimes in false

17   confession cases, but I don't think you can infer that

18   because somebody agrees to a polygraph that's indicia of a

19   false or unreliable confession.

20       **Q.**      But, I mean, the fact that he did, could that

21   also indicate the opposite, that he isn't?

22       **A.**      Certain --

23              MR. EASON:  I'll object as to that conclusion.

24              THE COURT:  I'll sustain the objection.

25

1    BY MS. SISON:

2         Q.    And in this case, no polygraph was ever given?

3         A.    Correct.

4         Q.    But he was willing to take one?

5         A.    Correct.

6         Q.    Now, sir, you indicated that the usual time, I

7    think that's based on your 2010 article, under six hours

8    would not normally be -- I mean, would be an indicator of

9    not it being a coercive technique?

10        A.    Well, not really.  So, in one of the studies, we

11   found that -- false confessions study being published to

12   date, we found that most of the ones were over six hours

13   and, so, not all of them, but there was a strong

14   correlation, as we've said, between length of time over six

15   hours and false confession.  Now there were plenty of

16   examples of false confessions that were applied to

17   interrogations less than six hours, but that was one of the

18   striking patterns that we found in that study.

19        Q.    So, in other words, you could still have

20   coercive techniques used in an interrogation that lasted

21   less than six?

22        A.    Absolutely.  And you can also have a coercive

23   techniques that didn't result in a false confession or a

24   proven false confession.  In that particular setting, it was

25   about proven false confessions, it wasn't been coerced

1    confessions.

2        Q.      And then you were also asked about mixing -- I

3    think -- I forget who said mixing things up with people

4    coming in and out and different questioning.  Now, that may

5    not be a coercive technique, but certainly it is a factor in

6    what happens in a person who is being questioned?

7        A.      It could add to the pressure; I wouldn't say

8    it's a coercive technique.

9        Q.      And part of creating that kind of environment

10   where there's psychological coercion would be to increase

11   the anxiety levels of somebody that's being questioned,

12   would that be fair to say?

13       A.      Correct.  As I mentioned, that's what the Reid

14   method says about psychology of confession.

15       Q.      That can happen in any method depending on the

16   person?

17       A.      Well, yes.  There are some people who just being

18   in the room will experience pressure, so people will react

19   differently to the pressure, but some interrogations,

20   obviously, are more psychologically pressure filled than

21   others.

22       Q.      And then Mr. Eason also talked about duress and

23   he asked you about Mr. Jumper did not cry during the

24   interrogation.  Does the absence of him not crying indicate

25   that there were no coercive techniques used?

1    **A.**    I would not say that.

2    **Q.**    And what about him not pacing?

3    **A.**    Again, same answer.

4    **Q.**    What about not sweating?

5    **A.**    Again, same answer.

6    **Q.**    Okay.  And, so, you were also asked about him

7    looking like he was rather engaged and we don't know

8    specifically what that is.  That can also mean a number of

9    things other than what Mr. Eason suggested, is that fair?

10    **A.**    Correct.  It's open to several different

11    possible explanations if it occurred, yes.

12    **Q.**    So an interpretation may be that he thinks he's

13    going to get out even though that was not implied, the fact

14    that there was --

15    **A.**    Correct.

16    **Q.**    And in this particular case, I believe that the

17    videotape lasted about three hours, so that was from the

18    time he was put in the room to the time that he left?

19    **A.**    Correct.

20    **Q.**    And -- but there was also time when he had been

21    arrested and driven -- or I should say picked up and driven

22    to the location at police headquarters, that's not factored

23    into that time?

24    **A.**    Correct.

25    **Q.**    And that could possibly play into a particular

1    person's anxiety level?

2        **A.**      It could, yes.  It could also play into the

3    tiredness fatigue, I'm not saying it necessarily did, but it

4    could.

5        **Q.**      And, so, here you were just asked not to

6    evaluate Mr. Jumper but just the confession itself?

7        **A.**      Well, the interrogation and the statements that

8    were made within the context of the case, yes.

9        **Q.**      And Mr. Eason also asked you questions about the

10   proven false confession, that there were four examples where

11   it doesn't happen.  We don't know yet what's going to happen

12   in this case, correct?

13       **A.**      Correct.

14       **Q.**      We may find out there's another perpetrator at

15   some point in the future?

16       **A.**      Certainly possible, yes.

17       **Q.**      So we can't rule any of those things out?

18       **A.**      Not definitively, correct.

19       **Q.**      All right.  And then, Dr. Leo, you also -- when

20   we talked about the 2010 article, so that's about nine years

21   old at this point?

22       **A.**      Correct.

23       **Q.**      And I believe you testified that this is a field

24   that evolved?

25       **A.**      Correct.

1    **Q.**    So, depending on the culture, in this case
2    American culture, there are certain things that they find
3    more helpful or more harmful, it may change things?
4    **A.**    Correct.
5    **Q.**    And, so, what was -- even though only several of
6    your suggestions were taken into consideration doesn't mean
7    that this particular interrogation was not filled with
8    psychological coercion, is that right?
9    **A.**    Correct.
10    MS. SISON:  Thank you.
11    No more questions, your Honor.
12    THE COURT:  Thank you, Professor.  You may step
13    down.
14    MS. SISON:  Your Honor, that would be my only
15    witness.
16    THE COURT:  All right.  Ms. Sison, so your
17    evidence is complete?
18    MS. SISON:  Yes, correct.
19    THE COURT:  Any rebuttal by the Government?
20    MR. EASON:  No, your Honor.
21    THE COURT:  All right.  I'm ready to hear
22    argument.  I'll hear from the Government first.
23    MR. EASON:  Thank you, your Honor.
24    Your Honor, the standard in the case is question
25    of whether or not a incriminating statement is involuntary

1    and that is solely on the basis of a statement being

2    induced by such duress or coercion that the suspect's will

3    has been overborne and his capacity for self-determination

4    has been critically impaired.

5         The court indicate that it's a totality of the

6    circumstances argument, but there are three major factors

7    to consider.  The first major factor are the

8    characteristics of the Defendant, then there's a setting

9    of the interview and, finally, there's the details of the

10   investigation.

11        Now, your Honor, we had testimony from Dr. Leo

12   regarding characteristics of the Defendant specifically

13   with regard to his susceptibility to these types of

14   coercive police tactics and we have no indication of

15   anything other than he is Native American of a specific

16   tribe of Native Americans and some research has imputed to

17   other tribes of Native Americans that they may be

18   susceptible.

19        The Defendant, so far as everybody was aware,

20   was of sound mind, he never complained of any ailments of

21   any kind, physical or mental.  He never demonstrated any

22   confusion or lack of understanding about the process,

23   about what was going on.  All of his responses were

24   appropriate by all accounts from all the persons who were

25   involved in the interview.  He was engaged, he was

1    understanding, he responded appropriately.  We have no

2    indication that this Defendant and his specific

3    characteristics was in any way more or less susceptible to

4    coercive -- to any coercion than the average person.

5            So then we look to the setting of the interview,

6    which was conducted at a police department, and it was

7    interview, the interview was videotaped.  Your Honor has

8    an opportunity to review that.  There was a transcript

9    prepared.  He was placed in a room that does not lock,

10   closest to the door where no one obstructed his ability to

11   leave.  And he was interviewed for a period of

12   approximately for -- the video ran for three hours, of

13   which approximately two and a half hours involved

14   questions.  He was given breaks, he was offered water, he

15   was offered food, he was offered chances to use the

16   restroom.  And he was allowed to keep his phone.

17           And, your Honor, I harped on this a little bit

18   in the proceedings because there's been a lot made about

19   the notion of isolation as a contributing factor to

20   coercion.  And, your Honor, it might have sounded silly at

21   the time that I was talking about the free wi-fi in the

22   Cherokee court, but it does matter, your Honor, because so

23   long as you -- in our modern day of technology, as long as

24   you have these little black squares or rectangles, you

25   aren't isolated.  You can reach out at any time to anyone

you might need to, family, friends, attorneys.

He was in -- he was not isolated during this interview. He had access to the entire world at his fingertips and he could have called at any time for anyone. And your Honor can watch the video, he may be texting with people, he may be browsing the web. I'm not sure what he's doing, but he has his phone with him during that time period.

And that should be considered as far as the setting of the interview. It's not that he was isolated in some dark box and then kept away from people who might have helped him. Just the opposite, he was put in a room where the officers specifically said their goal was to make him relatively comfortable so he could be forthright and that then he would engage with them and tell them the truth, and he had access to his cellular telephone the entire time, which I believe, your Honor, is a substantial factor that should weigh in favor of the Government.

Finally, the details of the investigation, your Honor, is where --

THE COURT: Go to the third element. Let me ask you one thing. You mentioned -- you referenced he was offered food. I don't recall that in the evidence.

MR. EASON: I believe that, in my view of the videos and the -- that he was offered a snack, but I'm not

1      sure that he took it up.  I think that was one of the

2      first things that they said, can we get you a snack or

3      something to drink, and he initially declined.

4              THE COURT:  (Nodding head).

5              You may proceed.

6              MR. EASON:  Thank you.  And I may be

7      disremembering, but that is my recollection of the video

8      when I watched it.

9              Now, the last part is the details of the

10     investigation, which we're talking specifically about the

11     interrogation itself right now.  First of all, your Honor,

12     coercive police activity is a necessary finding for

13     Miranda for any type of -- for a confession or a Miranda

14     waiver to be rendered involuntary and there was absolutely

15     no activity, coercive or otherwise, according to Dr. Leo,

16     involved in the waiver of the Miranda rights.

17             So what we're left with at this point is whether

18     or not there was coercive activity sufficient to render

19     his confession involuntary.  The courts have been specific

20     that the mere existence of threats or violence or implied

21     promises or even improper influence does not automatically

22     render a confession involuntary.

23             So, your Honor, we would argue that other than

24     the inherently coercive nature of the police

25     interrogation, which can't be avoided, that is the nature

1          of what a police interrogation is, that's the reason why

2          the Court in Miranda elected to create those safeguards

3          was sort of as a prophylactic against that inherent

4          coercion.

5                    But beyond that, there is nothing about this

6          interview that was sufficiently coercive to rise to the

7          level of police misconduct necessary to override the

8          Defendant's will or to render his capacity for

9          self-determination critically impaired.

10                   THE COURT:  And in the mind of the Government,

11         were any of the interrogation techniques employed by the

12         detectives in this case psychologically coercive?

13                   MR. EASON:  Your Honor, I think Dr. Leo

14         testified that the minimization and maximization had the

15         capacity to be coercive but is not inherently coercive,

16         and that that may have been something, but as far as -- I

17         guess the question is whether or not is how we define

18         coercive.  It may have played to his desire to confess or

19         to absolve himself of guilt or to other things, but

20         whether or not it was intended to overbear his will, that,

21         your Honor, I don't believe that we saw any evidence of an

22         intent to overbear the Defendant's will to get him to say

23         or do things outside of the truth, to say the truth.

24         That's all the officers indicated they wanted, his story,

25         they wanted to the truth.

1               If the totality of the circumstances surrounding

2     an interrogation reveal both an uncoerced choice and a

3     requisite level of comprehension that a Court may

4     appropriately determine a waiver or a statement to be

5     voluntary.  And, so, your Honor, we would argue that,

6     based on the totality of the circumstances, looking at the

7     Defendant, looking at the setting and nature of interview

8     and looking at the totality of the circumstances and all

9     of the conversations used in the interview, that we simply

10    don't rise to the level of coercive police activity.  Or

11    if your Honor does find that there is some coercion, it's

12    not just enough there be some coercive police activity, it

13    has to be sufficient to overbear the will of the Defendant

14    or to render his capacity for self-determination,

15    critically impaired.  This is an exceptionally high bar in

16    our argument.

17               THE COURT:  Let me explore that further; that

18    was the point of my last question.

19               Does the Government believe that any of the

20    techniques employed in this interrogation were in and of

21    themselves coercive and/or, if not, was there a coercive

22    atmosphere in that room?

23               MR. EASON:  Your Honor, there may well have been

24    a coercive atmosphere in that room and some of the

25    techniques taken together may constitute coercion, but

1          it's not just the presence or absence of coercion, it's

2          coercion sufficient to basically render the Defendant

3          incapable of surviving that coercion.  And from all of the

4          testimony that we've heard from the video and from the

5          transcripts, your Honor, we would argue that that simply

6          is not true.

7                    THE COURT:  In other words, the confession that

8          the Defendant provided may have been subject to some

9          amount of coercion but it was not otherwise

10         constitutionally affirmed.

11                   MR. EASON:  Your Honor, it may have been the

12         result of officers' continued -- your Honor, there has to

13         be some sort of interplay between the officers and the

14         Defendant to move the Defendant from the denials to the

15         admissions and we accept that that's part of the nature of

16         an interrogation.

17                   Arguably, and I'm sure there will be argument,

18         that could be determined to be coercive, but just because

19         it is coercive does not render it -- does not render his

20         confession involuntary for the purposes of the

21         Constitution.

22                   THE COURT:  And is the Government -- and I'm

23         sorry if you told me this and I've missed it -- is the

24         Government acknowledging there was some amount of coercion

25         involved in the questioning, I will say, of the Defendant?

1          MR. EASON:  Your Honor, if you put it to me like

2     that, then I have to say that there was pointed and

3     strenuous questioning that could, under circumstances,

4     rise to -- to be considered to rise to the level of

5     coercion.

6          THE COURT:  What I understand is some amount of

7     coercion is acceptable and not, for lack of a better word,

8     illegal, but there is a delta between the amount of

9     coercion that is acceptable and the amount that would make

10    a confession improper.  Is that what I heard you say?

11         MR. EASON:  Well, I'm quoting, your Honor, from

12    the United States versus Braxton when I say that.  That's

13    112 F3d 771, which is a Fourth Circuit case from 1997,

14    which indicates that the mere existence of threats, which

15    we don't have here, violence, which we don't have here,

16    implied promises, which Dr. Leo, the closest he came was

17    that something that was said shaded into an area where it

18    was almost implied promises.  Improper influence or other

19    coercive police activity does not automatically render a

20    confession involuntary.

21         THE COURT:  So what is the Government's argument

22    as to the size of the delta there?

23         MR. EASON:  Your Honor, as to the size of the

24    delta, this was, by all accounts, a professional, polite,

25    restrained interrogation of a suspect, the kind which we

should encourage all officers to emulate.  There were no
threats, no violence, he was allowed to keep his phone, he
was offered to be made comfortable.

I don't understand how a police interrogation
could function in its intended capacity or in any capacity
without some potential level of psychological coercion
mandated just by the nature of an interrogation, custodial
interrogation.  That was sort of the point here, your
Honor, that the Court in Miranda made was that there is
inherently psychologically coercive situations created by
custodial interrogations.

THE COURT:  So the Government would acknowledge
he was in custody for the purposes of Miranda?

MR. EASON:  Your Honor, it's an argument that
could be made but that we're not going to make at this
time.  And we -- he was given his Miranda warnings as a
prophylactic but also appropriately in this case, we would
argue.  And Dr. Leo's testified that there was no coercive
or trick or any type of activity happening that he was
aware of prior to the giving of the Miranda rights in
order to secure their waiver.

THE COURT:  I think the answer, then, is yes?

MR. EASON:  The answer is yes.

THE COURT:  The Government is not contending he
was not in custody?

1      MR. EASON:  No, your Honor, we're not making

2   that contention.

3      THE COURT:  To avoid the double negative, the

4   Government would acknowledge he was in custody when he was

5   interrogated?

6      MR. EASON:  Yes, your Honor, we will argue that.

7      Finally, I would just argue that the remedy in

8   this case that is being sought by the Defendant is one

9   that must be used as a last resort according to the

10   courts.  Hutson versus Michigan, 547 US 586, 2006 Supreme

11   Court case, says suppression is a remedy of last resort

12   because it requires for exclusion to be appropriate -- the

13   deterrence benefits of the suppression must outweigh the

14   heavy cost of throwing out a confession.

15      The purpose of exclusion is to deter future

16   violations of the Constitution and it applies only where

17   the deterrent affect would outweigh the substantial cost

18   of letting the possibly guilty and dangerous go free.

19      And under the circumstances, your Honor, from

20   the video from the testimony, there is no police conduct

21   so outrageous or so outlandish or so inappropriate that it

22   requires this type of a sanction.  It's just not

23   appropriate as far as remedies go in this case.

24      By all accounts, from the testimony, from the

25   video, the type of extreme inappropriate conduct that the

1    suppression rule was designed to deter simply does not

2    exist in this case.  United States versus Nielsen, which

3    is a Fourth Circuit case from 2016, outlines things like

4    threats of violence, lengthy marathon interrogations or

5    extended isolation as things that they would want to

6    deter.  None of those are present in this case your Honor.

7         And, so, to sum up, the totality of the

8    circumstances indicate that the Defendant's statements in

9    this case were not extracted or obtained by threats or

10   violence or direct or implied promises or the exertion of

11   improper police influence on the Defendant.  We'd ask the

12   Court to find that the Defendant's statements were

13   voluntary, that his waiver of Miranda was voluntary and

14   that, as such, the motion to suppress should be denied.

15         Thank you.

16         THE COURT:  Before you sit down, let me ask you

17   a question about the burden of proof.  What is the

18   Government's position regarding that issue?

19         MR. EASON:  It's a preponderance of the evidence

20   that the Government must prove by the preponderance of the

21   evidence that a confession is voluntarily obtained.

22         THE COURT:  Is there a threshold showing that

23   the Defendant must make on a suppression issue?

24         MR. EASON:  Your Honor, I'm not sure.  I simply

25   don't know.  I know that it's my burden to produce the

1     evidence by a preponderance that it was obtained

2     voluntarily.

3           THE COURT:  Thank you, sir.

4           Ms. Sison.

5           MS. SISON:  Your Honor, first and foremost, Mr.

6     Eason said that this is not police misconduct.  I don't

7     think that we're here today to say that the police acted

8     in a way that would amount to misconduct.  What we're

9     saying is this:  That they acted in a way to affect

10    psychological coercion upon a man so that he went from I

11    didn't do that, I didn't do this, denials for about two

12    hours, to whatever you say, and that's the change, that's

13    where the will was overborne.

14          Now, it may be subtle but it's no less

15    pernicious.  And I think part of the problem here is

16    people want to see somebody either beaten up or that

17    there's yelling and screaming or something much more to

18    say that there was psychological coercion, but that's not

19    what psychological coercion is.  It may be but that's not

20    all of it.

21          They worked on his will and they did in a number

22    of ways.  First, they go to his house.  They don't tell

23    him what they are there for, so they are already acting in

24    a deceitful manner.  We know for a fact there is an arrest

25    warrant and also a several criminal complaints, but that's

1        something they tell him.

2                During the hour, now I don't know if we are to

3        believe either men, one man said we didn't talk to him at

4        all, the other man said we made small talk, but even

5        during that hour, not once was he told that he was being

6        looked at as a suspect.  And I think that would raise

7        somebody's anxiety.

8                I know the Government will say, oh, no, the fact

9        that they didn't say anything, that's a good thing, but if

10       you're sitting in a police car, marked or not marked, with

11       people who are or aren't talking to you, you're still not

12       home hanging out on your couch.  It is not one of those

13       situations where you're not going to be anxious.

14               So what you have here is a number of factors

15       that I would say are relentless.  Now they are not beating

16       up on him, there's no doubt about that.  They're probably

17       speaking in tones -- and the Court will look that video,

18       you will see that.  So we're not claiming that, we're not

19       claiming that they're threatening him, that they are

20       showing their hands, I mean, but there are coercive

21       tactics being used.

22               The fact that it takes place in a small room,

23       could be anywhere from 6 to 8 or I believe it was 8 to 8,

24       it's still a small room.  And they say, well, he could

25       have used the phone at any time.  Well, he didn't know

1    that. There weren't rules, there weren't parameters that

2    were set for him, he was just put in this room.

3        And they make it sound like he could have gotten

4    up at any time and just leave and we know that's not the

5    case. If he could have gotten up and leave at any time,

6    that is one thing that they could have told him. You know

7    you're not under arrest, you can leave at any time and, in

8    fact, that was not their intention. Their intention was

9    to get a confession and we know that because Sergeant

10   Iadonisi said that's what we were there to do. It wasn't

11   to -- he said, all said, we're here to get the truth, but

12   it was truth as the police saw it. So that is not

13   entirely the same thing.

14       And I think the fact that this is a man that

15   readily said, fine, I'll take a polygraph. It may not

16   mean anything as far as coercive techniques, but it

17   certainly says something and addresses the fact that he

18   said I didn't do this, I didn't do this, I didn't do this,

19   and he kept saying that over and over.

20       And then if we look at the things that the

21   police said, they made suggestions, there implied

22   promises. And if you look at the techniques that Dr. Leo

23   talked about, we have the presumption of guilt, the

24   investigative bias that was present, the minimization and

25   the maximization, the promise of and threats.

1          And then he said threats and promises are two

2     different sides of same coin.  The fact that they were

3     saying, look, you know, after today, we're not going to be

4     able to help you, let's work on this.  Those are implied

5     threats.  I mean, they are not hitting him on the head

6     with a book, they're not throwing something at him, but

7     it's no less a psychological factors.

8          And as far as the interrogation it may not be

9     the six hours, but, again, it doesn't mean that it was not

10    a factor.  We had a 3-hour interrogation and that doesn't

11    count this time that he was placed in the car, then we

12    would spread it out to even longer than that.

13         And then there was a false evidence ploy in

14    which they were talking about specifics that a person

15    would not have known if they had not participated in that

16    and he didn't know any of these things.  They kept pushing

17    these things to him.  They kept saying it's not an

18    accident, you know she was part of it.  So those are all

19    the things to get somebody to break down.

20         Again, it's not same thing as taking a bat and

21    beating him to death, but it's the same thing to break

22    somebody down because he's thinking something good is

23    going to come out of it if I just go along with them.

24         And, again, this was relentless.  And as far as

25    people coming in and out of the room, that is maybe not a

1    psychological technique, but, certainly, it is a technique

2    to maximize or increase the anxiety a person would feel.

3            And, obviously, one of the statements that one

4    of the witnesses said, it wasn't working.  All of the

5    things he was trying, it was not working.  Okay.  So

6    that's tells you something.  If something isn't working,

7    then let's try something else until something works and

8    that's exactly what happened in this case.

9            As far as the remedy, I mean, the only remedy in

10   this case is to throw this entire case out.  And part of

11   it is what Dr. Leo said.  He said part of the problem is

12   when you have suggestions that only the police would know

13   in a particular case and as provided to the jury, you

14   could say there's some courts that say it does not.  The

15   fact that there are facts that a jury would say only a

16   person can say that they would not have the information

17   available to a common person, that these are some of the

18   techniques that somebody uses.

19           So I think that also, the fact that they kept

20   using deceit, and I'm not saying that they are mean

21   people, I'm not saying that I think they went out of their

22   way to, you know, beat something out of him, but I do

23   think that collectively they worked together to

24   cumulatively have this kind of effect.  So, at the 2-hour

25   mark, he broke, okay.

1          And the fact that, you know, if he is leaning

2     over, and I don't recall that, but even if he is leaning

3     over, perhaps that said, according to his characteristics,

4     that, oh, good, I'm going to get out of here because I'm

5     giving them something they want, they are responding to me

6     because, for the first two hours, they were not responding

7     to him.  So that is a behavior that I could see happening

8     after two hours of trying to break him.

9          And, so, your Honor --

10          THE COURT:  Am I correct about the lack of

11     reference to food?

12          MS. SISON:  I don't remember that, your Honor,

13     but I don't want to say that there is.  As I recall, there

14     was that bathroom break, but that was pretty much it.  And

15     as I recall, they -- this was during the evening hours.

16     So I could see where this Court is going with that, but,

17     unfortunately, I can't remember that at all.

18          THE COURT:  It would be in the transcript if it

19     was offered, though?

20          MS. SISON:  Yes, your Honor.

21          And I think it's important in this case to also

22     look at the video and not rely on transcripts because you

23     know how sometimes words don't always convey the meaning

24     behind it.  And I think the video is very constructive

25     because you will see some of these techniques in play.  So

1  it's not just Dr. Leo saying something, but something that

2  the Court, because of the knowledge that was imparted to

3  this Court today, that we as normal laypeople would not

4  know, I think those are some of the things that the Court

5  should look at to determine whether or not these coercive

6  tactics were used.

7          And Mr. Eason talked about looking in the

8  totality of the circumstances and that's really what

9  you're looking for.  It's everything into this, it's not

10  one particular thing.  I know he said that there are three

11  elements.  Those are not the main elements, those are the

12  things that the Court should look at but they are not the

13  only things.  And, certainly, there are other things based

14  on what an interrogation is that I think the Court should

15  also look to.

16          THE COURT:  Would you agree with the

17  Government's position about the burden of proof in this

18  case?

19          MS. SISON:  I do, your Honor.  I think it is

20  their burden.

21          THE COURT:  Is there a threshold showing that

22  the Defendant must provide before the Government -- I

23  mean, the Court undertakes that kind of an issue?

24          MS. SISON:  I don't believe so, your Honor.  I

25  think the fact that we alleged it is enough.

1          THE COURT:  All right.  One other question for

2     you.  I saw in the Government's briefing that it's

3     indicated that it does not anticipate offering any

4     evidence regarding Mr. Jumper's iPad and iPhone.

5          I need to ask Mr. Eason, Mr. Eason, let me ask

6     you, is that still the Government's position?

7          MR. EASON:  After a very exhaustive look at all

8     of the contents, yes, your Honor, there was nothing

9     probative that we could find.

10          THE COURT:  Ms. Sison, in that regard, would the

11     motion not be moot with respect to --

12          MS. SISON:  That would be, your Honor.  I think

13     when it was drafted, we weren't sure yet if they had done

14     any forensics on the two items, and ever since then, Mr.

15     Eason did indicate to me that they have reviewed it

16     exhaustively and they did not plan to present any evidence

17     from either two of those electronic objects.

18          THE COURT:  So the motion would go moot as to

19     the consent to search the iPad and iPhone?

20          MS. SISON:  That's correct, sir.

21          THE COURT:  I need to deal with a grand jury

22     matter at this time, so I'm going to take a recess for a

23     few moments.  We will take approximately 15 minutes.  This

24     is on your end of your argument, sounded like you are --

25          MS. SISON:  I am, your Honor.  I don't have

```
1          anything more to say.
2                    THE COURT:  Since you are at that point, I'll
3          come back and I'll give the Government final argument and
4          I may have a few closing things to do before we close the
5          record.
6                    MR. EASON:  Yes, your Honor.
7                    THE COURT:  We will stand in recess for
8          approximately 15 minutes.
9                    (Brief recess was taken.)
10                   THE COURT:  I believe the Defense had concluded
11         its argument.
12                   Mr. Eason, I'll give the Government final
13         rebuttal.
14                   MR. EASON:  Thank you, your Honor.
15                   I'm just going to talk a little bit about, if I
16         may, about the standards.  Again, it is a preponderance of
17         the evidence standard.  The burden is on the Government to
18         demonstrate by a simple preponderance that the Defendant's
19         confession was voluntarily given.
20                   Coercive police activity is necessary for
21         finding confession or waiver involuntary.  However, your
22         Honor, in any given interrogation, there is always going
23         to be some level of coercion getting a person from denial
24         to admission.
25                   The question of voluntariness has always
```

1   depended on the absence of police overreach and that's

2   Colorado versus Connolly.  So it's not just enough that

3   there be coercion, it's that there has to be coercion and

4   it has to be coercion that is beyond the pale, beyond what

5   the police should be doing and intentional on their part.

6        The mere existence is not sufficient -- of

7   coercion is not sufficient to render a confession

8   involuntary, but, again, it's a but-for cause.  If there's

9   no coercion, there can't be any question of voluntariness;

10  however, the presence of coercion does not automatically

11  render a confession involuntary.

12       Again, the appropriate inquiry is if the

13  Defendant's will has been overborne or his capacity for

14  self-determination critically impaired.  And that's an

15  exceptionally high bar, your Honor.  It's a totality of

16  the circumstances argument which deals with a number of

17  factors, but the courts have said most specifically that

18  considering the characteristics of the Defendant, setting

19  of the interview and the details of the investigation.

20       And, finally, your Honor that if the totality of

21  the circumstances reveal both an uncoerced choice, even a

22  decision to change from denial to admission, if prompted

23  by some coercion, is not considered an over -- it's not an

24  overridden will, it's not a capacity for

25  self-determination that's been critically impaired because

1          it's still a choice to change in this case.

2                    And, so, it has to be revealed both an uncoerced

3          choice and the requisite level of comprehension and, your

4          Honor, nothing in the record under any circumstances

5          indicates that the Defendant does not enjoy the requisite

6          level of comprehension to make a voluntary statement.  So,

7          really, we're just looking at the totality of the

8          circumstances test to see if there was coercion and, if

9          so, was it so monumental and such a product of police

10         overreach that it renders his confession involuntary.

11                   And, your Honor, then comes the question of

12         remedy and we would argue that the remedy in this case is

13         not suppression because suppression is a question of last

14         resort.  It's not even did the police do this, yes, they

15         did, but suppression is reserved for the most grave of

16         police misconduct.  So, even if you find that the police

17         did overreach and that they were being coercive and that

18         the confession was a result of that, you still have a

19         different inquiry on the question of suppression as to

20         whether or not this conduct is so extreme and outrageous

21         and so offends the moral principles of society and the

22         protections of the Constitution, that the risk of -- that

23         the deterrent effect outweighs the substantial cost to

24         society of letting the guilty and dangerous go free.

25                   So, your Honor, it's a stairstep evaluation and

1    I would argue we aren't even on the first step, that, you

2    know, such as it is, there is not enough police coercion

3    to even raise an inquiry as to voluntariness, but if there

4    is, it certainly doesn't rise to the level of suppressing

5    the voluntariness.  And even if it does, it certainly

6    doesn't rise to the level of police overreach necessary to

7    make suppression the appropriate remedy.

8         I know that Ms. Sison mentioned dismissal as a

9    remedy and that's even further beyond.  I don't know of

10   any case law that indicates that the appropriate response

11   for police successfully obtaining a confession is to

12   dismiss the case because they used some type of

13   psychological effort in that.  I just don't know where

14   that comes from, but, definitely, I don't think we've made

15   it -- I don't even think we've made it to the question of

16   whether or not there's enough coercion to question the

17   voluntariness.

18        THE COURT:  To be clear about that one point, I

19   did hear Ms. Sison make that reference, but the only issue

20   before this Court is whether the confession should be

21   suppressed and whether this Court should issue a

22   memorandum of recommendation to that effect.

23        MR. EASON:  In that case, your Honor, I'll leave

24   that issue alone and just end with the statement that,

25   under the totality of the circumstances, the Government

1          has met its burden and then some, we would argue, that by

2          a preponderance of the evidence, the Defendant's statement

3          was voluntary and knowingly made and after he had been

4          appropriately apprised of all the rights that he would

5          have under Miranda.  And, so, we would ask your Honor to

6          deny the Defendant's motion to suppress at this time.

7                    THE COURT:  Thank you, sir.

8                    Would there be any issues that either party

9          believes should or would benefit from supplemental

10         briefing?

11                   Anything from the Government?

12                   MR. EASON:  Your Honor, I think what I have in

13         my initial response is sufficient, so I wouldn't be asking

14         to brief any further.

15                   THE COURT:  Ms. Sison.

16                   MS. SISON:  Your Honor, we will be happy to

17         brief.  I think maybe if we make references to some of the

18         coercive techniques and then refer it to the video, that

19         might be helpful for the Court or would you like --

20                   THE COURT:  I'm not looking for further

21         briefing, I'm asking for the response to the question

22         whether the parties think there are issues that need

23         further briefing or that you would like to be heard

24         further in that regard.

