IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:19 CR 5

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND RECOMMENDATION** |
| | ) | |
| JOSEPH DWAYNE JUMPER | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court on Defendant's Motion to Suppress (Doc. 16), which has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B). The issues have been fully briefed, and the matter is ripe for ruling. Having carefully reviewed the evidence, the arguments, and applicable authority, the undersigned respectfully recommends that the Motion be denied.

## I. Relevant Procedural Background

A four-count Bill of Indictment was filed on January 16, 2019 charging Defendant with violations of 18 U.S.C. §§ 2241(c), 2244(a)(5) and 1153 (Doc. 1).

On January 28, 2019, Defendant made an initial appearance during which counsel was appointed for him.

Arraignment and detention hearings were conducted on January 30, 2019. Defendant entered a plea of not guilty and waived his right to a detention hearing.

On May 3, 2019, Defendant filed the instant Motion to Suppress (Doc. 16) and a supporting brief (Doc. 17). The Government filed a response (Doc. 19) on May 31, 2019 and Defendant replied (Doc. 23) on July 8, 2019.

On August 6, 2019, the undersigned conducted an evidentiary hearing on the Motion. Special Assistant United States Attorney Justin Eason appeared for the Government. Assistant Federal Defenders Fredilyn Sison and Jared Martin appeared with Defendant. The Government called Jason Cable, Daniel Iadonisi, and Mary Lambert, all of whom are detectives with the Cherokee Indian Police Department ("CIPD"). The Government also submitted, without objection, a video recording of the subject interrogation,[1] a transcript of the interrogation, and a CIPD Rights Form. Defendant called Dr. Richard Leo, a professor of law and social psychology at the School of Law at the University of San Francisco.

## II. Factual Background and Findings

### A. Law Enforcement's Initial Contact with Defendant

On August 29, 2018, Detective Lambert, who was then the Acting Interim Lieutenant of the Investigations Division of the CIPD, learned of

[1] The Government refers to the questioning of Defendant as an "interview," while Defendant refers to it as an "interrogation." Compare e.g., Gov.'s Response (Doc. 19) at 1 ("Officers from the Cherokee Indian Police Department conducted an investigation and interviewed the Defendant") with Def.'s Mem. (Doc. 17) at 9 ("the circumstances surrounding the custodial setting of Mr. Jumper's interrogation"). This Memorandum will refer to the questioning of Defendant as an "interrogation."

allegations of criminal conduct concerning Defendant from other CIPD personnel. Detective Lambert dispatched Detective Cable and Detective Iadonisi to locate and question Defendant.

Since Defendant was expected to be on a portion of the Cherokee Indian Reservation with which Detectives Cable and Iadonisi were unfamiliar, other CIPD officers helped with the search. One of those officers took Detectives Cable and Iadonisi to Defendant's home in the Snowbird community near Robbinsville, North Carolina.

Defendant was not at home when they arrived but was found at a nearby residence. Detectives Cable and Iadonisi advised Defendant that allegations involving him had been made and asked if he would accompany them to the police station for questioning. Defendant agreed. He was not placed under arrest or in handcuffs at the time.

The evidence indicates that an arrest warrant and a criminal complaint were issued for Defendant that day, though the extent of the detectives' knowledge of those documents at the time they contacted Defendant is unclear. It is undisputed, however, that Defendant was not advised of the existence of the warrant and complaint until after his interrogation.

Detectives Cable and Iadonisi then transported Defendant in a law enforcement vehicle to the CIPD in Cherokee, North Carolina, approximately one hour away. Detective Cable drove, Defendant rode in the front seat, and

Detective Iadonisi sat in the backseat. Some amount of "small talk" may have occurred during the trip, but the detectives did not ask Defendant any questions regarding the allegations against him.

### B. The Interrogation

Upon reaching the police station, which was located in the same building as the tribal courthouse, Defendant was placed in a relatively small interrogation room that contained a table and three chairs. Defendant was seated at the end of the table closest to the door, which remained unlocked throughout the interrogation. The room was equipped with audio and visual recording capabilities and a recording was initiated upon Defendant's entrance into the room. Defendant was allowed to keep his cell phone and was not prohibited from accessing the public Wi-Fi network that was available in the building.