25                   MS. SISON:  No, your Honor.  Thank you.

1          THE COURT:  Thank you.

2          With regard to the exhibits, Government's

3    Exhibit 1 is the video, and let me confirm I do have a

4    copy of that and I do have that in chambers.  Thank you

5    for providing that.

6          Government's Exhibit 2 was the transcript as now

7    amended.  Those two have been admitted by stipulation.

8          Government's Exhibit 3 was the waiver of rights

9    form that was submitted without objection.

10          Is there any objections to me considering any

11    further information in the record?  Specifically what I

12    would be referring to, I think the only thing beyond the

13    exhibits that have been offered today as I just discussed,

14    Government's 1, 2 and 3, would be the exhibits to the

15    Defendant's reply.  Any objection to -- that actually

16    includes the transcript as well.

17          Any objections by the Government to the Court

18    reviewing those materials?

19          MR. EASON:  No, your Honor.

20          THE COURT:  And with respect to the exhibits,

21    just to be clear, the copy I have is a copy and, Mr.

22    Eason, you'll have the originals, you're going to keep

23    that.  I presume you'll have the original of the

24    transcript and will keep those?

25          MR. EASON:  Yes, your Honor.

1    THE COURT:  Will there be anything further on

2    any matters that needs to be addressed today?

3    MS. SISON:  Your Honor, in regards to the

4    exhibit with the transcript, it wasn't -- do you need me

5    to do anything else or will the clerk's office deal with

6    that?  I didn't know if you needed me to resubmit it

7    without that and file it separately?

8    THE COURT:  As to the transcript, that will be

9    sealed.  That's already ordered, I believe that will be

10   reflected on the docket.  I'm ordering that to be sealed.

11   MS. SISON:  So I don't need to do anything else

12   about that, your Honor?

13   THE COURT:  Correct.

14   MS. SISON:  To submit separately?

15   THE COURT:  Correct.  I believe Madam Clerk, am

16   I correct about that?

17   THE CLERK:  Yes, Judge.

18   THE COURT:  And, Mr. Eason --

19   MR. EASON:  I'm going to redact and resubmit my

20   exhibit, yes, your Honor.

21   THE COURT:  Substitute that out for the record.

22   All right.  Anything further then from either

23   party?  Mr. Eason from the Government?

24   MR. EASON:  No, your Honor.

25   THE COURT:  Ms. Sison?

1          MS. SISON:  No, your Honor.  Thank you.

2          THE COURT:  Thank you both for your fine

3    advocacy today.  I will take this matter under advisement

4    and I will issue an memorandum of recommendation in due

5    course.

6          We will stand in recess.

7          (The proceedings were concluded at approximately

8    3:47 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>REPORTER'S CERTIFICATE</u>

2

3

4            I, BEVERLY BOURLIER JAMES, certify that I was

5    authorized to and did stenographically report the foregoing

6    proceedings and that the transcript is a true and complete

7    record of my stenographic notes.

8            Dated this 6th day of September, 2019.

9

10

        _____
11       BEVERLY BOURLIER JAMES
         Registered Professional Reporter
12       Certified Realtime Reporter
         Certified LiveNote Reporter
13       Florida Professional Reporter
         Georgia Certified Reporter
14       NCRA Realtime Systems Administrator

15

16

17

18

19

20

21

22

23

24

25

**'94** [1] - 78:1

**'96** [3] - 78:2

**1** [7] - 6:1, 5; 157:7; 190:14; 239:3, 14

**1-day** [1] - 144:19

**10** [4] - 67:24; 120:7; 183:4; 200:5

**10-minute** [1] - 91:22

**112** [1] - 222:13

**11:00** [2] - 3:23; 65:15

**13** [1] - 119:3

**137** [1] - 33:17

**13th** [1] - 78:11

**14** [1] - 156:20

**143** [3] - 95:5; 123:11

**15** [5] - 33:10; 156:20; 196:5; 233:23; 234:8

**15-foot** [1] - 12:8

**17** [3] - 42:16; 156:20

**17th** [2] - 78:1

**18** [1] - 156:25

**19-1** [1] - 2:14

**1908** [2] - 149:19, 22

**1930s** [1] - 141:8

**1940s** [5] - 141:10, 13; 142:18; 145:12

**1980s** [1] - 149:24

**1991** [1] - 131:22

**1993** [2] - 131:22

**1994** [1] - 131:23

**1997** [2] - 138:21; 222:13

**1998** [1] - 193:12

**1:19-CR-5** [1] - 2:5

**1:30** [1] - 183:1

**2** [6] - 6:1, 3, 7; 157:8; 239:6, 14

**2-hour** [1] - 230:24

**20** [6] - 84:5; 86:3; 93:1; 118:21; 196:5; 205:9

**2001** [1] - 137:19

**2003** [1] - 137:19

**2006** [1] - 224:10

**2007** [1] - 119:10

**2008** [1] - 9:2

**2010** [4] - 188:14; 210:7; 213:20

**2016** [1] - 225:3

**2018** [8] - 10:5; 16:24; 38:21; 66:15; 68:22; 78:12; 93:4

**2019** [1] - 2:22

**20th** [2] - 131:18; 141:8

**23** [2] - 5:12, 16

**23-4** [1] - 2:22

**24** [2] - 5:10, 15

**25** [6] - 66:19; 77:20; 84:5; 86:3; 156:22; 205:9

**28719** [1] - 33:18

**29** [5] - 10:5; 16:24; 66:14; 68:22; 93:3

**29th** [1] - 38:21

**2:15** [1] - 187:2

**2:18** [1] - 187:9

**2:37** [1] - 26:11

**2:43** [1] - 26:4

**3** [8] - 5:10, 15; 14:5; 16:3, 7; 84:17; 239:8, 14

**3-day** [1] - 144:19

**3-hour** [5] - 18:23; 52:14; 200:1, 3; 229:10

**30** [2] - 138:22; 205:9

**302** [1] - 190:13

**31st** [1] - 2:14

**35** [4] - 5:12, 16; 138:20; 205:9

**350** [2] - 138:19; 205:5

**36** [1] - 182:8

**4** [1] - 84:17

**4-day** [1] - 144:20

**40** [1] - 138:20

**402** [1] - 138:25

**41** [1] - 123:18

**4:00** [1] - 10:10

**4:30** [1] - 96:20

**50** [1] - 158:19

**547** [1] - 224:10

**586** [1] - 224:10

**59** [1] - 182:10

**5:27** [1] - 44:17

**5:30** [1] - 187:24

**5:47** [1] - 44:17

**5:48** [1] - 98:12

**6** [2] - 67:24; 227:23

**6th** [1] - 5:22

**70** [2] - 157:7, 11

**75** [1] - 147:3

**77** [1] - 190:14

**771** [1] - 222:13

**7:41** [1] - 98:15

**8** [5] - 12:8; 33:10; 227:23

**8-foot** [2] - 97:4

**8th** [1] - 2:22

**90** [2] - 103:3; 200:15

**90-minute** [2] - 198:19, 25

**99** [1] - 206:5

**aback** [1] - 100:17

**ability** [6] - 17:7; 100:1, 6; 156:3; 158:14; 216:10

**able** [18] - 9:19; 10:19; 13:15; 38:7; 41:23; 75:7; 97:6; 105:7; 122:3; 132:15; 148:12; 163:23; 167:17; 170:8; 171:21; 173:4; 180:2; 229:4

**abnormal** [1] - 199:10

**abnormally** [1] - 171:24

**absence** [5] - 160:18; 181:7; 211:24; 221:1; 235:1

**absolutely** [2] - 210:22; 218:14

**absolve** [1] - 219:19

**abuse** [6] - 41:1, 8, 11; 53:19, 25; 158:7

**abuse-type** [1] - 53:19

**academia** [1] - 133:11

**academic** [6] - 131:3; 132:20; 133:6; 134:25; 137:16; 139:15

**academics** [1] - 137:18

**academy** [1] - 42:19

**Academy** [1] - 42:7

**accept** [5] - 3:22; 133:17; 140:23; 184:3; 221:15

**acceptable** [2] - 222:7, 9

**acceptance** [1] - 136:3

**accepted** [15] - 6:3; 133:20; 134:5; 135:6, 9, 21, 23; 136:2, 9; 149:25; 150:3, 7, 13; 151:1

**access** [6] - 18:24; 77:1; 84:10; 98:22; 217:3, 16

**accident** [8] - 153:10, 12; 161:15; 175:13; 197:3, 8, 17; 229:18

**accidental** [3] - 121:6; 174:4, 11

**accidentally** [10] - 57:4, 7; 171:12, 18; 174:8; 175:14, 16; 176:24; 186:2; 208:4

**accompany** [2] - 11:16; 93:16

**accomplishments** [1] - 128:18

**accord** [1] - 3:14

**according** [7] - 86:14, 23; 120:18; 194:14; 218:15; 224:9; 231:3

**account** [4] - 170:20; 181:11; 197:12; 204:4

**accounts** [3] - 215:24; 222:24; 224:24

**accurate** [6] - 139:18; 140:6; 151:9; 152:4; 184:20; 201:21

**accusation** [1] - 162:13

**accusations** [4] - 170:15, 24; 173:25; 174:1

**accusatory** [3] - 142:25; 165:22; 196:9

**accuse** [1] - 164:7

**accused** [2] - 20:15; 161:13

**accusing** [4] - 151:22; 170:17, 25

**achievement** [2] - 134:20

**acknowledge** [2] - 223:12; 224:4

**acknowledging** [1] - 221:24

**acquire** [1] - 135:24

**acquired** [1] - 37:20

**Act** [1] - 3:15

**act** [4] - 161:13; 162:1, 17; 197:18

**acted** [2] - 226:7, 9

**acting** [5] - 9:15; 39:3, 13; 66:14; 226:23

**academia** [1] - 133:11

**action** [1] - 58:9

**actions** [2] - 58:10; 62:15

**active** [1] - 69:3

**actively** [2] - 201:18; 202:9

**activities** [1] - 136:25

**activity** [9] - 207:22; 218:12, 15, 18; 220:10, 12; 222:19; 223:19; 234:20

**actors** [1] - 162:8

**acts** [2] - 87:24; 162:19

**actual** [7] - 42:25; 86:4; 98:13; 113:25; 155:1; 164:1, 9

**add** [1] - 211:7

**addition** [3] - 44:11; 131:11; 160:8

**additional** [4] - 10:24; 27:2; 46:16; 52:24

**additions** [1] - 136:7

**address** [8] - 6:10; 15:13; 33:17; 95:3; 99:15; 123:11, 17

**addressed** [5] - 2:9; 4:5; 7:17; 187:15; 240:2

**addresses** [1] - 228:17

**adhered** [1] - 189:7

**adjacent** [1] - 35:17

**admissible** [1] - 155:11

**admission** [12] - 23:9, 25; 103:18; 143:21; 165:15-17, 25; 172:16; 200:2; 234:24; 235:22

**admissions** [2] - 168:2; 221:15

**admit** [11] - 4:11; 16:3; 20:3; 153:22; 161:25; 162:16; 170:20; 175:15; 179:10; 180:1; 197:17

**admits** [1] - 175:15

**admitted** [11] - 6:4, 7; 16:6; 103:9, 11; 171:16; 177:1; 239:7

**admittedly** [1] - 200:4

**admitting** [14] - 152:23; 153:2; 154:11, 19; 160:12, 14; 163:19, 22; 171:23; 172:2; 173:25; 179:7, 15; 186:3

**adopt** [2] - 4:11; 197:12

**adult** [1] - 41:13

**adult-type** [1] - 41:13

**adults** [3] - 41:18; 157:21; 158:20

**advance** [2] - 107:21; 143:2

**advantage** [1] - 57:13

**adversarial** [1] - 168:22

**adverse** [1] - 162:17

**advise** [2] - 14:10; 99:4

**advised** [1] - 16:10

**advisory** [2] - 137:13, 16

**affect** [3] - 185:9; 224:17; 226:9

**affected** [1] - 185:6
**affects** [1] - 159:10
**affiliated** [1] - 42:5
**affirmed** [2] - 191:8; 221:10
**afforded** [1] - 15:16
**afield** [1] - 128:17
**afternoon** [5] - 10:9; 38:21; 43:16; 96:19
**age** [2] - 156:19, 22, 24
**agent** [2] - 7:7; 63:6
**agents** [3] - 3:22; 144:6; 165:4
**aggregates** [1] - 194:4
**agitated** [1] - 101:13
**ago** [4] - 42:15; 137:7; 138:14; 139:24
**agree** [8] - 4:14; 11:16; 157:17, 20; 161:12; 175:22; 185:13; 232:16
**agreed** [5] - 31:22; 95:17; 193:21; 200:2; 209:13
**agreeing** [5] - 154:18; 157:23; 159:25; 160:19; 173:25
**agreement** [1] - 184:14
**agrees** [1] - 209:18
**ahead** [3] - 87:16; 127:21; 183:7
**ahold** [1] - 83:5
**ailments** [1] - 215:20
**airport** [1] - 187:25
**alcohol** [1] - 24:21
**alert** [1] - 17:9
**allegations** [14] - 20:20; 22:5; 55:8, 10, 13; 78:20; 86:23; 94:19; 95:15; 100:18, 24; 101:4; 152:3; 171:1
**alleged** [24] - 3:12; 53:14, 24; 61:3; 103:9; 152:3; 170:7, 20; 171:4; 172:13; 173:23; 174:1; 179:23; 180:12; 181:11; 182:6, 9-10, 12, 17; 184:4; 208:5; 232:25
**allegedly** [3] - 31:7; 115:23; 116:7
**alleging** [1] - 172:14
**allowed** [12] - 7:11; 12:2; 49:23; 88:15; 89:11; 109:22; 131:9; 152:6; 169:6, 8; 216:16; 223:2
**alluded** [1] - 161:3
**almost** [8] - 9:6; 34:7; 68:24; 139:8; 147:22; 189:4; 194:1; 222:18
**alone** [8] - 55:1; 60:1; 76:21; 98:17; 115:8, 10; 200:4; 237:24
**alternative** [1] - 153:7; 196:25
**altogether** [1] - 92:25
**ambiguous** [5] - 152:5; 171:5; 204:18, 20

**amended** [1] - 239:7
**Amendment** [2] - 14:11, 13
**America** [3] - 143:11; 158:4; 168:14
**American** [13] - 135:1; 145:18, 25; 166:23; 169:6; 173:16; 178:11; 191:22; 193:4; 214:2; 215:15
**American-style** [1] - 145:25
**Americans** [5] - 158:10; 191:24; 215:16
**amount** [8] - 34:7; 165:1; 221:9, 24; 222:6, 8-9; 226:8
**amp** [1] - 177:19
**amping** [1] - 177:24
**analysis** [5] - 120:11; 133:15; 155:1; 178:1
**analyze** [1] - 195:11
**animate** [1] - 135:25
**anonymously** [1] - 133:13
**answer** [8] - 40:10, 16; 47:10; 120:19; 212:3, 5; 223:22
**answered** [2] - 16:18; 17:10
**answers** [2] - 16:19; 101:19
**anticipate** [4] - 3:22; 8:13; 205:7; 233:3
**anticipated** [2] - 143:21; 165:25
**anxiety** [4] - 152:17; 164:23; 178:23; 202:5; 211:11; 213:1; 227:7; 230:2
**anxious** [1] - 227:13
**anyplace** [1] - 128:17
**apologize** [4] - 2:16; 65:14; 163:3; 201:25
**apology** [5] - 59:15, 18; 185:12, 20
**appeals** [4] - 152:23; 153:18
**appear** [7] - 2:23; 3:3; 70:6, 12; 72:13; 74:24; 104:7
**appearance** [1] - 23:10
**appellate** [2] - 6:16; 184:23
**applied** [2] - 206:25; 210:16
**applies** [1] - 224:16
**apply** [2] - 136:25; 194:16
**applying** [3] - 207:3
**appointment** [1] - 191:8
**appreciate** [1] - 100:6
**apprised** [1] - 238:4
**approach** [7] - 14:1; 117:8; 178:9, 17-18; 202:13
**approached** [1] - 20:12
**approaches** [3] - 141:13; 145:4; 192:8
**appropriate** [10] - 3:7; 16:23; 68:21; 96:10; 215:24; 224:12, 23; 235:12; 237:7, 10
**appropriately** [5] - 70:5; 216:1; 220:4; 223:17; 238:4

**April** [2] - 119:10; 169:21
**area** [23] - 27:14; 28:23; 29:5, 10; 38:11; 41:12; 46:3; 97:19; 103:17; 106:18; 128:14; 129:5, 9; 135:6; 136:4, 9; 137:18; 150:10, 22; 151:1; 156:11; 222:17
**areas** [4] - 135:8; 140:24; 148:3; 163:25
**arguably** [1] - 221:17
**argue** [9] - 218:23; 220:5; 221:5; 223:18; 224:6; 236:12; 237:1; 238:1
**argument** [10] - 214:22; 215:6; 220:16; 221:17; 222:21; 223:14; 233:24; 234:3, 11; 235:16
**arises** [1] - 187:17
**armed** [2] - 19:16; 101:22
**aroused** [3] - 106:23; 107:1
**arraigned** [2] - 122:2, 6
**arrangements** [1] - 47:25
**arrest** [31] - 11:12; 20:23; 25:15; 31:16; 45:3, 24; 59:1; 61:21; 62:5, 7-8, 12; 63:9; 69:1, 3; 76:19; 88:17, 19; 90:17; 91:2; 93:22; 108:6; 109:15, 18; 124:9; 126:13; 160:2; 174:25; 226:24; 228:7
**arrested** [2] - 109:12; 212:21
**arrived** [1] - 11:23
**article** [6] - 133:13, 17, 20-21; 210:7; 213:20
**articles** [7] - 131:24; 132:23, 25; 133:2, 6; 135:13, 17
**artificially** [1] - 164:5
**Asheville** [2] - 62:11; 187:24
**Asian** [2] - 158:5; 193:4
**aside** [1] - 94:18
**aspects** [1] - 142:4
**assaulted** [1] - 182:12
**assertion** [1] - 177:17
**assess** [3] - 154:21, 23
**assigned** [1] - 122:2
**assist** [6] - 9:16; 27:13; 29:4; 39:4; 72:5; 81:9
**assisting** [1] - 10:25
**associated** [2] - 188:16; 190:2
**Associates** [1] - 145:13
**Association** [2] - 135:2
**assume** [1] - 190:25
**assumed** [2] - 183:23; 193:22
**assuming** [5] - 28:17; 31:1; 88:17; 120:6; 122:19
**assumption** [2] - 146:21
**assumptions** [1] - 143:25
**atmosphere** [2] - 220:22,

24
**attached** [2] - 6:13; 34:2
**attachments** [1] - 128:11
**attacking** [2] - 151:25; 171:2
**attempt** [4] - 27:13; 40:3; 46:15; 105:15
**attempted** [1] - 47:9
**attempting** [3] - 9:16; 201:4; 202:9
**attempts** [1] - 29:11
**attend** [1] - 41:24
**attended** [1] - 175:4
**attention** [4] - 19:19; 66:24; 74:12; 102:8
**attire** [1] - 68:21
**attitudes** [2] - 149:8; 159:7
**attorney** [9] - 14:14; 15:1, 3, 19; 18:3; 73:21; 107:13; 122:3, 6
**attorneys** [3] - 137:3; 140:10; 217:1
**attribute** [2] - 153:15; 184:19
**audio** [5] - 18:20; 35:11; 62:11, 16; 108:19
**audio/video** [1] - 94:12
**August** [11] - 10:5; 16:24; 38:21; 66:14; 68:22; 78:1, 11; 93:3; 96:12
**authority** [1] - 192:9
**automatically** [2] - 218:21; 222:19; 235:10
**available** [3] - 120:5; 209:1; 230:17
**average** [1] - 216:4
**avoid** [3] - 144:17; 189:6; 224:3
**avoided** [1] - 218:25
**awards** [7] - 134:16, 19, 21-22, 24; 135:3
**aware** [15] - 9:12; 13:23; 25:6; 56:8; 66:21; 74:20; 86:15; 93:6; 94:9; 116:6; 129:3; 192:11; 193:5; 215:19; 223:20
**bachelor's** [1] - 131:5
**background** [1] - 66:17
**backup** [1] - 81:17
**bad** [6] - 109:10; 142:9; 153:5, 16; 161:16; 162:3
**bad/good** [1] - 171:20
**badge** [2] - 26:20, 22
**ballpark** [1] - 132:24
**Band** [4] - 10:15; 192:5, 8, 11
**bar** [2] - 220:15; 235:15
**bare** [1] - 197:14
**base** [1] - 143:3
**based** [17] - 43:4; 91:11; 131:25; 133:18; 134:21; 137:23; 143:10, 15; 155:9;

172:8; 173:16; 191:1; 193:24; 209:5; 210:7; 220:6; 232:13

**baseline** [1] - 41:5

**basic** [1] - 41:1

**basis** [3] - 147:12; 205:4; 215:1

**bat** [1] - 229:20

**Bates** [1] - 190:13

**bathroom** [5] - 19:14; 84:25; 102:15, 19; 231:14

**Beach** [2] - 137:15, 20

**bear** [2] - 100:5; 177:19

**beat** [3] - 87:5; 173:20; 230:22

**beaten** [1] - 226:16

**beating** [2] - 227:15; 229:21

**became** [6] - 78:15, 18; 82:1; 119:10; 141:22

**become** [8] - 9:12; 66:21; 78:11; 93:6; 101:13; 120:5; 132:21; 133:4

**becomes** [4] - 150:17; 151:21; 169:16; 186:19

**becoming** [2] - 119:9; 179:17

**began** [8] - 13:18, 20; 17:1; 21:5; 22:17; 53:2; 98:13; 103:4

**begin** [11] - 2:9; 4:5; 6:10, 23; 7:18, 25; 8:10; 22:9; 187:5; 198:10; 200:5

**BEGIN** [1] - 187:8

**beginning** [3] - 37:5; 99:3; 196:8

**begins** [2] - 149:24; 199:25

**behalf** [4] - 8:7; 65:19; 92:8; 128:5

**behaving** [4] - 17:12; 70:9; 72:10; 101:7

**behavior** [11] - 17:13; 18:11; 22:20; 23:4; 101:19; 103:19; 131:1; 149:6; 159:8, 11; 231:7

**behind** [3] - 95:25; 142:21; 231:24

**belief** [2] - 173:22; 202:2

**beliefs** [1] - 149:8

**believable** [1] - 185:14

**believes** [1] - 238:9

**belong** [1] - 158:16

**belongs** [1] - 34:3

**below** [3] - 15:25; 157:7; 188:25

**beneficial** [2] - 162:16; 163:17

**benefit** [11] - 92:17; 160:4, 11; 163:21; 175:23; 179:7, 13; 180:3; 186:5; 238:9

**benefits** [4] - 159:23; 162:15; 172:1; 224:13

**Berkeley** [3] - 131:6

**best** [14] - 34:5; 54:2; 91:12; 148:4; 154:11, 15; 159:18; 166:16; 168:23; 169:4; 188:1, 7

**better** [7] - 73:10; 132:19; 147:2; 153:1; 204:12; 222:7

**between** [17] - 23:24; 56:24; 68:2; 70:2; 86:8; 104:17; 105:19; 116:10; 118:15; 142:15; 180:20; 181:10; 200:19; 210:14; 221:13; 222:8

**beyond** [8] - 148:7; 156:24; 197:14; 219:5; 235:4; 237:9; 239:12

**bias** [2] - 172:8; 228:24

**bible** [1] - 145:20

**bicycle** [1] - 204:15

**big** [2] - 34:1; 116:9

**bill** [1] - 205:7

**bit** [22] - 9:21; 12:6; 28:7; 33:2, 9; 44:4, 22; 53:20; 54:17; 66:17; 67:14; 97:1; 100:22; 105:9; 120:6; 125:25; 145:1; 204:18; 205:23; 208:7; 216:17; 234:15

**bits** [2] - 105:12; 117:16

**black** [1] - 216:24

**blameworthiness** [3] - 153:12; 161:11, 20

**blameworthy** [2] - 162:5; 174:8

**blinds** [3] - 35:22, 25; 97:6

**blood** [1] - 120:11

**blooded** [2] - 153:17; 162:12

**bodily** [1] - 56:15

**body** [8] - 134:21; 135:9, 22-23; 136:5, 18, 24; 156:11

**bono** [1] - 140:4

**book** [7] - 48:4; 133:5, 13; 145:20, 22; 229:6

**books** [7] - 131:24; 132:23; 133:1; 134:22; 135:13, 17

**born** [1] - 146:25

**bottle** [1] - 83:23; 102:20

**bottom** [2] - 14:20; 99:14

**box** [1] - 217:11

**boxes** [1] - 14:24

**brain** [2] - 156:15, 21

**Braxton** [1] - 222:12

**break** [13] - 19:15; 102:11, 21; 134:19; 150:15; 173:5; 177:25; 183:8; 187:2; 229:19, 21; 231:8, 14

**breaks** [6] - 18:17; 19:9; 23:21; 49:24; 216:14

**brief** [6] - 44:24; 134:11; 141:4; 154:6; 238:14, 17

**Brief** [2] - 91:24; 234:9

**briefed** [1] - 71:22

**briefing** [5] - 80:17; 233:2; 238:10, 21, 23

**briefly** [6] - 64:16; 91:7; 93:12; 141:6; 175:8; 187:16

**bring** [6] - 9:17; 40:3; 67:3; 93:17; 95:15; 178:18

**bringing** [3] - 96:13, 17; 170:13

**brings** [3] - 50:3; 177:19; 178:21

**broad** [1] - 180:18

**broader** [1] - 168:19

**broke** [3] - 181:15; 204:12; 230:25

**broken** [2] - 197:18; 204:15

**brought** [20] - 12:1, 22; 16:20; 21:5; 24:11; 32:5; 45:10, 18; 66:24; 67:11, 13; 69:7, 11, 13; 88:1; 96:21; 102:19; 111:14; 184:16; 195:25

**browsing** [1] - 217:6

**brutal** [1] - 141:20

**Bryson** [1] - 119:14

**build** [2] - 41:4; 196:10

**building** [5] - 34:20; 46:3; 166:25; 170:14; 196:1

**bullet** [1] - 120:11

**Buncombe** [1] - 77:25

**burden** [6] - 225:17, 25; 232:17, 20; 234:17; 238:1

**bush** [2] - 87:5; 173:20

**business** [1] - 12:22

**busman's** [1] - 132:13

**but-for** [1] - 235:8

**BY** [27] - 8:17; 14:3; 16:9; 23:1; 24:7; 25:13; 54:6; 64:18; 66:2; 77:11; 85:14; 88:14; 91:9; 92:15; 107:6; 110:21; 112:8; 117:13; 126:24; 130:7; 141:3; 165:12; 183:9; 187:22; 205:2; 208:21; 210:1

**C-A-B-L-E** [1] - 8:21

**Cable** [53] - 5:11, 13, 15, 19; 8:3, 11, 20; 67:2; 69:14, 17; 70:16, 19; 71:10, 23; 80:7, 13; 81:8, 16, 20; 82:3, 8, 10, 16; 83:6, 12, 15-16; 84:10; 89:3; 93:16; 94:3, 20; 95:14; 100:16, 23; 106:1; 111:23; 112:9; 113:15; 115:14; 118:4; 124:5, 20, 23, 25; 146:2; 173:12; 201:2, 7; 202:1

**CABLE** [1] - 8:6

**cage** [3] - 32:17; 96:4

**California** [3] - 137:25; 138:25; 205:15

**calm** [1] - 101:9

**cameras** [3] - 12:10, 13; 97:18

**Canton** [1] - 103:17

**capabilities** [1] - 94:13

**capacity** [12] - 66:14; 138:10; 167:12; 206:21; 215:3; 219:8, 15; 220:14; 223:5; 235:13, 24

**captured** [1] - 208:6

**car** [12] - 27:5; 31:19-21; 32:13, 23; 95:20; 96:1; 103:16; 227:10; 229:11

**card** [10] - 12:24; 33:24; 98:4-6; 111:21, 24; 112:1, 9

**care** [1] - 77:14

**career** [3] - 120:7; 132:5; 134:20

**carefully** [1] - 148:25

**Carolina** [3] - 10:14; 33:18; 42:6

**carrots** [1] - 154:13

**cars** [1] - 29:13

**cart** [1] - 190:21

**case** [129] - 2:4, 12; 3:12; 7:7; 9:12; 21:22; 31:7; 32:24; 33:4; 37:19, 22; 38:7, 23-25; 43:1, 3, 7; 46:8; 57:19; 59:10; 62:1, 4, 8; 63:6, 18; 64:23; 65:1, 4; 66:21, 24; 67:1; 71:20; 76:13, 16, 22; 78:19, 23; 80:11; 90:6, 11; 92:3, 6, 11, 20; 94:19; 96:15; 99:17; 106:6; 113:17, 23; 115:7, 24; 117:18; 127:6; 129:14; 134:8; 145:4; 152:25; 153:8; 154:17; 155:10; 161:19; 166:19, 25; 167:3; 170:12; 171:5; 175:9; 182:4; 184:11; 185:18; 188:22; 189:2, 14; 190:3; 191:10; 194:15; 195:22, 25; 197:21; 198:6; 203:5, 11, 14; 204:7, 23; 205:3, 7, 19; 206:15; 207:15, 19; 209:6, 12; 210:2; 212:16; 213:8, 12; 214:1, 24; 219:12; 222:13; 223:17; 224:8, 11, 23; 225:2, 6, 9; 228:5; 230:8, 10, 13; 231:21; 232:18; 236:1, 12; 237:10, 12, 23

**case-documented** [1] - 43:1

**case-related** [1] - 46:8

**cases** [18] - 41:9, 14; 59:7; 64:24; 129:2; 139:9; 142:5; 180:25; 183:19; 193:24; 194:3, 6, 10; 197:21, 24; 209:17

**catch** [3] - 97:19; 166:17

**categories** [4] - 134:20; 151:14; 191:19; 194:1

**category** [2] - 171:25; 180:18

**caught** [1] - 154:7

**caused** [1] - 155:21

**cell** [7] - 12:2; 13:2; 48:22;

74:18; 98:23, 25; 106:4
**cellular** [1] - 217:16
**center** [3] - 34:12; 59:4; 68:3
**Central** [1] - 158:4
**century** [2] - 131:19; 141:8
**certain** [16] - 64:24; 72:4, 17; 133:5; 156:1; 157:14; 163:7; 165:1; 167:10; 170:25; 178:9; 206:9; 209:22; 214:2
**certainly** [10] - 132:13; 182:16; 194:2; 211:5; 213:16; 228:17; 230:1; 232:13; 237:4
**certainty** [2] - 193:14; 206:5
**certificates** [1] - 119:24
**chair** [12] - 36:10, 14; 68:1, 3, 9-10; 83:24; 97:9, 11
**chairs** [8] - 36:6, 12; 67:25; 68:2, 5; 97:10, 17
**challenge** [1] - 194:5
**challenged** [1] - 196:19
**challenges** [1] - 151:24
**challenging** [1] - 171:2
**chambers** [2] - 5:22; 239:4
**chance** [4] - 126:4; 181:8, 19; 184:12
**chances** [1] - 216:15
**change** [9] - 23:9; 91:10; 103:19; 136:6; 198:25; 214:3; 226:12; 235:22; 236:1
**changed** [1] - 131:18
**changes** [1] - 178:16
**changing** [2] - 103:18; 198:21
**chapters** [3] - 133:2, 5, 7
**characteristics** [5] - 215:8, 12; 216:3; 231:3; 235:18
**characterization** [2] - 56:25; 121:12
**characterizing** [1] - 55:17
**charge** [2] - 161:22
**charged** [3] - 55:25; 122:2, 6
**charges** [2] - 56:3; 174:24
**check** [1] - 4:23
**checked** [1] - 150:12
**Cherokee** [37] - 8:23, 25; 9:9; 10:16, 24; 11:9, 17, 19, 23; 12:19; 14:7; 27:3; 31:23; 33:18; 59:6; 61:19; 64:19; 66:10; 77:23; 78:4, 7; 92:23; 95:16; 96:13, 21-23; 98:1; 100:8; 110:2; 118:24; 119:2; 192:5, 8, 11; 216:22
**Chicago** [2] - 142:7; 145:13
**Chicawily** [1] - 11:1
**chief** [1] - 137:17
**child** [22] - 22:10; 38:10, 13; 40:25; 41:8, 10, 16; 51:25; 52:5; 53:19, 25; 57:4,