After approximately fifteen minutes,[2] Detectives Cable and Iadonisi entered the room and Detective Cable advised Defendant they wanted to speak with him regarding an issue pertaining to his girlfriend and her daughter. Detective Iadonisi provided Miranda warnings to Defendant using the Rights

[2] All time references concerning the interrogation track from the beginning of the video.

Form, which Defendant initialed and executed. Defendant did not appear to have difficulty understanding the form or the waiver of his rights.

Over portions of the next three hours, Defendant was questioned by Detectives Cable, Iadonisi, and Lambert. The questioning was not continuous, however; Defendant was left alone in the room at times and on one occasion is seen on the video using his phone.[3] No more than two detectives were in the room with Defendant at any given time, and on some occasions only one detective was with him.

Defendant was offered water and rest room breaks. The detectives were armed with sidearms, but they did not unholster their weapons or refer to them in any manner. Voices were not raised, and the questioning remained calm throughout its duration.

Other than leaving once to use the restroom, Defendant remained in the room and seated during the interrogation. Defendant was coherent and alert and answered the detectives' questions clearly. Defendant did not ask that the interrogation be stopped or request to speak with an attorney.

---

[3] The video appears to run continuously from shortly after Defendant's entrance into the room until Defendant's final exit from the room. The time between those events is approximately three hours, though it includes periods when Defendant was alone in the room, gone to the restroom, and receiving paperwork, as well as being questioned.

At approximately 90 minutes, Defendant admitted to engaging in sexual contact with his girlfriend's minor daughter. He then proceeded to admit multiple instances of sexual contact with her.

## III. Applicable Legal Principles

### A. Findings of Fact

Findings of fact may be made by a district court when deciding a motion to suppress. See United States v. Stevenson, 396 F.3d 538, 541 (4th Cir. 2005). "When material facts that affect the resolution of a motion to suppress . . . are in conflict, the appropriate way to resolve the conflict is by holding an evidentiary hearing after which the district court will be in a position to make findings." United States v. Taylor, 13 F.3d 786, 789 (4th Cir.1994). In doing so, the court determines "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." United States v. Gualtero, 62 F. Supp. 3d 479, 482 (E.D. Va. 2014) (citing United States v. McKneely, 6 F.3d 1447, 1452–53 (10th Cir. 1993)).

### B. Waiver of Miranda Rights

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Consequently, before the Government may use statements obtained from a custodial interrogation of a defendant, he must be warned "that he has a right

to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda v. Arizona, 384 U.S. 436, 444 (1966).

A suspect may waive these rights, provided that he does so "voluntarily, knowingly, and intelligently." Id. The burden is on the Government to establish such a waiver by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 168-169 (1986).

The "inquiry into whether an individual waived effectuation of the rights conveyed in the Miranda warnings has two distinct dimensions." United States v. Cristobal, 293 F.3d 134, 139 (2002) (citing Edwards v. Arizona, 451 U.S. 477, 482 (1981)). "First, the relinquishment of the right 'must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception.'" Cristobal, 293 F.3d at 139-40 (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. at 140.

Accordingly, "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Id.

### C. Statements Following Miranda Waivers

Though statements a suspect makes after waiving his Miranda rights are not immunized against all challenges, "giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver." Missouri v. Seibert, 542 U.S. 600, 608–09 (2004) (plurality opinion); see also United States v. Walker, 607 F. App'x 247, 255 (4th Cir. 2015) ("The Supreme Court has reiterated that while requiring Miranda warnings does not, of course, dispense with the voluntariness inquiry, cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.") (unpublished) (internal quotation marks, citations, and alterations omitted).

## IV. Discussion

Defendant argues that he did not knowingly, intelligently, and voluntarily waive his rights under Miranda and that his subsequent

incriminating statements were involuntary.[4] These arguments are addressed below, in turn.

**A. Waiver of Miranda Rights**

Defendant first contends that his waiver of his Miranda rights was involuntary because his "will was overborne and his capacity for self-determination was critically impaired due to: (1) his vulnerable characteristics; (2) the inherently coercive setting of the interrogation; and (3) law enforcement's strategy of isolating [him] and exploiting his vulnerability in order to extract a statement." Def.'s Mem. (Doc. 17) at 17. Next, Defendant argues that, because the detectives did not disclose the existence of the arrest warrant and criminal complaint, and instead told Defendant he was being questioned so they could obtain his side of the story, he did not have full awareness of the rights he was relinquishing and was therefore unable to make a knowing and intelligent waiver. Id. at 17-18.