7; 60:18; 66:23; 79:13; 106:17; 107:1, 9; 118:15; 122:19; 180:12
**child's** [1] - 103:10
**child-related** [1] - 41:16
**choice** [8] - 155:22; 161:5; 167:13, 15; 220:2; 235:21; 236:1, 3
**choice/bad** [1] - 161:5
**choose** [1] - 156:4
**cigarette** [1] - 102:21
**CIPD** [1] - 94:13
**circle** [3] - 194:13
**Circuit** [2] - 222:13; 225:3
**circumstance** [1] - 175:1
**circumstances** [13] - 215:6; 220:1, 6, 8; 222:3; 224:19; 225:8; 232:8; 235:16, 21; 236:4, 8; 237:25
**circumstantial** [1] - 152:5
**City** [2] - 119:14; 137:15
**claiming** [2] - 227:18
**Clans** [1] - 33:17
**clarification** [1] - 99:22
**clarifications** [1] - 16:13
**clarify** [2] - 18:13; 29:1
**class** [2] - 42:14, 19
**classes** [11] - 40:25; 41:6, 20, 22; 42:6, 15; 119:19, 22-23; 175:5
**clear** [11] - 16:19; 17:10; 55:21; 56:12; 112:15; 145:2; 174:16; 185:2; 237:18; 239:21
**Clerk** [1] - 240:15
**CLERK** [3] - 92:11; 128:8; 240:17
**clerk's** [1] - 240:5
**clinical** [4] - 149:11; 151:3; 156:10; 157:23
**close** [5] - 28:4; 84:14; 176:22; 198:22; 234:4
**closely** [1] - 189:6
**closer** [2] - 152:12; 204:22
**closest** [4] - 36:11; 68:10; 216:10; 222:16
**closing** [1] - 234:4
**clothes** [2] - 26:21
**clothing** [1] - 26:15
**CME** [5] - 70:22; 78:21; 86:14; 116:23
**co** [1] - 7:20
**co-counsel** [1] - 7:20
**coerce** [1] - 158:14
**coerced** [6] - 139:22; 185:16; 188:16; 199:17; 204:2; 210:25
**coercing** [2] - 142:6; 199:5
**coercion** [60] - 132:6; 138:8; 140:16, 24; 141:7, 18-21; 155:2, 9, 16, 20; 156:6; 167:6, 8, 18, 22;

169:14, 18; 186:17, 19; 199:4, 12; 202:10, 12; 204:1, 7; 211:10; 214:8; 215:2; 216:4, 20; 219:4; 220:11, 25; 221:1-3, 9, 24; 222:5, 7, 9; 223:6; 226:10, 18-19; 234:23; 235:3, 7, 9-10, 23; 236:8; 237:2, 16
**coercive** [61] - 155:17, 19; 156:1; 167:11; 169:9, 11, 16, 19; 180:22; 185:23; 186:6, 10, 18; 191:20; 194:23; 196:10, 17; 197:13; 202:8, 15, 24; 203:23; 207:2, 22; 209:6; 210:9, 20, 22; 211:5, 8, 25; 215:14; 216:4; 218:12, 15, 18, 24; 219:6, 12, 15, 18; 220:10, 12, 21, 24; 221:18; 222:19; 223:10, 18; 227:20; 228:16; 232:5; 234:20; 236:17; 238:18
**coffee** [1] - 75:14
**cognitive** [3] - 157:3, 10; 192:20
**coherent** [2] - 17:9; 185:11
**coin** [3] - 160:10, 17; 229:2
**coined** [3] - 193:12, 23; 194:7
**cold** [2] - 153:17; 162:12
**cold-blooded** [2] - 153:17; 162:12
**collected** [1] - 88:23
**collection** [1] - 120:11
**collective** [1] - 147:2
**collectively** [1] - 230:23
**Colorado** [1] - 235:2
**combined** [1] - 141:20
**comfort** [2] - 107:17; 201:18
**comfortable** [9] - 44:6, 8; 53:12; 87:22; 201:6, 12; 202:3; 217:14; 223:3
**coming** [19] - 6:19; 27:13; 37:13; 44:23; 53:17; 54:8; 75:13; 79:13; 85:20; 91:15; 110:14; 128:19, 22; 149:20; 161:15; 187:13; 211:4; 229:25
**comment** [1] - 74:14
**comments** [2] - 133:23; 174:6
**commit** [2] - 168:11; 181:14
**committed** [12] - 60:6, 24; 143:12; 147:15, 17; 161:12; 162:18; 182:15; 185:11; 193:17, 22
**committee** [3] - 137:16, 21; 138:2
**committing** [4] - 151:8, 22-23; 161:13
**common** [7] - 141:7; 148:7, 17; 158:5; 174:12; 209:2; 230:17

**communicate** [2] - 163:7
**community** [4] - 130:14; 135:7; 150:1, 4
**Community** [4] - 10:1, 12; 11:20; 95:7
**company** [1] - 42:4
**compare** [1] - 73:13
**compared** [1] - 86:4
**compelled** [1] - 204:3
**competence** [1] - 134:4
**complained** [2] - 194:3; 215:20
**complaint** [5] - 26:6; 31:16; 45:4; 124:12; 126:12
**complaints** [1] - 226:25
**complete** [2] - 183:2; 214:17
**completed** [5] - 21:7; 48:21; 69:9; 88:18; 187:15
**completely** [2] - 180:19
**compliant** [1] - 193:2
**complied** [1] - 118:7
**comply** [1] - 167:16
**composed** [1] - 198:4
**compound** [1] - 85:11
**comprehension** [3] - 220:3; 236:3, 6
**computers** [2] - 35:11, 19
**conceived** [1] - 107:21
**concept** [1] - 186:14
**concern** [2] - 100:1; 169:17
**concerned** [1] - 17:3
**concluded** [5] - 76:19; 143:12; 147:15; 167:1; 234:10
**conclusion** [2] - 108:7; 209:23
**conclusions** [1] - 133:16
**conduct** [5] - 40:4; 145:19; 224:20, 25; 236:20
**conducted** [5] - 35:13; 45:15; 132:2, 4; 216:6
**conducting** [1] - 91:11
**conducts** [1] - 47:10
**conference** [1] - 136:21
**conferences** [2] - 137:5, 8
**confess** [18] - 22:9; 56:14; 103:4; 146:23; 149:13; 153:14; 159:21, 25; 162:2; 172:13, 19, 23; 176:17; 179:1; 181:16; 184:16; 186:7; 219:18
**confesses** [2] - 113:3; 153:14
**confessing** [8] - 53:7, 14; 103:8; 160:5; 175:12, 24; 197:7; 200:15
**confession** [73] - 22:15; 56:15; 105:20; 115:18; 129:15; 140:25; 143:22; 150:16; 151:7, 9; 157:20, 23; 158:11, 14-15; 159:18;

164:5; 165:24; 166:15, 22; 173:15; 174:15; 177:23; 178:8; 180:15, 17, 25; 181:9, 11, 23; 183:19; 184:13, 23; 185:5, 7, 16; 193:10, 13, 16, 18, 20; 194:8; 202:7; 203:6; 206:12; 208:1; 209:17, 19; 210:15, 23-24; 211:14; 213:6, 10; 218:13, 19, 22; 221:7, 20; 222:10, 20; 224:14; 225:21; 228:9; 234:19, 21; 235:7, 11; 236:10, 18; 237:11, 20

**Confessions** [1] - 188:10

**confessions** [39] - 130:25; 132:6; 135:20; 138:5, 8; 139:18, 22; 140:16; 146:20, 24; 149:1, 10, 17; 155:12; 157:17; 158:19, 23; 166:21; 167:4, 25; 168:2; 180:24; 181:13; 184:22; 186:11; 188:17; 193:7, 9; 194:2, 4, 11; 200:20; 203:17, 25; 210:11, 16, 25; 211:1

**confessor** [2] - 185:1; 193:17

**confessors** [1] - 157:2

**confined** [1] - 157:22

**confinement** [1] - 32:19

**confines** [1] - 10:16

**confirm** [3] - 5:23, 25; 239:3

**confirmation** [1] - 5:25

**confirmed** [1] - 20:20

**confronted** [1] - 196:19

**confronting** [3] - 152:2; 171:4; 183:20

**confused** [3] - 18:14; 74:25; 101:20

**confusion** [1] - 215:22

**congressional** [1] - 138:2

**conjure** [1] - 161:10

**connected** [2] - 33:16; 133:3

**Connolly** [1] - 235:2

**consent** [3] - 48:17, 20; 233:19

**consequence** [3] - 163:16, 18; 176:4

**consequences** [10] - 139:21; 153:12; 161:11, 21, 25; 162:6; 175:17, 19; 177:4; 180:7

**conservative** [1] - 194:9

**consider** [2] - 206:15; 215:7

**consideration** [1] - 214:6

**considered** [6] - 4:12; 157:5; 159:13; 217:9; 222:4; 235:23

**considering** [2] - 235:18; 239:10

**consistent** [3] - 24:22;

170:23; 202:6

**constitute** [2] - 159:10; 220:25

**constitutes** [1] - 176:13

**Constitution** [3] - 221:21; 224:16; 236:22

**constitutional** [2] - 130:16; 195:10

**constitutionally** [1] - 221:10

**constructive** [1] - 231:24

**consult** [1] - 139:9

**consultant** [1] - 169:20

**consulting** [1] - 205:3

**contact** [20] - 11:4; 20:21; 22:10; 28:18; 30:14, 18; 47:8, 15, 19, 21; 49:10; 52:12; 67:4, 8; 76:7; 95:9; 96:18; 103:1; 172:9

**contacted** [4] - 28:13; 29:5; 30:1; 47:21

**contacting** [1] - 30:6

**contamination** [6] - 183:10, 12; 184:1, 15; 203:18; 204:3

**contending** [1] - 223:24

**contention** [2] - 207:21; 224:2

**contents** [1] - 233:8

**context** [11] - 136:23; 159:5; 160:6; 163:6, 9, 11, 13; 167:18; 168:16; 204:17; 213:8

**contexts** [1] - 149:7

**continual** [1] - 176:25

**continue** [7] - 15:3; 153:15; 162:4, 10, 18; 163:16; 172:15

**continued** [5] - 47:18; 141:16; 145:14; 201:16; 221:12

**continues** [1] - 151:24; 156:21, 24

**continuum** [2] - 156:24; 157:9

**contrary** [1] - 201:15

**contrasting** [1] - 208:4

**contribute** [4] - 169:13, 18; 203:24; 204:1

**contributed** [1] - 185:5

**contributes** [1] - 169:17

**contributing** [1] - 150:19; 216:19

**contrition** [2] - 22:20; 109:9

**control** [1] - 134:2

**controlled** [2] - 24:18; 164:11

**convention** [1] - 133:12

**conversation** [7] - 29:21; 32:3; 72:12; 125:4, 6; 143:18; 160:15

**conversations** [1] - 220:9

**converse** [1] - 45:11

**conversed** [1] - 76:22

**convey** [1] - 231:23

**conveying** [1] - 175:23

**conveys** [2] - 153:11; 179:3

**convict** [1] - 143:23; 185:15

**convicted** [2] - 184:23; 185:5

**convictions** [3] - 130:17, 25; 138:5

**convince** [4] - 105:15; 153:9; 154:6; 168:21

**convincing** [1] - 105:11

**cooperated** [1] - 121:14

**cops** [1] - 142:10

**copy** [10] - 2:18; 4:17, 21; 13:25; 45:3; 99:8; 239:4, 21

**core** [5] - 135:23; 136:5; 151:14, 16; 195:5

**correct** [172] - 5:17; 10:6; 13:4; 14:14; 21:19; 22:6; 23:20; 24:16; 25:25; 31:14; 33:22, 25; 37:1; 39:12; 43:13, 20; 48:6; 52:6; 61:18; 62:3; 64:22; 65:7; 72:5, 18; 73:6; 81:18, 24; 88:2; 98:2; 103:1, 5-6; 104:18; 105:17; 109:13, 20; 111:16, 22, 24-25; 114:3, 7; 115:3, 9, 12, 16; 116:20; 118:3, 11, 16-17, 23; 125:11, 15; 127:20; 128:16; 129:19; 138:15; 141:19, 24; 142:2, 11, 14; 146:4, 22; 153:25; 154:1; 158:18; 160:3, 22; 169:7, 23; 172:6, 20; 173:21; 174:5; 175:4; 179:19; 184:8; 188:4, 10, 18, 20, 22, 25; 189:3, 11-12, 14-15, 21, 24; 191:11, 13, 15; 192:1, 18, 22; 193:3, 6; 194:21; 195:20, 23; 196:2, 12, 18, 21; 197:1, 6, 11; 199:22; 200:8, 12, 16, 21-25; 201:2, 8, 13; 202:19; 203:1, 4, 14, 16, 19; 204:7, 12, 17; 206:17; 207:2, 13, 16, 20; 208:1, 23-24; 209:7, 10, 14; 210:3, 5; 211:13; 212:10, 15, 19, 24; 213:12, 18, 22, 25; 214:4, 9, 18; 231:10; 233:20; 240:13, 15

**corrected** [1] - 6:3

**correction** [1] - 5:6

**corrections** [4] - 5:8; 119:7, 11

**correctly** [2] - 55:17; 181:2

**correlate** [1] - 200:19

**correlation** [1] - 210:14

**corresponding** [1] - 176:16

**corroborate** [1] - 184:12

**corroboration** [2] - 184:24; 185:4

**cost** [3] - 224:14, 17;

236:23

**couch** [1] - 227:12

**counsel** [4] - 2:1; 7:20; 187:13

**count** [1] - 229:11

**counter** [1] - 84:16

**counterintuitive** [1] - 168:8

**countries** [2] - 158:4, 8

**country** [2] - 141:15; 145:15

**County** [9] - 9:5, 7; 10:1, 13, 17; 77:25

**couple** [9] - 54:13; 75:14; 78:24; 137:6, 17; 138:14; 139:14; 171:6

**course** [17] - 13:3; 17:11; 18:1; 25:4; 76:2; 101:6; 131:18; 146:8, 16; 149:19; 167:7, 25; 170:13; 174:9; 186:14; 190:13; 202:10

**coursed** [1] - 208:1

**courses** [13] - 130:13, 15, 22-23; 137:6; 141:15; 144:11, 13, 21; 146:5, 11, 13

**court** [17] - 8:19; 33:16; 34:2, 4, 8; 64:7; 66:6; 92:17; 105:13; 108:20; 122:11; 138:21; 155:11; 201:2; 205:8; 215:5; 216:22

**COURT** [120] - 2:1, 4, 18; 3:8, 10, 17, 24; 4:2, 14, 16, 23; 5:2, 14, 20, 24; 6:9, 17, 21; 7:4, 7, 10, 16, 22, 24; 8:4, 10, 15; 14:2; 16:4, 6; 22:23; 24:6; 25:9; 54:3; 64:15; 65:11, 22; 77:5, 8; 85:13; 88:12; 91:6, 18, 25; 92:4, 12; 107:3; 110:18; 112:7; 117:9, 11; 126:22; 127:10, 13, 17, 21; 128:1, 21, 24; 129:7, 17, 20, 24; 130:5; 140:17, 19, 22; 165:8, 10; 183:1, 7; 187:1, 7, 11; 205:1; 208:18; 209:24; 214:12, 16, 19, 21; 217:21; 218:4; 219:10; 220:17; 221:7, 22; 222:6, 21; 223:12, 22, 24; 224:3; 225:16, 22; 226:3; 231:10, 18; 232:16, 21; 233:1, 10, 18, 21; 234:2, 7, 10; 237:18; 238:7, 15, 20; 239:1, 20; 240:1, 8, 13, 15, 18, 21, 25

**Court** [35] - 2:4, 6; 3:21; 4:11, 19; 5:7; 6:15, 18; 9:21; 14:6; 97:1; 105:10; 138:11; 140:23; 165:7; 195:9; 205:23; 209:9; 219:2; 220:3; 223:9; 224:11; 225:12; 227:17; 231:16; 232:2-4, 12, 14, 23; 237:20; 238:19; 239:17

**courthouse** [2] - 13:6;

34:13
**courtroom** [4] - 7:14; 8:12, 14; 63:20
**courtrooms** [1] - 148:20
**courts** [7] - 138:22; 184:24; 195:13; 218:19; 224:10; 230:14; 235:17
**cousin** [8] - 28:19; 30:25; 32:5, 8; 48:9, 25; 49:3; 123:18
**cousin's** [8] - 27:11; 28:10; 29:16; 32:4, 7; 123:6, 14, 17
**cover** [1] - 191:6
**covered** [2] - 35:22, 25
**create** [2] - 161:22; 219:2
**created** [1] - 223:10
**creating** [1] - 211:9
**credentials** [1] - 129:4
**crediting** [1] - 172:21
**crime** [31] - 60:6, 24; 61:3, 6; 120:10; 143:4, 13; 144:16; 147:16; 151:8, 22-23; 153:22; 167:1; 168:11; 181:2, 14-15, 21; 182:15; 183:13, 17, 20, 25; 184:4; 185:12; 193:15, 17, 22
**Crime** [1] - 3:14
**crimes** [8] - 41:11, 13, 16; 53:20; 89:3; 140:7; 146:21; 147:5
**criminal** [20] - 9:10; 26:6; 45:4; 92:22; 93:7; 124:11; 126:12; 130:16-18, 24; 132:7; 136:23; 137:3; 140:10; 148:19; 149:15; 161:19; 175:25; 226:25
**Criminal** [1] - 14:8
**criminologists** [1] - 149:14
**Criminology** [1] - 135:1
**criminology** [4] - 130:20; 131:2, 10; 135:18
**criteria** [2] - 193:15; 194:9
**critical** [2] - 133:23; 135:10
**critically** [6] - 206:22; 215:4; 219:9; 220:15; 235:14, 25
**cross** [5] - 25:9; 77:8; 110:18; 187:5, 19
**CROSS** [4] - 25:12; 77:10; 110:20; 187:21
**crossed** [1] - 148:1
**crutch** [1] - 187:23
**cry** [1] - 211:23
**crying** [6] - 17:16; 23:12; 101:10; 103:22; 198:7; 211:24
**culpability** [5] - 161:11, 20, 24; 174:14; 181:24
**culpable** [5] - 162:6; 174:8; 177:3; 180:7; 181:25
**cultural** [4] - 158:2, 11; 191:24; 192:8
**culture** [5] - 146:10;

158:12; 192:4; 214:1
**cumulative** [1] - 186:19
**cumulatively** [5] - 155:21; 167:14, 23; 169:14; 230:24
**current** [1] - 130:8
**custodial** [2] - 223:7, 11
**custody** [7] - 81:12-14; 188:24; 223:13, 25; 224:4
**cut** [1] - 172:25
**CV** [6] - 6:12; 128:10, 17, 22; 129:1, 24
**CVU** [1] - 41:13
**daily** [1] - 148:17
**dangerous** [2] - 224:18; 236:24
**DANIEL** [1] - 92:7
**Daniel** [17] - 9:24; 13:21, 24; 21:15; 22:12; 27:8; 28:6; 29:9; 31:23; 36:16; 40:11; 50:3; 59:12; 63:24; 92:3, 18
**Danny** [1] - 87:16
**dark** [1] - 217:11
**data** [4] - 133:16; 149:20; 150:8, 11
**date** [5] - 10:5; 15:10; 66:15; 169:22; 210:12
**daughter** [3] - 20:15, 21; 101:2
**David** [1] - 8:20
**DAVID** [1] - 8:20
**days** [1] - 78:24
**de** [1] - 168:22
**de-adversarial** [1] - 168:22
**deal** [4] - 195:24; 197:2; 233:21; 240:5
**dealing** [1] - 206:23
**deals** [1] - 235:16
**death** [1] - 229:21
**decade** [1] - 156:21
**decades** [1] - 135:11
**deceit** [1] - 230:20
**deceitful** [1] - 226:24
**deception** [5] - 138:4; 168:4, 17, 19, 25
**deceptive** [1] - 168:24
**decide** [1] - 133:16
**decided** [2] - 72:17, 25
**decision** [5] - 149:8; 156:23; 159:8; 161:22; 235:22
**decision-making** [3] - 149:8; 156:23; 159:8
**decisions** [2] - 162:8; 201:18
**declined** [1] - 218:3
**deep** [1] - 106:19
**defect** [1] - 17:7
**Defendant** [115] - 2:21, 24; 5:16; 9:13; 13:9, 19, 22; 14:16; 16:10, 12, 15; 17:1, 6, 22-23; 18:7, 13, 24; 19:1, 8; 20:1, 3-4; 21:9, 21, 25; 22:5;

23:2; 24:8, 17, 25; 25:5; 68:14; 69:10, 20; 73:5, 21, 24; 74:2, 5, 14, 16, 19, 24; 75:17, 24; 76:2, 7, 12, 16, 18, 21; 93:13, 17, 20, 25; 95:10; 98:9; 99:4, 8, 11; 100:8; 101:7, 10; 102:11, 15, 25; 103:20; 104:18, 21; 105:4, 7, 11, 15, 25; 106:5, 14; 107:13, 16, 23; 108:2, 14, 23, 25; 109:9, 12, 19; 110:7; 128:5; 191:9, 17; 192:17, 19; 197:7; 198:7, 9; 215:8, 12, 19; 216:2; 220:7, 13; 221:2, 8, 14, 25; 224:8; 225:11, 23; 232:22; 235:18; 236:5
**Defendant's** [21] - 2:7, 15, 20; 7:13; 20:23; 22:2; 75:20; 104:23, 25; 105:1; 190:8; 206:21; 219:8, 22; 225:8, 12; 234:18; 235:13; 238:2, 6; 239:15
**defenders** [1] - 137:4
**Defense** [7] - 3:25; 77:8; 139:8; 190:6, 9; 208:18; 234:10
**defense** [5] - 137:3; 140:10; 153:10, 13; 161:14
**Defense's** [1] - 190:18
**deferential** [1] - 191:25
**define** [1] - 219:17
**definitely** [2] - 194:15; 237:14
**definition** [1] - 157:7
**definitively** [1] - 213:18
**degree** [6] - 131:5; 141:6, 17; 193:14; 203:13
**degrees** [1] - 131:4
**delta** [3] - 222:8, 22, 24
**delusional** [1] - 157:16
**demeanor** [3] - 23:6, 10; 103:19
**democratic** [1] - 140:7
**demonstrably** [1] - 198:15
**demonstrate** [1] - 234:18
**demonstrated** [2] - 193:19; 215:21
**denial** [7] - 23:8; 103:18; 143:21; 165:25; 199:22; 234:23; 235:22
**denials** [24] - 23:24; 105:19, 21; 151:25; 154:10; 166:1; 171:2; 172:15, 22-23; 173:2, 5; 177:14, 16, 21-22, 24-25; 196:19; 221:14; 226:11
**denied** [11] - 22:5; 55:13; 102:25; 117:23; 151:23; 171:1, 15; 172:17, 21; 197:8; 225:14
**denies** [1] - 177:18
**deny** [10] - 20:3; 87:1;

151:24; 153:15; 162:4, 10, 18; 163:17; 177:12; 238:6
**denying** [28] - 53:7; 55:8; 82:6; 86:24; 87:2; 117:21; 118:15; 152:22; 154:11, 18; 159:21; 160:12, 14; 162:16; 163:18, 22; 171:22; 172:1; 173:24; 177:7, 15; 179:1, 6, 15; 186:3; 200:14; 206:6
**Department** [24] - 8:24; 9:1, 9; 10:25; 11:9, 17, 20, 24; 12:20; 14:7; 27:4; 59:7; 61:20; 64:20; 66:10; 77:24; 78:1, 5, 7, 16; 92:23; 98:2; 110:3; 137:20
**department** [28] - 9:18; 11:22; 12:23; 13:6, 11, 13; 20:10; 21:5; 34:8, 13, 16, 18; 40:4; 41:13, 23; 62:23; 67:10, 17; 71:13; 89:16; 90:14; 114:10; 118:19; 125:3; 137:14; 146:17; 196:1; 216:6
**departments** [3] - 41:23; 137:7; 146:12
**depended** [1] - 235:1
**deprivations** [1] - 156:2
**derive** [1] - 145:23
**descendents** [1] - 192:12
**describe** [12] - 33:9; 34:23; 35:8; 40:23; 105:9; 106:15; 156:8; 158:6; 160:24; 170:10; 186:21; 207:8
**described** [8] - 60:14, 17; 106:16; 136:10; 157:4, 6, 15
**describing** [1] - 161:6
**designed** [11] - 97:9; 148:22; 153:21; 164:17, 19; 172:15; 174:20; 179:20; 205:25; 225:1
**desire** [1] - 219:18
**desired** [1] - 165:25
**desk** [1] - 97:10
**desks** [1] - 36:2
**detail** [1] - 184:19
**detailed** [2] - 179:24; 184:23
**details** [26] - 181:1, 13, 17-18, 22-23; 183:13, 16, 20, 22, 24-25; 184:9-11, 17, 25; 185:3; 204:4; 215:9; 217:19; 218:9; 235:19
**detection** [1] - 206:11
**detective** [9] - 25:19; 66:22; 92:22; 119:4, 9-10; 146:15; 166:3; 202:6
**Detective** [109] - 5:13, 18-19; 9:23, 25; 13:21, 24; 21:15; 22:12, 14, 16; 27:8; 28:6; 29:9; 31:23; 36:16, 19; 37:15, 20; 39:14; 40:10; 45:23; 50:2; 52:12, 24; 53:1, 9, 13; 54:2; 55:12; 58:25;

59:12; 63:23; 67:1; 69:6,
14-17; 70:15, 17, 19, 23;
71:4, 9, 23; 72:5; 77:17, 19;
78:18; 79:4; 81:8; 83:9, 11,
15-17, 20-21, 23; 84:12;
85:24; 86:6; 88:17, 22; 89:2;
91:10, 18; 93:10, 16, 21;
94:3, 19-21; 95:14; 100:16,
23; 103:4; 106:1; 108:7;
109:8; 110:22; 113:15;
116:5; 117:1; 126:14, 16, 25;
127:10; 173:9, 12, 19;
198:19; 201:1, 7, 10; 202:1

**detective's** [1] - 152:1

**detectives** [8] - 9:11;
54:17; 70:2; 83:18; 146:16;
170:11; 174:17; 219:12

**Detectives** [1] - 71:10

**detention** [4] - 34:12; 59:2

**deter** [3] - 224:15; 225:1, 6

**determination** [6] - 206:22;
215:3; 219:9; 220:14;
235:14, 25

**determine** [5] - 127:2;
206:20; 209:5; 220:4; 232:5

**determined** [2] - 163:17;
221:18

**determining** [1] - 207:1

**deterrence** [1] - 224:13

**deterrent** [2] - 224:17;
236:23

**detrimental** [1] - 162:17

**develop** [6] - 43:25; 141:16;
143:3; 156:21; 166:19;
168:20

**developed** [1] - 141:22

**developing** [1] - 151:19

**development** [2] - 150:24;
156:15

**devices** [2] - 98:14; 200:8

**Dewitt** [1] - 11:1

**DHS** [1] - 79:21

**diagram** [1] - 194:13

**difference** [2] - 86:8;
142:15

**different** [20] - 138:15;
142:19; 143:5, 16, 25; 145:8;
150:11; 153:23; 159:3;
161:9; 163:2; 178:18, 24;
202:13; 204:18; 211:4;
212:10; 229:2; 236:19

**differentiating** [1] - 144:16

**differently** [3] - 107:24;
199:8; 211:19

**difficult** [3] - 146:24; 147:4,
21

**dig** [1] - 191:6

**digital** [5] - 86:7, 9; 103:10;
171:13; 208:5

**direct** [8] - 16:19; 17:10;
55:16; 84:20; 113:21;
120:18; 188:1; 225:10

**DIRECT** [4] - 8:16; 66:1;

92:14; 130:6

**direction** [1] - 206:16

**directly** [4] - 96:24; 97:8;
130:4; 139:25

**disabled** [2] - 157:6; 192:21

**disbelieve** [1] - 201:22

**discipline** [6] - 134:1;
148:24; 149:4; 150:8, 15;
151:2

**disciplines** [1] - 135:18

**disclosing** [1] - 183:13

**discomfort** [2] - 72:14;
101:11

**discovery** [2] - 169:25;
190:10

**discuss** [6] - 6:15; 7:2;
55:3; 63:18; 100:24; 208:22

**discussed** [4] - 145:8;
158:13; 172:4; 239:13

**discussing** [4] - 69:15;
103:9; 129:12; 145:3

**discussion** [3] - 39:21;
40:9; 158:10

**disease** [1] - 17:6

**dishonestly** [1] - 142:20

**dismiss** [1] - 237:12

**dismissal** [1] - 237:8

**disorders** [1] - 157:16

**dispositive** [2] - 181:9;
193:19

**dispositively** [1] - 168:13

**disproportionately** [2] -
157:1; 158:22

**dispute** [3] - 57:6; 136:8;
151:1

**disremembering** [1] -
218:7

**dissertation** [3] - 131:13,
16, 21

**dissertations** [1] - 135:16

**distinction** [2] - 142:17;
144:23

**divided** [3] - 34:5; 149:3

**divider** [1] - 96:2

**divides** [2] - 35:18; 136:14

**division** [2] - 9:11, 16

**Division** [2] - 14:8; 66:11

**DNA** [2] - 168:11; 184:22

**docket** [1] - 240:10

**document** [15] - 2:12-14,
19, 22, 24-25; 3:3; 4:17;
12:14; 14:6, 9; 108:19;
135:15

**documented** [6] - 18:19;
43:1; 44:18; 62:10, 15;
158:19

**documenting** [1] - 42:8

**documents** [2] - 189:13;
191:5

**dominate** [1] - 143:17

**dominates** [1] - 145:15

**done** [20] - 42:8; 56:16;

60:17; 64:23; 75:11; 82:7;
93:23; 107:17; 131:22;
132:8; 135:5; 139:10; 140:1,
3; 154:25; 176:24; 183:5;
188:22; 233:13

**door** [25] - 10:23; 12:15, 17,
20; 28:3; 35:2; 36:9, 11, 14;
50:17; 67:20; 68:9, 12;
87:25; 88:3, 5; 97:13, 23;
111:15, 17, 21; 112:15;
216:10

**doors** [3] - 12:22; 67:18;
98:1

**double** [1] - 224:3

**doubt** [2] - 154:8; 227:16

**down** [22] - 12:1; 24:15;
34:6; 38:7; 59:3; 65:12;
67:18; 83:24; 91:19; 127:11;
150:15; 173:5; 176:25;
177:25; 181:3; 197:10, 18;
214:13; 225:16; 229:19, 22