The evidence, however, does not support this argument. Prior to waiving his Miranda rights, Defendant had been approached by law enforcement officers, had consented to go with them for questioning, had ridden in the front

[4] In his briefing, Defendant raised a third argument - that the Government failed to establish he knowingly and voluntarily consented to a search of certain electronic devices that were seized from Defendant on August 29, 2018. At the hearing, however, the Government advised that it does not intend to offer any evidence taken from these devices. Accordingly, this argument is moot.

seat of a law enforcement vehicle to the police station, and had been placed in an unlocked interrogation room with his personal cell phone.

Soon after entering the room, Detective Cable informed Defendant that a case was "open on [him]" and that it involved the daughter of Defendant's girlfriend. Interrogation Tr. (Doc. 23-4) at 3. Detective Iadonisi then advised Defendant of his Miranda rights using the written Rights Form. Defendant was relaxed and attentive during this process and expressed his understanding of it by marking and signing the form as Detective Iadonisi explained it.

In short, Defendant's waiver was "the product of free and deliberate choice rather than intimidation, coercion, or deception." Cristobal, 293 F.3d at 139-40 (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).[5]

Similarly, Defendant had "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Cristobal, 293 F.3d at 140 (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). The Rights Form described Defendant's rights clearly and in simple terms. Detective Iadonisi explained the rights and the waiver to Defendant, who initialed each paragraph and executed the Rights Form.

[5] Defendant's expert, Prof. Leo, acknowledged that the detectives' interactions with Defendant concerning the waiver were not psychologically coercive. Hr'g Tr. (Doc. 26) at 194-195.

While Defendant was not told at that time of the existence of an arrest warrant or criminal complaint, the evidence indicates that Defendant knew about the general nature of the allegations against him even before he was contacted by law enforcement. Detective Cable testified that, when he and Detective Iadonisi initially met Defendant and told him they needed to speak with him, Defendant referenced his girlfriend. Defendant provided more information in this regard at the police station. Early in the interrogation, Defendant stated that he had heard from a family member he was being "accused of molesting [his girlfriend's] daughter." Interrogation Tr. (Doc. 23-4) at 8. He also explained that his girlfriend had moved out of their house two days before, at which point the department of social services had become involved and told him the situation had "something to do with child safety and possibly molestation or something like that." Id. at 52-53.

**B. Defendant's Statements**

Defendant next argues that the incriminating statements he made during the interrogation were not voluntary due to the custodial setting of the interrogation, the length of the interrogation, the officers' presumption of Defendant's guilt, their minimization of the seriousness of the offense, and Defendant's personal characteristics. Def.s' Mem. (Doc. 17) at 9 – 14.

### 1. Defendant's Characteristics

At the time of the interrogation, Defendant was twenty-nine years old. He appears to be fluent in English and seemed to have no trouble understanding the detectives' questions. There was no indication that Defendant was under the influence of any impairing substance during the interrogation.

No evidence was presented that he has diminished mental capacity or that he has any special characteristics or infirmities that make him particularly susceptible to psychological manipulation. Though Defendant made some statements during the interrogation indicating he had suffered abuse himself as a child, evidence regarding the extent of such abuse does not appear in the record, nor does information as to how such abuse could have impacted his ability to respond to law enforcement.

### 2. The Setting of the Interrogation

As described, the interrogation took place in a small room in the police station. Defendant was not handcuffed and was seated near the unlocked interrogation room door.

Though the entire video runs for approximately three hours, it reveals that Defendant was left alone during several periods. His cell phone was not taken from him nor was his access to the building's Wi-Fi network restricted. At one point in the video, Defendant can be seen typing on his cell phone. He

was offered access to a restroom on more than one occasion and was given water.