**dozen** [4] - 133:1; 137:25;
151:14; 195:5

**dozens** [2] - 135:14; 151:16

**Dr** [23] - 6:12; 127:25;
128:1, 10; 129:2, 11; 130:8;
140:15; 159:1; 169:20;
183:10; 187:23; 188:2;
208:22; 213:19; 215:11;
218:15; 219:13; 222:16;
223:18; 228:22; 230:11;
232:1

**drafted** [2] - 26:7; 233:13

**draw** [5] - 19:19; 74:8, 12;
102:8; 155:12

**drawn** [2] - 25:20; 69:6

**dressed** [2] - 16:20; 68:17

**drink** [5] - 19:13; 50:4;
102:15; 218:3

**drinking** [1] - 24:18

**drive** [3] - 11:21; 30:2;
136:1

**driven** [2] - 212:21

**driving** [2] - 27:7, 9

**drop** [1] - 174:24

**drove** [1] - 32:12

**drunk** [1] - 171:17

**DSS** [1] - 78:17

**due** [2] - 29:3; 176:11

**duly** [4] - 8:7; 65:19; 92:8;
128:5

**duress** [15] - 23:15; 57:23,
25; 58:5, 14; 72:14; 104:7;
141:21; 197:22, 25; 198:2;
199:4, 12; 211:22; 215:2

**during** [63] - 12:21; 13:3;
17:11, 21; 18:1, 23; 19:9, 16;
21:13; 25:4; 36:22; 38:9;
39:16; 40:11; 46:22; 47:20;
52:14; 55:7, 15; 56:22;
57:25; 61:3, 5; 70:9; 75:11,
16; 76:2, 25; 82:5, 13; 86:3;
98:19, 22; 101:6, 18, 22;

103:25; 104:20; 105:3;
106:23, 25; 107:12, 15;
108:1; 110:8; 112:19;
115:20; 116:4; 119:4; 120:7;
124:14; 125:2; 126:3; 138:4;
167:9; 168:9; 200:6; 211:23;
217:2, 7; 227:2, 5; 231:15

**duties** [2] - 89:18; 90:1

**early** [7] - 48:3; 141:7;
143:8; 149:24; 170:15;
177:15; 194:20

**ease** [4] - 44:5, 12; 201:6;
202:2

**easier** [2] - 77:17; 156:18

**easily** [1] - 158:24

**EASON** [89] - 2:3, 16; 3:6,
16, 20; 4:7; 5:4, 18, 21; 7:5,
9, 15; 8:1, 13, 17; 14:1, 3;
16:2, 9; 23:1; 24:4, 7; 25:7;
54:1; 64:16, 18; 65:10, 14,
23; 66:2; 77:3, 6; 85:10;
88:11; 91:7, 9, 17, 23; 92:2,
13, 15; 107:5; 110:16; 112:6;
117:10; 126:24; 127:8, 15;
128:13, 23; 129:1, 22;
140:18, 21; 165:4, 11; 187:6,
20, 22; 204:24; 205:2;
208:16; 209:23; 214:20, 23;
217:24; 218:6; 219:13;
220:23; 221:11; 222:1, 11,
23; 223:14, 23; 224:1, 6;
225:19, 24; 233:7; 234:6, 14;
237:23; 238:12; 239:19, 25;
240:19, 24

**Eason** [35] - 2:11; 3:4, 12,
19; 4:6, 21; 6:11; 7:4, 12,
24; 8:10; 57:22; 63:23;
65:13; 91:20, 25; 92:12;
107:3; 126:22; 128:10, 19;
187:5; 209:11; 211:22;
212:9; 213:9; 226:6; 232:7;
233:5, 15; 234:12; 239:22;
240:18, 23

**Eastern** [4] - 10:15; 192:4,
8, 11

**easy** [2] - 157:16; 181:3

**eat** [1] - 102:16

**edited** [3] - 133:3, 5, 7

**editor** [1] - 133:16

**education** [1] - 158:1

**effect** [10] - 148:23; 156:3;
163:14, 24; 185:8; 186:6;
206:6; 230:24; 236:23;
237:22

**effective** [4] - 147:20, 24;
178:9; 198:1

**effectively** [2] - 141:8;
144:14

**effort** [1] - 237:13

**efforts** [1] - 202:5

**eight** [1] - 172:25

**either** [23] - 6:24; 48:10, 12,
17; 63:10; 100:4; 111:23;

115:13; 134:10; 137:6, 18; 173:11; 178:5; 181:20; 190:4; 193:15; 199:10; 206:16; 226:16; 227:3; 233:17; 238:8; 240:22
**elaborate** [1] - 193:8
**elaborated** [1] - 197:9
**elected** - 219:2
**electronic** [2] - 98:14; 233:17
**element** [2] - 174:10; 217:21
**elements** [2] - 232:11
**elicit** [5] - 147:5, 22; 166:12; 195:2; 206:12
**eliciting** [3] - 147:4, 21, 25
**email** [1] - 5:23
**emerge** [1] - 150:20
**emotional** [1] - 70:12
**empirical** [3] - 149:18, 20; 150:12
**employed** [9] - 8:22; 9:5; 66:9; 92:19; 172:3; 207:2; 219:11; 220:20
**emulate** [1] - 223:1
**encounter** [1] - 114:12
**encountered** [1] - 123:25
**encounters** [1] - 81:4
**encourage** [1] - 223:1
**encyclopedias** [3] - 135:19; 150:14, 25
**end** [17] - 36:17; 38:5; 39:5; 45:22; 58:24; 68:4; 87:14; 98:15; 99:12; 142:19; 147:23; 167:16; 200:7; 205:10; 233:24; 237:24
**ended** [3] - 142:24; 196:6; 197:7
**ends** [1] - 199:25
**enforcement** [12] - 9:4; 34:3; 42:16; 66:18, 20; 77:20; 92:24; 104:18; 118:22; 119:12; 137:9; 139:15
**engage** [1] - 217:15
**engaged** [3] - 198:18; 212:7; 215:25
**engagement** [1] - 198:21
**enjoy** [1] - 236:5
**enormously** [1] - 140:7
**enter** [1] - 126:10
**entertaining** [1] - 172:14
**entire** [21] - 13:13; 18:21-23; 23:18; 35:9; 47:21; 83:13; 104:13; 108:1; 109:18; 112:19; 114:12; 115:21; 119:4; 125:2; 199:24; 200:10; 217:3, 17; 230:10
**entirely** [1] - 228:13
**entirety** [11] - 13:8, 10, 15; 18:20; 23:17, 22; 38:8, 25; 75:3; 98:8; 104:16

**entrance** [4] - 12:21; 33:20; 34:18
**envelope** [1] - 136:7
**environment** [4] - 12:6; 44:8; 201:17; 211:9
**environments** [1] - 164:6
**equal** [1] - 34:7
**equivalent** [5] - 163:20; 175:18; 177:5; 202:20, 22
**Eric** [2] - 9:25; 29:3
**erroneous** [3] - 130:17, 25; 138:5
**error** [1] - 132:7
**escape** [1] - 175:25
**escorted** [2] - 10:2; 29:11
**especially** [2] - 170:15; 191:19
**essence** [1] - 208:6
**essentially** [8] - 132:18; 149:6; 163:20; 165:23; 167:15, 23; 170:20; 186:21
**establish** [2] - 43:5; 182:19
**establishes** [2] - 91:12; 154:8
**establishing** [2] - 41:5; 182:15
**estimate** [3] - 21:11; 48:1; 49:22
**estimating** [1] - 12:8
**ethical** [1] - 164:6
**evaluate** [5] - 73:14; 148:20; 173:4; 194:18; 213:6
**evaluating** [2] - 193:24; 198:1
**evaluation** [2] - 206:20; 236:25
**evaluations** [1] - 193:1
**evening** [1] - 231:15
**events** [2] - 90:7; 103:15
**eventually** [3] - 95:4; 103:13; 174:17
**Evidence** [2] - 6:6, 8; 16:8
**evidence** [72] - 2:9; 3:20, 23, 25; 4:3, 5; 6:10, 22; 7:18, 25; 43:5; 88:24; 113:4; 120:10; 127:13, 16, 18; 143:10; 147:4, 21, 25; 152:3-8; 154:8; 166:25; 167:2; 168:10, 13, 17; 169:1; 171:4-6, 8; 173:6; 179:23; 182:3, 6-7, 12, 15-18, 22-25; 183:3; 189:8; 190:7; 193:19; 195:21; 196:20; 206:4, 14; 214:17; 217:23; 219:21; 225:19, 21; 226:1; 229:13; 233:4, 16; 234:17; 238:2
**evidentiary** [4] - 2:7; 3:18; 6:24; 190:7
**evolved** [1] - 213:24
**exact** [4] - 43:2; 87:18; 95:3; 201:5
**exactly** [5] - 117:24; 121:7; 173:16, 23; 230:8

**exaggerate** [2] - 152:8; 168:15
**exaggerated** [1] - 182:21
**exaggerating** [2] - 169:2; 171:6
**exaggeration** [1] - 182:16
**EXAMINATION** [12] - 8:16; 25:12; 64:17; 66:1; 77:10; 91:8; 92:14; 110:20; 126:23; 130:6; 187:21; 208:20
**examination** [7] - 25:10; 77:8; 110:18; 118:6; 169:16; 187:5, 19
**examined** [4] - 8:8; 65:20; 92:9; 128:6
**example** [15] - 61:2; 135:20; 148:2; 153:8; 158:3; 161:14; 162:9; 164:7; 169:11; 173:8, 10; 174:19; 176:1; 179:21; 181:2
**examples** [5] - 171:7; 175:9; 184:21; 210:16; 213:10
**except** [2] - 12:21; 189:8
**exception** [3] - 7:1; 142:2, 12
**exceptional** [1] - 142:6
**exceptionally** [2] - 220:15; 235:15
**exceptions** [1] - 141:9
**exchange** [1] - 160:5; 174:15; 175:23
**exclusion** [2] - 224:12, 15
**exclusively** [2] - 145:22; 149:14
**excuse** [1] - 198:23
**executing** [2] - 24:10; 150:11
**exercise** [2] - 165:1; 166:5
**exerting** [1] - 178:23
**exertion** [1] - 225:10
**exhaustive** [1] - 233:7
**exhaustively** [1] - 233:16
**exhibit** [3] - 6:1; 240:4, 20
**Exhibit** [11] - 6:1-3, 5, 7; 14:5; 16:3, 7; 239:3, 6, 8
**exhibits** [5] - 5:5; 239:2, 13-14, 20
**exist** [6] - 20:22; 152:7; 169:1; 171:5; 225:2
**existence** [3] - 218:20; 222:14; 235:6
**existing** [1] - 152:8
**exit** [1] - 12:25
**expect** [4] - 3:18, 24; 177:11; 199:6
**expected** [2] - 127:18; 143:20
**expedition** [1] - 143:9
**expensive** [1] - 146:12
**experience** [19] - 9:4; 41:15, 17; 53:20, 23; 59:6;

61:19; 94:15; 118:22; 148:8, 10-11, 17; 152:2; 177:12; 205:21; 211:18
**experienced** [1] - 146:14
**experiencing** [1] - 199:7
**experimental** [1] - 203:8
**experiments** [2] - 164:3
**expert** [12] - 6:12, 14; 7:2, 13; 118:5; 128:15; 129:2, 17; 138:6, 18; 140:15; 186:15
**expertise** [4] - 129:5; 139:5; 186:9; 209:5
**experts** [3] - 133:14; 150:21; 176:12
**explain** [5] - 34:6; 70:16; 73:12; 75:9; 100:15
**explained** [3] - 78:19, 22; 93:12
**explanation** [2] - 161:18; 208:11
**explanations** [1] - 212:11
**explicit** [11] - 21:20; 76:15; 153:19; 159:22; 160:3, 7, 15-16; 161:21; 172:22; 175:9
**explicitly** [5] - 145:22; 160:13; 161:4; 173:13; 175:2
**explore** [1] - 220:17
**express** [5] - 22:20; 23:3; 109:9; 160:1; 185:12
**expressing** [1] - 101:11
**extended** [1] - 225:5
**extent** [1] - 165:19
**extracted** [1] - 225:9
**extreme** [4] - 72:13; 175:9; 224:25; 236:20
**extremes** [1] - 197:4
**F3d** [1] - 222:13
**face** [3] - 161:12; 177:3; 198:12
**fact** [25] - 24:14; 90:16; 97:18; 103:25; 108:1; 154:10; 180:11; 182:18; 188:6; 189:4; 191:5; 198:1; 209:20; 212:13; 226:24; 227:8, 22; 228:8, 14, 17; 229:2; 230:15, 19; 231:1; 232:25
**factor** [7] - 189:2; 199:20; 211:5; 215:7; 216:19; 217:18; 229:10
**factored** [1] - 212:22
**factoring** [1] - 91:14
**Factors** [1] - 91:11
**factors** [8] - 188:16; 189:4, 6; 194:16; 215:6; 227:14; 229:7; 235:17
**facts** [4] - 71:17; 154:16; 197:10; 230:15
**fail** [1] - 206:3
**fails** [2] - 206:3, 13
**fair** [12] - 56:25; 90:8; 115:18; 117:22; 118:2;

120:15; 121:11; 125:10; 140:6; 195:12; 211:12; 212:9
**fall** [1] - 194:15
**falls** [1] - 191:18
**false** [57] - 132:6; 135:20; 138:5; 139:18, 22; 157:2, 20, 23; 158:14, 19, 23; 164:5; 166:21; 167:24; 168:14, 17; 171:7; 180:15-17, 25; 181:8, 12, 23; 182:3, 7; 183:19; 184:21; 185:4; 189:8; 193:7, 9, 11-13, 16, 18, 20; 194:4, 8, 10-11; 195:21; 200:20; 203:6; 209:16, 19; 210:11, 15-16, 23-25; 213:10; 229:13
**falsely** [4] - 168:15; 182:22; 183:23; 186:8
**familiar** [7] - 10:11; 24:25; 27:14; 49:15; 93:2; 148:14; 156:12
**family** [9] - 22:3; 31:1; 75:21; 104:23; 105:1; 191:14; 217:1
**far** [51] - 11:19; 14:11; 15:12; 23:5, 25; 28:24; 33:4; 35:10, 15; 38:9; 39:16; 40:11; 41:1, 15; 46:13; 51:22; 53:18; 54:22; 55:23; 62:8, 15; 63:1; 65:3; 84:17; 89:20; 93:14; 97:2; 105:13; 107:20; 126:19; 128:17; 132:24; 149:18; 150:24; 189:14; 193:4; 199:21; 200:13; 205:14; 206:20; 207:21; 215:19; 217:9; 219:16; 224:23; 228:16; 229:8, 24; 230:9
**fascinating** [2] - 139:20; 168:7
**fatigue** [1] - 213:3
**favor** [1] - 217:18
**fear** [1] - 158:7
**fed** [1] - 184:17
**federal** [2] - 138:22; 195:10
**feeding** [2] - 183:24; 184:5
**feelings** [1] - 23:3
**feet** [2] - 12:8; 33:10
**fellowship** [1] - 132:15
**felt** [2] - 18:8; 74:3
**female** [1] - 53:12
**females** [1] - 87:23
**few** [6] - 119:23; 139:4; 148:9; 169:22; 233:23; 234:4
**fewer** [1] - 139:18
**fi** [3] - 13:5; 110:2; 216:21
**field** [18] - 129:9, 18; 133:14; 134:17; 136:8; 145:15; 149:2; 150:14, 17, 25; 163:4; 167:7; 168:3; 186:9, 12; 209:2; 213:23
**fields** [2] - 131:2, 10
**Fifth** [1] - 14:11

**figure** [2] - 132:24; 205:13
**file** [4] - 2:18; 38:24; 240:7
**filed** [6] - 2:12, 14, 21; 3:1; 4:19; 131:23
**files** [2] - 39:10; 76:23
**filings** [3] - 2:11, 21; 4:8
**fill** [1] - 99:14
**filled** [5] - 15:8, 11, 13; 211:20; 214:7
**film** [1] - 97:5
**final** [2] - 234:3, 12
**finally** [5] - 157:18; 215:9; 217:19; 224:7; 235:20
**findings** [3] - 135:23; 136:5; 194:4
**fine** [4] - 3:9; 77:16; 208:15; 228:15
**finger** [10] - 61:5, 7-8; 85:25; 86:4, 8-9; 87:11; 106:18, 21
**fingerprints** [1] - 168:10
**fingers** [2] - 61:5, 7
**fingertips** [1] - 217:4
**finish** [2] - 3:23; 183:7
**firearm** [7] - 19:20, 22; 20:1; 102:1, 3, 6, 8
**firm** [1] - 145:12
**firms** [1] - 145:21
**first** [38] - 2:10; 8:2; 20:12; 24:2, 12, 14; 25:2; 27:24; 28:2; 34:21; 36:24; 45:10; 49:9; 68:1, 9; 78:4; 79:10; 80:25; 95:3; 106:22; 108:13; 116:25; 123:8, 25; 127:22; 145:13; 150:5; 200:2; 201:20; 202:1; 214:22; 215:7; 218:2, 11; 226:5, 22; 231:6; 237:1
**fishing** [1] - 143:9
**fit** [1] - 193:25
**five** [9] - 24:12; 30:3, 22; 31:24; 48:1; 103:14; 115:23; 123:21
**fix** [10] - 121:15, 17, 19; 171:21; 175:22; 176:1; 204:11, 15; 207:24
**fixed** [1] - 186:3
**fixing** [6] - 176:3, 23; 204:10, 19; 208:11
**flag** [2] - 181:22; 200:24
**flight** [3] - 187:24; 205:14
**flip** [1] - 180:4
**floor** [1] - 34:21
**Florida** [2] - 119:16; 137:7
**focus** [3] - 156:9, 13; 157:19
**focused** [2] - 97:19; 204:8
**focusing** [1] - 194:3
**folder** [1] - 70:20
**follow** [3] - 101:20; 106:2; 206:2
**follow-up** [1] - 106:2

**followed** [3] - 95:1; 116:9; 189:11
**follows** [4] - 8:9; 65:21; 92:10; 128:7
**food** [4] - 50:13; 216:15; 217:23; 231:11
**footage** [1] - 67:22
**force** [1] - 56:15
**forced** [2] - 42:1; 167:16
**forces** [1] - 145:21
**forcibly** [1] - 192:13
**foremost** [1] - 226:5
**forensic** [13] - 38:9, 13; 39:17; 46:18; 48:15; 96:15; 116:1, 17; 118:6; 137:9; 170:7; 189:22
**forensic-type** [1] - 46:18
**forensics** [1] - 233:14
**forewarning** [1] - 206:12
**forget** [1] - 211:3
**form** [12] - 2:13; 14:8; 15:8, 15; 69:19; 98:14; 152:20; 153:20; 162:15; 166:1; 202:10; 239:9
**forms** [2] - 106:4; 142:18
**formulate** [1] - 190:23
**formulating** [1] - 190:19
**Fort** [1] - 119:16
**forth** [4] - 3:14; 56:25; 84:15; 116:24
**forthright** [1] - 217:14
**fortunate** [1] - 134:18
**forward** [2] - 103:25; 104:4
**foundation** [1] - 130:1
**four** [13] - 9:6; 40:8; 67:18; 71:25; 80:12; 81:5; 120:8; 156:12; 172:24; 193:14; 194:1, 16; 213:10
**Fourth** [2] - 222:13; 225:3
**Francisco** [1] - 130:10
**free** [7] - 13:5; 110:2; 132:14; 167:13; 216:21; 224:18; 236:24
**freely** [3] - 49:3, 7; 60:22
**friends** [1] - 217:1
**front** [7] - 30:18; 32:18, 20; 35:1; 95:21; 111:17
**full** [2] - 134:11; 151:9
**fully** [3] - 156:4; 166:13; 171:11
**function** [2] - 157:10; 223:5
**functional** [4] - 175:18; 177:4; 202:20, 22
**functioning** [1] - 157:4
**future** [2] - 213:15; 224:15
**gathering** [2] - 150:8, 11
**gender** [3] - 178:16
**general** [2] - 89:2; 136:3
**generalists** [1] - 150:20
**generalize** [1] - 203:10
**generally** [15] - 98:17; 135:6, 9, 21, 23; 136:2, 8;

149:25; 150:3, 7, 13; 151:1; 156:12; 167:13; 199:3
**girl** [1] - 122:11
**girlfriend** [10] - 20:8, 13; 22:3; 51:17, 19-20, 23; 75:21; 100:25; 104:25
**girlfriend's** [4] - 20:15, 21; 75:21; 105:1
**given** [25] - 13:25; 19:14; 39:10; 43:3; 48:9; 49:7; 59:11, 22, 24; 108:10; 110:22; 122:6; 134:24; 136:13; 137:2; 139:10; 154:10, 15-16; 167:2; 210:2; 216:14; 223:16; 234:19, 22
**goal** [15] - 143:2, 20; 144:3; 151:4; 166:10, 23; 167:3, 5; 172:13; 173:4; 177:11; 217:13
**good/bad** [1] - 153:21
**Government** [44] - 2:12; 3:4, 17; 4:6; 6:13; 7:4, 8, 24; 8:2, 7; 62:25; 63:5; 64:15; 65:16, 19; 91:6; 92:2, 8; 127:14, 16; 128:11; 140:17, 22; 192:14; 214:19, 22; 217:18; 219:10; 220:19; 221:22, 24; 223:12, 24; 224:4; 225:20; 227:8; 232:22; 234:3, 12, 17; 237:25; 238:11; 239:17; 240:23
**Government's** [21] - 5:5; 6:1, 5, 7; 7:11; 14:5; 16:3, 7; 129:20; 187:18; 190:8, 12; 222:21; 225:18; 232:17; 233:2, 6; 239:2, 6, 8, 14
**graduate** [4] - 130:25; 131:9; 132:15; 135:14
**Graham** [4] - 9:5; 10:1, 13, 19
**grand** [2] - 187:14; 233:21
**grave** [1] - 236:15
**gray** [1] - 41:12
**great** [3] - 195:6, 24; 197:2
**group** [6] - 39:21; 156:25; 157:4, 9, 13; 164:11
**groups** [8] - 136:12; 137:1; 156:13; 157:2, 19; 158:2, 16, 21
**guardian** [1] - 3:13
**guess** [23] - 28:24; 39:1; 40:25; 48:10; 54:7; 67:23; 72:2; 81:20; 86:11; 123:21; 125:22; 129:4; 150:5; 176:11; 181:2, 4, 19; 190:25; 196:24; 199:23; 205:9, 19; 219:17
**guessed** [2] - 181:3, 8
**guessing** [1] - 96:20
**guilt** [12] - 22:20; 23:3; 109:10; 154:8; 170:16; 172:8, 16; 173:8, 15; 196:13;

219:19; 228:23
**guilty** [7] - 143:23; 151:7; 167:1; 183:18, 23; 224:18; 236:24
**guy** [1] - 42:7
**guys** [4] - 10:8, 19; 71:1, 25
**half** [10] - 4:1; 43:21; 64:3; 119:3; 127:19; 133:1; 137:25; 151:14; 195:5; 216:13
**hall** [1] - 67:18
**hallway** [2] - 59:2; 88:13
**hand** [2] - 61:2; 89:19
**handcuffed** [2] - 12:2; 96:6
**handcuffs** [2] - 11:14; 68:14
**handled** [1] - 194:24
**handles** [1] - 41:14
**hands** [2] - 79:24; 227:20
**hanging** [1] - 227:12
**Hannah** [1] - 11:1
**happy** [1] - 238:16
**hard** [3] - 4:21; 74:21; 193:10
**harm** [1] - 56:15
**harmful** [1] - 214:3
**harped** [1] - 216:17
**harsh** [1] - 175:17
**haunt** [1] - 176:4
**head** [3] - 89:18; 149:21; 229:5
**head)** [1] - 218:4
**headquarters** [7] - 33:13, 15; 34:2; 46:6; 89:5; 111:14; 212:22
**heads** [2] - 181:3
**Health** [1] - 78:16
**hear** [12] - 75:17, 20, 23; 111:4, 10; 124:20, 23; 127:4; 179:4; 214:21; 237:19
**heard** [9] - 20:14; 38:23; 93:21; 146:1; 173:18; 201:1; 221:4; 222:10; 238:23
**hearing** [13] - 2:7; 3:13; 4:13; 14:4; 63:19; 66:15; 111:5, 11; 124:5, 22; 186:16; 190:7; 203:22
**hearings** [2] - 139:1; 186:12
**heavily** [1] - 24:18
**heavy** [1] - 224:14
**held** [1] - 184:24
**help** [32] - 29:5; 105:7; 121:11, 25; 122:9; 136:25; 143:22; 152:14; 168:21; 169:3, 12; 171:20; 175:21; 178:20, 25; 179:4-6, 11-12, 18; 180:1, 9; 186:1; 204:9; 208:3; 229:4
**helped** [1] - 217:12
**helpful** [3] - 132:18; 214:3; 238:19

**herein** [4] - 8:7; 65:19; 92:8; 128:5
**herself** [1] - 26:1
**hesitation** [1] - 118:12
**high** [4] - 157:25; 220:15; 235:15
**higher** [1] - 134:1
**highly** [4] - 157:19, 21-22; 193:1
**himself** [15] - 18:18; 37:2; 44:23; 54:16, 20; 83:19; 98:21; 103:22; 105:7; 120:25; 170:23; 171:21; 174:22; 219:19
**hinder** [1] - 17:7
**hired** [3] - 208:22, 25; 209:4
**history** [2] - 141:4; 192:15
**hitting** [1] - 229:5
**hold** [4] - 9:8; 78:13; 131:4; 184:9
**holiday** [1] - 132:13
**holster** [1] - 102:4
**home** [10] - 27:11; 123:5, 13-14, 17-18; 158:8; 160:12, 14; 227:12
**homelands** [1] - 192:13
**homicide** [3] - 153:8; 161:14; 162:9
**honest** [1] - 41:11
**Honor** [125] - 2:2, 16; 3:9, 20; 4:7, 9, 13, 15, 25; 5:4, 17; 6:20, 25; 7:6, 9, 15, 19, 23; 8:1, 13; 14:1; 16:2, 5; 24:5; 25:8; 64:14, 16; 65:23; 77:4; 85:10, 12; 91:5, 23; 92:2, 13; 107:5; 110:17; 117:8, 10; 126:21; 127:9, 15, 24; 128:9, 13, 16, 23; 129:1, 11, 22; 130:3; 140:14, 18, 21; 165:3, 9, 11; 183:4; 186:24; 187:6, 20; 204:25; 214:11, 14, 20, 23-24; 215:11; 216:7, 17, 20, 22; 217:5, 17, 20; 218:11, 23; 219:13, 21; 220:5, 11, 23; 221:5, 11-12; 222:1, 11, 23; 223:9, 14; 224:1, 6, 19; 225:6, 24; 226:5; 231:9, 12, 20; 232:19, 24; 233:8, 12, 25; 234:6, 14, 22; 235:15, 20; 236:4, 11, 25; 237:23; 238:5, 12, 16, 25; 239:19, 25; 240:3, 12, 20, 24
**honors** [2] - 134:16, 19
**hope** [5] - 3:21; 73:5, 8; 84:20
**hopes** [1] - 201:19
**horse** [1] - 190:22
**Hospital** [1] - 103:16
**hour** [19] - 4:1; 11:21; 21:12; 27:18, 20; 43:21; 64:3; 105:21, 23; 117:23; 125:3; 127:19; 177:8; 200:1;

205:5; 227:2, 5
**hourly** [1] - 205:4
**hours** [31] - 10:9; 12:22; 18:22; 23:18; 24:3; 91:21; 98:15; 105:24; 172:24; 177:15; 188:25; 198:5; 200:2, 20; 205:6, 9; 210:7, 12, 15, 17; 212:17; 216:12; 226:12; 229:9; 231:6, 8, 15
**house** [23] - 25:14, 24; 27:23, 25; 28:1, 11, 15-16; 29:7, 14, 16; 30:15, 17; 32:4, 7; 51:17; 103:17; 123:6; 124:15; 146:14; 226:22
**human** [1] - 149:6
**hundred** [2] - 133:8
**hundreds** [4] - 135:12; 136:13; 150:6; 151:15
**Hutson** [1] - 224:10
**I-A-D-O-N-I-S-I** [1] - 92:18
**Iadonisi** [74] - 5:13, 18; 9:24; 13:21, 24; 21:15; 22:12; 26:14, 17, 25; 27:8; 28:6; 29:9; 30:20; 31:23; 32:13; 33:6; 36:16, 25; 37:15; 40:6, 11, 15; 45:7; 46:4; 48:10; 50:3; 51:8, 24; 53:1; 54:11; 55:2; 56:24; 59:12; 60:20; 63:10, 24; 67:2; 69:15; 70:17, 23; 71:4, 10; 72:5; 80:7, 13; 81:9, 17, 21; 83:9, 11, 15, 17, 20-23; 84:9, 12; 86:6; 92:3, 18-19; 109:8; 110:22; 126:25; 146:1; 173:9, 12; 198:19; 228:10
**IADONISI** [2] - 9:24; 92:7
**idea** [19] - 142:21, 24; 143:6; 147:10; 153:14; 155:23; 161:2, 4, 9, 17; 162:9; 167:13; 169:12; 174:5, 7; 178:12, 21; 179:3; 181:12
**ideally** [5] - 143:21; 151:6, 8; 166:22; 167:4
**ideas** [1] - 136:7
**identified** [4] - 191:19; 193:21; 195:21; 202:18
**identify** [4] - 14:5; 148:12; 209:8
**ill** [2] - 157:13; 192:23
**illegal** [1] - 222:8
**Illinois** [1] - 137:25
**illness** [1] - 157:14
**illnesses** [1] - 74:21
**illogical** [1] - 151:25
**illusory** [1] - 185:4
**imagine** [1] - 141:17
**immaturity** [1] - 156:16
**immediately** [2] - 36:10; 97:14
**immune** [1] - 179:8
**immunity** [3] - 163:21;

174:14; 175:12
**impaired** [6] - 206:22; 215:4; 219:9; 220:15; 235:14, 25
**impairment** [1] - 24:22
**imparted** [2] - 82:10; 232:2
**implausible** [1] - 152:1
**implication** [11] - 159:12; 160:13; 161:20; 162:6, 20; 163:1, 10; 171:15; 176:18; 179:5; 180:5
**implications** [2] - 131:19; 159:22
**implicit** [1] - 172:22
**implicitly** [1] - 176:15
**implied** [28] - 159:15; 160:6, 15-16, 18; 163:10, 13; 175:1; 176:16, 20-21; 177:5; 186:5; 189:9; 202:18, 20, 22, 25; 207:25; 208:12; 212:13; 218:20; 222:16, 18; 225:10; 228:21; 229:4
**implies** [2] - 176:16; 179:12
**imply** [2] - 163:7; 175:11
**implying** [3] - 171:7; 172:1; 173:14
**important** [4] - 90:8; 140:8; 146:21; 231:21
**impossible** [1] - 193:17
**impression** [2] - 16:16; 101:19
**improper** [4] - 218:21; 222:10, 18; 225:11
**improve** [1] - 107:17
**improving** [2] - 139:17; 188:3
**impulsive** [2] - 156:17, 23
**impute** [1] - 153:15
**imputed** [1] - 215:16
**in-house** [2] - 146:14
**inaccurate** [1] - 139:19
**inappropriate** [8] - 20:21; 22:9; 102:25; 108:23; 194:23; 202:9; 224:21, 25
**inappropriately** [1] - 199:15
**incapable** [1] - 221:3
**incentives** [3] - 152:21; 153:4; 159:20
**incident** [5] - 22:15; 53:15; 54:24; 60:14
**include** [6] - 51:13; 150:15; 159:2, 4; 174:3; 178:2
**included** [1] - 174:25
**includes** [2] - 2:24; 239:16
**including** [3] - 23:21; 46:11; 205:7
**inconsistencies** [2] - 180:12; 181:10
**inconsistency** [1] - 116:10
**inconsistent** [4] - 152:1; 181:22; 202:4