### 3. The Details of the Interrogation

Without objection from the Government, Defendant's witness, Prof. Leo, was accepted as an expert in the area of police interrogation, psychological coercion, and involuntary confessions.[6] He testified that an "interview" is intended to help law enforcement develop a theory of what occurred in a given situation, while an "interrogation" involves the use of specialized techniques based on pressure and persuasion and is designed to assist law enforcement in obtaining an incriminating statement from a suspect. He also described the training that police officers often receive in interrogation, and discussed interrogation techniques that are commonly used by law enforcement, including isolating the suspect, attempting to develop rapport, accusing the suspect of committing a crime (and of lying when he denies it), challenging the suspect's denials as being illogical and inconsistent with law enforcement's superior knowledge, and confronting the suspect with alleged or real evidence. These techniques are intended to convince a suspect that he is trapped, that

[6] Prof. Leo provided expert testimony within his field of expertise but did not offer a legal opinion as to whether Defendant's confession was voluntary. Hr'g Tr. (Doc. 26) at 186.

all the evidence establishes his guilt, and that it is in the suspect's best interest to admit his guilt.

Prof. Leo also testified that certain individuals are more vulnerable to psychological coercion than others. These groups include juveniles or persons of psychosocial immaturity, people with low intellectual functioning, and persons who are mentally ill. Mentally normal adults can also be susceptible to psychological coercion, as can certain cultural groups because of their fears of police. He indicated there is some research and "a lot of discussion" about Native Americans being more vulnerable to interrogation because of cultural personality traits such as passivity and resignation.

With regard to this case, Prof. Leo opined that the CIPD detectives utilized some of the common interrogation techniques he had described. In particular, they used rapport building, accusations and guilt presumptive questioning, and the suggestion or implication of false or nonexistent evidence. They also employed minimization and maximization techniques through which they suggested that the alleged sexual contacts, which primarily involved digital penetration, may have occurred accidentally or were less significant than penile penetration, and that Defendant could "fix" the situation if he began admitting the allegations.

On cross-examination, Prof. Leo was asked about a 2010 publication in which he made several recommendations designed to reduce the risk factors

associated with involuntary confessions, such as that the questioning be videotaped and that the suspect's time in custody be limited to six hours or less. He admitted that most all of those recommendations had been adhered to in this case, except for the detectives' implication of false evidence and the use of minimization and implied promises. Further, he acknowledged that he had never met or spoken with Defendant or his family members and did not know anything specifically about the Eastern Band of Cherokee Indians and their history in Western North Carolina.

Having reviewed the video and the transcript of Defendant's interrogation, it appears to the undersigned that some of the techniques described by Prof. Leo were employed by law enforcement. For example, the detectives challenged Defendant's initial denials, asked if the alleged sexual contact could have happened accidentally, told Defendant that medical reports and the child's testimony had law enforcement "pretty convinced" of Defendant's guilt, and advised Defendant they could not help him once the interrogation finished.

However, the fact that pressure was applied to Defendant is not dispositive; "the mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically

render a confession involuntary."[7] United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997). The question is "whether the defendant's will has been overborne or his capacity for self-determination critically impaired because of coercive police conduct," United States v. Cristobal, 293 F.3d 134, 140 (4th Cir. 2002) (internal citations and quotations omitted), and whether this matter qualifies as the rare case in which subsequent law enforcement conduct will invalidate a prior voluntary Miranda waiver.

The evidence presented does not indicate that this is such a case. Defendant voluntarily submitted to questioning and waived his Miranda rights, knowing in advance the general nature of the allegations against him. While the detectives pushed Defendant to make admissions, the tone of their questioning was not loud or threatening. Defendant began making incriminating statements approximately 90 minutes into the video, not after numerous hours of interrogation. Defendant did not cry, pace, or sweat excessively during the interrogation. Though Prof. Leo testified that the absence of such behaviors by Defendant would not necessarily indicate a corresponding absence of coercive interrogation techniques, Prof. Leo also stated that he had never met Defendant.

---

[7] Prof. Leo's statement that "police interrogation is designed to be stress inducing within the limits of the law" recognizes this principle. Hr'g Tr. (Doc. 26) at 164.

Further, Defendant confessed to multiple acts of digital penetration, but he steadfastly maintained his denials of other conduct suggested by the detectives, specifically that the victim had touched, or been made to touch, Defendant. This fact indicates that Defendant, not law enforcement, was in control of his statements, and was making volitional decisions about which allegations to admit and which ones to deny.

In sum, the evidence of record does not suggest that law enforcement exerted such psychological pressure on Defendant that his confession should be considered involuntary.

## V. Recommendation

Based on the foregoing, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress (Doc. 16) be **DENIED**.

Signed: September 20, 2019

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140 (1985).