**increase** [4] - 201:18; 203:12; 211:10; 230:2

**increased** [5] - 203:3, 5, 7, 9; 207:25

**increases** [1] - 186:7

**increasing** [3] - 152:17; 178:22; 202:5

**incriminate** [4] - 166:18; 170:23; 174:22; 177:17

**incriminating** [9] - 143:19; 151:6, 9; 166:11, 13, 24; 167:2; 173:6; 214:25

**independent** [1] - 191:2

**Indian** [19] - 8:23, 25; 9:9; 10:24; 11:9, 17, 20, 23; 12:19; 14:7; 27:3; 64:19; 66:10; 77:23; 78:5, 7; 92:23; 98:1; 110:2

**Indians** [4] - 10:16; 192:5, 8, 12

**indicate** [14] - 15:15; 17:23; 18:1; 26:15; 106:25; 107:16; 191:18; 193:1; 209:15, 21; 211:24; 215:5; 225:8; 233:15

**indicated** [20] - 20:16; 36:18; 49:9; 51:7; 53:4; 87:25; 106:22; 112:1, 18; 113:7; 115:20; 117:19; 125:12; 127:17; 188:2; 201:10; 202:1; 210:6; 219:24; 233:3

**indicates** [4] - 117:20; 222:14; 236:5; 237:10

**indicating** [1] - 14:24

**indicating)** [1] - 26:22

**indication** [7] - 57:25; 192:16, 19, 23; 199:14; 215:14; 216:2

**indications** [1] - 57:23

**indicative** [2] - 199:12

**indicator** [2] - 204:6; 210:8

**indicia** [6] - 150:3, 13; 180:24; 181:8; 193:24; 209:18

**indictment** [4] - 170:1; 189:24; 190:16

**indirectly** [2] - 139:25; 147:8

**individual** [2] - 9:17; 194:6

**individuals** [2] - 156:5, 13

**induce** [1] - 165:2

**Induced** [1] - 188:9

**induced** [1] - 215:2

**inducement** [2] - 162:15; 171:25

**inducements** [5] - 152:21; 153:3; 159:1, 20; 163:12

**inducing** [2] - 164:17, 20

**inevitability** [1] - 154:17

**infer** [3] - 163:6; 176:2; 209:17

**inferring** [1] - 175:15

**infirmities** [1] - 74:21

**infirmity** [1] - 100:4

**influence** [4] - 157:17; 218:21; 222:18; 225:11

**Information** [3] - 170:1; 190:1, 17

**information** [40] - 15:9, 11; 29:1; 38:8, 17; 39:10, 16, 24; 43:5, 8, 12, 24; 44:4; 48:15; 54:24; 61:14, 16; 62:24; 80:10, 22, 25; 116:22; 120:14; 128:18; 135:24; 140:6; 142:19; 166:21; 167:25; 174:20; 178:7; 180:23; 181:6; 184:5; 191:22; 209:9; 230:16; 239:11

**informed** [2] - 31:6; 48:22

**inherent** [1] - 219:3

**inherently** [7] - 155:17; 167:11; 168:7; 204:21; 218:24; 219:15; 223:10

**initial** [10] - 14:19; 15:2; 37:6, 9, 21; 102:24; 172:8; 191:5; 197:17; 238:13

**initials** [1] - 99:11

**initiated** [2] - 22:13; 28:18

**innocent** [3] - 57:10; 183:24; 184:16

**inquiry** [3] - 235:12; 236:19; 237:3

**inside** [12] - 12:3; 18:18; 30:15; 32:17; 35:12; 36:3, 6; 44:24; 45:13, 19; 88:4; 106:18

**instances** [1] - 116:7

**instead** [4] - 5:12; 88:4; 113:8; 194:3

**instructions** [1] - 99:23

**instrument** [1] - 206:11

**instrumental** [3] - 205:20; 206:9; 209:12

**intellectual** [2] - 157:3, 10

**intellectually** [1] - 157:6; 192:20

**intend** [1] - 165:5

**intended** [4] - 176:20; 206:16; 219:20; 223:5

**intending** [1] - 183:15

**intense** [1] - 23:15

**intent** [3] - 48:7; 174:10; 219:22

**intention** [3] - 73:15; 228:8

**intentional** [5] - 85:4, 8; 162:11; 174:18; 235:5

**intentionally** [1] - 114:25; 166:20

**interactions** [2] - 70:2; 104:17

**interdisciplinary** [1] - 131:8

**interest** [9] - 44:14; 132:20; 146:23; 152:22; 153:18; 154:11, 15; 159:18

**interested** [9] - 44:15;

104:5; 129:5; 139:16; 155:15; 159:9; 163:12; 180:16; 188:3

**interesting** [1] - 155:14

**interim** [5] - 9:15; 66:13; 78:9, 11; 89:14

**interject** [1] - 114:23

**internet** [1] - 135:15

**interpersonal** [1] - 158:25

**interplay** [1] - 221:13

**interpret** [1] - 58:13

**interpretation** [1] - 212:12

**interpreted** [1] - 163:19

**interrogate** [9] - 37:16; 40:21; 46:5; 143:6, 11; 144:15; 147:7, 15; 178:14

**interrogated** [6] - 34:15; 148:10, 18; 198:4; 224:5

**interrogating** [3] - 140:24; 154:21; 183:18

**interrogation** [178] - 40:24; 42:14, 19, 25; 45:21; 54:9; 58:3; 62:5; 63:9; 72:18; 78:25; 83:7, 13; 89:9; 90:17; 91:2; 114:16; 119:19, 25; 120:9; 126:10; 129:12, 18; 130:24; 131:17; 132:5; 135:20; 138:4, 7; 139:11, 17, 20, 23-24; 140:5, 9, 12-13, 15; 141:5, 10, 13; 142:3, 5-6, 13, 16; 143:5, 8, 10, 14, 24; 144:3, 8-9, 14, 24; 145:2, 6-7, 10, 16-17, 21, 24-25; 146:5, 19; 147:1, 11, 13, 19; 148:4, 6, 25; 149:9, 16; 150:16; 151:4, 11, 14-15, 17, 19, 21; 154:12; 155:7, 17, 21; 156:4; 158:11; 159:16; 160:6; 163:9, 24; 164:4, 17, 19, 22; 165:13; 166:8, 24; 167:5, 9, 14, 16, 20; 168:4, 9, 16; 170:2, 4, 10, 17; 171:25; 172:4, 12, 15; 174:16, 18; 176:10; 177:19, 22; 178:6; 179:19, 22; 180:10, 23; 181:20; 183:17; 185:22; 186:10, 19; 191:20; 196:4, 8; 197:19; 199:19, 21, 25; 200:1, 3, 6, 13; 205:20; 206:1, 9; 207:2; 209:12; 210:20; 211:24; 213:7; 214:7; 218:11, 25; 219:1, 11; 220:2, 20; 221:16; 222:25; 223:4, 7-8; 229:8, 10; 232:14; 234:22

**interrogations** [18] - 145:19; 159:11; 164:2; 166:3; 167:21; 169:18; 180:22; 183:15; 186:21; 188:4; 199:20; 200:19; 201:16; 210:17; 211:19; 223:11; 225:4

**interrogator** [10] - 143:17;

154:16; 159:16; 162:21; 168:24; 169:3; 176:1; 177:19; 202:12; 204:5

**interrogators** [9] - 146:25; 148:19; 155:24; 175:21; 178:5, 13, 15; 197:20

**interrupt** [1] - 73:3

**interruptions** [1] - 115:1

**interview** [230] - 2:23; 4:10; 10:5; 12:1, 4, 11, 15; 13:3, 9, 11, 16, 18, 20, 24; 14:25; 15:4, 6-7; 17:11, 22, 24; 18:2, 16-19; 19:2, 9, 16; 21:5, 9, 13, 17; 22:9; 23:7, 17, 23; 24:9, 11; 25:4; 35:3, 6-7, 9, 13, 16-18, 21; 36:3, 6-7, 10, 22; 38:10, 13; 39:17, 22; 40:4, 13, 24; 41:2; 42:13, 19; 44:22; 45:14, 19, 23; 47:18, 21; 48:4, 13, 21; 50:5, 17; 52:25; 53:9, 13; 54:14-16, 22; 55:13; 56:11; 58:1, 24; 61:11, 21; 62:10; 63:17; 67:3, 11, 13-15, 20-22; 68:7, 15; 69:7, 12-14, 16-17; 70:4, 10, 18, 24-25; 71:19, 24; 72:1, 20; 73:1, 4, 20, 23-25; 74:17; 75:3, 7, 11-12; 76:2, 19, 22; 80:1, 3; 81:9, 15; 82:5, 13; 83:1, 12, 14, 16; 86:20; 91:11, 15; 93:3, 13; 95:16; 96:14, 16, 24; 97:2, 23; 98:9, 11, 13, 15; 99:3; 100:10, 14; 101:6, 16, 18, 23; 102:24; 104:1, 9-10, 12; 105:14, 19, 22, 24; 107:12, 15, 21; 108:10; 109:2, 5, 9, 13, 19; 110:8, 12; 112:19; 113:9; 115:5, 19-21; 116:2, 4; 119:25; 121:24; 122:1; 125:13; 126:3, 7; 127:1, 5; 142:15; 143:24; 144:4, 9, 23; 145:1, 5; 147:1, 20; 151:21; 170:7; 186:20; 189:17, 20, 22; 194:20; 215:9, 25; 216:5, 7; 217:3, 10; 219:6; 220:7, 9; 235:19

**interview/interrogation** [1] - 196:14

**interviewed** [9] - 14:11; 38:18; 44:7; 81:14; 113:14; 143:1; 144:1; 175:5; 216:11

**interviewee** [5] - 97:10, 20; 107:24; 143:18

**interviewer** [2] - 116:24; 142:22

**interviewing** [26] - 13:12; 37:7; 42:25; 44:1; 46:16, 18; 81:17; 107:20; 117:16; 120:9; 141:13; 142:18, 21, 23; 143:17; 144:2, 7, 10, 13; 145:1, 7, 16; 146:5; 164:3

**interviews** [9] - 42:8; 43:1, 4; 62:16; 64:20; 94:8; 108:18; 188:19

**intimidation** [1] - 138:3

**introduce** [1] - 7:21

**introduced** [1] - 4:8

**introductory** [1] - 146:4

**intrusive** [1] - 44:10

**investigate** [1] - 147:6

**investigated** [1] - 75:1

**investigating** [2] - 31:3, 6

**investigation** [26] - 11:10; 25:19; 35:19; 37:21; 39:4, 15; 43:24; 45:24; 67:12; 74:25; 78:8, 16; 81:7; 100:15; 120:10; 142:22; 143:2, 7; 146:11; 147:13; 149:16; 155:1; 215:10; 217:19; 218:10; 235:19

**investigations** [8] - 9:11, 15; 66:13; 67:19; 79:13; 89:2, 19; 139:7

**Investigations** [2] - 14:8; 66:11

**investigative** [4] - 35:24; 89:16; 172:8; 228:24

**Investigator** [31] - 39:6; 43:8; 45:8, 11; 51:13; 52:10, 18; 53:16; 55:2; 60:20; 63:11; 77:16; 79:5, 21; 80:19; 81:17; 84:9; 88:22; 111:23; 112:9; 115:14; 116:21; 118:4; 124:5, 20, 23, 25; 146:1

**investigator** [5] - 9:10; 77:12; 82:11; 92:22; 120:12

**investigator's** [3] - 143:13; 154:9; 177:11

**investigators** [6] - 64:6; 81:2; 93:7; 120:3; 137:9; 141:14

**investigators'** [6] - 35:12; 45:13, 21; 82:21; 125:22; 126:7

**invitations** [1] - 136:19

**invited** [4] - 136:11; 137:2, 11; 140:2

**involuntarily** [2] - 129:15; 186:8

**involuntary** [20] - 138:7; 139:22; 140:16, 25; 155:11; 168:1; 185:17; 186:11, 13-14; 214:25; 218:14, 19, 22; 221:20; 222:20; 234:21; 235:8, 11; 236:10

**involve** [1] - 159:22

**involved** [13] - 31:7, 12; 78:15, 18; 82:2; 100:25; 178:15; 194:3; 215:25; 216:13; 218:16; 221:25

**involvement** [2] - 62:8; 109:2

**involves** [3] - 101:1;

143:14; 147:12

**involving** [2] - 164:12

**iPad** [15] - 32:1, 5, 7; 48:10, 12, 16, 18-20, 22, 25; 49:4; 106:4; 233:4, 19

**iPhone** [2] - 233:4, 19

**IQ** [5] - 157:3, 7-8; 207:10

**IQs** [1] - 157:25

**Irvine** [1] - 130:20

**isolated** [3] - 216:25; 217:2, 10

**isolating** [1] - 151:18

**isolation** [2] - 216:19; 225:5

**issue** [13] - 2:10; 3:11; 6:21; 82:4, 8; 171:19; 203:18; 225:18, 23; 232:23; 237:19, 21, 24

**issued** [6] - 20:24; 26:3, 11; 69:11; 93:20; 94:1

**issues** [5] - 2:8; 4:4; 51:22; 238:8, 22

**issuing** [1] - 93:22

**items** [4] - 4:7; 74:17; 170:10; 233:14

**itself** [9] - 32:16; 35:17; 109:5; 169:10; 196:16; 202:10; 213:6; 218:11

**January** [2] - 78:1, 4

**Jared** [1] - 7:20

**jargon** [1] - 163:4

**jargons** [1] - 161:1

**Jason** [5] - 8:3, 20; 93:16; 94:20; 123:9

**JASON** [2] - 8:6, 20

**JD** [5] - 128:4; 131:7; 132:9, 12, 18

**Jenkins** [34] - 25:21; 37:20, 25; 39:14; 40:5, 15; 43:8; 45:23; 46:4; 55:2; 58:25; 63:10; 66:22; 69:6; 71:7, 9, 22; 78:19; 79:5, 21; 80:13, 18-20; 88:17, 23; 93:10, 21; 94:19; 108:7; 126:5, 14, 16

**Jenkins'** [1] - 38:3

**jig** [1] - 154:10

**joint** [1] - 106:22

**Joseph** [2] - 2:5; 9:13

**journal** [2] - 133:6; 135:13

**Judge** [2] - 207:15; 240:17

**judge** [2] - 138:15; 185:16

**judges** [4] - 137:5; 162:7; 184:18; 195:11

**judgment** [1] - 161:16

**judgments** [1] - 186:16

**July** [1] - 2:22

**Jumper** [145] - 2:5; 5:11; 9:13, 19; 10:3, 8, 19; 11:2, 4, 7-8, 16, 24-25; 12:5, 23; 13:2; 15:13, 15; 17:23; 18:18; 19:10; 20:13, 25; 22:13, 15, 17, 20; 25:3; 27:2, 14-15, 17; 28:4, 7, 13, 18,

22, 24; 29:2, 10, 12, 22; 30:10, 18, 24; 32:12; 36:7, 13; 37:16, 24; 38:3, 10, 18; 40:2; 43:15; 44:16; 45:10, 17, 24; 46:5, 16; 47:14; 48:13, 22; 49:10, 23; 50:2; 52:23; 53:3, 7, 10, 14, 22; 54:15, 18; 55:11, 24; 57:3; 58:25; 59:1, 4; 62:6, 9; 67:3, 6, 8, 11-12; 68:7; 69:16; 71:10, 12; 72:7, 10; 78:25; 80:3, 7; 81:11; 82:6; 83:14, 17, 19, 22-23; 85:25; 86:22; 88:1; 89:4; 93:3; 95:2, 4, 10, 14, 17; 98:13; 99:19, 21; 100:17; 101:1; 112:4; 113:14; 114:1; 115:8; 117:17, 21; 118:7, 9; 120:23; 122:18; 123:8; 124:1; 126:13; 170:2, 13, 17; 173:22; 177:7; 182:7, 12, 19; 209:12; 211:23; 213:6

**Jumper's** [13] - 25:14; 27:25; 29:7, 14, 16; 30:2; 49:4; 60:11; 90:7; 93:22; 123:13; 185:19; 233:4

**jurors** [4] - 161:19; 162:7; 184:18, 23

**jury** [8] - 162:11; 185:5, 15; 187:14; 203:22; 230:13, 15; 233:21

**justice** [7] - 42:19; 130:18, 24; 132:7; 136:24; 148:19; 149:15

**Justice** [1] - 42:7

**Justin** [1] - 63:23

**juvenile** [1] - 192:17

**juveniles** [1] - 156:14

**keep** [8] - 75:7, 10; 109:22; 216:16; 223:2; 239:22, 24

**kept** [11] - 55:8; 82:6; 87:2; 117:21, 25; 177:7; 217:11; 228:19; 229:16; 230:19

**keynote** [1] - 136:17

**kid** [2] - 57:13; 156:17

**kid-like** [1] - 156:17

**kids** [1] - 179:24

**killed** [1] - 153:13

**kind** [39] - 32:17; 33:5; 38:8; 39:1, 21; 41:4, 11; 42:7; 44:8, 15; 53:9; 56:21, 23; 58:12; 70:19; 76:7; 79:9; 88:3; 89:12; 90:19; 130:22; 139:5; 142:8; 144:7; 147:4, 9, 21; 156:23; 161:3; 167:19; 175:8; 195:1; 206:1; 211:9; 215:21; 222:25; 230:24; 232:23

**knocked** [2] - 10:22; 28:3

**knowing** [1] - 182:9

**knowingly** [1] - 238:3

**knowledge** [18] - 20:22; 21:14; 27:15; 68:13, 25;

69:2; 74:16; 108:5; 114:17; 126:11; 136:24; 148:7; 152:2; 181:7; 191:16; 194:17; 209:1; 232:2

**known** [7] - 10:2; 28:21; 45:16; 112:4; 158:22; 182:9; 229:15

**knuckle** [1] - 106:22

**L-A-M-B-E-R-T** [1] - 66:8

**laboratory** [1] - 164:6

**lack** [3] - 215:22; 222:7; 231:10

**laid** [1] - 197:5

**Lambert** [50] - 9:14; 21:16; 22:13, 16-17; 25:23; 36:19; 37:15; 39:6, 13, 19; 40:5, 15; 43:9; 45:8, 11; 46:4; 51:13; 52:10, 12, 18, 25; 53:9, 13, 16; 54:2; 55:2, 12; 60:20; 63:11, 24; 65:16; 66:5, 9; 77:16, 19; 85:24; 91:10; 94:21; 103:4; 115:14; 116:5, 21; 117:1; 173:19; 201:2, 10

**LAMBERT** [1] - 65:18

**land** [1] - 10:17

**Lane** [1] - 33:18

**language** [1] - 177:21

**lap** [2] - 171:13, 17

**large** [1] - 135:17

**largely** [1] - 156:10

**larger** [2] - 194:11, 13

**Larry** [10] - 39:14; 45:23; 58:25; 66:22; 71:7, 22; 78:18; 88:17; 93:10, 21

**last** [18] - 9:24; 11:2; 18:16; 28:7; 42:21; 77:15; 98:11; 123:7; 147:3; 156:21; 166:3; 183:5; 200:19; 218:9; 220:18; 224:9, 11; 236:13

**lasted** [3] - 23:17; 210:20; 212:17

**lasts** [1] - 127:18

**latter** [1] - 122:16

**law** [33] - 9:3; 34:3; 42:16; 66:18; 77:20; 92:24; 104:18; 118:22; 119:12; 130:9, 16; 131:8, 11, 19; 132:16; 134:9; 137:8; 139:15; 144:17; 148:3; 155:8, 10, 14; 164:20; 165:1; 174:9; 175:9; 195:10; 207:20; 237:10

**laws** [1] - 164:25

**lawyer** [3] - 122:2; 132:10, 21

**laying** [1] - 129:25

**layout** [2] - 67:15; 97:2

**laypeople** [1] - 232:3

**lead** [2] - 156:18; 159:23

**leading** [5] - 22:22; 138:5; 142:25; 145:9, 11

**leads** [1] - 155:11

**leaking** [1] - 183:13

**lean** [1] - 199:4

**leaning** [3] - 104:4; 231:1
**leans** [1] - 103:25
**learn** [5] - 144:16; 146:25; 147:24; 164:15
**learned** [3] - 177:13; 181:19; 185:3
**learning** [2] - 147:2; 183:22
**least** [9] - 11:21; 29:17, 19; 89:20; 138:12; 143:6; 149:5; 171:6; 174:15
**leave** [24] - 35:3, 5; 50:15; 53:11, 24; 54:11; 58:12; 72:17, 20; 73:1, 25; 88:15, 20; 111:6, 10, 12; 125:13, 18; 216:11; 228:4, 7; 237:23
**leaving** [7] - 46:13; 52:9; 54:19; 73:4; 84:20, 25; 110:12
**lectures** [6] - 136:14, 17; 137:2, 8, 11
**led** [1] - 158:24
**leering** [1] - 199:11
**left** [35] - 8:11; 18:18; 31:18, 25; 36:11; 37:3; 47:2; 51:5; 52:10, 12, 14, 19, 24; 53:1, 13; 55:1; 60:1; 68:1; 70:16; 76:21; 87:15; 88:6, 9; 94:2; 97:14; 98:17; 103:4; 118:4, 7; 125:14; 200:4, 7; 201:10; 212:18; 218:17
**legal** [18] - 128:20; 132:17, 19; 147:23; 148:1; 152:25; 153:20; 155:9; 186:14, 16; 206:20, 23; 207:3, 12, 14; 208:23; 209:2
**legislative** [1] - 137:22
**legitimate** [1] - 136:4
**length** [2] - 199:18; 210:14
**lengthy** [1] - 225:4
**leniency** [9] - 162:21; 163:21; 174:14; 175:11, 18, 25; 179:8, 13; 186:5
**Leo** [22] - 6:12; 127:25; 128:1; 129:2, 11; 130:8; 140:15; 159:1; 169:20; 183:10; 187:4, 23; 188:2; 208:22; 213:19; 215:11; 218:15; 219:13; 222:16; 228:22; 230:11; 232:1
**LEO** [1] - 128:4
**Leo's** [3] - 128:10; 140:23; 223:18
**less** [19] - 44:10; 117:23; 141:22; 174:8; 175:16; 177:3; 181:25; 205:11; 206:24; 208:2; 210:17, 21; 216:3; 226:14; 229:7
**letter** [3] - 59:14, 19; 191:6
**letting** [5] - 6:18; 30:6; 179:18; 224:18; 236:24
**level** [17] - 131:1; 157:10; 164:8; 169:13; 198:21; 201:18; 213:1; 219:7; 220:3,

10; 222:4; 223:6; 234:23; 236:3, 6; 237:4, 6
**levels** [1] - 211:11
**levied** [1] - 56:4
**lie** [3] - 166:18; 168:9; 206:11
**lies** [4] - 166:17; 168:18; 169:1, 11
**lieu** [1] - 113:10
**lieutenant** [10] - 9:15; 29:4; 39:3; 66:13; 77:13; 78:10; 79:14; 89:14
**Lieutenant** [10] - 9:25; 10:2; 26:14; 28:5; 29:3; 39:2; 80:18; 94:5, 23; 95:1
**life** [1] - 44:14
**lifetime** [1] - 134:20
**light** [1] - 130:3
**likely** [6] - 147:16; 149:12; 167:12; 181:7; 194:2; 203:24
**limine** [1] - 138:24
**limitations** [2] - 157:3; 192:20
**limited** [4] - 129:16; 177:14; 179:17; 188:25
**limiting** [1] - 108:12
**limits** [1] - 164:20
**line** [5] - 5:10, 12, 15-16; 155:12
**lines** [2] - 148:1
**linguistics** [2] - 163:4
**link** [1] - 110:5
**linking** [1] - 152:3
**listed** [3] - 188:15; 195:4, 6
**listen** [1] - 170:9
**listening** [1] - 80:22
**literal** [1] - 159:13
**literally** [1] - 163:8
**live** [3] - 35:13; 103:17; 164:1
**local** [2] - 47:9; 137:17
**locate** [8] - 9:17, 19; 10:19; 27:14; 40:2; 93:17, 24; 95:4
**located** [14] - 10:12, 15; 11:2; 27:2, 17; 28:13; 29:11; 30:7; 34:12, 17, 19; 35:19; 97:12
**location** [7] - 10:2; 27:16; 30:3, 21; 80:7; 95:1; 212:22
**locations** [1] - 97:16
**lock** [4] - 12:15; 88:3, 5; 216:9
**locked** [5] - 12:17; 50:18; 68:12; 87:25
**locks** [1] - 97:24
**look** [21] - 28:21; 38:4, 25; 48:12, 18; 49:5; 69:21; 117:5; 155:8; 198:3; 199:1; 216:5; 227:17; 228:20, 22; 229:3; 231:22; 232:5, 12, 15; 233:7
**looked** [9] - 38:3; 39:23;

48:18; 56:23; 64:11; 84:12; 170:5; 195:19; 227:6
**looking** [20] - 21:10; 29:2; 44:18; 69:18; 116:25; 117:1, 15; 138:2; 162:22; 199:20; 206:19; 212:7; 220:6-8; 232:7, 9; 236:7; 238:20
**lost** [1] - 79:14
**low** [3] - 157:3, 10
**lower** [1] - 164:7
**lump** [1] - 133:2
**lumping** [1] - 133:6
**LUNCH** [1] - 187:8
**luncheon** [1] - 187:8
**lunchtime** [1] - 79:3
**lying** [4] - 151:23; 153:1; 195:16; 206:5
**ma'am** [84] - 25:16; 26:5, 10, 19, 24; 27:22; 29:15, 18, 23; 30:9, 13; 31:4; 32:14, 24; 33:8, 14, 17; 34:22; 36:1, 20, 23; 38:16; 39:7; 40:22; 41:9, 24; 42:13, 24; 43:10, 22; 44:2; 45:9, 12; 46:20, 24; 47:4, 13, 23; 48:11, 14, 17; 49:6, 8, 11; 50:22; 51:6, 14; 52:2, 8; 54:10; 55:14, 18, 20; 58:18; 59:9, 16, 21, 25; 61:1, 4, 15, 22, 24; 62:19; 64:1, 10, 12; 77:12, 22; 87:9, 13; 88:7, 21; 89:10, 13-14, 17, 22; 90:5, 9; 91:3; 117:11; 119:5; 130:5
**Madam** [1] - 240:15
**magistrate** [2] - 59:5; 138:15
**main** [7] - 12:21; 33:20; 34:18; 151:10, 17; 232:11
**major** [4] - 89:3; 199:20; 215:6
**majority** [2] - 134:13; 195:18
**male** [1] - 53:12
**males** [1] - 87:22
**man** [4] - 226:10; 227:3; 228:14
**mandated** [1] - 223:7
**manipulate** [1] - 156:18
**manipulated** [1] - 158:24
**manipulation** [1] - 165:14
**manner** [1] - 226:24
**mantra** [1] - 147:9
**manual** [6] - 145:9, 11, 13; 154:25; 161:8
**Manual** [1] - 145:11
**manuals** [8] - 139:23; 140:12; 141:14; 144:12; 151:16; 175:5; 177:22; 184:8
**manuscript** [1] - 133:13
**marathon** [1] - 225:4
**March** [2] - 9:2; 169:21
**mark** [3] - 198:19, 25; 230:25

**marked** [5] - 14:4; 27:3, 5; 227:10
**Martin** [2] - 7:20, 22
**MARTIN** [1] - 7:23
**MARY** [2] - 65:18; 66:8
**Mary** [13] - 9:14; 21:16; 22:12, 14; 52:24; 53:9, 13; 55:12; 63:24; 65:16; 66:5; 77:14; 94:21
**master's** [1] - 131:6
**material** [2] - 176:4; 179:13
**materials** [5] - 37:8; 79:21; 169:24; 239:18
**Mathieson** [1] - 11:1
**matter** [11] - 2:6; 135:14; 136:22; 150:15; 172:17, 20; 187:14; 205:24; 207:20; 216:22; 233:22
**mattered** [1] - 173:3
**matters** [2] - 201:12; 240:2
**maturity** [2] - 156:16, 23
**maximization** [12] - 161:7; 162:3; 171:10, 23; 174:3; 197:13; 203:10; 204:9; 207:23; 208:10; 219:14; 228:25
**maximization/ minimization** [1] - 208:13
**maximize** [2] - 202:7; 230:2
**maximizing/minimizing** [1] - 202:25
**maximum/minimization** [1] - 160:25
**mean** [75] - 7:13; 15:2; 17:9; 30:1; 31:13; 33:2; 34:7; 35:5, 18; 37:12; 39:14; 40:12; 42:18; 43:4; 44:3, 6, 19, 21; 45:18; 46:17; 47:6, 17; 48:8; 49:24; 50:25; 51:9; 55:21, 23; 56:12; 59:18; 60:21; 63:6; 64:5, 8; 73:8; 81:20; 85:16, 20; 89:15; 90:9; 108:16; 110:23; 117:15; 122:24; 123:7; 132:24; 133:25; 141:17; 144:22; 155:16, 20; 161:15; 163:8; 166:17; 167:18; 176:7; 178:4; 183:12, 25; 184:2; 199:23; 202:11; 204:14; 209:20; 210:8; 212:8; 214:6; 227:20; 228:16; 229:5, 9; 230:9, 20; 232:23
**meaning** [6] - 121:18, 24; 123:1; 163:6; 231:23
**meaningful** [2] - 155:22; 167:15
**means** [9] - 56:16, 19; 58:5; 149:20; 163:10; 168:22; 176:3; 198:1; 204:17
**meant** [7] - 86:12; 122:19; 167:8; 182:23; 186:11; 204:19, 23

**measure** [1] - 199:24
**measured** [2] - 67:25; 150:18
**mechanism** [1] - 134:3
**medical** [6] - 39:24; 74:20; 79:22; 168:13; 179:23; 182:15
**medicated** [1] - 153:16
**meditated** [1] - 162:11
**meet** [1] - 27:11
**meeting** [1] - 25:3
**member** [3] - 31:1; 137:13, 20
**members** [1] - 191:14
**memorandum** [2] - 190:8; 237:22
**memories** [1] - 108:20
**men** [1] - 227:3
**mental** [3] - 17:7; 157:14; 215:21
**mentally** [5] - 157:5, 13, 21; 158:20; 192:23
**mention** [2] - 74:2; 100:4
**mentioned** [18] - 31:12; 43:23; 52:1; 57:19; 101:25; 132:9, 22; 134:6; 135:8; 147:14; 150:14; 164:21; 175:10; 180:21; 208:2; 211:13; 217:22; 237:8
**mere** [3] - 218:20; 222:14; 235:6
**message** [1] - 175:15
**messages** [2] - 163:10; 164:15
**met** [11] - 9:25; 29:6, 8; 51:16; 94:5, 23; 137:17; 191:9; 207:18; 238:1
**method** [15] - 42:22; 141:6, 22; 145:17, 23-24; 147:10, 14; 162:22; 164:21; 173:16; 202:4; 211:14
**methodologically** [1] - 150:10
**methods** [20] - 44:11; 135:24; 136:5; 141:5, 10; 145:5; 146:19; 147:19, 24; 148:6, 25; 149:10, 24; 150:7; 155:3; 164:5, 16; 173:16; 186:10, 18
**Michigan** [1] - 224:10
**middle** [5] - 34:6; 36:15; 83:24; 133:22; 200:7
**might** [41] - 10:11; 17:7; 27:15; 57:6, 19; 78:24; 95:2; 97:4; 100:5; 107:10; 112:13; 144:25; 148:4, 19; 152:4, 23-24; 153:9; 157:11, 16; 159:12; 160:3; 163:17; 171:15; 178:9; 181:4, 22, 24; 182:21; 204:20; 205:10, 24; 216:20; 217:1, 11; 238:19
**military** [1] - 138:22
**mind** [7] - 129:25; 143:13;

147:16; 154:9; 178:21; 215:20; 219:10
**mine** [1] - 16:1
**minimal** [1] - 179:9
**minimization** [16] - 161:7, 24; 171:9, 23; 174:2, 12; 175:11; 189:9; 197:13; 203:9; 204:9; 207:24; 208:3, 10; 219:14; 228:24
**minimization/ maximization** [4] - 162:14; 171:20; 185:25; 196:24
**minimize** [3] - 132:8; 161:18, 24
**minimized** [1] - 171:17
**minimizes** [1] - 161:10
**minimizing** [1] - 177:2
**minimum** [1] - 197:14
**minor** [17] - 22:10; 38:10, 13; 51:25; 52:5; 57:4; 60:17; 103:1; 107:1, 9; 115:24; 116:2, 6, 17; 117:3; 118:15; 122:19
**minors** [1] - 2:25
**minute** [2] - 21:10
**minutes** [16] - 24:12; 30:3; 31:24; 48:2; 49:22; 60:3; 84:5; 86:3; 103:3; 123:21; 200:5, 15; 233:23; 234:8
**Miranda** [28] - 13:23, 25; 15:12; 24:10; 44:25; 45:2; 49:19; 69:11, 19; 99:4, 9-10, 13; 148:2; 151:20; 194:19; 195:2; 218:13, 16; 219:2; 223:9, 13, 16, 20; 225:13; 238:5
**mirror** [1] - 35:8
**misconduct** [4] - 219:7; 226:6, 8; 236:16
**misconstrue** [1] - 57:16
**misleading** [1] - 207:9
**misperception** [1] - 140:11
**misremembering** [1] - 196:4
**missed** [1] - 221:23
**missing** [1] - 54:22
**Mission** [1] - 103:16
**mistakes** [1] - 144:11
**mitigated** [1] - 175:17
**mitigating** [3] - 174:10; 175:19; 179:13
**mitigation** [1] - 153:11
**mix** [1] - 202:12
**mixing** [2] - 211:2
**modern** [3] - 149:22; 216:23
**modified** [1] - 134:12
**molesting** [1] - 20:15
**moment** [8] - 23:8; 24:4; 39:2; 77:3; 161:16; 183:1; 190:5; 204:24
**moments** [1] - 233:23

**money** [2] - 132:15; 146:12
**monitor** [6] - 35:13; 69:18, 23; 70:3; 75:8; 125:22
**monitoring** [1] - 157:15
**monitors** [2] - 21:18; 75:4
**month** [2] - 42:21; 66:19
**months** [2] - 137:17; 169:22
**monumental** [1] - 236:9
**moot** [2] - 233:11, 18
**moral** [3] - 152:23; 153:19; 236:21
**morning** [9] - 2:1-3, 6; 8:18; 38:20; 43:14, 18; 79:2
**most** [31] - 3:6; 43:4; 51:10, 12; 71:20; 81:21; 82:15; 88:23; 115:13; 134:6; 138:21; 143:1; 145:25; 148:9, 13; 149:9; 155:18; 158:18; 160:5, 22; 164:25; 167:21; 168:8, 18; 197:25; 202:16; 208:9; 210:12; 235:17; 236:15
**mostly** [2] - 41:12; 102:25
**mother** [2] - 57:19; 122:14
**motion** [8] - 2:7; 5:1; 190:6, 9; 225:14; 233:11, 18; 238:6
**motions** [4] - 138:24; 190:4, 18
**motivating** [2] - 154:14
**motive** [1] - 185:12
**move** [7] - 16:2; 145:2, 6; 152:12; 165:24; 181:15; 221:14
**moved** [1] - 23:8
**moving** [1] - 23:24
**MR** [90] - 2:3, 16; 3:6, 16, 20; 4:7; 5:4, 18, 21; 7:5, 9, 15, 23; 8:1, 13, 17; 14:1, 3; 16:2, 9; 23:1; 24:4, 7; 25:7; 54:1; 64:16, 18; 65:10, 14, 23; 66:2; 77:3, 6; 85:10; 88:11; 91:7, 9, 17, 23; 92:2, 13, 15; 107:5; 110:16; 112:6; 117:10; 126:24; 127:8, 15; 128:13, 23; 129:1, 22; 140:18, 21; 165:4, 11; 187:6, 20, 22; 204:24; 205:2; 208:16; 209:23; 214:20, 23; 217:24; 218:6; 219:13; 220:23; 221:11; 222:1, 11, 23; 223:14, 23; 224:1, 6; 225:19, 24; 233:7; 234:6, 14; 237:23; 238:12; 239:19, 25; 240:19, 24
**MS** [66] - 2:2; 3:9; 4:1, 15, 18, 24; 5:6, 17; 6:11, 20, 25; 7:19; 16:5; 22:22; 25:11, 13; 54:6; 64:13; 77:9, 11; 85:12, 14; 88:14; 91:4; 110:19, 21; 112:8; 117:8, 13; 126:20; 127:20, 24; 128:9, 16; 129:11, 19; 130:2, 7; 140:14;

141:2; 165:3, 9, 12; 183:4, 9; 186:23; 208:19, 21; 210:1; 214:10, 14, 18; 226:5; 231:12, 20; 232:19, 24; 233:12, 20, 25; 238:16, 25; 240:3, 11, 14
**multiple** [4] - 164:1; 171:12; 178:5, 15
**murder** [2] - 153:17; 164:7
**must** [6] - 201:16; 224:9, 13; 225:20, 23; 232:22
**name** [14] - 5:8; 8:19; 9:24; 11:2; 26:20; 31:11; 66:3; 77:13, 15; 92:16; 123:7; 124:12; 148:13
**narrative** [9] - 143:21; 151:6; 162:1, 12, 16, 17; 184:3; 185:11, 14
**narrow** [2] - 179:20; 180:6
**narrowing** [1] - 196:23
**Native** [7] - 158:10; 191:22-24; 215:15
**nature** [11] - 75:1; 100:15; 106:3; 135:4; 207:22; 218:24; 220:7; 221:15; 223:7
**near** [3] - 34:17; 94:6; 193:14
**nearby** [1] - 11:2
**necessarily** [14] - 64:6; 153:24; 154:1; 160:1, 20; 165:13; 166:8; 182:25; 196:16; 201:20; 202:15; 204:14; 213:3
**necessary** [8] - 6:21; 106:8; 118:8; 165:21; 218:12; 219:7; 234:20; 237:6
**neck** [1] - 26:22
**need** [25] - 2:8; 3:18; 4:3, 5; 33:24; 61:25; 98:4-6; 111:21; 112:1; 113:22; 115:4; 165:18; 166:5; 183:2; 187:14, 16-17; 217:1; 233:5, 21; 238:22; 240:4, 11
**needed** [10] - 11:10; 19:12; 20:7, 12; 33:23; 50:1; 51:21; 62:13; 173:24; 240:6
**needs** [2] - 7:17; 240:2
**negative** [4] - 133:20; 163:16; 193:11; 224:3
**neighbor** [1] - 28:4
**nervousness** [1] - 199:15
**never** [30] - 51:5; 55:19; 67:25; 71:15; 85:2; 102:13; 114:15; 116:9; 120:19; 122:15; 124:3, 8, 10-11, 13; 139:8; 146:22; 152:13; 167:16; 174:24; 176:7; 178:25; 191:9, 12, 14; 204:15; 215:20
**New** [1] - 138:1
**new** [5] - 53:19; 136:7; 178:9; 202:14
**next** [10] - 3:11; 36:14;

53:6; 65:13; 67:20; 91:20, 25; 99:12; 166:16; 177:9

**Nielsen** [1] - 225:2

**night** [4] - 21:9; 78:5; 83:5

**nine** [1] - 213:20

**nobody** [5] - 44:6; 98:19; 113:13; 154:9; 167:25

**non** [3] - 183:24; 184:9, 11

**non-public** [3] - 183:24; 184:9, 11

**none** [5] - 165:9; 194:16; 195:4, 6; 225:6

**nonexistent** [1] - 171:7

**normal** [8] - 12:21; 17:13; 72:12; 157:21; 158:20; 199:6, 9; 232:3

**normally** [4] - 143:5, 13; 155:4; 210:8

**North** [3] - 10:14; 33:18; 42:6

**note** [4] - 5:20; 185:13, 20

**notes** [2] - 76:23; 98:12

**nothing** [12] - 17:14; 32:24; 33:4; 108:22; 117:25; 118:1; 126:21; 178:8; 194:23; 219:5; 233:8; 236:4

**notice** [2] - 4:20; 46:10

**notified** [1] - 3:13

**notifying** [1] - 4:21

**notion** [2] - 107:9; 216:19

**Number** [1] - 14:5

**number** [31] - 2:14, 22; 18:17; 19:10; 40:24; 41:6; 42:8, 17; 49:24; 50:1; 99:15; 103:13; 134:18; 135:3; 137:17, 24; 149:3; 150:18, 23; 153:23; 172:4; 173:11; 178:23; 212:8; 226:21; 227:14; 235:16

**nutshell** [1] - 154:13

**object** [3] - 7:5, 13; 209:23

**objecting** [1] - 6:14

**objection** [17] - 3:8; 16:4; 22:22; 54:1; 85:10, 13; 88:11; 112:6; 117:9; 128:12; 129:23; 140:17, 22; 165:8; 209:24; 239:9, 15

**objections** [2] - 239:10, 17

**objects** [1] - 233:17

**observe** [11] - 13:15; 21:24; 22:2; 24:21; 69:20; 70:1; 76:6, 15; 101:10; 103:19; 164:10

**observed** [8] - 21:18; 35:9; 68:14; 69:23; 75:17; 189:2; 196:22

**observing** [4] - 17:22; 19:5; 45:14; 70:10

**obstructed** [1] - 216:10

**obstructing** [1] - 110:11

**obtained** [3] - 225:9, 21; 226:1

**obtaining** [1] - 237:11

**obviously** [5] - 40:12; 136:6; 172:23; 211:20; 230:3

**occasion** [4] - 137:15; 138:12; 174:6

**occasions** [3] - 137:24; 138:9; 139:3

**occupation** [1] - 130:8

**occur** [7] - 143:4, 8; 144:1; 162:18; 163:16; 176:18

**occurred** [5] - 170:21; 182:24; 184:4; 193:15; 212:11

**occurring** [1] - 93:3

**occurs** [1] - 142:21

**odor** [1] - 24:21

**offends** [1] - 236:21

**offer** [4] - 87:19; 102:14; 106:5; 208:11

**offered** [17] - 19:10; 49:25; 50:15; 118:6; 128:24; 197:8; 207:17; 216:14; 217:23, 25; 223:3; 231:19; 239:13

**offering** [3] - 193:25; 207:5; 233:3

**offers** [2] - 208:2, 13

**offhand** [1] - 123:8

**office** [6] - 35:12, 24; 45:13, 20; 62:22; 240:5

**Office** [2] - 9:6

**officer** [15] - 32:8, 10; 41:21; 59:2; 108:15, 24; 115:5, 11; 119:7, 9, 11, 13, 16; 179:5, 18

**Officer** [14] - 5:11, 15; 25:21, 23; 29:6; 30:20; 38:3; 39:13; 43:8; 55:2; 63:10; 65:11; 83:22; 126:4

**Officers** [1] - 10:25

**officers** [36] - 18:7; 19:1, 11; 24:9; 26:16; 27:10; 28:12; 29:4, 19; 30:22, 24; 32:6; 44:23; 46:11; 54:8; 59:3; 76:22; 89:24; 108:9; 110:14; 114:16, 18; 115:4, 13; 120:2; 121:3; 137:5; 144:6; 176:6, 12; 177:9; 178:19; 217:13; 219:24; 221:13; 223:7

**officers'** [1] - 221:12

**official** [1] - 77:20

**often** [16] - 120:4; 140:9; 141:20; 157:6; 158:4; 162:6, 23-24; 168:17; 179:4; 184:17; 185:10; 186:6; 197:22; 199:24

**oftentimes** [7] - 166:12; 179:12; 183:14; 195:12, 14; 209:16

**old** [2] - 141:6; 213:21

**once** [25] - 11:23; 20:10; 28:17; 30:1; 31:22, 24; 44:23; 45:18; 46:5; 47:17; 48:21; 52:18, 22; 53:13;

58:24; 67:25; 96:23; 103:11; 106:17; 143:12; 147:15; 197:17; 227:5

**one** [116] - 10:22; 11:25; 18:5; 22:24; 24:14; 28:3; 29:3, 17; 33:12, 15, 24; 34:23; 36:5; 42:9, 21; 43:23; 47:6, 9, 12; 48:13; 50:2; 52:4; 53:23; 59:10; 60:14; 68:5; 80:6; 81:3; 83:21; 84:19; 90:1, 20; 93:7; 96:24; 97:7, 9, 11; 98:14; 99:10; 101:1; 103:12; 108:14; 112:21; 114:22; 115:5; 121:2, 5; 122:3, 7; 136:15; 137:15; 138:12, 24; 139:14; 142:7; 146:13; 147:9; 149:5; 156:13, 25; 158:16; 160:17; 163:4, 7, 25; 164:11, 21; 167:24; 171:3; 172:7; 174:6; 177:6, 10; 178:6, 16-17, 21-22; 179:1, 25; 180:21; 182:2, 19; 185:9; 188:9, 19; 191:18; 193:14; 194:5; 195:18; 201:24; 204:2; 210:4, 10, 17; 216:10; 217:22; 218:1; 224:8; 227:3, 12; 228:6; 230:3; 232:10; 233:1; 237:18

**one-on-one** [2] - 122:3, 7

**one-third** [1] - 138:24

**ones** [2] - 148:7; 210:12

**ongoing** [2] - 11:10; 136:20

**open** [8] - 32:17; 73:11; 111:17; 112:16; 142:24; 196:6; 212:10

**open-ended** [2] - 142:24; 196:6

**opened** [1] - 12:22

**opening** [1] - 67:19

**operational** [1] - 72:2

**opinion** [15] - 17:14; 23:7, 11; 60:23; 176:22; 185:22, 24; 190:23; 191:1; 194:1; 199:13; 207:5, 18; 208:23

**opinions** [1] - 193:25

**opponent** [3] - 140:2, 8, 12

**opponents** [1] - 139:24

**opportunities** [1] - 102:14

**opportunity** [15] - 59:11; 70:1; 71:2, 16; 96:14; 106:6; 152:13; 179:2, 25; 180:8; 190:23; 197:9; 198:6; 216:8

**opposed** [2] - 139:11; 207:12

**opposite** [3] - 36:17; 209:21; 217:12

**optimistic** [1] - 65:14

**option** [3] - 110:22, 25; 111:2

**options** [4] - 179:17, 21; 180:6; 196:23

**oral** [1] - 43:12

**orally** [1] - 39:10

**order** [8] - 33:23; 111:20; 154:20; 173:5; 175:2; 177:22; 185:15; 223:21

**ordered** [2] - 3:10; 240:9

**ordering** [1] - 240:10

**organization** [1] - 107:19

**organizational** [1] - 131:1

**organizations** [3] - 134:24; 137:8

**oriented** [1] - 41:1

**original** [1] - 239:23

**originality** [1] - 133:15

**originals** [1] - 239:22

**Oswalt** [9] - 9:25; 10:2; 28:5; 29:3, 6; 30:20; 94:5, 23; 95:1

**otherwise** [6] - 17:7; 19:9; 21:21; 169:18; 218:15; 221:9

**ourselves** [1] - 64:3

**outcome** [5] - 169:4; 172:18; 176:18; 180:8

**outlandish** [1] - 224:21

**outlined** [1] - 195:19

**outlines** [1] - 225:3

**outrageous** [2] - 224:21; 236:20

**outright** [2] - 195:16; 200:14

**outside** [10] - 19:2; 30:15; 35:23; 42:4, 7; 88:4; 110:8; 142:7; 219:23

**outward** [1] - 23:14

**outweigh** [2] - 224:13, 17

**outweighs** [1] - 236:23

**overabundance** [1] - 108:15

**overbear** [4] - 167:12; 219:20, 22; 220:13

**overbearing** [1] - 156:3

**overborne** [4] - 206:21; 215:3; 226:13; 235:13

**overcome** [7] - 172:23; 173:5; 177:14, 21-22, 25; 199:22

**overcoming** [1] - 173:2

**overreach** [4] - 235:1; 236:10, 17; 237:6

**overridden** [1] - 235:24

**override** [1] - 219:7

**overruled** [3] - 22:23; 54:3; 88:12

**overwhelming** [1] - 134:12

**own** [5] - 41:13; 64:5; 190:23; 200:8

**p.m** [5] - 10:10; 26:4; 96:20; 187:9

**pace** [1] - 101:13

**pacing** [3] - 17:19; 198:10; 212:2

**pack** [1] - 166:16

**page** [7] - 5:10, 12, 15-16;

182:8, 10; 196:5

**pages** [1] - 151:15

**pain** [1] - 101:11

**pair** [1] - 68:20

**pale** [1] - 235:4

**paper** [5] - 59:23, 25; 106:9; 188:13; 189:5

**papers** [3] - 133:4; 188:6, 9

**paperwork** [3] - 88:23; 96:15; 190:2

**paralegals** [1] - 137:9

**parameters** [1] - 228:1

**pardon** [3] - 16:11; 22:18; 120:21

**parent** [1] - 3:13

**parrot** [1] - 184:17

**part** [44] - 2:17; 4:2; 34:3; 41:21; 50:4; 54:8; 57:19; 61:9; 82:15, 18; 85:4, 7; 89:18, 23; 113:22; 118:12; 119:18; 120:13; 122:14, 16; 128:11; 131:12; 136:1; 141:7; 145:25; 148:17; 154:5, 23; 156:10; 165:21; 168:20; 174:23; 176:9; 179:19; 183:5; 211:9; 218:9; 221:15; 226:15; 229:18; 230:10; 235:5

**partially** [2] - 180:17

**participant** [1] - 107:10

**participate** [4] - 88:24; 109:16; 156:4; 179:18

**participated** [1] - 229:15

**particular** [38] - 15:8; 37:10; 42:22; 72:25; 96:1; 99:12; 107:23; 115:22; 129:14; 131:25; 134:22; 136:12, 22; 137:1, 4; 143:3; 147:10; 150:18; 151:3; 154:3; 155:25; 164:12; 169:1; 170:11; 174:25; 185:25; 186:18; 194:5; 198:24; 200:23; 208:3; 210:24; 212:16, 25; 214:7; 230:13; 232:10

**particularly** [8] - 133:11; 149:7; 151:2; 156:15; 157:14; 159:11; 195:17

**parties** [4] - 2:25; 161:18; 184:18; 238:22

**parties'** [1] - 2:11

**parts** [1] - 122:20

**party** [5] - 5:2; 185:15; 190:4; 238:8; 240:23

**party's** [1] - 5:8

**pass** [2] - 67:18; 84:15

**passenger** [1] - 32:20

**passing** [1] - 116:24

**passivity** [1] - 158:12

**past** [2] - 41:3; 64:19

**patrol** [8] - 10:24; 27:3; 28:23; 29:4, 17; 32:16; 95:19; 119:13

**pattern** [1] - 181:9

**patterns** [1] - 210:18

**pause** [3] - 17:3; 37:11; 100:1

**pay** [3] - 132:14; 205:15

**PD** [2] - 23:22; 31:23

**peer** [15] - 133:9, 18-19; 134:7, 10-12, 14; 135:10, 22; 150:5, 12, 23

**peer-reviewed** [4] - 133:9; 135:10, 22; 150:5

**peers** [1] - 133:14

**pen** [1] - 59:22

**pencil** [1] - 106:9

**pending** [1] - 3:21

**penetrated** [1] - 182:18

**penetration** [7] - 86:7, 9, 13; 103:10; 171:13; 177:1

**penile** [4] - 86:12; 171:14; 177:1; 208:5

**penis** [5] - 85:25; 86:4, 8; 87:10; 182:10

**people** [64] - 14:10; 40:21; 41:4; 54:8; 59:8; 63:19; 89:20; 90:21; 91:15; 108:15; 136:7, 12; 146:16; 147:5; 148:9, 13; 149:12, 14; 150:20; 152:16; 153:15; 154:23; 155:7; 156:14, 19; 157:3, 9, 13, 16, 25; 158:3; 159:9; 162:10; 163:6; 164:7; 167:7; 168:8, 18; 171:15; 174:7; 175:14; 176:14; 178:2; 179:4; 181:20; 192:12; 197:18; 198:3; 199:15, 19; 201:11, 17; 206:8; 209:2; 211:3, 17-18; 217:6, 11; 226:16; 227:11; 229:25; 230:21

**perceive** [7] - 155:22; 159:9; 161:19; 167:14; 171:16; 174:7; 176:14

**perceived** [2] - 159:12; 162:5

**perceiving** [2] - 155:23; 175:20

**percent** [3] - 157:8; 158:19; 206:5

**perception** [8] - 71:20; 73:13; 159:7; 167:12; 179:20; 185:7; 203:25

**perceptions** [1] - 149:8

**performed** [1] - 191:17

**perhaps** [3] - 57:9; 136:21; 231:3

**period** [15] - 17:21; 18:23; 52:14; 70:15; 75:11; 76:25; 98:16, 20, 22; 105:3; 125:18; 200:6, 14; 216:11; 217:8

**periods** [1] - 104:20

**permeated** [1] - 146:10

**permits** [1] - 165:1

**permitted** [2] - 13:2; 168:14

**pernicious** [1] - 226:15

**perpetrator** [4] - 185:1; 193:20; 213:14

**person** [40] - 14:23; 24:22; 35:23; 43:25; 79:17; 89:19; 112:20; 120:14; 143:1; 144:1; 146:8, 15; 147:15, 17; 153:13; 154:7, 21; 155:4; 175:20; 179:9, 17; 183:18; 184:25; 193:21; 194:5; 198:1, 19; 199:4; 209:2; 211:6, 16; 216:4; 229:14; 230:2, 16-17; 234:23

**person's** [3] - 159:8; 178:9; 213:1

**personal** [4] - 44:14; 74:17; 152:18; 181:7

**personality** [2] - 149:11; 158:11

**personally** [6] - 38:4; 50:17; 51:1; 65:1, 3; 110:1

**persons** [3] - 144:2; 192:9; 215:24

**perspective** [1] - 194:14

**persuade** [2] - 152:21; 159:17

**persuasion** [6] - 143:16; 149:7; 165:19; 166:2, 7

**pertains** [3] - 2:11; 3:11; 120:16

**PhD** [4] - 128:4; 131:7, 12

**philosophizing** [1] - 149:21

**phone** [21] - 12:3; 13:3; 47:11; 48:22; 74:18; 77:1; 82:25; 98:23, 25; 99:15; 106:4; 109:20, 22; 112:18, 23; 113:4; 118:8; 216:16; 217:7; 223:2; 227:25

**phonetic** [1] - 11:1

**photo** [1] - 183:21

**photos** [1] - 168:12

**phrase** [1] - 194:8

**physical** [11] - 43:4; 76:6; 100:5; 141:7, 18-20; 142:4; 160:21, 23; 215:21

**physically** [10] - 56:17, 20; 76:1; 108:5; 110:11; 122:24; 123:2; 142:6; 176:9; 193:16

**pick** [2] - 43:20; 123:4

**picked** [6] - 20:6, 25; 21:2; 43:15; 114:9; 212:21

**picking** [4] - 62:9; 114:1, 6; 172:10

**piece** [1] - 59:22

**pieces** [2] - 105:12; 117:16

**Pierce** [1] - 119:16

**place** [8] - 15:10; 32:3; 38:15; 78:9; 103:15; 104:17; 207:23; 227:22

**placed** [18] - 11:12, 14, 25; 32:15, 20; 36:7, 10, 14; 37:7, 9; 68:25; 69:14; 76:18; 83:14; 95:19; 108:6; 216:9;

229:11

**places** [3] - 77:24; 173:11; 174:7

**plain** [1] - 26:21

**plan** [15] - 27:11; 37:15, 17; 46:5, 7; 54:9; 72:1; 81:6, 16; 85:5, 7; 107:19; 115:17; 172:22; 233:16

**planned** [1] - 153:17

**planning** [1] - 4:2

**plans** [1] - 47:5

**play** [5] - 176:10; 177:8; 212:25; 213:2; 231:25

**played** [1] - 219:18

**playing** [1] - 176:25

**plenty** [1] - 210:15

**ploy** [4] - 182:3; 206:4, 14; 229:13

**ply** [1] - 195:21

**point** [63] - 19:25; 20:22; 29:13; 36:22; 37:3; 45:6; 46:10, 22; 50:2; 55:12, 14; 57:18; 58:17; 69:1; 71:2; 72:4, 17, 21; 74:10; 79:9, 20; 80:21; 81:5; 82:1; 83:18; 85:21; 86:2; 87:1, 14; 88:16; 89:1; 90:7; 93:19; 96:6; 99:1; 102:6; 104:7; 109:8; 118:4; 121:6; 122:13; 123:24; 125:13; 133:1, 7; 137:25; 138:19; 143:25; 147:1; 150:17; 165:23; 170:15; 178:10; 213:15, 21; 218:17; 220:18; 223:8; 234:2; 237:18

**pointed** [1] - 222:2

**points** [2] - 16:13; 193:8

**Police** [23] - 8:23; 9:1, 9; 10:25; 11:9, 17, 20, 23; 12:19; 14:7; 27:3; 59:7; 61:20; 64:19; 66:10; 77:23; 78:5, 7; 92:23; 98:1; 110:3; 137:20; 188:9

**police** [181] - 9:18; 11:22; 12:23; 13:5, 11, 13; 20:10; 21:5; 26:16; 27:19; 30:8; 33:13, 15; 34:1, 8, 13, 15, 17; 40:3; 41:21; 42:3, 5; 44:7; 46:6; 49:12, 16; 52:4; 61:20; 62:4, 14; 67:10, 17; 71:13; 79:10; 89:5, 24; 90:4, 14, 16, 18; 111:14; 113:5, 10, 12, 14-16, 19, 22; 114:9; 118:19; 120:2, 24; 124:15; 125:3; 130:24; 131:1, 17; 134:4; 137:5, 8, 14, 16; 138:7; 139:11, 20, 23-24; 140:2, 8, 12-13, 15; 141:4, 12, 14; 142:4, 17; 143:6, 11; 144:5, 11, 22; 145:15, 19, 25; 146:10, 18; 147:2, 14, 18; 148:2, 20, 25; 149:15; 151:4; 152:10, 21; 153:4, 6, 9; 155:7; 158:5, 7; 161:8;

164:19, 25; 165:1, 21;
166:12, 15, 20, 23; 167:4;
168:9, 14, 16, 18, 20;
170:14, 17; 173:17; 175:5;
178:12; 181:16, 19; 183:10,
12, 14-15, 18-19; 184:8, 14;
185:1, 3, 10; 191:20, 25;
192:9; 194:2; 195:25;
201:16; 212:22; 215:14;
216:6; 218:12, 24; 219:1, 7;
220:10, 12; 222:19; 223:4;
224:20; 225:11; 226:6;
227:10; 228:12, 21; 230:12;
234:20; 235:1, 5; 236:9, 14,
16; 237:2, 6, 11

**policing** [2] - 137:18

**policy** [2] - 108:18; 131:20

**polite** [1] - 222:24

**polo** [1] - 26:19

**polo-type** [1] - 26:19

**polygraph** [16] - 46:19, 22;
47:22; 55:11; 83:3; 118:5,
10; 205:18, 25; 206:2, 10,
18; 209:11, 18; 210:2;
228:15

**polygraphed** [1] - 209:13

**polygrapher** [7] - 47:5,
15-16, 19; 52:10, 23; 82:17

**polygraphers** [1] - 47:10

**polygraphs** [2] - 206:8

**population** [2] - 157:8, 21

**porch** [1] - 30:18

**portion** [6] - 15:10; 99:14;
102:24; 104:1; 116:4; 144:13

**portions** [1] - 200:4

**position** [7] - 3:4; 9:8;
78:13; 129:20; 225:18;
232:17; 233:6

**positive** [1] - 133:21

**possible** [4] - 85:23; 199:1;
212:11; 213:16

**possibly** [2] - 212:25;
224:18

**potent** [2] - 156:2; 167:11

**potential** [2] - 142:23;
223:6

**potentially** [1] - 153:17

**practices** [1] - 148:5

**practicing** [1] - 132:10

**pragmatic** [2] - 163:1, 9

**pre** [2] - 153:16; 162:11

**pre-medicated** [1] - 153:16

**pre-meditated** [1] - 162:11

**prefer** [3] - 77:15; 87:15;
143:7

**preliminarily** [2] - 6:10, 23

**preliminary** [4] - 2:8, 10;
3:11; 4:4

**preparation** [1] - 64:5

**prepare** [2] - 63:25; 71:25

**prepared** [4] - 63:13; 64:7;
65:6; 216:9

**preponderance** [6] -

225:19; 226:1; 234:16, 18;
238:2

**presence** [6] - 15:21; 18:9;
99:4; 100:16; 221:1; 235:10

**present** [36] - 3:16; 6:12;
7:14; 13:8, 11; 15:19; 18:2,
8; 19:2; 21:13, 17; 29:21;
30:23; 40:11, 15; 63:20;
67:4, 7, 10; 75:4, 16; 87:23;
98:8; 108:10; 127:18;
131:21; 136:19; 137:11;
181:5, 14, 21; 185:18;
201:13; 225:6; 228:24;
233:16

**presentation** [2] - 3:18;
6:24

**presentations** [2] - 136:12,
16

**presented** [3] - 4:18; 49:20;
137:4

**pressure** [24] - 143:15;
147:12; 152:9, 16, 18;
158:25; 165:14, 19-20;
166:2, 6; 177:18, 20, 24;
178:22-24; 185:10; 202:8,
10; 211:7, 18

**pressuring** [2] - 181:16;
184:2

**presume** [3] - 183:18;
186:10; 239:23

**presumed** [2] - 143:23;
151:7

**presuming** [1] - 173:15

**presumption** [3] - 172:7;
173:8; 228:23

**presumptive** [4] - 170:16;
172:11; 183:17; 196:13

**pretend** [2] - 152:6; 168:9

**pretrial** [2] - 138:24; 186:16

**pretty** [9] - 19:18; 48:3;
53:8; 101:9; 145:18, 23;
189:6, 10; 231:14

**prevent** [1] - 138:5

**previous** [1] - 9:3

**previously** [4] - 4:8;
127:18; 130:19; 172:5

**primarily** [13] - 132:19;
135:13; 137:2; 141:11, 19;
142:1; 143:11; 144:14;
149:2, 14; 168:17; 190:12;
204:8

**primary** [8] - 132:4; 149:3;
151:5; 166:10, 23; 167:3;
207:21

**principles** [2] - 135:25;
236:21

**private** [1] - 122:19

**privy** [1] - 116:3

**pro** [2] - 140:4; 159:13

**probative** [1] - 233:9

**problem** [6] - 132:7;
174:13; 175:10; 184:15;
226:15; 230:11

**problematic** [1] - 202:19

**procedure** [1] - 130:17

**procedures** [1] - 140:5

**proceed** [10] - 8:15; 12:20;
14:25; 65:22; 92:12; 94:25;
127:21; 141:1; 196:22; 218:5

**proceeded** [1] - 12:4

**proceeding** [2] - 91:21;
187:16

**proceedings** [3] - 17:8;
105:13; 216:18

**process** [20] - 21:14; 73:25;
100:2; 101:16; 107:12, 15;
109:9; 115:21; 134:14;
143:9; 144:1; 149:10;
150:13; 151:12; 155:21;
164:24; 167:14; 168:22;
215:22

**produce** [3] - 109:1;
186:11; 225:25

**produced** [2] - 106:11;
145:13

**product** [1] - 236:9

**professional** [4] - 134:25;
136:16; 137:1; 222:24

**professionals** [2] - 136:24;
148:19

**professor** [3] - 130:9, 19;
187:11

**Professor** [3] - 140:23;
187:4; 214:12

**professors** [1] - 135:15

**proffered** [1] - 129:17

**profusely** [1] - 198:12

**program** [1] - 131:9

**progressed** [1] - 75:8

**promise** [27] - 55:19, 22,
24; 56:2; 159:10, 13; 160:11,
16; 163:20; 169:13; 174:23;
175:1-3, 18-19; 176:14,
16-17; 177:5; 179:11-13;
180:5; 195:9; 228:25

**promised** [2] - 174:24

**promises** [37] - 21:20;
55:16, 18; 56:3; 76:12, 16;
105:4; 156:1; 159:2, 4-5, 15;
160:5, 8; 163:13; 167:10;
169:15; 175:7; 176:13, 20;
186:5; 189:9; 195:8, 13, 17;
202:18, 21-22; 203:1;
207:25; 208:12; 218:21;
222:16, 18; 225:10; 228:22;
229:1

**promising** [1] - 160:4

**prompted** [1] - 235:22

**proof** [2] - 225:17; 232:17

**prop** [1] - 206:11

**proper** [1] - 206:2

**prophylactic** [2] - 219:3;
223:17

**prosecute** [3] - 147:5;
167:3; 173:7

**prosecution** [6] - 139:2, 6;

143:22; 166:14; 167:2;
175:25

**prosecution's** [1] - 161:22

**prosecutor** [2] - 121:14;
162:10

**prosecutors** [3] - 139:9;
162:7; 194:2

**protections** [1] - 236:22

**protocols** [1] - 206:2

**prove** [5] - 193:10, 13;
194:10; 225:20

**proven** [10] - 158:23;
184:21; 193:7, 9, 12; 194:8;
206:4; 210:24; 213:10

**provide** [10] - 106:8;
120:14; 158:15; 169:24;
181:16; 184:9; 185:4, 11;
209:9; 232:22

**provided** [26] - 4:21; 19:14;
38:9; 39:15, 22; 43:12, 14;
50:13; 62:24; 63:4; 80:25;
99:8; 169:25; 170:1-4;
191:3, 7; 205:16; 221:8;
230:13

**providing** [2] - 183:16;
239:5

**province** [1] - 186:15

**provoked** [1] - 161:17

**psychiatrists** [1] - 137:10

**psychological** [53] - 74:20;
100:5; 132:6; 138:8; 140:16,
24; 141:10-12, 20, 23;
142:1, 3; 143:16; 146:19;
148:7; 151:11; 152:24;
153:19; 155:2, 16, 20; 156:6,
22; 163:24; 165:14; 167:6, 8,
18, 22; 168:20; 169:14;
175:7; 186:6, 17, 19; 191:17,
21; 192:25; 207:5, 9, 11;
208:23; 211:10; 214:8;
223:6; 226:10, 18-19; 229:7;
230:1; 237:13

**Psychological** [1] - 135:2

**psychologically** [16] -
122:25; 155:18; 156:1;
169:9, 11, 19; 180:22;
185:23; 186:18; 199:5;
202:24; 207:1, 22; 211:20;
219:12; 223:10

**psychologist** [1] - 175:10

**psychologists** [6] - 137:10;
149:10; 156:10; 157:24;
159:5

**psychology** [22] - 130:9,
19; 131:2, 10, 19; 132:5;
135:18; 147:3; 148:15;
149:2, 4-5; 150:16; 151:3;
154:5, 12; 159:6; 164:22;
211:14

**psychosocial** [2] - 156:16,
23

**public** [8] - 33:20; 111:17;
131:20; 137:4; 150:8;

183:24; 184:9, 11
**publication** [4] - 130:13; 133:10; 134:2, 5
**publications** [7] - 133:24; 134:6, 13, 22; 135:12; 150:6, 18
**publish** [1] - 188:13
**published** [6] - 131:24; 132:22; 134:9; 175:13; 188:6; 210:11
**publishing** [3] - 135:16; 150:8
**pull** [1] - 112:15
**punished** [2] - 179:9
**punishment** [2] - 161:23; 175:16
**pure** [1] - 180:16
**purported** [2] - 116:10
**purportedly** [1] - 115:22
**purpose** [11] - 12:13; 14:9; 46:12; 53:16; 54:19; 108:12, 17; 115:19; 127:1, 5; 224:15
**purposes** [5] - 4:2, 13; 108:20; 221:20; 223:13
**push** [1] - 136:7
**pushing** [1] - 229:16
**put** [21] - 4:3; 32:20; 37:2; 81:15; 99:11; 133:4; 140:3; 141:14; 145:14; 146:4; 151:18; 152:15; 166:4; 167:17; 178:13, 17; 212:18; 217:12; 222:1; 228:2
**puts** [1] - 166:1
**putting** [4] - 44:12; 152:9, 18; 190:21

**Q**

**qualification** [1] - 155:6
**qualifications** [2] - 6:15; 150:24
**qualified** [1] - 138:17
**qualify** [1] - 200:23
**quality** [6] - 133:15; 134:1, 4; 139:17; 188:3
**quantify** [2] - 203:5, 7
**quarrel** [1] - 26:4
**questioned** [5] - 16:18; 45:1; 62:2; 211:6, 11
**questioning** [17] - 8:11; 14:10; 22:13; 24:1; 38:2; 41:17; 46:22; 53:2, 10; 56:23; 88:25; 93:18; 183:6; 196:6; 211:4; 221:25; 222:3
**questions** [51] - 11:11; 13:22; 16:12; 17:1, 10; 25:7; 31:8; 32:22, 25; 33:5, 7; 37:20, 23; 46:8; 52:24; 54:22; 64:14; 65:10; 70:6, 20; 77:6; 82:5; 84:8, 19; 91:5, 17; 98:19; 99:23; 101:20; 106:2; 110:16; 120:14; 124:16, 24; 125:10; 127:8; 130:2, 4; 140:19; 142:24; 151:13; 165:18; 186:25; 189:18; 200:10;

203:22; 208:16; 213:9; 214:11; 216:14
**quickly** [1] - 156:9
**quid** [1] - 159:13
**quietly** [1] - 199:19
**quite** [3] - 119:23; 120:6; 146:11
**quo** [1] - 159:14
**quotes** [1] - 201:5
**quoting** [1] - 222:11

**R**

**radio** [2] - 28:12
**raise** [7] - 25:5; 75:23; 108:2; 152:11; 164:23; 227:6; 237:3
**raised** [1] - 171:3
**ramping** [1] - 201:17
**ran** [1] - 216:12
**randomized** [1] - 164:10
**range** [1] - 138:21
**rape** [4] - 164:7; 176:25; 197:4; 208:6
**rapist** [1] - 171:14
**rapport** [8] - 41:4; 43:25; 91:12; 151:19; 168:21; 170:14; 196:1, 10
**rare** [3] - 139:5, 7; 142:2
**rarely** [1] - 175:6
**rate** [1] - 205:3
**rather** [3] - 198:18; 203:22; 212:7
**re** [1] - 165:6
**re-call** [1] - 165:6
**reach** [1] - 216:25
**reached** [1] - 83:4
**react** [1] - 211:18
**reaction** [2] - 199:9
**read** [17] - 13:24; 14:18; 15:13; 39:9; 69:18; 86:17; 90:4; 99:9; 117:20; 142:5; 144:12; 148:13, 21; 175:5; 190:22; 194:20
**readily** [3] - 118:9; 209:13; 228:15
**reading** [10] - 44:25; 71:18; 84:7, 10; 86:16, 21; 99:11, 13; 117:16; 121:10
**reads** [2] - 164:11
**ready** [1] - 214:21
**real** [4] - 28:4; 71:15; 152:3; 172:1
**reality** [2] - 157:15; 159:9
**realizing** [1] - 183:16
**really** [19] - 29:10; 40:10; 54:5; 104:6; 117:15; 134:2, 19; 139:16; 148:21; 153:6; 154:13; 155:9; 174:20; 177:16; 196:5; 205:25; 210:10; 232:8; 236:7
**reason** [17] - 20:16; 26:12; 72:25; 76:8; 82:2; 87:21; 88:24; 112:23, 25; 113:22; 132:20; 165:21; 193:23;

201:22; 206:8; 208:25; 219:1
**reasonable** [1] - 193:14
**reasonably** [1] - 147:16
**reasons** [5] - 112:21; 132:20; 148:9; 156:14; 164:6
**rebuttal** [2] - 214:19; 234:13
**recap** [1] - 106:3
**receive** [9] - 134:18; 144:7; 146:18; 147:18; 159:23; 161:23; 175:16
**received** [4] - 4:20; 5:22; 134:17
**recently** [4] - 42:18, 21; 118:18; 137:6
**recess** [7] - 91:22, 24; 187:8, 16; 233:22; 234:7, 9
**recognize** [1] - 138:4
**recognized** [1] - 136:5
**recollection** [6] - 117:6, 14; 195:3; 197:16; 200:9; 218:7
**recommendation** [1] - 237:22
**Recommendations** [3] - 188:10
**recommendations** [4] - 188:15, 19; 189:5, 11
**recommended** [1] - 188:24
**record** [12] - 3:2; 4:12; 6:3, 16; 66:4; 92:16; 129:25; 198:25; 234:5; 236:4; 239:11; 240:21
**recorded** [3] - 11:25; 18:19; 164:2
**recording** [7] - 12:4, 10; 18:21; 35:11; 94:12; 108:17
**recreate** [1] - 164:4
**rectangles** [1] - 216:24
**red** [1] - 181:22
**redact** [1] - 240:19
**redacted** [1] - 2:18
**redaction** [1] - 2:17
**redefined** [1] - 174:9
**redirect** [5] - 64:15; 91:6; 126:22; 127:9; 208:18
**REDIRECT** [4] - 64:17; 91:8; 126:23; 208:20
**reduce** [2] - 188:16; 202:9
**reduced** [1] - 174:14
**reentered** [1] - 106:2
**refer** [5] - 63:14; 139:25; 155:25; 180:18; 238:18
**reference** [9] - 11:9; 19:22; 34:15; 83:1; 146:2; 182:7; 201:4; 231:11; 237:19
**referenced** [7] - 4:9; 20:7, 13; 51:17, 19-20; 217:22
**references** [8] - 2:24; 57:9; 176:24; 182:6, 14; 186:1; 208:3; 238:17
**referencing** [1] - 184:24
**referred** [9] - 39:24; 51:17,

23; 63:16; 79:17; 139:24; 140:12; 157:15; 171:11
**referring** [4] - 67:6; 146:3; 147:8; 239:12
**reflected** [2] - 60:4; 240:10
**refresh** [3] - 108:20; 117:6, 14
**refuse** [1] - 15:2
**refused** [1] - 192:12
**regard** [11] - 3:5; 129:22; 130:1; 155:16; 169:10; 174:21; 215:13; 233:10; 238:24; 239:2
**regarded** [1] - 195:13
**regarding** [20] - 20:11; 21:21; 33:4; 61:20; 62:5; 63:8, 15; 76:13; 81:7; 85:25; 90:17; 91:2; 109:1; 114:5, 8; 116:17; 167:11; 215:12; 225:18; 233:4
**regards** [4] - 20:19; 47:8; 132:23; 240:3
**Reid** [22] - 42:9, 11; 145:11, 13, 17-18, 23-24; 146:2, 8-9, 11; 147:10, 14; 152:16; 154:25; 155:7; 164:21, 24; 173:16; 202:4; 211:13
**REID** [2] - 42:12; 145:12
**reject** [1] - 133:17
**related** [7] - 32:24; 41:16; 46:8; 137:19; 163:1, 3
**relation** [1] - 97:12
**relatively** [1] - 217:14
**relax** [3] - 44:9; 201:7; 202:3
**relaying** [1] - 178:6
**relays** [1] - 178:14
**release** [2] - 98:14; 165:10
**released** [2] - 141:9; 165:5
**relentless** [2] - 227:15; 229:24
**relevant** [2] - 148:4; 150:1
**reliability** [4] - 180:16, 18; 184:12; 203:17
**reliable** [3] - 139:18; 180:19; 203:25
**rely** [2] - 113:23; 231:22
**relying** [2] - 109:5; 113:7
**remainder** [1] - 105:22
**remains** [1] - 8:14
**remedies** [1] - 224:23
**remedy** [8] - 224:7, 11; 230:9; 236:12; 237:7, 9
**remember** [36] - 4:25; 16:12; 45:8; 48:3; 57:3, 12, 14-15, 18, 23; 61:9; 68:18; 77:18; 82:17; 84:23; 85:24; 86:5; 87:5, 11, 17-18; 95:9; 96:8, 10; 101:25; 112:12; 121:15, 23; 122:18; 123:6; 124:5; 125:16; 165:23; 191:4; 231:12, 17
**remembering** [1] - 199:2

**remorse** [2] - 23:3; 185:12
**remove** [2] - 102:3; 143:20
**removed** [1] - 192:13
**render** [10] - 218:18, 22;
219:8; 220:14; 221:2, 19;
222:19; 235:7, 11
**rendered** [1] - 218:14
**renders** [1] - 236:10
**repeat** [4] - 177:20; 181:4;
201:24; 204:4
**repeated** [5] - 176:24;
182:6, 14; 186:1; 208:3
**repetition** [2] - 154:3; 166:6
**rephrase** [2] - 104:10;
107:8
**replaced** [1] - 141:9
**reply** [4] - 5:1; 6:13; 128:11;
239:15
**report** [34] - 62:5, 7, 14;
63:8; 70:20, 22; 84:7, 15;
86:14, 16-18, 21; 90:16,
18-19, 22; 91:1; 109:1, 3;
113:8; 11-12, 14-16, 19, 22;
114:5, 8; 116:1, 16-17, 23
**reporter** [3] - 8:19; 66:7;
92:17
**Reporting** [1] - 62:21
**reports** [23] - 38:3; 39:24;
43:11; 61:20; 63:14; 71:2, 6,
9, 17-18; 79:10, 21-22, 25;
84:10, 13; 90:4; 96:15;
191:21; 192:25
**representations** [1] -
168:15
**representative** [1] - 7:8
**represented** [4] - 157:1;
158:22; 182:11
**representing** [3] - 154:16;
169:2; 182:22
**request** [8] - 7:10; 15:1, 3,
5; 18:6; 50:5; 73:21; 190:7
**requested** [3] - 9:16; 38:6;
39:4
**require** [1] - 12:25
**required** [1] - 166:2
**requirements** [1] - 190:13
**requires** [4] - 12:24; 148:3;
224:12, 22
**requisite** [3] - 220:3; 236:3,
5
**research** [53] - 130:13;
131:22, 25; 132:2, 4, 23;
133:3, 24-25; 134:1, 4, 9,
21; 135:5, 10-11, 16, 22, 25;
136:1, 17-18, 21; 137:23;
138:3; 139:10, 19; 140:1;
148:13, 21, 23; 149:23;
150:12, 22; 156:11, 20;
158:9, 14, 24; 161:6; 172:9;
175:7, 13; 176:2, 14; 180:15;
186:6; 194:14; 200:18;
205:19; 215:16
**researchers** [10] - 135:15;

139:16; 150:9, 19; 155:13;
163:5; 168:3; 169:17;
184:14; 186:10
**reservation** [2] - 10:16
**reserve** [1] - 119:16
**reserved** [1] - 236:15
**reside** [1] - 10:3
**resided** [1] - 15:14
**residence** [12] - 10:21-23;
11:3; 28:2; 29:11; 30:2, 12,
25; 95:10
**resides** [3] - 28:4, 24; 29:10
**resignation** [1] - 158:13
**resigned** [1] - 191:25
**resistance** [2] - 166:1, 5
**resists** [1] - 165:20
**resort** [3] - 224:9, 11;
236:14
**respect** [6] - 2:20; 149:7;
176:11; 198:13; 233:11;
239:20
**respond** [1] - 199:8
**responded** [1] - 216:1
**responding** [7] - 8:8; 65:20;
70:5; 92:9; 128:6; 231:5
**response** [6] - 86:24;
190:8; 199:6; 237:10;
238:13, 21
**responses** [3] - 17:2;
190:4; 215:23
**responsibilities** [1] -
130:11
**responsive** [2] - 133:22;
138:1
**restrained** [1] - 222:25
**restroom** [11] - 19:8, 12;
50:1, 5-6, 8, 10; 72:22;
75:14; 102:12; 216:16
**restrooms** [1] - 67:19
**resubmit** [2] - 240:6, 19
**resubmitted** [1] - 133:18
**result** [6] - 120:24; 140:6;
206:12; 210:23; 221:12;
236:18
**retain** [2] - 13:2; 169:20
**retained** [1] - 198:23
**retarded** [1] - 157:5
**retire** [1] - 92:21
**retired** [2] - 92:20; 118:18
**retreating** [1] - 103:22
**retrieve** [1] - 106:4
**return** [2] - 72:23; 159:24
**returned** [1] - 71:12
**reveal** [2] - 220:2; 235:21
**revealed** [1] - 236:2
**review** [19] - 49:19; 71:2,
16; 96:14; 133:23; 134:11,
14; 150:12; 169:24; 170:9;
190:3, 18; 194:19; 198:6;
216:8
**reviewed** [19] - 60:5; 64:8;
65:8; 76:23; 107:3; 129:24;

133:9, 14; 134:7; 135:10, 22;
150:5, 23; 189:13, 16-17;
190:3; 198:23; 233:15
**reviewer** [1] - 134:15
**reviewing** [2] - 195:9;
239:18
**reviews** [5] - 133:18, 21;
134:10
**revised** [2] - 133:18, 22
**RICHARD** [1] - 128:4
**Richard** [2] - 6:12; 127:25
**Rights** [1] - 3:14
**rights** [30] - 2:13; 3:14;
13:23, 25; 14:8, 12-13, 17,
20, 24; 15:8, 12, 16; 16:10;
24:10; 44:25; 49:19; 69:18,
22; 99:5, 10, 13, 22; 194:19;
195:2; 218:16; 223:20;
238:4; 239:8
**rise** [6] - 219:6; 220:10;
222:4; 237:4, 6
**risk** [13] - 167:24; 168:1;
186:7; 188:16; 189:4, 6;
203:3, 5, 7, 9, 12; 207:25;
236:22
**Risk** [2] - 188:11
**risks** [3] - 167:19, 24;
180:21
**Risks** [1] - 188:10
**Road** [4] - 95:5; 123:11, 19
**Robbinsville** [15] - 10:14;
27:19, 21; 38:22; 40:18;
80:14; 93:17, 24; 94:4, 6-7,
16, 22; 123:5; 125:3
**role** [6] - 84:6; 89:25; 93:14;
165:23; 173:15; 180:14
**rolling** [2] - 97:10, 17
**room** [139] - 12:3, 7, 15;
13:10, 12; 18:19; 19:2; 21:9,
17; 22:12; 23:23; 24:9,
12-13; 33:9; 34:14; 35:3,
6-7, 11, 15-17, 19-21; 36:3,
6, 8, 10, 21, 25; 37:2; 44:16,
22, 24; 45:19, 21; 46:12;
47:3; 50:18; 53:5, 9, 11, 13;
54:11, 16, 20; 55:13; 56:11;
61:12; 67:12-14, 16, 20-22;
68:8, 15; 69:13, 17; 70:18,
25; 71:19; 72:18, 20; 73:4,
20, 23; 74:17; 75:11; 76:22;
80:4; 81:15; 82:11, 20-21;
83:7, 9, 12, 14, 16-17,
19-20, 22, 25; 84:2, 4; 85:9;
86:20; 87:16, 23; 88:1; 89:9;
97:2, 4, 23; 98:21; 100:14;
101:23; 104:10, 12, 17;
106:2; 108:10, 15; 109:19,
23; 110:8, 12; 114:16; 118:7;
125:13, 22; 126:8, 10, 18;
178:3, 14; 198:20; 200:5;
201:11; 211:18; 212:18;
216:9; 217:12; 220:22, 24;
227:22, 24; 228:2; 229:25

**rooms** [5] - 12:1; 33:12;
35:18; 96:25; 151:19
**rose** [1] - 169:12
**rough** [1] - 67:23
**round** [1] - 205:12
**rule** [4] - 140:20; 185:16;
213:17; 225:1
**rules** [1] - 228:1
**runs** [3] - 23:18; 199:21
**ruse** [1] - 206:14
**ruses** [1] - 168:18
**safeguards** [1] - 219:2
**safety** [1] - 108:24
**San** [1] - 130:10
**sanction** [1] - 224:22
**sat** [5] - 83:24; 95:21, 25;
171:12, 17
**satisfactory** [1] - 129:1
**save** [1] - 146:12
**saw** [8] - 19:25; 104:16;
112:9, 11; 168:11; 219:21;
228:12; 233:2
**scarred** [2] - 122:22; 123:1
**scarring** [2] - 182:10
**scenario** [12] - 153:5, 11,
16; 161:10; 162:3; 171:20,
24; 175:14; 177:2; 197:15
**scenario/bad** [1] - 171:24
**scenarios** [6] - 153:4, 21;
161:5; 171:10; 196:24
**scene** [4] - 120:10; 181:2,
15; 183:20
**schedule** [1] - 47:6
**scheduling** [1] - 46:18
**scholar** [3] - 132:17;
193:12; 194:7
**scholars** [1] - 149:9
**school** [3] - 131:10; 132:16;
134:9
**science** [12] - 43:2; 131:9;
133:11; 135:11; 136:6, 9;
148:13; 151:2; 155:13; 206:4
**sciences** [1] - 150:9
**scientific** [10] - 133:25;
134:25; 135:7, 10; 136:16;
148:24; 149:23; 150:1, 4;
193:19
**scientist** [1] - 132:17
**scientists** [4] - 134:3;
149:13; 163:23
**screaming** [2] - 17:16;
226:17
**script** [1] - 185:14
**scripting** [5] - 183:11;
184:2; 185:9; 203:18; 204:3
**seal** [1] - 3:1
**sealed** [3] - 3:3; 240:9
**sealing** [1] - 3:6
**search** [2] - 48:18; 233:19
**searched** [1] - 89:5
**seat** [3] - 32:15, 20
**seated** [5] - 12:3; 36:13, 15;

68:7; 92:11
**seats** [4] - 32:18; 97:9; 108:13
**second** [6] - 80:24; 81:1; 150:7; 154:5; 157:12; 168:1
**secondary** [1] - 167:5
**section** [1] - 135:19
**secure** [3] - 12:20; 98:2; 223:21
**Security** [2] - 2:15; 99:15
**security** [3] - 12:24; 33:24
**see** [39] - 2:11, 21; 3:2; 23:9; 25:17; 28:15; 35:23; 43:11; 46:8; 52:20; 54:21; 58:19, 24; 97:6; 109:14, 25; 140:8; 154:15; 170:11; 180:25; 181:9; 182:3, 5; 187:17; 197:22; 198:7, 9; 201:5; 202:23; 204:16; 209:16; 226:16; 227:18; 231:7, 16, 25; 236:8
**seeing** [6] - 25:18; 117:3; 125:24; 198:8, 11, 14
**seek** [1] - 10:8
**seeking** [1] - 204:5
**seem** [3] - 99:25; 100:17; 101:3
**segment** [3] - 145:7; 147:23
**seize** [1] - 48:20
**seized** [1] - 48:23
**self** [12] - 146:23; 152:22; 153:10, 13, 18; 161:14; 206:22; 215:3; 219:9; 220:14; 235:14, 25
**self-defense** [3] - 153:10, 13; 161:14
**self-determination** [6] - 206:22; 215:3; 219:9; 220:14; 235:14, 25
**self-interest** [3] - 146:23; 152:22; 153:18
**seminar** [2] - 130:17; 144:20
**seminars** [5] - 120:9; 131:1; 136:12
**send** [1] - 146:13
**sending** [1] - 71:10
**sense** [5] - 135:9; 154:18; 173:3; 197:11; 202:5
**sensitive** [1] - 178:12
**sent** [2] - 5:23; 80:6
**sentence** [4] - 14:18; 99:10, 12
**separate** [1] - 186:14
**separately** [3] - 144:19; 240:7, 14
**sequestered** [2] - 7:1, 12
**sequestration** [1] - 7:5
**sergeant** [1] - 92:22
**Sergeant** [19] - 9:14; 26:17, 25; 30:20; 32:13; 33:6; 36:25; 37:15; 40:6, 15; 45:7; 51:8, 24; 54:11; 55:2; 56:24;

60:20; 63:10; 228:9
**series** [1] - 133:4
**serve** [3] - 45:24; 58:25; 134:14
**served** [4] - 21:1, 4; 126:12; 138:10
**service** [1] - 130:14
**set** [11] - 3:14; 12:1; 35:12; 46:15; 52:22; 55:11; 72:2; 118:8; 194:9; 197:9; 228:2
**setting** [6] - 210:24; 215:8; 216:5; 217:10; 220:7; 235:18
**settings** [1] - 155:15
**settle** [1] - 103:13
**setup** [2] - 49:16; 206:1
**Seven** [1] - 33:17
**several** [11] - 119:25; 174:15; 188:15; 189:13; 193:8; 195:4; 198:4; 200:6; 212:10; 214:5; 226:25
**sexual** [5] - 22:10; 40:25; 87:24; 102:25; 201:12
**sexually** [2] - 182:12, 17
**shade** [3] - 174:13; 202:25; 208:12
**shaded** [3] - 186:4; 207:25; 222:17
**sharing** [1] - 116:22
**Sheriff's** [3] - 9:6; 77:25
**shift** [4] - 78:5; 200:14
**shifted** [1] - 134:8
**shirt** [3] - 16:21; 68:19; 96:9
**shirts** [1] - 26:20
**shoes** [2] - 16:22; 68:20
**short** [2] - 44:21; 166:4
**shorthand** [1] - 163:8
**shortly** [1] - 71:22
**shorts** [3] - 16:21; 68:20; 96:9
**show** [5] - 42:25; 45:3; 51:2; 121:10; 203:9
**showed** [2] - 106:20; 193:15
**showing** [4] - 14:4; 225:22; 227:20; 232:21
**shown** [2] - 58:8; 185:2
**shows** [2] - 148:23; 168:13
**sic** [1] - 78:20
**side** [11] - 6:24; 34:8; 46:8; 73:12, 18; 83:25; 97:6; 100:25; 170:19; 180:5
**sidearm** [3] - 19:17; 51:8; 74:6, 8, 10, 12, 14
**sidearms** [1] - 51:11
**sides** [3] - 160:10, 17; 229:2
**sign** [10] - 14:21, 23; 15:18, 21; 44:17; 98:13; 99:13; 106:4; 199:3, 16
**signature** [2] - 15:23, 25
**signed** [1] - 49:21
**significant** [1] - 178:1

**signs** [4] - 23:14; 24:22; 197:22, 25
**silly** [1] - 216:20
**silver** [1] - 97:5
**similar** [1] - 155:23
**simple** [3] - 155:5; 161:2; 234:18
**simply** [6] - 58:11; 85:12; 220:9; 221:5; 225:1, 24
**simultaneously** [1] - 114:19
**SISON** [66] - 2:2; 3:9; 4:1, 15, 18, 24; 5:6, 17; 6:11, 20, 25; 7:19; 16:5; 22:22; 25:11, 13; 54:6; 64:13; 77:9, 11; 85:12, 14; 88:14; 91:4; 110:19, 21; 112:8; 117:8, 13; 126:20; 127:20, 24; 128:9, 16; 129:11, 19; 130:2, 7; 140:14; 141:2; 165:3, 9, 12; 183:4, 9; 186:23; 208:19, 21; 210:1; 214:10, 14, 18; 226:5; 231:12, 20; 232:19, 24; 233:12, 20, 25; 238:16, 25; 240:3, 11, 14
**Sison** [20] - 2:21; 3:24; 4:14; 6:19; 16:4; 25:9; 110:18; 127:17; 129:9, 24; 141:1; 165:8; 183:1; 214:16; 226:4; 233:10; 237:8, 19; 238:15; 240:25
**sit** [5] - 38:7; 83:23; 95:24; 199:19; 225:16
**sits** [1] - 97:7
**sitting** [5] - 7:21; 24:15; 70:14; 126:2; 227:10
**situation** [8] - 44:10; 127:1; 159:17; 171:21; 177:6; 195:16; 199:7
**situations** [5] - 136:15; 146:7; 164:4; 223:10; 227:13
**six** [13] - 48:2; 119:13; 172:24; 188:25; 190:13; 200:20; 210:7, 12, 14, 17, 21; 229:9
**Sixth** [1] - 14:13
**size** [6] - 97:2; 150:18; 182:8; 222:22
**sleeveless** [1] - 96:9
**sleeves** [1] - 68:19
**small** [11] - 33:2; 68:2; 108:15; 124:18, 21; 144:13; 194:13, 15; 227:4, 22, 24
**smaller** [2] - 84:16; 194:9
**smile** [1] - 199:15
**smiling** [1] - 199:11
**snack** [2] - 217:25; 218:2
**Snowbird** [6] - 10:1, 12; 11:20; 94:16; 95:7; 123:19
**Social** [2] - 2:15; 99:15
**social** [30] - 131:2, 8, 10; 132:17; 133:12; 134:3; 135:6, 10-11, 18; 136:6, 9;

148:13; 149:4-6, 10, 13, 23; 150:9; 151:1, 3; 155:13; 156:23; 157:25; 159:4, 6; 163:23; 175:6, 10
**societies** [3] - 136:16; 158:6
**society** [4] - 140:7; 184:19; 236:21, 24
**Society** [1] - 135:1
**Sociological** [1] - 135:2
**sociology** [3] - 131:5, 11
**solely** [1] - 215:1
**solid** [1] - 204:6
**solidly** [1] - 143:10
**solve** [2] - 140:7; 147:5
**solving** [1] - 146:21
**someone** [13] - 49:18; 83:2; 99:4; 104:11, 13; 111:2; 112:25; 146:7, 13; 167:14; 175:15; 196:10; 199:6
**someplace** [2] - 118:25; 119:12
**sometime** [3] - 43:14; 79:2; 169:22
**sometimes** [49] - 87:22; 91:10; 114:21; 134:11; 139:25; 141:19; 142:20; 144:15; 146:12; 151:20; 152:7, 11-12; 153:3, 18-20; 155:25; 157:15, 24; 158:1, 5, 12-13; 159:15, 21; 160:7; 161:6, 21; 163:12; 164:9; 165:18; 176:2; 178:5, 7, 14, 16; 181:23; 197:18, 21; 198:3; 199:14; 201:11; 205:25; 231:23
**somewhere** [6] - 10:10; 12:9; 27:22; 48:2; 119:1; 138:20
**soon** [3] - 24:11; 36:9; 97:13
**sophisticated** [2] - 149:23; 206:13
**sorry** [17] - 22:25; 26:18; 42:20; 45:7; 57:24; 67:7; 77:13; 79:4; 80:19; 87:9; 90:9; 104:10; 126:15; 130:3; 165:3; 221:23
**sort** [30] - 34:5; 39:5; 67:15; 70:1; 91:15; 97:19; 98:17; 103:25; 107:19; 109:6; 125:23; 141:18; 145:15; 153:5, 20; 154:13; 162:20; 168:22; 171:9, 24; 177:16; 190:21; 195:16; 197:4; 201:15; 207:12; 219:3; 221:13; 223:8
**sorts** [1] - 207:10
**sought** [1] - 224:8
**sound** [2] - 215:20; 228:3
**sounded** [3] - 35:7; 216:20; 233:24
**sounds** [4] - 44:19; 88:22;

141:25; 200:17

**South** [2] - 158:4; 193:4

**space** [1] - 34:7

**speaking** [14] - 16:15; 19:11; 24:13; 41:4; 53:2, 12; 54:18; 72:7, 11; 74:5; 80:12; 199:3, 6; 227:17

**special** [1] - 144:6

**specialize** [1] - 131:9

**specialized** [3] - 143:14; 150:25; 209:1

**specialty** [1] - 129:11

**specific** [20] - 16:13; 31:5; 33:4; 37:19, 22; 60:24; 61:7; 72:1; 81:3; 129:5; 135:8; 179:24; 189:14; 192:4; 195:25; 201:4; 215:15; 216:2; 218:19

**specifically** [21] - 4:8; 41:8; 97:9, 18; 100:9; 105:23; 128:14; 135:22; 163:14; 191:4, 23; 192:7; 201:11; 202:18; 207:24; 212:8; 215:12; 217:13; 218:10; 235:17; 239:11

**specifics** [3] - 60:6; 85:25; 229:14

**spectres** [1] - 188:4

**spectrum** [1] - 180:18

**speculation** [3] - 54:1; 88:11; 112:6

**spell** [2] - 8:19; 92:17

**spelled** [2] - 66:6; 171:11

**spend** [1] - 21:8

**splatter** [1] - 120:11

**splits** [1] - 195:11

**spoken** [4] - 31:19; 162:25; 191:12, 14

**sponsored** [1] - 42:3

**spontaneous** [1] - 165:16

**spread** [2] - 42:17; 229:12

**spur** [2] - 39:1; 161:16

**squad** [1] - 95:20

**squares** [1] - 216:24

**stage** [1] - 142:22

**stairstep** [1] - 236:25

**stamped** [1] - 190:13

**Stan** [1] - 42:7

**stand** [6] - 92:3; 101:13; 187:4, 12; 198:9; 234:7

**standard** [5] - 207:12, 14; 214:24; 234:17

**standards** [5] - 133:25; 207:6; 208:23; 234:16

**start** [20] - 37:8, 10; 54:18; 103:22; 114:22; 119:6; 128:9; 143:19; 144:25; 147:13; 152:23; 154:11, 18; 160:14; 170:17; 172:2; 173:25; 179:1, 6

**started** [21] - 12:3; 24:13; 25:19; 37:6; 39:15; 45:23; 53:24; 82:25; 98:12; 103:8;

104:3; 119:7; 141:14; 153:2; 163:18, 22; 171:22; 172:12; 175:12; 186:3

**starting** [2] - 69:8; 139:20

**starts** [5] - 37:12; 53:10, 14; 160:12; 179:15

**state** [4] - 8:18; 66:3; 92:16; 138:21

**statement** [24] - 7:12; 59:12, 17-19; 61:10; 90:11; 106:6, 12; 116:10; 151:6, 9; 160:4; 166:11; 173:18; 180:12; 214:25; 215:1; 220:4; 236:6; 237:24; 238:2

**statements** [24] - 22:18; 23:3; 38:9; 44:24; 59:7; 60:22; 143:19; 146:20, 24; 159:23; 166:12, 24; 168:1; 173:9; 180:24; 185:13; 186:22; 190:9; 213:7; 225:8, 12; 230:3

**states** [2] - 138:18, 20

**States** [4] - 2:5; 141:5; 222:12; 225:2

**station** [7] - 27:19; 49:12, 16; 52:4; 124:15; 170:14

**statistical** [1] - 200:19

**status** [1] - 157:25

**stay** [1] - 27:23

**stayed** [1] - 52:18

**staying** [1] - 123:16

**steadfastly** [1] - 197:8

**step** [7] - 65:12; 87:15, 19; 91:18; 127:10; 214:12; 237:1

**stepped** [6] - 22:11, 14, 17; 47:17; 54:13; 55:9

**sticks** [2] - 154:13

**still** [13] - 15:3; 32:4; 76:25; 78:9; 81:16; 126:2; 158:15; 210:19; 227:11, 24; 233:6; 236:1, 18

**stipulation** [2] - 4:11; 239:7

**stipulations** [1] - 3:21

**stood** [1] - 17:14

**stop** [13] - 17:24; 73:24; 101:15; 152:22; 154:11, 18; 159:21; 160:14; 162:16; 169:8; 173:24; 177:15; 206:6

**stopped** [7] - 58:17; 153:1; 163:18, 22; 171:22; 175:12; 186:3

**stopping** [1] - 172:1

**stops** [2] - 160:11; 179:14

**stories** [2] - 34:9

**story** [7] - 46:9; 73:12, 18; 100:25; 127:4; 170:19; 219:24

**straight** [3] - 71:17; 165:15; 177:21

**straightforward** [1] - 144:10

**stratagem** [1] - 107:20

**strategically** [4] - 178:4,

11, 15; 202:7

**strategy** [1] - 72:1

**strenuous** [1] - 222:3

**stress** [6] - 164:17, 20; 165:1; 198:2; 199:8

**stressful** [4] - 164:18, 24; 199:7; 201:17

**striking** [1] - 210:18

**strong** [2] - 200:18; 210:13

**strongest** [1] - 208:9

**students** [1] - 135:14

**studied** [4] - 116:1; 137:18; 149:16; 164:1

**studies** [6] - 148:25; 149:5; 164:11; 194:4; 203:8; 210:10

**study** [22] - 38:7; 116:3, 16; 135:6; 136:4; 149:6, 9, 11, 18, 22; 157:24; 159:7; 163:23, 25; 167:6; 168:3, 16; 186:17; 203:8; 206:8; 210:11, 18

**stuff** [1] - 128:18

**style** [1] - 145:25

**subcommittees** [1] - 138:2

**subfiled** [2] - 149:3; 150:21

**subfields** [1] - 149:3

**subject** [14] - 5:25; 53:12; 74:25; 91:12; 93:2; 131:15; 135:14; 136:22; 138:7; 143:23; 147:11; 150:15; 152:22; 221:8

**subjects** [3] - 41:2; 137:18; 176:2

**submit** [2] - 133:12; 240:14

**submitted** [2] - 64:20; 239:9

**submitting** [1] - 5:2

**substance** [2] - 5:9; 24:23

**substances** [1] - 24:19

**substantial** [4] - 23:9; 217:17; 224:17; 236:23

**substantively** [1] - 150:10

**substation** [5] - 29:8; 94:5, 7, 16, 24

**substitute** [1] - 240:21

**subtle** [1] - 226:14

**successfully** [2] - 167:3; 237:11

**suffering** [1] - 198:2

**suffers** [1] - 192:19

**sufficient** [6] - 218:18; 220:13; 221:2; 235:6; 238:13

**sufficiently** [1] - 219:6

**suggest** [5] - 107:9; 159:20; 175:24; 202:11; 206:4

**suggested** [7] - 107:7; 112:21; 120:19; 160:11, 19; 177:1; 212:9

**suggestible** [2] - 157:22; 193:1

**suggesting** [10] - 160:4; 162:15; 168:23; 170:24;

171:7, 25; 174:3; 177:2; 181:5

**suggestion** [10] - 120:24; 159:12; 162:4; 163:20; 174:14; 176:17, 23; 179:4, 11

**suggestions** [8] - 121:2; 159:22; 186:1, 4; 204:9; 214:6; 228:21; 230:12

**suggestive** [1] - 142:25

**sum** [1] - 225:7

**summarize** [1] - 150:20

**summertime** [1] - 96:12

**superior** [1] - 152:1

**supervisor** [1] - 89:15

**supplemental** [1] - 238:9

**support** [1] - 190:8

**suppose** [2] - 113:6; 169:5

**supposed** [2] - 10:3; 142:4

**suppress** [5] - 2:7; 190:6, 9; 225:14; 238:6

**suppressed** [1] - 237:21

**suppressing** [1] - 237:4

**suppression** [11] - 63:19; 138:25; 224:11, 13; 225:1, 23; 236:13, 15, 19; 237:7

**Supreme** [1] - 224:10

**surprised** [5] - 3:2; 100:18; 101:3; 113:18, 20

**surrounding** [1] - 220:1

**surveillance** [1] - 168:12

**surviving** [1] - 221:3

**susceptibility** [1] - 215:13

**susceptible** [5] - 157:20; 158:21, 25; 215:18; 216:3

**suspect** [60] - 31:9; 43:6; 61:21; 70:2; 94:8; 114:20; 124:1; 143:19; 151:22-24; 152:2, 7, 10, 13, 16, 19; 153:10, 21; 159:21; 160:11; 161:25; 163:15; 165:15, 19, 24; 166:1, 14, 18, 25; 168:21, 23; 169:3, 12; 174:21; 176:4; 177:12, 18; 179:14; 181:1, 13; 183:13, 19-20, 21, 25; 184:2, 6, 9, 16; 185:10; 206:3, 5, 13; 222:25; 227:6

**suspect's** [8] - 152:25; 161:10; 164:23; 169:4; 177:17; 179:20; 181:11; 215:2

**suspects** [12] - 59:8; 142:24; 143:6; 148:18; 152:17; 159:18; 164:3; 166:4; 176:2; 177:15; 186:7, 20

**sustain** [2] - 85:13; 209:24

**sustained** [1] - 112:7

**Swain** [1] - 9:6

**sweating** [3] - 17:19; 198:12; 212:4

**swipe** [4] - 98:5; 111:21;

112:10

**sworn** [6] - 8:4, 8; 65:20; 92:5, 9; 128:6

**symposiums** [1] - 120:9

**synonymous** [2] - 145:18, 24

**synthesis** [1] - 136:21

**synthesizing** [1] - 136:18

**system** [9] - 130:18, 24; 132:7, 17, 19; 149:15; 152:25; 162:7; 169:6

**T-shirt** [3] - 16:21; 68:19; 96:9

**table** [11] - 7:21; 36:5, 14, 16-17; 68:2-5; 84:16; 97:7

**tactics** [6] - 72:2; 191:20; 202:25; 215:14; 227:21; 232:6

**tag** [1] - 178:12

**tag-teaming** [1] - 178:12

**talks** [2] - 140:2; 164:21

**tape** [1] - 113:8

**taught** [4] - 42:23; 130:23, 25; 142:13

**teach** [6] - 130:13, 15-16, 22; 146:8, 16

**teaching** [3] - 134:8; 137:6; 144:22

**teaming** [1] - 178:12

**technique** [26] - 42:9-11; 144:23; 145:17; 152:8; 154:3; 160:25; 167:20; 169:10; 171:10; 174:12, 19; 175:11, 14; 178:22; 185:20; 206:1; 210:9; 211:5, 8; 230:1

**techniques** [71] - 41:2; 119:20, 25; 120:9, 13; 129:12, 18; 140:24; 142:13; 143:15; 144:2, 15; 145:8; 146:19; 148:12, 14-15, 22; 151:10, 16-17; 153:24; 154:4, 24; 155:18, 25; 162:14; 163:24; 164:10, 12-13, 15; 165:22; 166:5; 167:10, 22; 169:15; 170:11; 171:25; 172:4; 177:12, 20, 25; 182:2; 185:25; 195:1, 4-7; 203:10; 209:6, 8; 210:20, 23; 211:25; 219:11; 220:20, 25; 228:16, 22; 230:18; 231:25; 238:18

**technology** [1] - 216:23

**telephone** [3] - 18:24; 19:3; 217:16

**tend** [7] - 133:2; 156:2, 17; 157:19; 158:3, 6; 186:13

**tender** [2] - 140:14, 20

**tendered** [1] - 128:14

**tennis** [1] - 16:22

**term** [7] - 157:5; 159:5; 162:25; 193:7, 12, 23; 204:19

**terminate** [1] - 15:5

**terminated** [1] - 15:7

**terms** [5] - 135:23; 143:25; 161:2, 9; 195:11

**test** [8] - 206:19, 23, 25; 207:3-5, 8; 236:8

**testified** [13] - 8:8; 27:18; 31:2; 55:15; 65:20; 92:9; 128:6; 129:2; 138:6; 139:2; 213:23; 219:14; 223:18

**testify** [6] - 128:25; 129:6; 138:18; 140:9; 186:13

**testifying** [2] - 129:10; 176:6

**testimony** [21] - 7:2; 63:13; 120:18; 137:23; 138:1; 140:23; 170:9; 173:6; 174:23; 188:2; 190:19; 193:8; 198:23; 201:1; 205:8; 215:11; 221:4; 224:20, 24

**testing** [1] - 191:21

**tests** [5] - 157:24; 191:17; 207:9

**textbooks** [2] - 150:19, 25

**texting** [1] - 217:6

**THE** [128] - 2:1, 4, 18; 3:8, 10, 17, 24; 4:2, 14, 16, 23; 5:2, 14, 20, 24; 6:9, 17, 21; 7:4, 7, 10, 16, 22, 24; 8:4, 10, 15; 14:2; 16:4, 6; 22:23; 24:6; 25:9; 54:3; 64:15; 65:11, 22; 77:5, 8; 85:13; 88:12; 91:6, 18, 25; 92:4, 11-12; 107:3; 110:18; 112:7; 117:9, 11-12; 126:22; 127:10, 12-13, 17, 21; 128:1, 8, 21, 24; 129:7, 17, 20, 24; 130:5; 140:17, 19, 22; 165:8, 10; 183:1, 7; 187:1, 7, 11; 205:1; 208:18; 209:24; 214:12, 16, 19, 21; 217:21; 218:4; 219:10; 220:17; 221:7, 22; 222:6, 21; 223:12, 22, 24; 224:3; 225:16, 22; 226:3; 231:10, 18; 232:16, 21; 233:1, 10, 18, 21; 234:2, 7, 10; 237:18; 238:7, 15, 20; 239:1, 20; 240:1, 8, 13, 15, 17-18, 21, 25

**theirselves** [2] - 27:16; 83:18

**theme** [1] - 136:22

**themes** [1] - 153:6

**themselves** [6] - 27:12; 44:5; 155:18; 177:17; 184:7; 220:21

**theories** [2] - 135:25; 155:15

**theory** [5] - 133:19, 24; 143:3; 184:3; 201:16

**therefore** [4] - 134:1; 146:23; 177:4; 206:6

**THEREUPON** [4] - 8:5;

65:17; 92:6; 128:3

**they've** [1] - 147:15

**thinking** [3] - 91:14; 177:10; 229:22

**thinks** [2] - 202:6; 212:12

**third** [11] - 2:25; 136:23; 137:10; 138:24; 141:6, 17; 157:13; 161:18; 184:18; 185:15; 217:21

**thirds** [1] - 138:23

**thousands** [2] - 135:12; 150:6

**threat** [13] - 56:12, 16, 19; 159:11; 160:15; 163:17; 169:13; 176:17; 177:5; 180:5, 7; 195:10

**threaten** [7] - 21:24; 22:2; 75:17, 20; 104:20, 23, 25

**threatened** [6] - 18:9; 56:7, 10, 13; 74:3; 176:7

**threatening** [1] - 227:19

**threats** [22] - 56:20; 156:1; 160:6, 9, 20; 163:13; 169:15; 175:8; 176:13, 15, 21; 195:8, 13, 17; 218:20; 222:14; 223:2; 225:4, 9; 228:25; 229:1, 5

**three** [31] - 3:22; 18:22; 23:18; 34:9; 36:5, 21; 49:22; 52:20-22; 67:25; 68:2, 5; 97:8; 108:13; 116:7, 14; 117:3, 18, 20; 120:8; 136:15; 139:3; 156:12; 157:19; 200:1; 212:17; 215:6; 216:12; 232:10

**threshold** [3] - 157:11; 225:22; 232:21

**throw** [2] - 48:4; 230:10

**throwing** [3] - 204:15; 224:14; 229:6

**ticket** [1] - 205:16

**tiredness** [1] - 213:3

**title** [2] - 45:8; 66:12

**today** [15] - 55:24; 62:2; 63:13, 20; 121:23; 122:8; 129:6, 10; 178:20; 201:2; 226:7; 229:3; 232:3; 239:13; 240:2

**together** [9] - 37:8; 55:3; 99:14; 121:18; 133:2, 4; 144:19; 220:25; 230:23

**tones** [1] - 227:17

**tonight** [1] - 178:20

**took** [22] - 23:25; 27:18, 20; 32:3; 40:24; 41:20, 22, 25; 42:6, 18, 21; 70:23; 78:6; 103:15; 104:17; 105:23; 111:23; 124:14; 144:21; 200:14; 207:22; 218:1

**top** [4] - 15:9; 34:12; 149:21

**topic** [2] - 100:9; 133:6

**topics** [3] - 131:2; 132:2, 4

**torn** [1] - 122:19

**torture** [3] - 158:4, 7

**total** [2] - 21:12; 117:18

**totality** [10] - 215:5; 220:1, 6, 8; 225:7; 232:8; 235:15, 20; 236:7; 237:25

**totally** [1] - 159:2

**touch** [6] - 57:10, 16; 76:2, 7; 108:5; 174:4

**touched** [3] - 57:7; 106:17; 115:23

**touching** [4] - 57:4; 121:6; 208:5

**toward** [2] - 87:14; 183:5

**towards** [5] - 33:19; 34:19; 50:4; 199:4; 200:7

**town** [1] - 10:13

**traditional** [1] - 134:14

**trained** [14] - 141:12; 143:11, 17; 144:18; 146:25; 147:6, 14; 150:9; 154:23; 155:8; 165:22; 175:7; 183:14

**trainers** [3] - 155:8; 164:24; 175:6

**training** [28] - 40:20, 23; 41:21; 119:18, 24; 120:12; 131:3; 140:3; 141:15; 143:7; 144:7; 145:9, 14, 21; 146:5, 18; 147:2, 19; 151:15; 153:6; 154:24; 161:8; 166:15; 168:20; 173:17; 175:4; 177:14

**traits** [3] - 149:12; 158:12; 191:24

**trajectory** [1] - 120:11

**transcribed** [4] - 62:17-19; 64:20

**transcript** [33] - 4:9; 5:3, 7, 10; 6:2; 7:3; 64:11; 65:5, 8; 107:4; 113:9, 23, 25; 114:4; 121:10; 164:11, 13; 170:3, 6; 182:8; 189:17, 20, 22; 198:24; 216:8; 231:18; 239:6, 16, 24; 240:4, 8

**transcription** [5] - 2:23; 62:11; 63:1, 3, 16

**transcripts** [3] - 164:10; 221:5; 231:22

**transgressions** [1] - 164:8

**transition** [1] - 79:12

**transitioning** [1] - 89:1

**transportation** [1] - 205:14

**transporting** [1] - 100:8

**trapped** [1] - 154:7

**trash** [1] - 204:15

**traumatized** [1] - 123:3

**treat** [2] - 107:23; 162:8

**tremendously** [1] - 139:20

**trial** [1] - 62:1

**trials** [1] - 138:23

**tribal** [5] - 33:16; 34:2, 4; 110:3; 144:5

**tribal-wide** [1] - 110:3

**tribe** [2] - 78:17; 215:16
**tribes** [1] - 215:10
**trick** [1] - 223:19
**trickery** [4] - 168:4, 19, 25; 169:4
**tried** [3] - 47:21, 24; 52:11
**troublesome** [1] - 208:10
**true** [12] - 132:6; 152:4; 164:4; 180:15, 17, 19, 25; 181:12; 185:1; 193:20; 221:6
**truth** [24] - 48:8; 54:24; 105:11, 14, 16-17; 121:13, 19, 21-22; 127:2, 4; 143:3; 166:9, 11; 180:2; 206:10; 217:16; 219:23, 25; 228:11
**truthful** [11] - 44:9; 151:8; 166:13, 22; 167:4; 174:20; 184:20; 201:7, 19; 202:3
**try** [25] - 37:21; 40:3; 41:2; 43:5, 25; 44:5, 9; 47:12, 15; 52:22; 53:21; 54:23; 55:10; 93:17; 106:3; 146:8; 152:21; 153:9; 163:25; 164:14; 185:13; 201:6; 202:2; 230:7
**trying** [18] - 4:25; 41:3; 47:18; 59:2; 75:10; 121:10; 154:6; 163:5; 169:12; 170:18, 22; 197:11; 202:13; 205:12; 230:5; 231:8
**tuition** [1] - 132:16
**turned** [4] - 58:21-23; 132:14
**twice** [3] - 52:14; 103:17; 106:17
**two** [55] - 11:25; 24:3; 28:8; 29:13, 17, 19; 33:12; 34:9-12; 35:8; 36:12; 37:3; 49:22; 56:25; 68:3; 73:14; 78:21; 80:18; 81:1, 4; 84:14; 91:21; 97:10, 16; 98:15; 103:12; 105:24; 108:9; 114:15; 115:4, 13; 134:19; 136:14; 138:23; 146:15; 151:13; 153:4; 160:10, 17; 161:5; 167:23; 171:10; 196:24; 197:4; 216:13; 226:11; 229:1; 231:6, 8; 233:14, 17; 239:7
**two-thirds** [1] - 138:23
**two-way** [1] - 35:8
**type** [25] - 19:19; 24:22; 26:19; 33:3; 37:19; 41:1, 13-14; 46:18; 53:19; 96:1; 97:3; 102:25; 106:9; 137:11; 147:25; 148:14; 165:17; 187:23; 192:20; 218:13; 223:19; 224:22, 25; 237:12
**types** [8] - 22:17; 136:15; 139:7; 144:16; 153:24; 157:14; 189:6; 215:13
**typically** [24] - 61:23; 136:20; 142:23; 144:9, 13, 18-19, 25; 145:3; 146:18;

147:23; 148:12, 16, 20; 149:15; 150:15; 151:18; 157:9, 11; 160:5; 175:8; 176:13
**typing** [1] - 109:3
**UC** [4] - 130:20; 131:6
**ultimate** [1] - 172:18
**ultimately** [4] - 134:5; 143:2, 20; 206:19
**unable** [1] - 101:20
**unclear** [1] - 69:21
**uncoerced** [3] - 220:2; 235:21; 236:2
**uncomfortable** [3] - 18:8; 58:6; 107:16
**under** [18] - 3:1; 11:12; 13:23; 58:13; 69:1; 76:18; 79:13; 90:22; 104:7; 108:6; 156:20; 210:7; 222:3; 224:19; 228:7; 236:4; 237:25; 238:5
**undergraduate** [1] - 130:23
**underlying** [3] - 153:22; 161:12, 25
**underneath** [1] - 97:8
**understood** [5] - 15:16; 81:20; 142:3; 163:11, 19
**undertakes** [1] - 232:23
**undue** [1] - 198:2
**unfold** [1] - 152:25
**unfortunately** [2] - 161:1; 231:17
**uniforms** [1] - 30:8
**unintended** [1] - 139:21
**unintentional** [1] - 174:10
**unit** [3] - 66:23; 79:13
**United** [4] - 2:5; 141:5; 222:12; 225:2
**units** [3] - 10:24; 27:3
**universe** [3] - 157:2; 158:22; 194:11
**universities** [1] - 136:20
**University** [1] - 130:10
**university** [2] - 130:12, 14
**unlawful** [4] - 195:7, 13, 19, 22
**unless** [4] - 26:20; 155:24; 169:11; 196:3
**unpleasant** [1] - 164:24
**unreliability** [2] - 193:24; 203:25
**unreliable** [6] - 167:24; 180:19, 23; 181:8; 204:1; 209:19
**unusually** [1] - 158:21
**up** [71] - 3:23; 20:6, 25; 21:2; 35:12; 36:15; 37:22; 43:15, 20; 46:4, 7, 15; 52:22; 55:11, 13; 59:4; 62:9; 75:7, 10; 81:6, 22; 84:16; 87:2; 88:6, 8; 97:7, 14; 101:13; 102:18; 106:2, 18, 22; 109:3; 110:5; 114:1, 6, 9; 116:9;

118:8; 120:25; 123:4; 149:20; 152:6; 153:4; 154:10; 155:22; 156:19; 161:10; 166:1, 4; 172:10; 173:2; 177:19, 24; 179:24; 181:3; 187:13; 197:7; 198:9; 201:17; 202:12; 207:14; 211:3; 212:21; 218:1; 225:7; 226:16; 227:16; 228:4
**updates** [1] - 145:14
**upset** [2] - 70:12; 198:15
**US** [2] - 192:13; 224:10
**uses** [1] - 230:18
**usual** [1] - 210:6
**vagina** [1] - 103:10
**vaginal** [1] - 106:18
**variations** [1] - 154:2
**variety** [3] - 152:10, 15, 18
**various** [2] - 170:10; 174:6
**vast** [1] - 195:18
**vehicle** [4] - 27:9; 31:25; 32:16
**vehicles** [1] - 29:17
**Venn** [1] - 194:13
**verbal** [1] - 56:20
**verbally** [2] - 15:3, 5
**verifiable** [1] - 151:8
**verification** [1] - 206:10
**version** [4] - 60:7, 9; 90:7; 146:16
**versus** [11] - 2:5; 34:3; 85:25; 144:2, 4, 7; 154:25; 222:12; 224:10; 225:2; 235:2
**victim** [15] - 3:12; 115:24; 116:2, 6, 17; 117:19; 161:18; 170:7; 172:14; 173:24; 179:23; 182:9, 13, 17
**victim's** [3] - 170:20; 174:1; 181:11
**victims** [3] - 66:23; 79:13; 142:23
**Victims'** [1] - 3:14
**video** [50] - 4:9, 16; 5:3, 22; 6:2; 7:3; 12:10, 13; 18:20; 21:10, 18; 23:18; 35:11; 37:12; 40:13; 45:14; 46:11; 52:7; 58:16, 22; 60:4; 62:9, 11, 13, 16, 18-19; 63:16; 64:9; 76:4, 10; 108:19; 114:12; 125:22; 189:17; 194:19; 198:7; 216:12; 217:5; 218:7; 221:4; 224:20, 25; 227:17; 231:22, 24; 238:18; 239:3
**videos** [2] - 42:25; 217:25
**videotape** [5] - 37:10; 51:2; 170:5; 198:22; 212:17
**videotaped** [4] - 170:2; 188:20; 216:7
**view** [3] - 12:14; 90:7; 217:24
**violations** [1] - 224:16
**violence** [5] - 218:20;

222:15; 223:2; 225:4, 10
**vis-à-vis** [1] - 192:9
**visible** [3] - 23:14; 197:22, 25
**voice** [6] - 25:5; 58:8, 10; 75:23; 108:2; 171:3
**voices** [1] - 152:11
**volumes** [2] - 133:3, 7
**voluntarily** [6] - 31:22; 60:22; 201:19; 225:21; 226:2; 234:19
**voluntariness** [9] - 185:6, 8, 10; 204:2; 234:25; 235:9; 237:3, 5, 17
**voluntary** [8] - 185:13; 186:22; 220:5; 225:13; 236:6; 238:3
**vulnerability** [1] - 158:7
**vulnerable** [8] - 149:12; 156:6, 17; 157:22; 158:3, 6, 10; 191:20
**Wachacha** [3] - 95:5; 123:11
**wait** [1] - 18:5
**waiver** [11] - 14:20; 24:10; 44:17; 195:2; 218:14, 16; 220:4; 223:21; 225:13; 234:21; 239:8
**walk** [4] - 55:24; 56:3; 85:9; 97:13
**walked** [2] - 30:16; 55:12
**wall** [5] - 35:18; 68:1, 4; 97:8, 14
**Walters** [1] - 42:7
**wants** [1] - 167:25
**warning** [1] - 200:24
**warnings** [3] - 69:11; 151:20; 223:16
**warrant** [17] - 25:15, 20; 26:3, 9; 31:16; 45:3; 48:18; 49:2; 88:16, 18-19; 93:20, 22; 94:1; 124:8; 126:13; 226:25
**warrants** [10] - 20:23; 21:1, 4; 45:25; 59:1; 69:3, 6, 9
**watch** [2] - 75:3; 170:8; 217:5
**watched** [2] - 198:22; 218:8
**watching** [6] - 18:3; 53:6; 82:13; 125:21, 24; 178:6
**water** [9] - 19:14; 50:3, 12; 83:23; 102:12, 20; 216:14
**wavered** [1] - 173:21
**ways** [9] - 136:9; 150:11; 152:10, 15, 18; 164:1; 178:24; 185:9; 226:22
**weapons** [3] - 89:5, 8, 12
**wear** [3] - 26:19; 51:8, 10
**wearing** [8] - 19:17; 26:15, 23, 25; 51:7; 74:6; 96:8
**weapons** [16] - 16:23; 33:3; 68:21, 23; 96:11
**web** [1] - 217:6

**weeds** [1] - 133:24
**weigh** [1] - 217:18
**welcome** [1] - 7:22
**whoever's** [1] - 124:15
**whole** [11] - 18:25; 23:6; 38:24; 54:23; 105:17, 24; 118:14; 204:12, 22
**wi** [3] - 13:5; 110:2; 216:21
**wi-fi** [3] - 13:5; 110:2; 216:21
**wide** [2] - 84:17; 110:3
**width** [1] - 84:17
**wildly** [1] - 65:14
**willing** [3] - 46:21; 107:10; 210:4
**willingly** [2] - 20:14; 46:25
**window** [3] - 35:21; 97:5, 8
**windows** [1] - 35:20
**wiping** [1] - 198:12
**Wisconsin** [1] - 137:25
**wisdom** [1] - 147:3
**wise** [1] - 84:17
**wish** [1] - 14:21
**wished** [1] - 15:18
**witness** [22] - 7:2; 8:2, 7; 15:12; 25:8; 31:13; 61:21; 65:13, 19; 77:7; 91:20; 92:1, 8; 110:17; 127:23; 128:5; 138:6, 18; 140:15; 186:15; 208:17; 214:15
**WITNESS** [5] - 22:24; 54:4; 88:13; 117:12; 127:12
**witnessed** [2] - 14:22; 15:12
**witnesses** [7] - 7:1, 11; 8:11; 59:8; 142:23; 168:12; 230:4
**woman** [1] - 201:12
**won** [1] - 153:13
**word** [4] - 39:2; 121:21; 207:24; 222:7
**words** [9] - 53:7; 60:19; 87:18; 121:7; 185:6; 207:23; 210:19; 221:7; 231:23
**works** [2] - 10:24; 230:7
**world** [2] - 172:1; 217:3
**worse** [5] - 162:5, 9; 176:19; 180:7
**wrapped** [1] - 162:12
**write** [19] - 59:11, 14, 17, 20; 61:20; 62:4, 7, 13; 63:8; 90:12, 20; 91:1; 113:19; 114:5, 8; 145:14; 157:24; 185:12, 21
**writing** [4] - 135:16; 141:14; 192:2
**written** [11] - 59:8, 10; 90:19; 106:6, 11; 109:1; 113:8; 116:23; 131:23; 134:23; 144:12
**wrote** [6] - 90:22; 113:11, 14

**y'all** [4] - 20:17; 76:22; 96:11, 23
**y'all's** [1] - 95:19
**year** [5] - 9:6; 68:24; 96:11; 119:17; 135:17
**years** [19] - 9:6; 42:16-18; 53:21; 66:19; 77:20; 93:1; 119:3, 13; 135:3; 136:4; 137:7, 12; 138:14; 139:24; 147:3; 175:6; 213:20
**years'** [1] - 118:21
**yelling** [2] - 17:16; 226:17
**York** [1] - 138:1
**younger** [1] - 156:14
**yourself** [4] - 39:23; 40:5; 41:25; 61:16

**zeros** [2] - 190:14